**RECORD NOS. 21-1764 – 21-2029**

In The

# United States Court of Appeals

### For The Fourth Circuit

## BRIAN BOWEN, II,

*Plaintiff – Appellant,*

v.

## ADIDAS AMERICA, INC.; JAMES GATTO; CHRISTIAN DAWKINS; MUNISH SOOD; THOMAS GASSNOLA; CHRISTOPHER RIVERS,

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA AT COLUMBIA

---

### JOINT APPENDIX
### VOLUME I OF VII
### (Pages 1 – 389)

---

William W. Wilkins
NEXSEN PRUET
104 South Main Street, Suite 900
Greenville, SC 29601
(864) 370-2211

W. Mullins McLeod, Jr
Colin V. Ram
MCLEOD LAW GROUP LLC
3 Morris Street, Suite A
Charleston, SC 29403
(843) 277-6655

*Counsel for Appellant*

Matthew D. Forbes
Andrew M. Levine
Nathan S. Richards
William H. Taft
DEBEVOISE & PLIMPTON LLP
919 3rd Avenue
New York, NY 10022
(212) 909-6000

Deborah B. Barbier
DEBORAH B. BARBIER, LLC
1811 Pickens Street
Columbia, SC 29201
(803) 730-6290

*Counsel for Appellee
James Gatto*

Robert L. Lindholm
NELSON MULLINS RILEY
& SCARBOROUGH, LLP
One Wells Fargo Center,
23rd Floor
301 South College Street
Charlotte, NC 28202
(704) 417-3231

Wilbur E. Johnson
CLEMENT RIVERS, LLP
25 Calhoun Street
Post Office Box 993
Charleston, SC 29402
(843) 724-6659

*Counsel for Appellee
Munish Sood*

Mary L. Dinkins
Matthew Richardson
WYCHE, P.A.
807 Gervais Street, Suite 301
Columbia, SC 29201
(803) 254-6542

*Counsel for Appellee
Adidas America, Inc.*

Terry A. Finger
FINGER, MELNICK,
BROOKS & LABRUCE
Post Office Box 24005
Hilton Head Island, SC 29925
(843) 681-7000

*Counsel for Appellee
Christian Dawkins*

Cory Manning
Wesley T. Moran
NELSON MULLINS RILEY
& SCARBOROUGH, LLP
Post Office Box 11070
Columbia, SC 29211
(803) 255-5524

*Counsel for Appellee
Christopher Rivers*

## TABLE OF CONTENTS
### VOLUME I OF VII

Appendix Page

Docket Entries....................................................................................... 1

Plaintiff's Amended Complaint (Jury Trial Demanded),
With Exhibits,
    filed August 23, 2019 ..................................................................... 37

Exhibits:

1.    Adidas Endorsement/Sponsorship Agreement
        dated October 30, 2014 ......................................................... 143

2.    Criminal Complaint
        dated September 25, 2017 ...................................................... 176

3.    Adidas 2015-2016 Agreement with Thomas Gassnola
        dated February 15, 2015 ........................................................ 205

4.    New England Playaz Inc. Bank Statement
        dated October 31, 2015........................................................... 219

5.    New England Playaz Inc. Invoice
        dated November 1, 2015 ........................................................ 221

6.    Dennis Smith Jr.'s Athletically Related Financial Aid Agreement
    From North Carolina State University
        dated November 11, 2015........................................................ 223

7.    Dennis Smith Jr.'s NCAA Division I Certification
        dated December 17, 2015 ....................................................... 225

8.    New England Playaz Inc. Invoice
        dated October 18, 2016........................................................... 231

9.    New England Playaz Inc. Bank Statement
        dated October 31, 2016........................................................... 233

<u>Exhibits</u>, continued:

10.  Billy Preston's Athletic Multi-Year Financial Aid Agreement
     From University of Kansas
          dated November 9, 2016 ....................................................... 235

11.  Adidas/NE Playaz 2017-2018 Endorsement, Sponsorship and
     Supplier Agreement
          dated January 1, 2017 ........................................................... 238

12.  Email from Jim Gatto to Edwin Janes Requesting Payment
     For Consultant Invoice
          dated January 9, 2017 ........................................................... 254

13.  New England Playaz Inc. Bank Statement
          dated January 31, 2017 ......................................................... 260

14.  Wire Transfer
          dated February 24, 2017 ....................................................... 261

15.  New England Playaz Inc. Invoice
          dated May 1, 2017 ................................................................ 263

16.  New England Playaz Inc. Bank Statement
          dated May 31, 2017 .............................................................. 265

17.  Wire Transfer
          dated June 14, 2017 ............................................................. 267

18.  Silvio DeSousa's Athletic Multi-Year Financial Aid Agreement
     From University of Kansas
          dated November 8, 2017 ....................................................... 268

19.  Transcript of Recorded Conversation between Merl Code and
     James Gatto
          dated August 11, 2016........................................................... 273

20.  Email from Brian T. Chatman to Chris Rivers
     Re: Karolina Khaos Direct Deposit Information
          dated May 18, 2017 .............................................................. 280

<u>Exhibits</u>, continued:

21.    Text Message from Merl Code
           dated May 22, 2017 ................................................ 281

22.    Transcript of Recorded Voicemail from Jim Gatto
           dated May 27, 2017 ................................................ 282

23.    Brian Bowen's University of Louisville Unofficial Visit Record
           dated May 28, 2017 ................................................ 284

24.    Text Message between Christian Dawkins and Merl Code
           dated May 31, 2017 ................................................ 287

25.    Text Messages Merl Code and TJ Gassnola
           dated May 31, 2017 ................................................ 288

26.    Transcript of Recorded Voicemail from Jim Gatto
           dated June 1, 2017 ................................................ 289

27.    Brian Bowen II's 2017-2018 Athletics Financial Aid Agreement
       From University of Louisville
           dated June 1, 2017 ................................................ 291

28.    Brian Bowen II's NCAA Division I Certification
           dated June 9, 2017 ................................................ 294

29.    Karolina Khaos Invoice
           dated June 8, 2017 ................................................ 298

30.    Emails between Jim Gatto and Trevor Ames
       Re:  Invoice to Process
           various dates ........................................................ 300

31.    Emails between Merl Code and Olivia Guidera
       Re:  Invoice
           dated July 6, 2017 ................................................ 302

32.    Transcript of Recorded Conversation between Munish Sood,
       Merl Code, and "Jeff"
           dated July 10, 2017 .............................................. 305

Exhibits, continued:

33. Text Messages between Munish Sood and Christian Dawkins
   various dates ........................................................................ 321

34. Text Messages from Munish Sood
   various dates ........................................................................ 327

35. Transcript of Recorded Conversation between
   Christian Dawkins and Munish Sood
   dated July 13, 2017 ............................................................. 328

36. Email from Jim Gatto to Trevor Ames
   Re: Invoice Payment Issues
   dated July 25, 2017 ............................................................. 333

37. Emails between Jim Gatto and Olivia Guidera
   Re: Karolina Khaos Invoice
   dated July 25, 2017 ............................................................. 335

38. Email from Trevor Ames to Jim Gatto
   Re: Invoice Ready for Immediate Pay
   dated July 26, 2017 ............................................................. 337

39. Karolina Khaos Bank Statement
   dated May 18-31, 2017 ........................................................ 339

40. Payment to Loyd Inc for Consulting Fees
   dated August 1 and September 21, 2017 ............................ 359

41. Princeton Advisory Group, Inc. Check to Loyd Inc.
   dated June 3, 2017 .............................................................. 361

42. University of Louisville's 2017-2018 Men's Basketball
   Team Certification
   dated August 31, 2017 ........................................................ 362

43. Transcript of Recorded Conversation between Merl Code
   And James Gatto
   dated September 13, 2017 .................................................. 363

<u>Exhibits</u>, continued:

44. Karolina Khaos Invoice
       dated September 18, 2017 ..................................... 366

45. Email from Jim Gatto to Olivia Guidera
    Re:  Karolina Khaos Invoice
       dated September 14, 2017 ..................................... 368

46. Jim Gatto's Karolina Khaos Invoice Approval
       dated September 18, 2017 ..................................... 370

47. Transcript of Recorded Conversation between Merl Code
    And Ricky Robertson
       dated September 20, 2017 ..................................... 373

48. Photograph of Text Message from Rick Robertson
       dated September 21, 2017 ..................................... 378

49. Email 1 from Jim Gatto to Olivia Guidera
    Re:  Karolina Khaos Travel Expenses Invoice
       dated June 19, 2017 ..................................... 380

50. Email 2 from Jim Gatto to Olivia Guidera
    Re:  Karolina Khaos Travel Expenses Invoice
       dated July 6, 2017 ..................................... 382

51. Email 2 from Jim Gatto to Olivia Guidera
    Re:  Karolina Khaos Travel Expenses Invoice
       dated July 6, 2017 ..................................... 384

52. New England Playaz Payment Summary Chart
       undated ..................................... 385

53. Thomas Gassnola's Payment Summary Chart
       undated ..................................... 386

54. Merl Code's Invoice for Consulting Fee and Travel Expenses
       dated June 17, 2017 ..................................... 387

## <u>TABLE OF CONTENTS</u>
## VOLUME II OF VII

<u>Appendix Page</u>

**Attachments and Exhibits to Defendant-Cross Claimant
Adidas America, Inc.'s Motion for Summary Judgment on RICO Standing:**

<u>Attachments:</u>

1.    **Defendant-Cross Claimant Adidas America, Inc.'s
      Memorandum in Support of its Motion for Summary Judgment
      On RICO Standing**
            dated April 8, 2021 ............................................................ 390

2.    **Declaration of Josephine R. Potuto**
            dated April 8, 2021 ............................................................ 430

<u>Exhibits:</u>

1.    **Order of
      The Honorable Joseph F. Anderson, Jr.
      Re:  Granting in Part and Denying in Part Defendants'
      Motion to Dismiss**
            entered February 27, 2020 ..................................................... 448

2.    **Transcript of Deposition of Brian Lamar Bowen, II**
            dated January 7, 2021 ........................................................ 471

3.    **Transcript of Deposition of Brian L. Bowen, Sr.**
            dated January 20, 2021 ....................................................... 530

4.    **247 Composite, 2017 Top Basketball Recruits**
            dated April 2, 2021 ........................................................... 564

5.    **Transcript of Dawkins Trial Proceedings before
      The Honorable Edgardo Ramos**
            dated May 1, 2019............................................................ 571

<u>Exhibits</u>, continued:

6.    Transcript of Gatto Trial Proceedings before
      The Honorable Lewis A. Kaplan
              dated October 4, 2018 ........................................ 591

7.    Pat Forde Pete Thamel Yahoo Article
              undated ............................................................ 600

8.    USC Report to NCAA
              dated May 16, 2018 .......................................... 609

9.    Text Messages between C. Malecke and C. Dawkins
              various dated .................................................... 617

10.   Email from C. Dawkins to M. Sood
      Re:  Breakdown of Budget
              dated September 5, 2017 .................................. 630

12.   Sports Illustrated Article
              dated October 2, 2017 ...................................... 637

13.   Text Message from C. Dawkins to TJ Gassnola
              dated June 1, 2017 ............................................ 642

14.   Brian Bowen II's Student-Athlete Statement
              dated June 9, 2017 ............................................ 644

15.   Invoice from M. Code to J. Gatto
              dated June 17, 2017 .......................................... 656

16.   Transcript of Recorded Conversation between M. Code
      And C. Dawkins
              dated July 7, 2017 ............................................ 660

17.   Transcript of Recorded Conversation between M. Sood,
      M. Code, and J. D'Angelo
              dated July 10, 2017 ........................................... 682

<u>Exhibits</u>, continued:

18.   **Text Messages between C. Dawkins, M. Sood, and B. Bowen Sr.**
          dated July 12-15, 2017 ........................................................ 699

19.   **Text Messages between B. Bowen Jr. and K. Johnson**
          various dates ........................................................................ 701

20.   **USAO/SDNY's Press Conference Advisory**
          dated September 26, 2017 .................................................. 708

21.   **U.S. v. Gatto Criminal Complaint**
          dated September 25, 2017 ...................................................711

22.   **Gary Parrish CBS Tweet**
          dated September 26, 2017 .................................................. 741

24.   **Brian Bowen Jr.'s Personal Statement**
          undated ................................................................................ 745

26.   **Letter from John Carns, Senior Associate Athletic Director, To NCAA Legislative Relief Committee Re: Brian Bowen**
          dated May 7, 2018 .............................................................. 748

28.   **Letter from Vince Tyra to Brian Bowen, Jr. Re: Athletic Status at University of Louisville**
          dated November 22, 2017 .................................................. 750

29.   **LouisvilleMBB Tweet**
          dated November 22, 2017 .................................................. 752

31.   **Plaintiff's Supplemental Rule 26(a)(1)(A)(iii) Initial Disclosure**
          dated January 5, 2021 ........................................................ 760

32.   **University of South Carolina Athletics Financial Aid Agreement for Brian Bowen II**
          dated January 8, 2018 ........................................................ 766

## TABLE OF CONTENTS
## VOLUME III OF VII

**Appendix Page**

**Exhibits,** continued:

33.  2017-2018 NCAA Bylaws
     dated August 1, 2017 .......................................................... 768

34.  Letter from Chance Miller to NCAA Legislative
     Relief Committee
     Re:  Brian Bowen Relief from NCAA Bylaw 14.5.5.2.10
     dated March 27, 2018 ......................................................1197

37.  2018 NBA Draft Combine Invitation and Schedule
     dated April 28, 2018........................................................1200

38.  Expert Report of Mike Bratz
     dated February 22, 2021....................................................1205

39.  Letter from Brian Bowen II to Erika Ruiz
     Re:  Withdrawal from the 2018 NBA Draft
     dated June 11, 2018...........................................................1220

41.  Transcript of Deposition of Brandon Michael Rosenthal
     dated January 14, 2021 .....................................................1223

43.  Brian Bowen II's Statistics by StatsCrew
     undated ...............................................................................1233

45.  ESPN.com Brian Bowen II Stats
     undated ...............................................................................1237

# TABLE OF CONTENTS
## VOLUME IV OF VII

**Appendix Page**

Exhibits, continued:

46.  Order of
     The Honorable Joseph F. Anderson, Jr.
     Re:  Granting in Part and Denying in Part Defendants'
     Motions for Leave
          entered August 8, 2019......................................................1240

47.  Final Amended Scheduling Order or
     The Honorable Joseph F. Anderson, Jr.
          entered March 22, 2021......................................................1250

48.  University of Louisville Financial Aid Agreement with
     Brian Bowen II
          dated June 1, 2017 ..........................................................1255

Defendant Christopher Rivers's Motion for Summary Judgment
On RICO Standing
     filed April 9, 2021 ...............................................................1259

Defendant Merl Code and Christian Dawkins Motion for Summary
Judgment on RICO Standing
     filed April 9, 2021 ...............................................................1261

Defendant Gatto's Motion for Summary Judgment on RICO Standing
     filed April 12, 2021..............................................................1263

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion
For Summary Judgment on RICO Standing, with Exhibits,
     filed April 22, 2021..............................................................1265

Exhibits:

1.   Adidas Uprising Presentation
          undated ..........................................................................1320

<u>Exhibits</u>, continued:

2.     Email from Jillyn Pendleton to Chris Rivers
Re: December Financial Support Update
       dated December 9, 2016 ....................................1323

3.     K. Johnson Text Messages
       various dates ........................................................1325

4.     University of Louisville Text Messages
       various dates ........................................................1329

5.     Email from Matthew Banker, Associate Athletic Director
To University of Louisville Staff
Re: Brian Bowen Ineligible from Participation
       dated September 27, 2017 ....................................1330

6.     Transcript of Deposition of Zion Armstrong
       dated March 26, 2021 ..........................................1331

8.     Adidas 2017 Annual Report
       undated ...............................................................1371

9.     Email chain from Chris McGuire to Adidas Staff
Re: University Update
       dated January 21, 2015 ........................................1376

10.    Michael Ladinig Adidas Presentation
       undated ...............................................................1379

11.    Adidas Next Generation Presentation
       undated ...............................................................1383

12.    Excerpts of Deposition of Kenny Johnson
       dated April 14, 2021 ............................................1408

14.    Email from Tonie Hanson to Chris Rivers
Re: Travel Program Investments
       dated August 30, 2017 ........................................1586

Exhibits, continued:

15.   Adidas NCAA Collegiate Assets 2013 Overview
         dated September 2013......................................................1588

16.   NCAA Statement
      Re:  Agent Ties Found with Four Nonscholastic Teams
         dated July 5, 2012 ...............................................1591

17.   Emails between TJ Gassnola, Jeff Robbins, and Chris McGuire
         January 14, 2014...............................................1592

18.   Emails between Chris Grancio and Chris McGuire
      Re:  Gottfried
         dated February 19, 2015 ....................................1594

19.   Excerpt of Transcript of Trial Proceedings
      In *U.S. v. Gatto, et al.* before
      The Honorable Lewis A. Kaplan
         on October 11, 2018.........................................1595

20.   Gassnola 2015-2016 Adidas Contract with NE Playaz
         dated February 15, 2015 ....................................1601

21.   Soul Patrol Email
      Re:   Uprising
         dated February 23, 2015...................................1615

22.   Adidas Field Reps Presentation
         undated ..............................................................1617

23.   Soul Patrol Descriptions
         dated January 17, 2017 ....................................1627

Additional Exhibits to Plaintiff's Memorandum in Opposition to Defendants'
Motions for Summary Judgment on RICO Standing
filed April 22, 2021.......................................................................1628

Exhibits:

24.    Email from Chris Rivers to Adidas Staff
       Re:  Adidas Soul Patrol aka Black Ops Update
            dated February 18, 2015 ......................................1629

25.    Excerpt of Transcript of Trial Proceedings
       In *U.S. v. Gatto, et al.* before
       The Honorable Lewis A. Kaplan
            on October 10, 2018............................................1631

26.    Email from Chris Rivers to Adidas Staff
       Re:  Adidas Basketball Next Generation 90 Day
       Status Report
            dated April 10, 2015 ...........................................1634

27     Email from Chris Rivers to Adidas Staff
       Re:  Soul Patrol Upcoming Missions
            dated December 20, 2015.....................................1636

28     Email from TJ Gassnola to Chris Rivers
       Re:  Soul Patrol Upcoming Missions
            dated December 22, 2015.....................................1637

29.    Email from Corey Hulio to Adidas Staff
       Re:  Soul Patrol Upcoming Missions
            dated December 22, 2015.....................................1639

30.    Email from TJ Gassnola to Chris Rivers
       Re:  Soul Patrol Upcoming Missions
            dated December 23, 2015.....................................1640

31.    Email from Chris Rivers to Adidas Staff
       Re:  Black Ops Solo Mission Recap Napa, CA
            dated February 1, 2016 .......................................1641

<u>Exhibits</u>, continued:

32.   Emails between Chris Rivers and Jim Gatto
      Re:  2015 Uprising Staffing Travel and Expense Schedule
            dated February 3, 2015.................................................................1642

33.   New England Playaz Payment Summary Chart
            undated .................................................................................1644

34.   Pendleton Promotions Invoice
            dated February 15, 2016 ............................................................1646

35.   Email from TJ Gassnola to Jim Gatto
      Re:  Adidas January 2015 Expenses
            dated January 27, 2015 ............................................................1650

36.   Email from Tonie Hanson
      Re:  Final Four Room List
            dated March 9, 2017.................................................................1651

37.   NCAA 2016-2017 Division I Bylaw Extracts
            undated .................................................................................1653

39.   Excerpt of J. Carnes Testimony
      In *U.S. v. Gatto, et al.* before
      The Honorable Lewis A. Kaplan
            on October 4, 2018 .................................................................1671

40.   University of Louisville Men's Basketball 2017-2018
      Certification of Eligibility
            dated August 31, 2017 ............................................................1678

41.   Expert Report of Mike Bratz
            dated February 22, 2021...........................................................1679

42.   Text Message from Merl Code to Christian Dawkins
            dated May 22, 2017.................................................................1695

43.   Brian Bowen II's 2017-2018 Athletic Tender Agreement
      With University of Louisville
            dated June 1, 2017 .................................................................1696

<u>Exhibits</u>, continued:

44.   **NBADraft.net 2019 Mock Draft**
         **dated August 2, 2017** ...........................................................1699

45.   **K. Johnson Text Messages**
         **various dates** .......................................................................1702

46.   **Text Messages between K. Johnson and Brian Bowen, Sr.**
         **various dates** .......................................................................1703

47.   **Transcript of Deposition of Brian Bowen, II**
         **dated January 7, 2021** ........................................................1706

48.   **Brooklyn Farm Advance Trip Itinerary**
         **dated July 12, 2017** .............................................................1714

# TABLE OF CONTENTS
## VOLUME V OF VII

**Appendix Page**

**Exhibits**, continued:

49.   **Transcript of De Bene Esse Deposition of John Carns**
      dated April 15, 2021.............................................................1717

50.   **Restitution Letter from University of Louisville to**
   **The Honorable Lewis A. Kaplan**
      dated February 25, 2019......................................................1904

51.   **Excerpt of Government's Sentencing Memorandum**
   **In** *U.S. v. Gatto, et al.*
      dated February 26, 2019......................................................1907

52.   **Transcript of Deposition of Jason A. Setchen, PA**
      dated April 9, 2021 ..............................................................1910

53.   **Todd A McFall, Ph.D.'s Expert Report on Financial Loss**
   **Suffered by Plaintiff in** *Bowen v. Adidas, Inc., et al.*
      dated March 16, 2021 ..........................................................1917

54.   **Transcript of Recorded Conversation between**
   **Christian Dawkins and Munish Sood**
      dated July 14, 2017..............................................................1940

55.   **Email from Madeline Breskin to Adidas Staff**
   **Re:  Adidas Gauntlet Indianapolis PR Update**
      dated April 27, 2015.............................................................1958

56.   **Soul Patrol Scouting Report**
      undated ................................................................................1962

57.   **Adidas NBA Draft Targets Presentation**
      undated ................................................................................1967

58.   **Adidas Mission Statement**
      undated ................................................................................1974

Exhibits, continued:

59.  Emails between Steven Berryman and Andrew Ceresney
     Re:  NCAA Related Investigation
          various dates ...................................................1975

60.  University of Louisville's Response to NCAA Notice
     of Allegations
          dated September 16, 2020 ................................1977

Defendant-Cross Claimant Adidas America, Inc.'s Reply in Support of
Its Motion for Summary Judgment on RICO Standing, with Exhibits,
     filed April 29, 2021...............................................2081

Exhibits:

B.   Order Denying Motion to Dismiss Crossclaims
     The Honorable Joseph F. Anderson, Jr.
          entered October 23, 2020 ................................2106

D.   Email from Jeff Whitehead to Matthew Banker
     Re:  Bowen Year-In-Residence Waiver
          dated April 2, 2018 .........................................2138

G.   Excerpts of Transcript of Trial Proceedings before
     The Honorable Lewis A. Kaplan
          on October 22, 2018 .......................................2142

H.   Excerpts from Deposition of Brian Bowen, Sr.
          dated January 20, 2021 ...................................2146

Defendant Christopher Rivers's Reply in Support of Motion
For Summary Judgment on RICO Standing
     filed April 29, 2021...............................................2155

Defendant James Gatto's Reply in Support of Motion for
Summary Judgment on RICO Standing
     filed April 29, 2021...............................................2158

**Memorandum Opinion & Order of**
**The Honorable Joseph F. Anderson, Jr.**
**Re: Granting Movants' Motion for Summary Judgment on**
**RICO Standing and Dismissing Plaintiff's Claims, with Prejudice**
        entered May 26, 2021 ............................................................2160

**Joint Stipulation to Dismiss Adidas America, Inc.'s Crossclaims**
        filed June 1, 2021 ................................................................2177

**Judgment in a Civil Action**
        entered June 7, 2021............................................................2185

**TABLE OF CONTENTS**
**VOLUME VI OF VII**

**Appendix Page**

**Plaintiff's Motion for Reconsideration and Relief from Judgment**
**Of The Court's Order Granting Summary Judgment on RICO Standing,**
**With Exhibits,**
        filed July 6, 2021 ................................................................2186

        **Exhibits:**

        1.      **Transcript of Motions Hearing before**
                **The Honorable Joseph F. Anderson, Jr.**
                        on June 26, 2019 .......................................2221

        2.      **Transcript of Deposition of Jason A. Setchen, PA**
                        dated April 9, 2021 ........................................ 2227

        3.      **Retainer Agreement between Brian Bowen and**
                **Law Offices of Jason A. Setchen, PA**
                        dated September 29, 2017 ...................................2231

        4.      **Transcript of Deposition of Brian Bowen, II**
                        dated January 7, 2021 ........................................ 2236

**Plaintiff's Notice of Appeal**
                filed July 6, 2021 ................................................. 2240

**Defendant-Cross Claimant Adidas America, Inc.'s Opposition to**
**Plaintiff's Motion for Reconsideration and Relief from The Court's**
**Judgment, with Exhibits,**
        filed July 20, 2021 ...............................................................2241

        **Exhibits:**

        A.      **Transcript of Deposition of Jason A. Setchen, PA**
                        dated April 9, 2021 ........................................ 2262

        B.      **Transcript of Deposition of John Carns**
                        dated April 15, 2021....................................... 2273

-xix-

<u>Exhibits</u>, continued:

    C.    Transcript of Deposition of Brian Bowen, Sr.
              dated January 20, 2021 ...................................................... 2286

Defendant James Gatto's Memorandum Opposing Plaintiff's Motion
For Reconsideration and Relief from Judgment,
        filed July 20, 2021 ................................................................. 2295

    <u>Exhibits</u>:

    A.    Excerpts of Deposition of Jason Setchen
              dated April 9, 2021 ..........................................................2311

    B.    Excerpts of Deposition of Brian Bowen, II
              dated January 7, 2021 .......................................................2317

    C.    Excerpts of Deposition of Brian Bowen, Sr.
              dated January 20, 2021 ...................................................... 2323

Defendant Christopher Rivers's Opposition to Plaintiff's Motion
For Reconsideration
        filed July 21, 2021............................................................... 2328

Plaintiff's Reply in Support of Motion for Reconsideration
        Filed July 27, 2021 ...............................................................2331

Memorandum Opinion and Order of
The Honorable Joseph F. Anderson, Jr.
Re:  Denying Plaintiff's Motion to Alter or Amend Judgment
        entered August 20, 2021 ....................................................... 2345

Plaintiff's Amended Notice of Appeal
        filed September 15, 2021 ...................................................... 2354

## **TABLE OF CONTENTS**
## **VOLUME VII OF VII – UNDER SEAL**

**Appendix Page**

Defendant-Cross Claimant Adidas America, Inc.'s Memorandum in Support
Of Its Motion for Summary Judgment on RICO Standing (Unredacted)
  dated April 8, 2021 ................................................................. 2356

Exhibits to Adidas America Inc.'s Motion for Summary Judgment
On RICO Standing:

  11.   Summary of Bowen Jr. Interview
        dated November 17, 2017.................................................. 2396

  23.   Email from Shoemaker to Setchen
        dated October 4, 2017 ..................................................... 2411

  25.   Email from M. Coffay to C. Miller
        dated April 6, 2018 ........................................................... 2414

  27.   Letter from Setchen to Carns
        dated September 29, 2017 ................................................ 2430

  30.   Louisville Report to NCAA
        dated January 5, 2018 ....................................................... 2432

  35.   NCAA Case Notes (Case 1015627)
        dated May 18, 2018............................................................ 2437

  36.   Setchen Invoice to Bowen Jr.
        dated August 19, 2019 ....................................................... 2439

  40.   Bowen NBL Contract
        dated August 3, 2018.......................................................... 2445

  42.   Pacers Contract
        dated July 1, 2019 .............................................................. 2459

  44.   Pacers Contract
        dated November 27, 2020.................................................... 2488

**Exhibits to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment on RICO Standing:**

    7.    **Deposition of Chris McGuire**
          dated Dec. 8, 2020.............................................................2517

    13.    **SC Supreme Endorsement, Sponsorship and Supplier Agreement**
          dated January 1, 2017 .......................................................2541

    38.    **University of Louisville Endorsement Agreement dated July 1, 2014, with Amendment, dated July 1, 2018** .............................................................. 2555

**Exhibits to Defendant-Cross Claimant Adidas America, Inc.'s Reply In Support of Its Motion for Summary Judgment on RICO Standing:**

    A.    **Excerpts from Deposition of Kenneth Johnson dated April 14, 2021**............................................................ 2588

    C.    **Excerpts from J. Carnes Testimony in 30(b)(6) Deposition of University of Louisville, Rivers Notice dated April 15, 2021**............................................................ 2596

    E.    **Excerpts from Deposition of Law Office of Jason A. Setchen, P.A. dated April 9, 2021** .......................................................... 2627

    F.    **Excerpts from Deposition of University of Louisville, Plaintiff Notice dated April 15, 2021**............................................................2641

**Defendant-Cross Claimant Adidas America, Inc.'s Reply in Support of Its Motion for Summary Judgment on RICO Standing (Unredacted) filed April 29, 2021**.................................................................. 2653

**Defendant-Cross Claimant Adidas America, Inc.'s Opposition to Plaintiff's Motion for Reconsideration and Relief from The Court's Judgment (Unredacted) filed July 20, 2021** ................................................................. 2678

CM/ECF - scd

Query    Reports    Utilities    Help    Log Out

APPEAL,JURY,LC 2

# U.S. District Court
## District of South Carolina (Columbia)
## CIVIL DOCKET FOR CASE #: 3:18-cv-03118-JFA

Bowen v. Adidas America Inc et al                    Date Filed: 11/19/2018
Assigned to: Honorable Joseph F Anderson, Jr          Date Terminated: 06/07/2021
Case in other court: 4CCA, 21-01764                   Jury Demand: Both
                     4CCA, 21-02029                   Nature of Suit: 470 Racketeer/Corrupt
Cause: 18:1961 Racketeering (RICO) Act                Organization
                                                      Jurisdiction: Federal Question

**Plaintiff**

**Brian Bowen, II**                 represented by  **Colin V Ram**
                                                    McLeod Law Group LLC
                                                    PO Box 21624
                                                    Charleston, SC 29413
                                                    843-614-6477
                                                    Email: colin@mcleod-lawgroup.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Harry Cooper Wilson , III**
                                                    McLeod Law Group LLC
                                                    PO Box 21624
                                                    Charleston, SC 29413
                                                    843-277-6655
                                                    Fax: 843-277-6660
                                                    Email: cooper@mcleod-lawgroup.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **W Mullins McLeod , Jr**
                                                    McLeod Law Group LLC
                                                    PO Box 21624
                                                    Charleston, SC 29413
                                                    843-277-6655
                                                    Email: mullins@mcleod-lawgroup.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Adidas America Inc**              represented by  **Andrew J Ceresney**
                                                    Debevoise and Plimpton
                                                    919 Third Avenue
                                                    New York, NY 10022

- 1 -

212-909-6947
Fax: 212-909-6836
Email: aceresney@debevoise.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew David Forbes**
Debevoise and Plimpton
919 Third Avenue
New York, NY 10022
212-909-6000
Fax: 212-909-6836
Email: mforbes@debevoise.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew T Richardson**
Wyche PA
807 Gervais Street
Suite 301
Columbia, SC 29201
803-254-6542
Fax: 803-254-6544
Email: mrichardson@wyche.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miheer Vilas Mhatre**
Debevoise and Plimpton
919 Third Avenue
New York, NY 10022
212-909-6892
Fax: 212-909-6836
Email: mmhatre@debevoise.com
*TERMINATED: 08/27/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan Samuel Richards**
Debevoise and Plimpton
919 Third Avenue
New York, NY 10022
212-909-6000
Email: nsrichards@debevoise.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Howard Taft , V**
Debevoise and Plimpton
919 Third Avenue

New York, NY 10022
212-909-6877
Fax: 212-909-6836
Email: whtaft@debevoise.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Edward Cox , Jr**
Wyche PA
200 E Camperdown Way
PO Box 728
Greenville, SC 29601
864-242-8212
Email: jcox@wyche.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Lucille Dinkins**
Wyche PA
807 Gervais Street
Suite 301
Columbia, SC 29201
803-254-6542
Email: ldinkins@wyche.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Gatto**                    represented by  **Deborah B Barbier**
                                                    Barbier Law Office
                                                    1811 Pickens Street
                                                    Columbia, SC 29201
                                                    803-445-1032
                                                    Fax: 803-445-1036
                                                    Email: dbb@deborahbarbier.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Merl Code**                      represented by  **Terry Allan Finger**
                                                    Finger Fraser and Andrews
                                                    PO Box 24005
                                                    Hilton Head Island, SC 29925
                                                    843-681-7000
                                                    Fax: 843-681-8802
                                                    Email: tfinger@fingerlaw.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Benjamin Thomas Shelton**
                                                    Shelton Law Firm LLC
                                                    PO Box 21069
                                                    Hilton Head, SC 29925
                                                    843-802-0087

Fax: 843-459-7908
Email: ben@sheltonlawsc.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christian Dawkins**                 represented by   **Steven Alan Haney**
Haney Law Group
3000 Town Center
Suite 2570
Southfield, MI 48075
248-414-1470
Fax: 248-414-1471
Email: steve@haneygroup.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Terry Allan Finger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Munish Sood**                       represented by   **Francis A Weber**
Pepper Hamilton LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
215-981-4084
Fax: 800-878-2035
Email: weberf@pepperlaw.com
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J Zack**
Pepper Hamilton LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
215-981-4726
Fax: 800-521-6515
Email: zackr@pepperlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas H Cordova**
Troutman Pepper LLP
300 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
215-981-4675

Fax: 215-827-5361
Email: thomas.cordova@troutman.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wilbur Eugene Johnson**
Clement Rivers LLP
25 Calhoun Street
Suite 400
Charleston, SC 29401
843-724-6659
Fax: 843-579-1332
Email: wjohnson@ycrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas Gassnola**

**Defendant**

**Christopher Rivers**                    represented by    **Cory E Manning**
Nelson Mullins Riley and Scarborough LLP
(Cola)
Meridian Building
17th Floor
1320 Main Street
Columbia, SC 29201
803-255-5524
Email: cory.manning@nelsonmullins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Lauri Lindholm , Jr**
Nelson Mullins Riley and Scarborough -
Char
301 South College Street
23rd Floor
Charlotte, NC 28202
704-417-3231
Fax: 704-377-4814
Email: robert.lindholm@nelsonmullins.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wesley Tyler Moran**
Nelson Mullins Riley and Scarborough LLP
(Cola)
Meridian Building
17th Floor
1320 Main Street
Columbia, SC 29201
803-255-9585

Email: wes.moran@nelsonmullins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Interested Party**

**Dan Cutler**                    represented by  **La'Jessica Stringfellow**
Robinson Gray Stepp and Laffitte LLC
1310 Gadsden Street
Columbia, SC 29201
803-255-8037
Email: lstringfellow@robinsongray.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip C Ciccarelli**
Philip C Ciccarelli Attorney at Law
55 N Pleasant Street
Amherst, MA 01002
413-230-3255
Email: phil@ciccarelli.law
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Adidas America Inc**            represented by  **Andrew J Ceresney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew David Forbes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew T Richardson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miheer Vilas Mhatre**
(See above for address)
*TERMINATED: 08/27/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan Samuel Richards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Howard Taft , V**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Edward Cox , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary Lucille Dinkins**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Cross Defendant**
**Brian Bowen, Sr.**                    represented by  **Jessica Lee Gooding**
                                                        Goings Law Firm
                                                        914 Richland Street
                                                        Suite A-101
                                                        Columbia, SC 29201
                                                        803-350-9230
                                                        Fax: 877-789-6340
                                                        Email: jgooding@goingslawfirm.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Robert Fredrick Goings**
                                                        Goings Law Firm LLC
                                                        1510 Calhoun Street
                                                        Columbia, SC 29201
                                                        803-350-9230
                                                        Fax: 877-789-6340
                                                        Email: rgoings@goingslawfirm.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Cross Defendant**
**Thomas Gassnola**

**Cross Defendant**
**Munish Sood**                         represented by  **Francis A Weber**
                                                        (See above for address)
                                                        *TERMINATED: 06/13/2019*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Richard J Zack**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Thomas H Cordova**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wilbur Eugene Johnson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Munish Sood**                    represented by    **Francis A Weber**
*TERMINATED: 11/09/2020*                             (See above for address)
                                                     *TERMINATED: 06/13/2019*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Richard J Zack**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Thomas H Cordova**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Wilbur Eugene Johnson**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

V.

**Cross Defendant**

**Brian Bowen, Sr.**               represented by    **Jessica Lee Gooding**
*TERMINATED: 11/09/2020*                             (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Robert Fredrick Goings**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 11/19/2018 | 1 | COMPLAINT against Adidas America Inc, Merl Code, Christian Dawkins, Thomas Gassnola, James Gatto, Christopher Rivers, Munish Sood ( Filing fee $ 400 receipt number 0420-8114197.), filed by Brian Bowen, II. Service due by 2/19/2019 (Attachments: # 1 Exhibit 1 - Louisville Agreement with Adidas, # 2 Exhibit 2 - Federal Criminal Complaint)(mdea ) (Entered: 11/19/2018) |

**- 8 -**

| 11/19/2018 | 3 | Local Rule 26.01 Answers to Interrogatories by Brian Bowen, II.(mdea ) (Entered: 11/19/2018) |
|---|---|---|
| 11/19/2018 | 4 | Summons Issued as to Adidas America Inc. (mdea ) (Entered: 11/19/2018) |
| 11/19/2018 | 5 | Summons Issued as to James Gatto. (mdea ) (Entered: 11/19/2018) |
| 11/19/2018 | 6 | Summons Issued as to Merl Code. (mdea ) (Entered: 11/19/2018) |
| 11/19/2018 | 7 | Summons Issued as to Christian Dawkins. (mdea ) (Entered: 11/19/2018) |
| 11/19/2018 | 8 | Summons Issued as to Munish Sood. (mdea ) (Entered: 11/19/2018) |
| 11/19/2018 | 9 | Summons Issued as to Thomas Gassnola. (mdea ) (Entered: 11/19/2018) |
| 11/19/2018 | 10 | Summons Issued as to Christopher Rivers. (mdea ) (Entered: 11/19/2018) |
| 12/03/2018 | 12 | SUMMONS Returned Executed by Brian Bowen, II. Adidas America Inc served on 11/26/2018, answer due 12/17/2018. (Attachments: # 1 Affidavit Service on Adidas America, Inc.)(McLeod, W) (Entered: 12/03/2018) |
| 12/31/2018 | 13 | NOTICE of Appearance by Deborah B Barbier on behalf of James Gatto (Barbier, Deborah) (Entered: 12/31/2018) |
| 12/31/2018 | 14 | Consent MOTION for Extension of Time to File Answer *OR OTHERWISE MOVE* by James Gatto. Response to Motion due by 1/14/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Barbier, Deborah) (Entered: 12/31/2018) |
| 01/04/2019 | 15 | NOTICE of Appearance by Matthew T Richardson on behalf of Adidas America Inc (Richardson, Matthew) (Entered: 01/04/2019) |
| 01/04/2019 | 16 | JOINT MOTION for Extension of Time to File Answer by Adidas America Inc, Merl Code, Christopher Rivers. Response to Motion due by 1/18/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Richardson, Matthew) Modified on 1/7/2019 to add text(mflo, ). (Entered: 01/04/2019) |
| 01/04/2019 | 17 | NOTICE of Appearance by Mary Lucille Dinkins on behalf of Adidas America Inc (Dinkins, Mary) (Entered: 01/04/2019) |
| 01/07/2019 | 18 | **TEXT ORDER granting 14 Consent MOTION for Extension of Time to File Answer *OR OTHERWISE MOVE* as to defendant James Gatto; answer due 2/5/2019. Directed by Honorable Joseph F Anderson, Jr on 1/7/19.(mflo, ) (Entered: 01/07/2019)** |
| 01/07/2019 | 19 | **TEXT ORDER granting 16 JOINT MOTION for Extension of Time to File Answer or otherwise respond to plaintiff's complaint Adidas America Inc answer due 2/5/2019; Merl Code answer due 2/5/2019; Christopher Rivers answer due 2/5/2019. Directed by Honorable Joseph F Anderson, Jr on 1/7/19.(mflo, )** Modified on 1/8/2019 to add text (mflo, ). (Entered: 01/07/2019) |
| 01/31/2019 | 20 | WAIVER OF SERVICE by Brian Bowen, II. Munish Sood waiver executed on 12/10/2018, answer due 2/8/2019. (McLeod, W) (Entered: 01/31/2019) |
| 02/04/2019 | 21 | MOTION to Appear Pro Hac Vice by Andrew J. Ceresney ( Filing fee $ 250 receipt number 0420-8248494) by Adidas America Inc. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Pro Hac Vice Application, # 2 Certificate of Good Standing)No proposed order.(Richardson, Matthew) (Entered: 02/04/2019) |

| 02/04/2019 | 22 | MOTION to Appear Pro Hac Vice by Miheer Vilas Mhatre ( Filing fee $ 250 receipt number 0420-8248537) by Adidas America Inc. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Pro Hac Vice Application, # 2 Certificate of Good Standing)No proposed order.(Richardson, Matthew) (Entered: 02/04/2019) |
| 02/04/2019 | 23 | MOTION to Appear Pro Hac Vice by Nathan Samuel Richards ( Filing fee $ 250 receipt number 0420-8248558) by Adidas America Inc. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Pro Hac Vice Application, # 2 Certificate of Good Standing)No proposed order.(Richardson, Matthew) (Entered: 02/04/2019) |
| 02/04/2019 | 24 | MOTION to Appear Pro Hac Vice by William Howard Taft, V ( Filing fee $ 250 receipt number 0420-8248571) by Adidas America Inc. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Pro Hac Vice Application, # 2 Certificate of Good Standing)No proposed order.(Richardson, Matthew) (Entered: 02/04/2019) |
| 02/04/2019 | 25 | MOTION to Appear Pro Hac Vice by Rober L. Lindholm, Jr. *on behalf of Defendant Rivers* ( Filing fee $ 250 receipt number 0420-8248856) by Christopher Rivers. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit, # 2 Supporting Documents Certificate of Good Standing)No proposed order.(Manning, Cory) (Attachment 1 replaced on 2/6/2019 as provided by filing user) (mflo, ). (Entered: 02/04/2019) |
| 02/05/2019 | 27 | First MOTION to Dismiss by Merl Code. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Finger, Terry) (Entered: 02/05/2019) |
| 02/05/2019 | 28 | Local Rule 26.01 Answers to Interrogatories by Merl Code.(Finger, Terry) (Entered: 02/05/2019) |
| 02/05/2019 | 29 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Adidas America Inc. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Adidas's Memorandum of Law in Support of its Motion to Dismiss, # 2 Exhibit B - Declaration of Mary Lucille Dinkins, # 3 Exhibit A to Exhibit B - Tweet by University of Louisville, Nov. 22, 2017, # 4 Exhibit B to Exhibit B - Excerpts from criminal trial of United States vs.James Gatto, et al,)No proposed order.(Richardson, Matthew) Modified on 2/6/2019 to edit text (mflo, ). (Entered: 02/05/2019) |
| 02/05/2019 | 30 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Christopher Rivers. Response to Motion due by 2/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support)No proposed order.(Manning, Cory) (Entered: 02/05/2019) |
| 02/05/2019 | 31 | Local Rule 26.01 Answers to Interrogatories by Christopher Rivers.(Manning, Cory) (Entered: 02/05/2019) |
| 02/06/2019 | 33 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by James Gatto. Response to Motion due by 2/20/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support)No proposed order.(Barbier, Deborah) (Entered: 02/06/2019) |
| 02/06/2019 | 34 | MOTION to Dismiss for Lack of Jurisdiction by James Gatto. Response to Motion due by 2/20/2019. Add an additional 3 days only if served by mail or otherwise allowed under |

| | | |
|---|---|---|
| | | Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support)No proposed order.(Barbier, Deborah) (Entered: 02/06/2019) |
| 02/06/2019 | 35 | DELETION OF DOCKET ENTRY NUMBER 26 Reason: refiled by filing user using correct event and signature; Corrected Filing Document Number 27 (mflo, ) (Entered: 02/06/2019) |
| 02/06/2019 | | DELETION OF DOCKET ENTRY NUMBER 32 Reason: duplicate filing and at the request of the filing user; Corrected Filing Document Number 34 (mflo, ) (Entered: 02/06/2019) |
| 02/07/2019 | 36 | **TEXT ORDER granting 21 Motion for Andrew J. Ceresney to Appear Pro Hac Vice for Adidas America Inc.; granting 22 Motion for Miheer Vilas Mhatre to Appear Pro Hac Vice for Adidas America Inc; granting 23 Motion for Nathan Samuel Richards to Appear Pro Hac Vice for Adidas America Inc.; granting 24 Motion for William Howard Taft, V to Appear Pro Hac Vice for Adidas America Inc. Directed by Honorable Joseph F Anderson, Jr on 2/7/19.(mflo, ) (Entered: 02/07/2019)** |
| 02/07/2019 | 37 | **TEXT ORDER granting 25 Motion for Robert L. Lindholm, Jr. to Appear Pro Hac Vice for Christopher Rivers. Directed by Honorable Joseph F Anderson, Jr on 2/7/19.(mflo, ) (Entered: 02/07/2019)** |
| 02/07/2019 | 38 | Local Rule 26.01 Answers to Interrogatories by James Gatto.(Barbier, Deborah) (Entered: 02/07/2019) |
| 02/08/2019 | 39 | Local Rule 26.01 Answers to Interrogatories by Adidas America Inc.(Richardson, Matthew) (Entered: 02/08/2019) |
| 02/08/2019 | 40 | First MOTION to Appear Pro Hac Vice by Steven Alan Haney ( Filing fee $ 250 receipt number 0420-8259823) by Christian Dawkins. Response to Motion due by 2/22/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Finger, Terry) (Additional attachment(s) added on 2/14/2019 as provided by filing user: # 1 Certificate of Good Standing) (mflo, ). (Entered: 02/08/2019) |
| 02/08/2019 | 41 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Munish Sood. Response to Motion due by 2/22/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit A - Affidavit of Wilbur E. Johnson)No proposed order. (Johnson, Wilbur) (Entered: 02/08/2019) |
| 02/08/2019 | 42 | Local Rule 26.01 Answers to Interrogatories by Munish Sood.(Johnson, Wilbur) (Entered: 02/08/2019) |
| 02/14/2019 | 43 | NOTICE of Appearance by Colin Venkat Madhira Ram on behalf of Brian Bowen, II (Ram, Colin Venkat) (Entered: 02/14/2019) |
| 02/14/2019 | 44 | Consent MOTION for Extension of Time to File Response/Reply as to 27 First MOTION to Dismiss , 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Brian Bowen, II, 34 MOTION to Dismiss for Lack of Jurisdiction by James Gatto. Response to Motion due by 2/28/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Ram, Colin Venkat) Modified on 2/15/2019 to add link(mflo, ). (Entered: 02/14/2019) |
| 02/15/2019 | 45 | **TEXT ORDER granting 44 Motion for Extension of Time to File Response to 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 34 MOTION to** |

| | | |
|---|---|---|
| | | **Dismiss for Lack of Jurisdiction , 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 27 First MOTION to Dismiss . Response to Motion due by 3/8/2019. Directed by Honorable Joseph F Anderson, Jr on 2/15/19.(mflo, ) (Entered: 02/15/2019)** |
| 02/15/2019 | 47 | **TEXT ORDER granting 40 Motion for Steven Alan Haney to Appear Pro Hac Vice on behalf of defendant Christian Dawkins. Directed by Honorable Joseph F Anderson, Jr on 2/15/19.(mflo, ) (Entered: 02/15/2019)** |
| 02/18/2019 | 48 | NOTICE of Request for Protection from Court Appearance by Deborah B Barbier for April 15-17, 2019; June 1-10, 2019 (Barbier, Deborah) (Entered: 02/18/2019) |
| 02/19/2019 | 49 | MOTION to Appear Pro Hac Vice by Richard J. Zack ( Filing fee $ 250 receipt number 0420-8276161) by Munish Sood. Response to Motion due by 3/5/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit for Pro Hac Vice Admission)No proposed order. (Johnson, Wilbur) (Entered: 02/19/2019) |
| 02/19/2019 | 50 | MOTION to Appear Pro Hac Vice by Francis A. Weber ( Filing fee $ 250 receipt number 0420-8276213) by Munish Sood. Response to Motion due by 3/5/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit for Pro Hac Vice Admission)No proposed order. (Johnson, Wilbur) (Entered: 02/19/2019) |
| 02/20/2019 | 51 | **TEXT ORDER granting 49 Motion for Richard J. Zack to Appear Pro Hac Vice for defendant Munish Sood; granting 50 Motion for Francis A. Weber to Appear Pro Hac Vice for defendant Munish Sood. Directed by Honorable Joseph F Anderson, Jr on 2/20/19.(mflo, ) (Entered: 02/20/2019)** |
| 02/22/2019 | 52 | ANSWER to Complaint by Christian Dawkins.(Finger, Terry) (Entered: 02/22/2019) |
| 02/26/2019 | 53 | SUMMONS Returned Executed by Brian Bowen, II. Thomas Gassnola served on 12/17/2018, answer due 1/7/2019. Refiled by the Clerk using the correct event type. (Attachments: # 1 Certified mail receipt, # 2 Affidavit from attempt of personal service) (mflo, ) (Entered: 02/27/2019) |
| 03/08/2019 | 54 | RESPONSE in Opposition re 34 MOTION to Dismiss for Lack of Jurisdiction Response filed by Brian Bowen, II.Reply to Response to Motion due by 3/15/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (McLeod, W) (Entered: 03/08/2019) |
| 03/08/2019 | 55 | RESPONSE in Opposition re 27 First MOTION to Dismiss , 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Brian Bowen, II.Reply to Response to Motion due by 3/15/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (McLeod, W) See 56 for additional attachments (mflo, ). (Entered: 03/08/2019) |
| 03/08/2019 | 56 | DECLARATION by Brian Bowen, IIre 55 Response in Opposition to Motion,, *Declaration of Colin V. Ram*. (Attachments: # 1 Exhibit 1 NCAA Bylaws, # 2 Exhibit 2 Govt Sentencing Memo, # 3 Exhibit 3 Gatto Sentencing Memo, # 4 Exhibit 4 Code Sentencing Memo, # 5 Exhibit 5 Student-Athlete Agreement, # 6 Exhibit 6 Cert of Eligibility, # 7 Exhibit 7 Adidas v NCAA Complaint, # 8 Exhibit 8 Adidas v NCAA Mot. Prelim. Injunction, # 9 Exhibit 9 Gatto Criminal Trial Transcripts, # 10 Exhibit 10 Gassnola Hrg'g Transcript, # 11 Exhibit 11 Gatto Expert Memo, # 12 Exhibit 12 Sood |

- 12 -

| | | |
|---|---|---|
| | | Crim. Info, # 13 Exhibit 13 Gassnola Crim Info, # 14 Exhibit 14 Gatto Sentencing Transcript)(McLeod, W) (Entered: 03/08/2019) |
| 03/11/2019 | 57 | Consent MOTION for Extension of Time to File Response/Reply as to 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Adidas America Inc. Response to Motion due by 3/25/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Richardson, Matthew) (Entered: 03/11/2019) |
| 03/11/2019 | 58 | Consent MOTION for Extension of Time to File Response/Reply as to 55 Response in Opposition to Motion,, 27 First Motion to Dismiss, 30 Motion to Dismiss for Failure to State a Claim, 29 Motion to Dismiss for Failure to State a Claim, 41 Motion to Dismiss for Failure to State a Claim, 33 Motion to Dismiss for Failure to State a Claim by Munish Sood. Response to Motion due by 3/25/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Email from counsel for Plaintiff dated March 11, 2019)No proposed order.(Johnson, Wilbur) (Entered: 03/11/2019) |
| 03/11/2019 | 59 | Consent MOTION for Extension of Time to File Response/Reply as to 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and 34 MOTION TO DISMISS FOR LACK OF JURISDICTION by James Gatto. Response to Motion due by 3/25/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Barbier, Deborah) Modified on 3/12/2019 to edit text and link to motion (mflo, ). (Entered: 03/11/2019) |
| 03/14/2019 | 60 | **TEXT ORDER granting 57 Motion for Extension of Time to File Reply by Adidas America, Inc; re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , and 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . Replies due by 3/20/2019. Directed by Honorable Joseph F Anderson, Jr on 3/14/19.(mflo, ) Modified on 3/14/2019 to edit text(mflo, ). (Entered: 03/14/2019)** |
| 03/14/2019 | 61 | **TEXT ORDER granting 58 Motion for Extension of Time to File Reply ; re 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . Replies due by 3/20/2019. Directed by Honorable Joseph F Anderson, Jr on 3/14/19.(mflo, ) (Entered: 03/14/2019)** |
| 03/14/2019 | 62 | **TEXT ORDER granting 59 Motion for Extension of Time to File Reply ; re 34 MOTION to Dismiss for Lack of Jurisdiction , and 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . Replies due by 3/20/2019. Directed by Honorable Joseph F Anderson, Jr on 3/14/19.(mflo, ) (Entered: 03/14/2019)** |
| 03/19/2019 | 63 | REPLY to Response to Motion re 27 First MOTION to Dismiss Response filed by Merl Code. (Finger, Terry) (Entered: 03/19/2019) |
| 03/19/2019 | 64 | REPLY to Response to Motion re 34 MOTION to Dismiss for Lack of Jurisdiction Response filed by James Gatto. (Barbier, Deborah) (Entered: 03/19/2019) |
| 03/20/2019 | 65 | REPLY to Response to Motion re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Adidas America Inc. (Richardson, Matthew) (Entered: 03/20/2019) |
| 03/20/2019 | 66 | REPLY to Response to Motion re 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Munish Sood. (Attachments: # 1 Supporting Documents Declaration of Wilbur E. Johnson)(Johnson, Wilbur) (Entered: 03/20/2019) |
| 03/20/2019 | 67 | REPLY to Response to Motion re 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Christopher Rivers. (Manning, Cory) (Entered: |

| | | 03/20/2019) |
|---|---|---|
| 03/20/2019 | 68 | REPLY to Response to Motion re 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by James Gatto. (Barbier, Deborah) (Entered: 03/20/2019) |
| 04/19/2019 | 69 | NOTICE of Request for Protection from Court Appearance by Cory E Manning for May 9-20, May 23-24, July 3-22, 2019 (Manning, Cory) (Entered: 04/19/2019) |
| 05/10/2019 | 70 | NOTICE of Hearing on Motion 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 34 MOTION to Dismiss for Lack of Jurisdiction , 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 27 First MOTION to Dismiss : Motion Hearing on all pending motions set for 6/25/2019 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 05/10/2019) |
| 06/07/2019 | 71 | RESCHEDULED NOTICE of Hearing on Motions 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 34 MOTION to Dismiss for Lack of Jurisdiction , 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 27 First MOTION to Dismiss : Motion Hearing set for 6/25/2019 10:00 AM has been cancelled and rescheduled: Motion Hearing set for 6/26/2019 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 06/07/2019) |
| 06/11/2019 | 72 | MOTION to Withdraw as Attorney *(Francis A. Weber of Pepper Hamilton LLP)* by Munish Sood. Response to Motion due by 6/25/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Johnson, Wilbur) (Entered: 06/11/2019) |
| 06/13/2019 | 73 | **TEXT ORDER granting 72 Motion for Francis A. Weber to Withdraw as PHV Attorney for Munish Sood. Directed by Honorable Joseph F Anderson, Jr on 6/13/19.(mflo, ) (Entered: 06/13/2019)** |
| 06/21/2019 | 75 | NOTICE of Appearance by James Edward Cox, Jr on behalf of Adidas America Inc (Cox, James) (Entered: 06/21/2019) |
| 06/25/2019 | 76 | RESCHEDULED NOTICE of Hearing ***CHANGE IN TIME ONLY*** on Motion 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 34 MOTION to Dismiss for Lack of Jurisdiction , 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 27 First MOTION to Dismiss : Motion Hearing set for 6/26/2019 10:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 06/25/2019) |
| 06/26/2019 | 77 | **Minute Entry. Proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing held on 6/26/2019; taking under advisement 27 First MOTION to Dismiss filed by Merl Code; denying 34 MOTION to Dismiss for Lack of Jurisdiction filed by James Gatto; taking under advisement 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Christopher Rivers; taking under advisement 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Adidas America Inc; taking under advisement 41 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Munish Sood; taking under advisement 33 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by James** |

| | | |
|---|---|---|
| | | Gatto. Court will file written order. Court Reporter Carly Horenkamp. (mflo, ) (Entered: 06/27/2019) |
| 07/08/2019 | 78 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Hearing on Motions held on June 26, 2019, at 10:37 a.m., before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Carly Horenkamp, RDR, CRR, CRC, Telephone number/E-mail carleen_horenkamp@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 7/29/2019. Redacted Transcript Deadline set for 8/8/2019. Release of Transcript Restriction set for 10/7/2019. (chor, ) (Entered: 07/08/2019) |
| 07/12/2019 | 79 | Joint MOTION for Leave to File a Supplemental Brief in Support of their Motions to Dismiss by Adidas America Inc., James Gatto, Merl Code, Munish Sood, and Christopher Rivers. Response to Motion due by 7/26/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Defendants' Joint Supplemental Memorandum of Law in Support of Their Motions to Dismiss)No proposed order.(Dinkins, Mary) Modified on 7/12/2019 to edit text and to add joint filers (mflo, ). (Entered: 07/12/2019) |
| 07/26/2019 | 80 | RESPONSE in Opposition re 79 Joint MOTION for Leave to File Response filed by Brian Bowen, II.Reply to Response to Motion due by 8/2/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Ram, Colin) (Entered: 07/26/2019) |
| 08/02/2019 | 81 | RESPONSE in Support re 79 Joint MOTION for Leave to File *Joint* Response filed by Adidas America Inc, Merl Code, James Gatto, Christopher Rivers, Munish Sood. (Dinkins, Mary) Modified on 8/2/2019 to remove incorrect filers (mflo, ). (Entered: 08/02/2019) |
| 08/08/2019 | 82 | **ORDER Plaintiff has 15 days from the date of this order to file an amended complaint to conform to Rule 9(b). Defendants' motions are granted as to Plaintiff's allegation that defendants committed sports bribery as a predicate act of racketeering, this allegation is dismissed with prejudice and without leave to refile. granting in part and denying in part 41 Motion to Dismiss for Failure to State a Claim by Munish Sood ; denying 79 Joint Motion for Leave to File Supplemental briefs; granting in part and denying in part 27 Motion to Dismiss by Merl Code ; granting in part and denying in part 29 Motion to Dismiss for Failure to State a Claim by Adidas America Inc ; granting in part and denying in part 30 Motion to Dismiss for Failure to State a Claim by Christopher Rivers ; granting in part and denying in part 33 Motion to Dismiss for Failure to State a Claim James Gatto. Signed by Honorable Joseph F Anderson, Jr on 8/8/19.(mflo, ) (Entered: 08/08/2019)** |
| 08/21/2019 | 83 | Consent MOTION to Withdraw as Attorney *Miheer Mhatre* by Adidas America Inc. Response to Motion due by 9/4/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order. (Dinkins, Mary) (Entered: 08/21/2019) |
| 08/23/2019 | 84 | AMENDED COMPLAINT against All Defendants, filed by Brian Bowen, II. Service due by 11/21/2019 (Attachments: # 1 Exhibit Adidas sponsorship agreement, # 2 Exhibit Criminal Complaint, # 3 Exhibit Adidas 2015-16 agreement with Gassnola, # 4 Exhibit NE Playaz Oct 2015 stmt, # 5 Exhibit NE Playaz Nov 2015 invoice, # 6 Exhibit D. Smith NLI, # 7 Exhibit D. Smith certification, # 8 Exhibit NE Playaz Oct 2016 invoice, # 9 Exhibit NE Playaz Oct 2016 stmt, # 10 Exhibit B.Preston FAA) (McLeod, W) See 85 and 86 additional attachments. (Entered: 08/23/2019) |

| | | |
|---|---|---|
| 08/23/2019 | 85 | Additional Attachments to Main Document 84 Amended Complaint,,. First attachment description: Additional Exhibits . (Attachments: # 1 Exhibit Ex 11 Adidas / NE Playaz 2017-18 agreement, # 2 Exhibit Ex 12 Jan 9 2017 email, # 3 Exhibit Ex 13 NE Playaz Jan 2017 stmt, # 4 Exhibit Ex 14 Feb 2017 wire transfer, # 5 Exhibit Ex 15 NE Playaz May 1 2017 invoice, # 6 Exhibit Ex 16 NE Playaz May 2017 stmt, # 7 Exhibit Ex 17 June 14 2017 wire transfer, # 8 Exhibit Ex 18 S. DeSousa FAA, # 9 Exhibit Ex 19 Aug 11 2017 wiretap, # 10 Exhibit Ex 20 May 18 2017 email to Rivers, # 11 Exhibit Ex 21 May 22 2017 text msg, # 12 Exhibit Ex 22 May 27 2017 voicemail, # 13 Exhibit Ex 23 UofL visit records, # 14 Exhibit Ex 24 May 31 2017 text msg, # 15 Exhibit Ex 25 May 31 2017 text msg Code/Gassnola)(McLeod, W) (Entered: 08/23/2019) |
| 08/23/2019 | 86 | Additional Attachments to Main Document 84 Amended Complaint,,. First attachment description: Additional Exhibits . (Attachments: # 1 Exhibit Ex 26 June 1 2017 voicemail, # 2 Exhibit Ex 27 B. Bowen FAA, # 3 Exhibit Ex 28 B. Bowen Certification, # 4 Exhibit Ex 29 Karolina Khaos June 8 2017 invoice, # 5 Exhibit Ex 30 Gatto emails June 26 2017, # 6 Exhibit Ex 31 Code June 2017 email and invoice, # 7 Exhibit Ex 32 July 10 2017 wiretap, # 8 Exhibit Ex 33 Sood / Dawkins text messages, # 9 Exhibit Ex 34 Sood text messages, # 10 Exhibit Ex 35 July 13, 2017 wiretap, # 11 Exhibit Ex 36 Gatto July 25 2017 email no. 1, # 12 Exhibit Ex 37 Gatto July 25 2017 email no.2, # 13 Exhibit Ex 38 Gatto invoice approval, # 14 Exhibit Ex 39 Karolina Khaos bank stmt, # 15 Exhibit Ex 40 Checks to Loyd Inc., # 16 Exhibit Ex 41 Princeton Advisory Group check, # 17 Exhibit Ex 42 UofL Team Certification, # 18 Exhibit Ex 43 Sept. 13, 2017 wiretap, # 19 Exhibit Ex 44 Sept. 18, 2017 invoice, # 20 Exhibit Ex 45 Sept 14 2017 email, # 21 Exhibit Ex 46 Gatto invoice approval, # 22 Exhibit Ex 47 Sept 20 2017 wiretap, # 23 Exhibit Ex 48 Sept 21 2017 deposit, # 24 Exhibit Ex 49 June 19, 2017 email, # 25 Exhibit Ex 50 July 6, 2017 Code email, # 26 Exhibit Ex 51 July 6, 2017 Gatto email, # 27 Exhibit Ex 52 NE Playaz payment summary chart, # 28 Exhibit Ex 53 Gassnola payment summary chart, # 29 Exhibit Ex 54 June 17, 2017 Code invoice)(McLeod, W) (Entered: 08/23/2019) |
| 08/27/2019 | 87 | **TEXT ORDER granting 83 Motion for Miheer Mhatre to Withdraw as Attorney for defendant. Directed by Honorable Joseph F Anderson, Jr on 8/27/19.(mflo, ) (Entered: 08/27/2019)** |
| 09/18/2019 | 90 | NOTICE of Request for Protection from Court Appearance by Deborah B Barbier for October 28-November 2, 2019 (Barbier, Deborah) (Entered: 09/18/2019) |
| 09/18/2019 | 91 | MOTION to Appear Pro Hac Vice by Matthew D. Forbes ( Filing fee $ 250 receipt number 0420-8676789) by Adidas America Inc. Response to Motion due by 10/2/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Application for Pro Hac Vice Admission, # 2 Certificate of Good Standing)No proposed order.(Dinkins, Mary) (Entered: 09/18/2019) |
| 09/19/2019 | 92 | **TEXT ORDER granting 91 Motion for Matthew David Forbes to Appear Pro Hac Vice for defendant Adidas America Inc. Directed by Honorable Joseph F Anderson, Jr on 9/19/19.(mflo, ) (Entered: 09/19/2019)** |
| 09/20/2019 | 93 | MOTION to Dismiss by Merl Code. Response to Motion due by 10/4/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Finger, Terry) (Entered: 09/20/2019) |
| 09/20/2019 | 94 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Adidas America Inc. Response to Motion due by 10/4/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Memorandum in Support of adidas America, Inc.'s Motion to Dismiss, # 2 Exhibit B - Declaration of William H. Taft V, # 3 Attachment 1 to Declaration of William |

| | | |
|---|---|---|
| | | H. Taft V)No proposed order.(Richardson, Matthew) (Additional attachment(s) added on 9/23/2019 at the request and as provided by filing user: # 4 Redline Comparison of pla amd cmp to original cmp) (mflo, ). (Entered: 09/20/2019) |
| 09/20/2019 | 95 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by James Gatto. Response to Motion due by 10/4/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support)No proposed order.(Barbier, Deborah) (Entered: 09/20/2019) |
| 09/20/2019 | 96 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Munish Sood. Response to Motion due by 10/4/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Transcript of Sentencing Proceeding)No proposed order.(Johnson, Wilbur) (Entered: 09/20/2019) |
| 09/20/2019 | 97 | MOTION to Dismiss *Amended Complaint*, ( Response to Motion due by 10/4/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ) by Christopher Rivers. (Attachments: # 1 Memo in Support, # 2 Exhibit A - Excerpt of June 26, 2019 Oral Argument Transcript)No proposed order. (Manning, Cory) Modified on 2/27/2020 to edit text (mflo, ). (Entered: 09/20/2019) |
| 09/23/2019 | 98 | Consent MOTION for Extension of Time to File Response/Reply as to 96 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 93 MOTION to Dismiss , 95 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 97 MOTION to Dismiss *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 94 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Brian Bowen, II. Response to Motion due by 10/7/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Ram, Colin) (Entered: 09/23/2019) |
| 09/24/2019 | 99 | **TEXT ORDER Granting 98 Consent MOTION for Extension of Time to File Response to 96 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Munish Sood, 93 MOTION to Dismiss filed by Merl Code, 95 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by James Gatto, 97 MOTION to Dismiss *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Christopher Rivers, 94 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Adidas America Inc, ( Response to Motion due by 10/18/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ). Directed by Honorable Joseph F Anderson, Jr on 9/24/19. (mflo, )** (Entered: 09/24/2019) |
| 09/27/2019 | 100 | NOTICE of Request for Protection from Court Appearance by Cory E Manning for Oct 2-3, Oct 30-31, Nov 11-13 (Manning, Cory) (Entered: 09/27/2019) |
| 10/18/2019 | 101 | RESPONSE in Opposition re 96 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 93 MOTION to Dismiss , 95 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 97 MOTION to Dismiss *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 94 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Brian Bowen, II. Reply to Response to Motion due by 10/25/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (McLeod, W) Modified on 10/21/2019 to correct date of filing and reply date due to a CM/ECF servers nationwide service outage. (mflo, ). (Entered: 10/21/2019) |
| 10/24/2019 | 102 | MOTION for Extension of Time to File Response/Reply as to 95 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 97 MOTION to Dismiss *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 94 |

| | | |
|---|---|---|
| | | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Adidas America Inc, James Gatto, Christopher Rivers. Response to Motion due by 11/7/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Moran, Wesley) (Entered: 10/24/2019) |
| 10/24/2019 | 103 | **TEXT ORDER granting 102 Motion for Extension of Time to File Reply to Responses by Addidas America Inc, James Gatto, Christopher Rivers ; re 94 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 97 MOTION to Dismiss *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 95 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Replies due by 11/8/2019). Directed by Honorable Joseph F Anderson, Jr on 10/24/19.(mflo, ) (Entered: 10/24/2019)** |
| 10/24/2019 | 104 | MOTION for Extension of Time to File Reply to 96 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Munish Sood. Response to Motion due by 11/7/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Johnson, Wilbur) Modified on 10/25/2019 to edit text and linkage (mflo, ). (Entered: 10/24/2019) |
| 10/25/2019 | 105 | **TEXT ORDER granting 104 Motion for Extension of Time to File Reply to Response by Munish Sood ; re 96 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Reply due by 11/8/2019). Directed by Honorable Joseph F Anderson, Jr on 10/25/19.(mflo, ) (Entered: 10/25/2019)** |
| 11/08/2019 | 106 | REPLY to Response to Motion re 94 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Adidas America Inc. (Attachments: # 1 Declaration of William H. Taft V, # 2 Attachment 1 - Consent Degree issued in United States v. International Boxing Federation, # 3 Attachment 2 - Excerpts from the record of the criminal trial of United States vs. James Gatto, # 4 Attachment 3 - Press Release issued by the NCAA on December 1, 2010, # 5 Attachment 4 - Article published by ESPN) (Richardson, Matthew) (Entered: 11/08/2019) |
| 11/08/2019 | 107 | REPLY to Response to Motion re 95 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by James Gatto. (Barbier, Deborah) (Entered: 11/08/2019) |
| 11/08/2019 | 108 | REPLY to Response to Motion re 97 MOTION to Dismiss *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Christopher Rivers. (Manning, Cory) (Entered: 11/08/2019) |
| 11/08/2019 | 109 | REPLY to Response to Motion re 96 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Munish Sood. (Johnson, Wilbur) (Entered: 11/08/2019) |
| 01/16/2020 | 110 | NOTICE of Hearing on All Pending Motions; 94 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 93 MOTION to Dismiss , 96 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 97 MOTION to Dismiss *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 95 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 2/3/2020 02:00 PM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 01/16/2020) |
| 01/29/2020 | 111 | NOTICE of Cancellation of Hearing: Motions Hearing set for 2/3/2020 at 2:00PM before Judge Joseph F. Anderson, Jr. Motions to be decided without a hearing. (mflo, ) (Entered: 01/29/2020) |
| 02/27/2020 | 112 | **ORDER Defendants' Motions to Dismiss are granted as to Plaintiff's allegation of money laundering premised on tax fraud and that allegation is dismissed with** |

- 18 -

12/9/21, 1:45 PM                                CM/ECF - scd

|  |  |  |
|---|---|---|
|  |  | prejudice and the allegation of the first bribe payment is dismissed and will not be considered because it failed to satisfy Rule 9(b); Defendants' Motions to Dismiss are denied as to all remaining allegations; granting in part and denying in part <u>93</u> Motion to Dismiss; granting in part and denying in part <u>94</u> Motion to Dismiss for Failure to State a Claim; granting in part and denying in part <u>95</u> Motion to Dismiss for Failure to State a Claim; granting in part and denying in part <u>96</u> Motion to Dismiss for Failure to State a Claim; granting in part and denying in part <u>97</u> Motion to Dismiss. Signed by Honorable Joseph F Anderson, Jr on 2/27/20.(mflo, ) (Entered: 02/27/2020) |
| 04/15/2020 | <u>114</u> | *Merl Code's* ANSWER to <u>84</u> Amended Complaint,, by Merl Code.(Finger, Terry) (Entered: 04/15/2020) |
| 04/16/2020 | <u>115</u> | ANSWER to <u>84</u> Amended Complaint,, by Munish Sood.(Johnson, Wilbur) (Entered: 04/16/2020) |
| 04/16/2020 | <u>116</u> | ANSWER to <u>84</u> Amended Complaint,, , CROSSCLAIM against Thomas Gassnola, Munish Sood, Brian Bowen, Sr. by Adidas America Inc.(Richardson, Matthew) (Entered: 04/16/2020) |
| 04/16/2020 | <u>117</u> | ANSWER to <u>84</u> Amended Complaint,, by Christopher Rivers.(Manning, Cory) (Entered: 04/16/2020) |
| 04/16/2020 | <u>118</u> | ANSWER to <u>84</u> Amended Complaint,, by James Gatto.(Barbier, Deborah) (Entered: 04/16/2020) |
| 05/26/2020 | <u>119</u> | Summons Issued as to Brian Bowen, Sr. on crossclaim. (mflo, ) (Entered: 05/26/2020) |
| 05/26/2020 | <u>120</u> | Summons Issued as to Thomas Gassnola on crossclaim. (mflo, ) (Entered: 05/26/2020) |
| 05/27/2020 | <u>122</u> | SUMMONS Returned Executed by Adidas America Inc. Brian Bowen, Sr. served on 5/27/2020, answer due 6/17/2020. (Attachments: # <u>1</u> Acceptance of Service)(Richardson, Matthew) (Entered: 05/27/2020) |
| 05/27/2020 | 123 | DELETION OF DOCKET ENTRY NUMBER 121 Reason: refiled by filing user under correct event and with signature. Corrected Filing Document Number <u>122</u> (mflo, ) (Entered: 05/27/2020) |
| 05/28/2020 | <u>124</u> | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM <u>116</u> CROSSCLAIM by Munish Sood. Response to Motion due by 6/11/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # <u>1</u> Memo in Support, # <u>2</u> Exhibit A - Transcript of Plea, # <u>3</u> Exhibit B - Transcript of Sentence)No proposed order.(Johnson, Wilbur) to add filing link(mflo, ). (Entered: 05/28/2020) |
| 06/05/2020 | <u>125</u> | Consent MOTION for Extension of Time to File Response/Reply as to <u>124</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Adidas America Inc. Response to Motion due by 6/19/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Richardson, Matthew) (Entered: 06/05/2020) |
| 06/09/2020 | 126 | **TEXT ORDER Granting <u>125</u> Consent MOTION for Extension of Time to File Response to <u>124</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Adidas America Inc with reply brief to be filed by 8/13/20. ( Response to Motion due by 7/23/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ). Directed by Honorable Joseph F Anderson, Jr on 6/9/20. (mflo, ) (Entered: 06/09/2020)** |
| 06/10/2020 | <u>127</u> | SUMMONS Returned Executed by Adidas America Inc. Thomas Gassnola served on |

| | | 6/6/2020, answer due 6/29/2020. (Attachments: # 1 Affidavit of Service)(Richardson, Matthew) (Entered: 06/10/2020) |
|---|---|---|
| 06/18/2020 | 128 | NOTICE OF SUPPLEMENTAL AUTHORITY by James Gatto *Merl Code, and Christian Dawkins*. (Attachments: # 1 Exhibit A - Kelly v. USA Opinion, # 2 Exhibit B - Second Circuit Order, # 3 Exhibit C - Defendants' Supplemental Brief, # 4 Exhibit D - Govt's Supplemental Brief)(Barbier, Deborah) Modified on 6/18/2020 edit text (mflo, ). (Entered: 06/18/2020) |
| 06/25/2020 | 129 | NOTICE of Appearance by Robert Fredrick Goings on behalf of Brian Bowen, Sr. (Goings, Robert) (Entered: 06/25/2020) |
| 06/25/2020 | 130 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Brian Bowen, Sr.. Response to Motion due by 7/9/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order. (Goings, Robert) (Entered: 06/25/2020) |
| 06/29/2020 | 132 | MOTION Motion for Status Conference by Brian Bowen, II. Response to Motion due by 7/13/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Ram, Colin) (Entered: 06/29/2020) |
| 06/30/2020 | 133 | NOTICE of Hearing: Status Conference set for 7/9/2020 02:00 PM before Honorable Joseph F Anderson Jr. The Court will conduct the conference via telephone. Counsel shall initiate the call and once everyone is on the line please call Judge Anderson at 803-765-5136. Alternatively, the parties may supply a conference call-in number to chambers. (mflo, ) (Entered: 06/30/2020) |
| 06/30/2020 | 134 | **TEXT ORDER granting 132 Motion for Status Conference. Directed by Honorable Joseph F Anderson, Jr on 6/30/20.(mflo, ) (Entered: 06/30/2020)** |
| 07/09/2020 | 135 | **Minute Entry. Proceedings held before Honorable Joseph F Anderson, Jr: Status/Rule 16 Conference held on 7/9/2020. Court will file scheduling order. Court Reporter not present. (mflo, ) (Entered: 07/09/2020)** |
| 07/09/2020 | 136 | **SCHEDULING ORDER and SPECIAL NOTICE TO COUNSEL WITH CASES BEFORE JUDGE JOSEPH F. ANDERSON, JR. Plaintiffs ID of Expert Witness due by 1/22/2021, Defendants ID of Expert Witnesses Due by 3/22/2021, Discovery due by 4/2/2021, Motions due by 4/23/2021, Jury Selection Deadline 7/6/2021. Signed by Honorable Joseph F Anderson, Jr on 7/9/20. (mflo, ) (Entered: 07/09/2020)** |
| 07/10/2020 | 137 | ANSWER to 84 Amended Complaint,, by Christian Dawkins.(Finger, Terry) (Entered: 07/10/2020) |
| 07/23/2020 | 138 | RESPONSE in Opposition re 124 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 130 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Adidas America Inc.Reply to Response to Motion due by 7/30/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Richardson, Matthew) (Entered: 07/23/2020) |
| 08/13/2020 | 139 | CROSSCLAIM against Brian Bowen, Sr., filed by Munish Sood. (Johnson, Wilbur) Modified on 8/14/2020 to edit text(mflo, ). (Entered: 08/13/2020) |
| 08/13/2020 | 140 | RESPONSE in Support re 124 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Munish Sood. (Johnson, Wilbur) (Entered: 08/13/2020) |
| 08/13/2020 | 141 | REPLY to Response to Motion re 130 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Brian Bowen, Sr.. (Gooding, Jessica) (Entered: 08/13/2020) |

| 08/28/2020 | 142 | Consent MOTION for Extension of Time *to Answer Defendant Munish Soon's Cross-Claim* by Brian Bowen, Sr.. Response to Motion due by 9/11/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Goings, Robert) (Entered: 08/28/2020) |
| 08/28/2020 | 143 | MOTION for Confidentiality Order by Adidas America Inc. Response to Motion due by 9/11/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Confidentiality Order, # 2 Proposed Confidentiality Order- Redline Version)Proposed order is being emailed to chambers with copy to opposing counsel.(Richardson, Matthew) Modified on 8/31/2020 to edit text at the request of filing user (mflo, ). (Entered: 08/28/2020) |
| 08/31/2020 | 144 | **TEXT ORDER granting in part 142 Motion for Extension of Time to Answer defendant Munish Sood's crossclaim by Brian Bowen, Sr. (Answer to crossclaim by Brian Bowen, Sr due by 9/10/20). Directed by Honorable Joseph F Anderson, Jr on 8/31/20.(mflo, ) (Entered: 08/31/2020)** |
| 09/10/2020 | 145 | MOTION to Dismiss *Cross Claims Brought by Munish Sood and Memorandum in Support* by Brian Bowen, Sr.. Response to Motion due by 9/24/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Goings, Robert) (Entered: 09/10/2020) |
| 09/11/2020 | 146 | Rule 26(f) Report by Adidas America Inc.(Richardson, Matthew) (Entered: 09/11/2020) |
| 09/11/2020 | 147 | RESPONSE in Opposition re 143 MOTION for Confidentiality Order Response filed by Brian Bowen, II.Reply to Response to Motion due by 9/18/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Ram, Colin) Modified on 9/14/2020 to edit text (mflo, ). (Entered: 09/11/2020) |
| 09/18/2020 | 148 | MOTION to Seal by Adidas America Inc. Response to Motion due by 10/2/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Ex. A - List of Documents to be Sealed)No proposed order.(Richardson, Matthew) (Entered: 09/18/2020) |
| 09/18/2020 | 149 | REPLY to Response to Motion re 143 MOTION for Confidentiality Order Response filed by Adidas America Inc. (Attachments: # 1 Declaration of Keith McIntire, # 2 Exhibit 1 - Grand Jury Subpoena, Sept. 26, 2017, # 3 Exhibit 2 - Chicago Public School Budget Proposal, # 4 Exhibit 3 - Invoice re Payment dated July 19, 2017, # 5 Exhibit 4 - W-9 with personal banking information attached, # 6 Exhibit 6 - Sports Marketing Planning 2020, # 7 Exhibit 7 - US Team Rooming List for Eurocamp, # 8 Exhibit 8 - Bowen Jr.'s First Set of RFPs to adidas, # 9 Exhibit 9 - Bowen Jr.'s First Set of RFPs to Gatto, # 10 Exhibit 10 - Email Correspondence between William Taft and Colin Ram, # 11 Exhibit 11 - Basketball-Working Budget SBP, # 12 Exhibit 12 - Letter from William Taft to Colin Ram)(Richardson, Matthew) (Entered: 09/18/2020) |
| 09/21/2020 | 150 | UNREDACTED DOCUMENT *Movant's Reply in Support of the Motion for Entry of a Confidentiality Order* by Adidas America Inc. (Richardson, Matthew) (Entered: 09/21/2020) |
| 09/24/2020 | 151 | RESPONSE in Opposition re 145 MOTION to Dismiss *Cross Claims Brought by Munish Sood and Memorandum in Support* Response filed by Munish Sood.Reply to Response to Motion due by 10/1/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Johnson, Wilbur) (Entered: 09/24/2020) |
| 09/25/2020 | 152 | **ORDER granting 143 Motion for Confidentiality Order; denying as moot 148 Motion to Seal. Signed by Honorable Joseph F Anderson, Jr on 9/25/20.(mflo, ) (Entered: 09/25/2020)** |

- 21 -

| 09/25/2020 | 153 | **CONFIDENTIALITY ORDER Signed by Honorable Joseph F Anderson, Jr on 9/25/20. (mflo, ) (Entered: 09/25/2020)** |
| 09/28/2020 | 156 | DELETION OF DOCKET ENTRY NUMBER 154 and 155 Reason: document is not to be filed only served and exchanged between parties. (mflo, ) (Entered: 09/28/2020) |
| 10/22/2020 | 157 | Rule 26(f) Report by Brian Bowen, II.(Ram, Colin) (Entered: 10/22/2020) |
| 10/22/2020 | 158 | Local Rule 26.03 Answers to Interrogatories by Brian Bowen, II.(Ram, Colin) (Entered: 10/22/2020) |
| 10/23/2020 | 159 | **ORDER denying 124 Motion to Dismiss for Failure to State a Claim by Munish Sood as to the Crossclaims brought by Adidas America Inc's; denying 130 Motion to Dismiss for Failure to State a Claim by Brian Bowen, Sr as to the Crossclaims brought by Adidas America Inc's; granting 145 Motion to Dismiss by Brian Bowen Sr as to the Crossclaims brought by Munish Sood. Signed by Honorable Joseph F Anderson, Jr on 10/23/2020.(jpet, ) Modified on 11/9/2020 to add text (mflo, ). (Entered: 10/23/2020)** |
| 11/03/2020 | 160 | MOTION to Appear Pro Hac Vice by Thomas Cordova ( Filing fee $ 350 receipt number 0420-9448806) by Munish Sood. Response to Motion due by 11/17/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit A - Affidavit/Application, # 2 Exhibit B - Certificate of Good Standing)Proposed order is being emailed to chambers with copy to opposing counsel.(Johnson, Wilbur) (Entered: 11/03/2020) |
| 11/05/2020 | 161 | REPLY to Crossclaim 116 by Brian Bowen, Sr..(Goings, Robert) (Entered: 11/05/2020) |
| 11/06/2020 | 162 | **TEXT ORDER granting 160 Motion for Thomas H. Cordova to Appear Pro Hac Vice for defendant Munish Sood. Directed by Honorable Joseph F Anderson, Jr on 11/6/20.(mflo, ) (Entered: 11/06/2020)** |
| 11/19/2020 | 164 | MOTION to Quash *or in the Alternative Motion for a Protective Order* by James Gatto. Response to Motion due by 12/3/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit Exhibit A - Notice of Subpoena, # 3 Exhibit Exhibit B - First Requests to Produce to Gatto, # 4 Exhibit Exhibit C - Gatto's Responses to Requests to Produce)No proposed order.(Barbier, Deborah) (Entered: 11/19/2020) |
| 11/24/2020 | 165 | MOTION to Compel by Adidas America Inc. Response to Motion due by 12/8/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Declaration of Matthew D. Forbes, # 2 Ex. A - adidas's RFPs, # 3 Ex. B - Plaintiff's Responses and Objections to RTP, # 4 Ex. C - Letter from M Forbes to C Ram, # 5 Ex. D - Plaintiff's Initial Disclosures, # 6 Ex. E - Bowen Instagram Screenshots, # 7 Ex. F - Bowen Twitter Screenshots)No proposed order.(Richardson, Matthew) (Entered: 11/24/2020) |
| 11/24/2020 | 166 | MOTION to Compel *Adidas America, Inc.* by Brian Bowen, II. Response to Motion due by 12/8/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Ex 1 Pl's RFPs to Adidas, # 2 Exhibit Ex 2 Adidas's RFP Response, # 3 Exhibit Ex 3 Skechers Complaint, # 4 Exhibit Ex 4 Oct 16 2020 Ltr, # 5 Exhibit Ex 5 Skechers Docket, # 6 Exhibit Ex 6 Nov 6 2020 Ltr, # 7 Exhibit Ex 7 UofL NOA, # 8 Exhibit Ex 8 KU Statement, # 9 Exhibit Ex 9 Discovery Email)No proposed order.(Ram, Colin) (Entered: 11/24/2020) |
| 12/03/2020 | 167 | RESPONSE in Opposition re 164 MOTION to Quash *or in the Alternative Motion for a Protective Order* Response filed by Brian Bowen, II.Reply to Response to Motion due by 12/10/2020 Add an additional 3 days only if served by mail or otherwise allowed under |

**- 22 -**

| | | |
|---|---|---|
| | | Fed. R. Civ. P. 6. (Attachments: # 1 Declaration of Colin Ram, # 2 Exhibit Ex A - hrg'g tr. excerpts, # 3 Exhibit Ex B - Oct 13, 2020 email, # 4 Exhibit Ex C - Nov 3, 2020 email, # 5 Exhibit Ex D - Gatto Ltr dtd 3-13-19, # 6 Exhibit Ex E - Art of Org, # 7 Exhibit Ex F - Annual Report, # 8 Exhibit Ex G - Gatto profile, # 9 Exhibit Ex H - Gatto Ltr dtd 4-30-19, # 10 Exhibit Ex I - Gatto Ltr dtd 5-29-19)(Ram, Colin) (Entered: 12/03/2020) |
| 12/04/2020 | 168 | MOTION to Compel *Defendant Christian Dawkins to Respond to Plaintiff's First Set of Requests for Production of Documents* by Brian Bowen, II. Response to Motion due by 12/18/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Ex 1 Dawkins Initial Disclosures, # 2 Exhibit Ex 2 - RFP to Dawkins, # 3 Exhibit Ex 3 - Rule 11 Steve Haney dtd 11-20-20)No proposed order.(Ram, Colin) (Entered: 12/04/2020) |
| 12/08/2020 | 169 | RESPONSE in Opposition re 166 MOTION to Compel *Adidas America, Inc.* Response filed by Adidas America Inc.Reply to Response to Motion due by 12/15/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Declaration of Matthew Forbes, # 2 Declaration of Sara Vanderhoff, # 3 Ex. A - Bowen Jr First Request for Producion to adidas, # 4 Ex. B Skechers v adidas Docket Sheet, # 5 Ex. C Email from Shannon York to Paul Ehrlich, May 4, 2018, # 6 Ex. D Letter from Condoleezza Rice to adidas AG, Apr. 27, 2018, # 7 Ex. E Email from Steven Berryman to Andrew Ceresney, Oct. 30, 2020, # 8 Ex. F Attachment to Berrymans Oct. 30, 2020 Email, # 9 Ex. G Email from Andrew Ceresney to Steven Berryman, Nov. 9, 2020, # 10 Ex. H adidas's Responses to Bowen Jr 1st Request for Production)(Richardson, Matthew) (Entered: 12/08/2020) |
| 12/08/2020 | 170 | RESPONSE in Opposition re 165 MOTION to Compel Response filed by Brian Bowen, II.Reply to Response to Motion due by 12/15/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Ram, Colin) (Entered: 12/08/2020) |
| 12/10/2020 | 171 | REPLY to Response to Motion re 164 MOTION to Quash *or in the Alternative Motion for a Protective Order* Response filed by James Gatto. (Attachments: # 1 Exhibit Exhibit A - Affirmation of Consultation)(Barbier, Deborah) (Entered: 12/10/2020) |
| 12/15/2020 | 172 | REPLY to Response to Motion re 165 MOTION to Compel Response filed by Adidas America Inc. (Attachments: # 1 Declaration of Matthew Forbes, # 2 Ex. A Correspondence Between adidas Counsel and Pl.s Counsel, Aug. 1121, 2020, # 3 Ex. B Draft Rule 26(f) Report, # 4 Ex. C Letter from William Taft to Colin Ram Oct. 7, 2020, # 5 Ex. D Correspondence Between adidas Counsel and Pl.s Counsel, Oct. 5-21, 2020, # 6 Ex. E Bowen Jr.'s Rule 26(a)(1) Initial Disclosures, # 7 Ex. F Letter from Matthew Forbes to Colin Ram, Oct. 16, 2020, # 8 Ex. G Correspondence Between adidas Counsel and Pl.s Counsel., Nov. 12-23, 2020)(Richardson, Matthew) (Entered: 12/15/2020) |
| 12/18/2020 | 173 | RESPONSE in Opposition re 168 MOTION to Compel *Defendant Christian Dawkins to Respond to Plaintiff's First Set of Requests for Production of Documents* Response filed by Christian Dawkins.Reply to Response to Motion due by 12/29/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Appendix Index of Exhibits in Opposition to Plaintiff's Motion to Compel, # 2 Exhibit Exhibit A to Memorandum in Opposition to Plaintiff's Motion to Compel, # 3 Exhibit Exhibit B to Memorandum in Opposition to Plaintiff's Motion to Compel)(Finger, Terry) (Entered: 12/18/2020) |
| 01/11/2021 | 174 | MOTION to Compel *Christopher Rivers* by Brian Bowen, II. Response to Motion due by 1/25/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Pl's Rogs to Rivers, # 2 Exhibit Pl's RFPs to Rivers, # 3 Exhibit Rivers ROG Response, # 4 Exhibit Rivers RFP |

| | | |
|---|---|---|
| | | Response, # 5 Exhibit Meet and Confer correspondence)No proposed order.(Ram, Colin) (Entered: 01/11/2021) |
| 01/12/2021 | 175 | Consent MOTION to Amend/Correct 136 Scheduling Order, by Brian Bowen, II. Response to Motion due by 1/26/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Amended Scheduling Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Ram, Colin) See 176 , 177 , 178 , 179 , 180 181 , 182 , 183 and 190 client consent forms. (Entered: 01/12/2021) |
| 01/13/2021 | 176 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Motion to Amend SO . (Ram, Colin) (Entered: 01/13/2021) |
| 01/13/2021 | 177 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Client Consent Form for Scheduling Order . (Moran, Wesley) (Entered: 01/13/2021) |
| 01/13/2021 | 178 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Consent to Amend Scheduling Order . (Barbier, Deborah) (Entered: 01/13/2021) |
| 01/15/2021 | 179 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Consent Form by Merl Code . (Finger, Terry) (Entered: 01/15/2021) |
| 01/15/2021 | 180 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Consent Form by Munish Sood . (Johnson, Wilbur) (Entered: 01/15/2021) |
| 01/15/2021 | 181 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Consent Form by Keith McIntire . (Richardson, Matthew) (Entered: 01/15/2021) |
| 01/18/2021 | 182 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Client Consent to Extend Scheduling Order Deadlines *Christopher Vaughn-Dawkins*. (Finger, Terry) (Entered: 01/18/2021) |
| 01/18/2021 | 183 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Consent Form Dawkins . (Finger, Terry) (Entered: 01/18/2021) |
| 01/21/2021 | 184 | NOTICE of Hearing set for 1/28/2021 at 02:00 PM on Motions 165 MOTION to Compel by Adidas America Inc. and 166 MOTION to Compel Adidas America, Inc. by Brian Bowen, II. This hearing is to address the cross-motions to compel between Brian Bowen II and Adidas America, Inc. The Court will address the other pending discovery motions (ECF Nos. 164, 168, 174) separately, without a hearing, based on the parties' briefs. All attorneys need to be advised of the webex conference and should be able to join/view, but we will only hear argument from counsel for Bowen II and Adidas. Instructions for participating in the webex conference or by telephone forthcoming before Judge Joseph F. Anderson, Jr.(mflo, ) (Entered: 01/21/2021) |

| 01/22/2021 | 185 | NOTICE of Cancellation of Hearing: Motions Hearing set for 1/28/2021 at 02:00 PM before Judge Joseph F. Anderson, Jr. (mflo, ) (Entered: 01/22/2021) |
|---|---|---|
| 01/22/2021 | 186 | NOTICE of Hearing on ALL PENDING DISCOVERY MOTIONS AND TO AMEND THE SCHEDULING ORDER 164 MOTION to Quash *or in the Alternative Motion for a Protective Order*, 175 Consent MOTION to Amend/Correct 136 Scheduling Order, , 168 MOTION to Compel *Defendant Christian Dawkins to Respond to Plaintiff's First Set of Requests for Production of Documents*, 165 MOTION to Compel , 174 MOTION to Compel *Christopher Rivers*, 166 MOTION to Compel *Adidas America, Inc.* : <br><br> Motions Hearing set for 2/3/2021 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 01/22/2021) |
| 01/25/2021 | 187 | RESPONSE in Opposition re 174 MOTION to Compel *Christopher Rivers* Response filed by Christopher Rivers.Reply to Response to Motion due by 2/1/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Defendant Rivers's Responses to Plaintiff's Interrogatories and Requests for Production)(Manning, Cory) (Entered: 01/25/2021) |
| 01/29/2021 | 188 | MOTION to Continue *Hearing on Gatto's Motion to Quash* by James Gatto. Response to Motion due by 2/12/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Barbier, Deborah) (Entered: 01/29/2021) |
| 02/02/2021 | 189 | MOTION to Withdraw 188 MOTION to Continue *Hearing on Gatto's Motion to Quash* by James Gatto. Response to Motion due by 2/16/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Barbier, Deborah) (Entered: 02/02/2021) |
| 02/03/2021 | 190 | Additional Attachments to Main Document 175 Consent MOTION to Amend/Correct 136 Scheduling Order, . First attachment description: Brian Bowen Sr. Consent to Amend Scheduling Order . (Goings, Robert) (Entered: 02/03/2021) |
| 02/03/2021 | 191 | **Minute Entry. Proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing held on 2/3/2021; Dismissed as moot 166 MOTION to Compel *Adidas America, Inc.* filed by Brian Bowen, II,; taking under advisement 168 MOTION to Compel *Defendant Christian Dawkins to Respond to Plaintiff's First Set of Requests for Production of Documents* filed by Brian Bowen, II, Granting 175 Consent MOTION to Amend 136 Scheduling Order, filed by Brian Bowen, II,; taking under advisement 174 MOTION to Compel *Christopher Rivers* filed by Brian Bowen, II,; granting 164 MOTION to Quash *or in the Alternative Motion for a Protective Order* filed by James Gatto, dismissing as moot 165 MOTION to Compel filed by Adidas America Inc. Court to file written order. Court Reporter Kathleen Richardson. (mflo, ) (Entered: 02/03/2021)** |
| 02/03/2021 | 192 | **TEXT ORDER withdrawing 188 Motion to Continue motions hearing; granting 189 Motion to Withdraw 188 Motion to Continue motions hearing. Directed by Honorable Joseph F Anderson, Jr on 2/3/21.(mflo, ) (Entered: 02/03/2021)** |
| 02/05/2021 | 193 | **MEMORANDUM OPINION AND ORDER denying 168 Motion to Compel as it seeks discovery and other documents shielded pursuant to the protective orders issued in the Southern District of New York. Plaintiff and Defendant are to file a joint motion in the Southern District of New York in both criminal cases requesting authorization or modification allowing for disclosure of the discovery sought in this civil case. The joint motion shall be filed within fourteen days of the date this order** |

12/9/21, 1:45 PM | CM/ECF - scd

| | | is entered. Signed by Honorable Joseph F Anderson, Jr on 2/5/21.(mflo, ) Modified on 2/7/2021 to add text (mflo, ). (Entered: 02/05/2021) |
|---|---|---|
| 02/11/2021 | 194 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Motion hearing held on February 3, 2021, before Judge Joseph F. Anderson, Jr.. Court Reporter/Transcriber Kathleen Richardson, RMR, CRR, Telephone number/E-mail Kathleen_Richardson@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/4/2021. Redacted Transcript Deadline set for 3/15/2021. Release of Transcript Restriction set for 5/12/2021. (kari, ) (Entered: 02/11/2021) |
| 02/22/2021 | 195 | PLAINTIFF'S ID OF EXPERT WITNESSES by Brian Bowen, II.(Ram, Colin) (Entered: 02/22/2021) |
| 03/11/2021 | 196 | NOTICE of Hearing: Telephone Conference set for 3/18/2021 10:00 AM before Honorable Joseph F Anderson Jr. The matter to be discussed is in re 174 Motion to Compel by Christopher Rivers. The Court will conduct the conference via telephone. Counsel shall initiate the call and once everyone is on the line please call Judge Anderson at 803-765-5136. Alternatively, the parties may supply a conference call-in number to chambers.(mflo, ) (Entered: 03/11/2021) |
| 03/12/2021 | 197 | NOTICE OF RESCHEDULED HEARING Telephone Conference set for 3/18/2021 10:00 AM cancelled and rescheduled to:<br><br>Telephone Conference set for 3/17/2021 10:30 AM before Honorable Joseph F Anderson Jr.<br><br>The matter to be discussed is in re 174 Motion to Compel by Christopher Rivers. The Court will conduct the conference via telephone. Counsel shall initiate the call and once everyone is on the line please call Judge Anderson at 803-765-5136. Alternatively, the parties may supply a conference call-in number to chambers.(mflo, ) (Entered: 03/12/2021) |
| 03/16/2021 | 198 | PLAINTIFF'S ID OF EXPERT WITNESSES *supplement* by Brian Bowen, II.(Ram, Colin) (Entered: 03/16/2021) |
| 03/17/2021 | 199 | **Minute Entry. Proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference held on 3/17/2021; Plaintiff's motion to compel 174 Defendant Rivers to provide full and complete responses to Plaintiffs First Set of Requests for Production of Documents and First Set of Interrogatories is denied in part. The Court holds that Defendant Rivers has not waived his Fifth Amendment privilege. Therefore, Plaintiff's motion to compel is denied without prejudice and with leave to refile via a separate motion challenging the refusal of any specific discovery requests where the invocation of the privilege is not believed to be in good faith. The Court holds the motion to compel in abeyance as it pertains to discovery requests regarding litigation financing, pending Adidas's responses to similar requests. Plaintiff is ordered to advise the court if Adidass responses render this inquiry moot or if further action is necessary within 10 days of receipt of Adidas's responses. denied without prejudice with leave to refile 174 Motion to Compel. Court Reporter Teresa Johnson. (mflo, ) (Entered: 03/17/2021)** |
| 03/22/2021 | 200 | **FINAL AMENDED SCHEDULING ORDER and SPECIAL NOTICE TO COUNSEL WITH CASES BEFORE JUDGE JOSEPH F. ANDERSON, JR. Defendants ID of Expert Witnesses Due by 4/23/2021, Discovery due by 5/3/2021,** |

| | | Dispositive Motion pertaining to RICO standing by 4/12/21, Motions due by 5/24/2021, Jury Selection Deadline 7/7/2021, Mediation Due by 5/10/2021. Signed by Honorable Joseph F Anderson, Jr on 3/22/21. (mflo, ) (Entered: 03/22/2021) |
|---|---|---|
| 03/30/2021 | 202 | MOTION for Protective Order by Adidas America Inc. Response to Motion due by 4/13/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A- Deposition of Dan Cutler, # 2 Declaration of Andrew M. Levine, # 3 Declaration of William H. Taft, V, # 4 Declaration of Phillip C. Cicarelli, # 5 Declaration of Tai Park, # 6 Declaration of La'Jessica Stringfellow)No proposed order.(Richardson, Matthew) (Entered: 03/30/2021) |
| 04/08/2021 | 203 | STATUS REPORT *pursuant to March 17, 2021 Minute Order* by Brian Bowen, II. (Attachments: # 1 Exhibit Excerpt of Adidas Interrogatory Responses)(Ram, Colin) (Entered: 04/08/2021) |
| 04/08/2021 | 204 | MOTION to Seal *Exhibits to its Memorandum in Support of adidas's Motion for Summary Judgment on RICO Standing* by Adidas America Inc. Response to Motion due by 4/22/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A to Motion to Seal)No proposed order.(Richardson, Matthew) (Entered: 04/08/2021) |
| 04/08/2021 | 205 | MOTION for Summary Judgment *on RICO Standing* by Adidas America Inc. Response to Motion due by 4/22/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Declaration of Josephine R. Pututo, # 3 Exhibit 1- Order - 2/27/20, # 4 Exhibit 2 - Bowen Jr. Depo Tr., # 5 Exhibit 3 - Bowen Sr. Dep. Tr., # 6 Exhihit 4 - 247 Composite, 2017 Top Basketball Recruits, # 7 Exhibit 5 - Dawkins Trial Tr., # 8 Exhibit 6 - Gatto Trial Tr., # 9 Exhibit 7 - Pat Forde Pete Thamel Yahoo Article, # 10 Exhibit 8 - USC Report to NCAA, May 16, 2018 (1015627), # 11 Exhibit 9 - Text Messages between C. Malecke and C. Dawkins, # 12 Exhibit 10 - Email from C. Dawkins to M. Sood, Sept. 5, 2017, # 13 Exhibit 11 - Summary of Bowen Jr. Interview, Nov. 17, 2017, # 14 Exhibit 12 - Sports Illustrated Article, # 15 Exhibit 13 -Text Messages between C. Dawkins to TJ Gassanola, June 1, 2017, # 16 Exhibit 14 - Bowen Jr. Stud-Ath. Stmt., # 17 Exhibit 15 - Invoice from M. Code to J. Gatto, June 17, 2017, # 18 Exhibit 16 - Recorded Conversation between M. Code and C. Dawkins, # 19 Exhibit 17 - Recorded Conversation between M. Sood, M. Code, and J. D'Angelo, # 20 Exhibit 18 - Text Messages between C. Dawkins, M. Sood, and B. Bowen Sr., # 21 Exhibit 19 - Text messages between B. Bowen Jr and K. Johnson, # 22 Exhibit 20 - Press Conference Advisory- USAO/SDNY, # 23 Exhibit 21 - US v Gatto Criminal Complaint, # 24 Exhibit 22 - Gary Parrish CBS Tweet, 9/26/17, # 25 Exhibit 23 - Email from Shoemaker to Setchen, # 26 Exhibit 24 - Bowen Jr. Personal Statement, # 27 Exhibit 25 - Email from M. Coffay to C. Miller, # 28 Exhibit 26 - J. Carns letter to NCAA Legislative Relief Comm., # 29 Exhibit 27 - Letter from Setchen to Carns, # 30 Exhibit 28 - Letter from V. Tyra to B. Bowen Jr. 11/22/17, # 31 Exhibit 29- Louisville MBB Tweet 11/22/17, # 32 Exhibit 30 - Louisville Report to NCAA 1/5/18, # 33 Exhibit 31 - Pl's Supp Initial Disclosures, # 34 Exhibit 32 - USA Athletics Financial Aid Agree for Bowen II, # 35 Exhibit 33 - 2017-18 NCAA Bylaws, # 36 Exhibit 34 - Ltr from C. Miller to NCAA Leg Rel Comm 3/27/18, # 37 Exhibit 35 - NCAA Case Notes, Case 1015627, # 38 Exhibit 36 - Setchen Invoice to Bowen Jr, # 39 Exhibit 37 - 2018 NBA Draft Combine Invitation and Schedule 4/28/18, # 40 Exhibit 38 - Pl's Expert Bratz Report, # 41 Exhibit 39 - Letter from B Bowen II to E. Ruiz 6/11/18, # 42 Exhibit 40 - Bowen NBL Contract 8/3/18, # 43 Exhibit 41 - Rosenthal Dep Tr, # 44 Exhibit 42 - Pacers Contract 7/1/19, # 45 Exhibit 43 - The StatsCrew Brian Bowen, # 46 Exhibit 44 - Pacers Contract 11/27/20, # 47 Exhibit 45 - ESPN.com Brian Bowen II Stats, # 48 Exhibit 46 - Order, 8/8/19, # 49 Exhibit 47- Final |

| | | |
|---|---|---|
| | | Scheduling Order ECF 200, # 50 Exhibit 48 - U of L Fin Aid Agreement)No proposed order.(Richardson, Matthew) (Entered: 04/08/2021) |
| 04/08/2021 | 206 | UNREDACTED DOCUMENT by Adidas America Inc. (Richardson, Matthew) (Entered: 04/08/2021) |
| 04/09/2021 | 207 | MOTION for Summary Judgment *on RICO Standing* by Christopher Rivers. Response to Motion due by 4/23/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Manning, Cory) (Entered: 04/09/2021) |
| 04/09/2021 | 208 | NOTICE of Appearance by La'Jessica Stringfellow on behalf of Dan Cutler (Stringfellow, La'Jessica) (Entered: 04/09/2021) |
| 04/09/2021 | 209 | MOTION to Appear Pro Hac Vice by Philip C. Ciccarelli ( Filing fee $ 350 receipt number 0420-9764990) by Dan Cutler. Response to Motion due by 4/23/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Ex. A - Affidavit Application for Pro Hac Vice, # 2 Exhibit Ex. B - Certificate of Good Standing)No proposed order.(Stringfellow, La'Jessica) (Attachment 1 replaced on 4/12/2021 with notarized signature as provided by filing user) (Entered: 04/09/2021) |
| 04/09/2021 | 210 | MOTION for Summary Judgment by Merl Code and Christian Dawkins. Response to Motion due by 4/23/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Finger, Terry) (Entered: 04/09/2021) |
| 04/09/2021 | 211 | MOTION to Compel *Adidas America, Inc.* by Brian Bowen, II. Response to Motion due by 4/23/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Pl's Interrogatories to Adidas, # 2 Exhibit Adidas's Interrogatory Response)No proposed order.(Ram, Colin) (Entered: 04/09/2021) |
| 04/12/2021 | 212 | MOTION for Summary Judgment *ON RICO STANDING* by James Gatto. Response to Motion due by 4/26/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Barbier, Deborah) (Entered: 04/12/2021) |
| 04/12/2021 | 213 | First MOTION for Summary Judgment *on RICO Standing* by Brian Bowen, Sr.. Response to Motion due by 4/26/2021. (Attachments: # 1 Exhibit 1 potentially falls under Confidentiality Order, being submitted only by courtesy copy to the Court, # 2 Exhibit potentially falls under Confidentiality Order, being submitted only by courtesy copy to the Court, # 3 Exhibit potentially falls under Confidentiality Order, being submitted only by courtesy copy to the Court, # 4 Exhibit potentially falls under Confidentiality Order, being submitted only by courtesy copy to the Court) No proposed order.(Gooding, Jessica). Modified on 4/13/2021 replacing exhibits as provided by filing user (mflo, ). (Main Document 213 replaced on 4/15/2021 with a redacted document as requested by filing user) (mflo, ). (Entered: 04/12/2021) |
| 04/13/2021 | 214 | **TEXT ORDER granting 209 Motion for Philip C. Ciccarelli to Appear Pro Hac Vice on behalf of interested party Dan Cutler. Directed by Honorable Joseph F Anderson, Jr on 4/13/21.(mflo, ) (Entered: 04/13/2021)** |
| 04/13/2021 | 216 | DELETION OF DOCKET ENTRY NUMBER 215 Reason: filed in error by attorney for Brian Bowen Sr. (mflo, ) (Entered: 04/13/2021) |
| 04/14/2021 | 217 | RESPONSE in Opposition re 202 MOTION for Protective Order Response filed by Brian Bowen, II.Reply to Response to Motion due by 4/21/2021 Add an additional 3 days only |

CM/ECF - scd

| | | if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit March 31, 2021 email)(Ram, Colin) (Entered: 04/14/2021) |
|---|---|---|
| 04/15/2021 | 218 | UNREDACTED DOCUMENT re 213 First MOTION for Summary Judgment *on RICO Standing* by Brian Bowen, Sr.. (Gooding, Jessica) (Entered: 04/15/2021) |
| 04/15/2021 | 219 | MOTION to Seal *Brian Bowen Sr.'s Unredacted Motion and Memorandum in Support of Motion for Summary Judgment on RICO Claims* by Brian Bowen, Sr.. Response to Motion due by 4/29/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Gooding, Jessica) (Entered: 04/15/2021) |
| 04/21/2021 | 220 | MOTION for Leave to File Excess Pages by Brian Bowen, II. Response to Motion due by 5/5/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(McLeod, W) (Entered: 04/21/2021) |
| 04/21/2021 | 221 | **TEXT ORDER Plaintiff's Motion for Leave to File Excess Pages (ECF No. 220) is granted. Under the Court's exception to Local Civil Rule 7.05(B)(1), Plaintiff may file a single, consolidated opposition brief, not to exceed fifty (50) pages. The Court will allot an additional five (5) pages to Defendants on reply, for a total of twenty (20) pages. Filings shall comply with the deadlines in the Final Amended Scheduling Order (ECF No. 200), and the parties are advised that extensions will not be granted absent extraordinary circumstances. granting 220 Motion for Leave to File Excess Pages Directed by Honorable Joseph F Anderson, Jr on 4/21/21.(mflo, )** (Entered: 04/21/2021) |
| 04/21/2021 | 222 | REPLY to Response to Motion re 202 MOTION for Protective Order Response filed by Adidas America Inc. (Attachments: # 1 Exhibit A- Declaration submitted in American Management Services, LLC. v. Department of the Army)(Richardson, Matthew) (Entered: 04/21/2021) |
| 04/22/2021 | 223 | MOTION motion to confirm confidentiality designations and for protective order by Adidas America Inc. Response to Motion due by 5/6/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit Declaration of William H. Taft V, # 2 Affidavit Declaration of Keith McIntire, # 3 Exhibit Exhibit A - 9-25-2020 Confidentiality Order, # 4 Exhibit Exhibit B - 3-29-2021 C Ram Letter to W Taft and M Richardson, # 5 Exhibit Exhibit C - 4-13 and 4-18 W Taft Emails to M McLeod and C Ram, # 6 Exhibit Exhibit D - 4-20-2021 M McLeod Letter to W Taft, # 7 Exhibit Exhibit E - 4-21-2021 W Taft Email to M McLeod and C Ram)No proposed order.(Richardson, Matthew) (Entered: 04/22/2021) |
| 04/22/2021 | 224 | RESPONSE in Opposition re 212 MOTION for Summary Judgment *ON RICO STANDING*, 210 MOTION for Summary Judgment , 205 MOTION for Summary Judgment *on RICO Standing*, 207 MOTION for Summary Judgment *on RICO Standing* Response filed by Brian Bowen, II.Reply to Response to Motion due by 4/29/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Adidas Uprising Presentation, # 2 Exhibit Dec. 4 2016 Email, # 3 Exhibit K. Johnson Text Messages, # 4 Exhibit UofL Text Messages, # 5 Exhibit M Banker Email, # 6 Exhibit Zion Deposition, # 7 Exhibit McGuire Deposition, # 8 Exhibit 2017 Annual Report, # 9 Exhibit Feb 6. 2016 Email, # 10 Exhibit M. Ladinig Presenation, # 11 Exhibit Next Gen Presentation, # 12 Exhibit K. Johnson Deposition, # 13 Exhibit SC Supreme Contract, # 14 Exhibit Aug 30 2017 Email, # 15 Exhibit Collegiate Assets, # 16 Exhibit NCAA Statement, # 17 Exhibit Jan 14, 2014 Email, # 18 Exhibit Feb 18, 2019 Email, # 19 Exhibit TJ GGassnola trial transcript Day 2, # 20 Exhibit Gassnola 2015-16 Contract, # 21 Exhibit Feb 23, 2015 Email, # 22 Exhibit Field |

| | | |
|---|---|---|
| | | Reps, # 23 Exhibit Sole Patrol Descriptions)(McLeod, W) See 225 additional exhibits (mflo, ). (Entered: 04/22/2021) |
| 04/22/2021 | 225 | Additional Attachments to Main Document 224 Response in Opposition to Motion,,,,,. First attachment description: Opp'n to MSJ re Standing . (Attachments: # 1 Exhibit Feb 15 Black Ops Email, # 2 Exhibit TJ GGassnola trial transcript Day 1, # 3 Exhibit April 10, 2015 Email, # 4 Exhibit Soul Patrol Upcoming Missions, # 5 Exhibit Dec 22, 2015 Email, # 6 Exhibit C Hulio Email, # 7 Exhibit Dec 23, 2015, # 8 Exhibit Black Ops Mission Recap, # 9 Exhibit Feb 3, 2015 Email, # 10 Exhibit Payment Chart, # 11 Exhibit Pendleton Inv, # 12 Exhibit Jan 27, 2015 Email, # 13 Exhibit Extreme Wow Suite, # 14 Exhibit NCAA ByLaw Extracts, # 15 Exhibit UofL Endorsement Agreement, # 16 Exhibit John Carns Trial Trans Day 2, # 17 Exhibit Cert of Eligibility, # 18 Exhibit Bratz Report_Redacted, # 19 Exhibit Dawkins and Code - texts, # 20 Exhibit Athletic Tender Agreement, # 21 Exhibit NBADraft.net, # 22 Exhibit K Johnson Texts with Brian, # 23 Exhibit KJ with Brian Bowen Sr._Redacted, # 24 Exhibit B Bowen Transcript, # 25 Exhibit July 12, 2017, # 26 Exhibit Carns de bene esse Depo, # 27 Exhibit Restitution Letter- from UoL, # 28 Exhibit Gov't Sentencing Memo, # 29 Exhibit J Setchen Depo, # 30 Exhibit McFall Reports, # 31 Exhibit July 14, 2017 Wiretap, # 32 Exhibit April 27, 2015 Email Extract, # 33 Exhibit Soul Patrol Scouting Report, # 34 Exhibit NBA Draft Targets_Redacted, # 35 Exhibit Adidas Mission Statement, # 36 Exhibit Adidas email to NCAA, # 37 Exhibit Louisville Response to NOA)(McLeod, W) (Entered: 04/22/2021) |
| 04/23/2021 | 226 | **TEXT ORDER Plaintiff shall file a response to motion no later than 12:00 noon on Monday, April 26, 2021 ; re 223 MOTION motion to confirm confidentiality designations and for protective order filed by Adidas America Inc, ( Response to Motion due by 4/26/2021 at 12:00 noon). Directed by Honorable Joseph F Anderson, Jr on 4/23/21. (mflo, ) (Entered: 04/23/2021)** |
| 04/23/2021 | 227 | DEFENDANT'S ID OF EXPERT WITNESSES *and Certificate of Disclosure* by Adidas America Inc.(Richardson, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | 228 | RESPONSE in Opposition re 211 MOTION to Compel *Adidas America, Inc.* Response filed by Adidas America Inc.Reply to Response to Motion due by 4/30/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Declaration of William H. Taft V, # 2 Exhibit A - adidas' Amended Responses to Brian Bowen, Jr.'s Interrogatories)(Richardson, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | 229 | DEFENDANT'S ID OF EXPERT WITNESSES *and Certificate of Disclosure* by James Gatto.(Barbier, Deborah) (Entered: 04/23/2021) |
| 04/23/2021 | 230 | DEFENDANT'S ID OF EXPERT WITNESSES by Christopher Rivers.(Moran, Wesley) (Entered: 04/23/2021) |
| 04/26/2021 | 231 | RESPONSE in Opposition re 223 MOTION motion to confirm confidentiality designations and for protective order Response filed by Brian Bowen, II.Reply to Response to Motion due by 5/3/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (McLeod, W) (Entered: 04/26/2021) |
| 04/26/2021 | 232 | UNREDACTED DOCUMENT re 224 Response in Opposition to Motion,,,,, 225 Additional Attachments to Main Document,,,,,, by Brian Bowen, II. (Attachments: # 1 Exhibit 13 SC Supreme Contract, # 2 Exhibit 41 Bratz Report, # 3 Exhibit 45 K Johnson Texts with Brian, # 4 Exhibit 57 NBA Draft Targets)(McLeod, W) (Entered: 04/26/2021) |
| 04/26/2021 | 233 | **TEXT ORDER Defendant Adidas shall file a reply on or before Thursday, April 29, 2021 at 12:00 noon, to 231 Response in Opposition to 223 Motion, filed by Brian** |

| | | |
|---|---|---|
| | | **Bowen, II, ( Reply due by 4/29/2021.) Directed by Honorable Joseph F Anderson, Jr on 4/26/21. (mflo, ) (Entered: 04/26/2021)** |
| 04/26/2021 | 235 | **TEXT ORDER Pending the outcome of 223 MOTION motion to confirm confidentiality designations and for protective order filed by Adidas America Inc the following ECF entries are temporarily filed under seal: ECF Nos. [224-7], [224-13] and [225-15] with ECF #225-15 referenced by plaintiff as ECF #224-38. Directed by Honorable Joseph F Anderson, Jr on 4/26/21. (mflo, ) (Entered: 04/26/2021)** |
| 04/26/2021 | 236 | RESPONSE in Opposition re 213 First MOTION for Summary Judgment *on RICO Standing* Response filed by Adidas America Inc.Reply to Response to Motion due by 5/3/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Ex. 1 - Order on MTD Crossclaims, Oct. 23, 2020, # 2 Ex. 2 Bowen Sr. Dep. Tr., # 3 Ex. 3 Gatto Trial. Tr., # 4 Ex. 4 Text Message from C. Dawkins to TJ Gassnola, June 1, 2017, # 5 Ex. 5 Bowen Jr. Dep. Tr., # 6 Ex. 6 - Email from M. Code to J. Gatto, June 5, 2017, # 7 Ex. 7 - Email from J. Gatto to T. Ames, June 13, 2017, # 8 Ex. 8 Ames Dep. Tr., # 9 Ex. 9 Email from J. Gatto to O. Guidera, June 19, 2017, # 10 Ex. 10 Email from T. Ames to J. Gatto, June 22, 2017, # 11 Ex. 11 Email from M. Code to O. Guidera, Jul. 6, 2017, # 12 Ex 12 Recorded Conversation between M. Code and C. Dawkins, July 7, 2017, # 13 Ex. 13 Recorded Conversation between M. Sood, M. Code, and J. D'Angelo, July 10, 2017, # 14 Ex. 14 Text Messages between C. Dawkins, M. Sood, and B. Bowen Sr., July 13, 2017, # 15 Ex. 15 Email from J. Gatto to T. Ames, Jul. 25, 2017, # 16 Ex. 16 Harksen Dep. Tr., # 17 Ex. 17 Email from T. Ames to J. Gatto and O. Guidera, Jul. 26, 2017, # 18 Ex. 18 Karolina Khaos Wells Fargo Checking Account Statements, # 19 Ex. 19 Checks from Karolina Khaos to LOYD, Inc, # 20 Ex. 20 Text Messages between M. Code and R. Robertson, # 21 Ex. 21 Text Messages between C. Dawkins and M. Code, # 22 Ex. 22- Recorded Conversation between M. Code and J. Gatto, Sept. 13, 2017, # 23 Ex. 23 - Email from M. Code to J. Gatto, Sept. 14, 2017, # 24 Ex. 24 Email from J. Gatto to O. Guidera, Sept. 14, 2017, # 25 Ex. 25 Text Messages between R. Robertson and M. Code, Sept. 21, 2017, # 26 Ex. 26 Metadata of Text Messages between C. Dawkins and M. Code, Sept. 21, 2017, # 27 Ex. 27 Bowen Sr. Non-Prosecution Agreement, # 28 Ex. 28 Armstrong Dep. Tr., # 29 Ex. 29 McGuire Dep. Tr)(Richardson, Matthew) (Entered: 04/26/2021) |
| 04/27/2021 | 237 | MOTION for Protective Order *on Non-Party Subpoenas to Bank of America and Bank of the West* by Christopher Rivers. Response to Motion due by 5/11/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Notice of Sub - Bank of America, # 2 Exhibit B - Notice of Sub - Bank of the West, # 3 Exhibit C - Notice of Sub - Bank of the West 2)No proposed order.(Manning, Cory) (Entered: 04/27/2021) |
| 04/28/2021 | 238 | REPLY to Response to Motion re 223 MOTION motion to confirm confidentiality designations and for protective order Response filed by Adidas America Inc. (Attachments: # 1 Declaration of William H. Taft V, # 2 Exhibit A - Cloniger Article April 23, 2021, # 3 Exhibit B - Haynes Article April 23, 2021, # 4 Exhibit C - Email from William Taft to McLeod April 24, 2021, # 5 Exhibit D - Certification of Matthew Forbes, # 6 Exhibit E - Letter from William Taft to Colin Ram September 18, 2020, # 7 Exhibit F - Email from Tristan Ellis to Counsel April 21, 2021)(Richardson, Matthew) (Entered: 04/28/2021) |
| 04/29/2021 | 239 | **ORDER granting 202 Motion for Protective Order between Adidas and Cutler and denies any fees and costs associated with the protective oder; granting 204 Motion to Seal by Adidas to seal 10 exhibits attached to Adidas's memorandum in support of motion for summary judgment on RICO ; granting 219 Motion to Seal by Bowen, Sr. Court will set a hearing on discovery motions for 5/10/21 at 2:00pm. Signed by** |

|  |  | Honorable Joseph F Anderson, Jr on 4/29/21.(mflo, ) (Main Document 239 replaced on 4/29/2021 to correct a typographical error) (mflo, ). (Entered: 04/29/2021) |
|---|---|---|
| 04/29/2021 | 240 | NOTICE of Hearing on Motion 211 MOTION to Compel *Adidas America, Inc.*, and 223 MOTION to confirm confidentiality designations and for protective order : Motion Hearing set for 5/10/2021 02:00 PM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 04/29/2021) |
| 04/29/2021 | 241 | MOTION to Seal *Exhibits to Its Reply in Support of adidas's Motion for Summary Judgment on RICO Standing* by Adidas America Inc. Response to Motion due by 5/13/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - List of Exhibits to be Sealed)No proposed order.(Richardson, Matthew) (Entered: 04/29/2021) |
| 04/29/2021 | 242 | REPLY to Response to Motion re 205 MOTION for Summary Judgment *on RICO Standing* Response filed by Adidas America Inc. (Attachments: # 1 Ex. A - Excerpts from Deposition of Kenneth Johnson, # 2 Ex. B - 10.23.2020 Order on Motion to Dismiss Crossclaims, # 3 Ex. C - Excerpts from Deposition of Univ. of Louisville - Rivers Notice, # 4 Ex. D - 4.2.2018 Email from J. Whitehead to M. Banker, # 5 Ex. E - Excerpts from Deposition of Law Office of Jason A. Setchen, P.A, # 6 Ex. F - Excerpts from Deposition of Univ. of Louisville - Plaintiff Notice, # 7 Ex. G - Excerpts from Gatto Trial Transcript, # 8 Ex. H - Excerpts from Deposition of Brian Bowen, Sr)(Richardson, Matthew) (Entered: 04/29/2021) |
| 04/29/2021 | 243 | UNREDACTED DOCUMENT re 242 Reply to Response to Motion,, by Adidas America Inc. (Richardson, Matthew) (Entered: 04/29/2021) |
| 04/29/2021 | 244 | REPLY to Response to Motion re 207 MOTION for Summary Judgment *on RICO Standing* Response filed by Christopher Rivers. (Moran, Wesley) (Entered: 04/29/2021) |
| 04/29/2021 | 245 | REPLY to Response to Motion re 212 MOTION for Summary Judgment *ON RICO STANDING* Response filed by James Gatto. (Barbier, Deborah) (Entered: 04/29/2021) |
| 04/30/2021 | 248 | DELETION OF DOCKET ENTRY NUMBER 247 Reason: Filed using the incorrect event and attorney is refiling. (mflo, ) (Entered: 04/30/2021) |
| 04/30/2021 | 249 | Sealed Document in re document 205 . (Attachments: # 1 Ex. 11 - Summary of Bowen Jr. Interview, Nov. 17, 2017, # 2 Ex. 23 - Email from Shoemaker to Setchen, # 3 Ex. 25 - Email from M Coffay to C Miller, # 4 Ex. 27 - Letter from Setchen to Carns, # 5 Ex. 30 - Louisville Report to NCAA, Jan. 5, 2018, # 6 Ex. 35 - NCAA Case Notes, Case 1015627, # 7 Ex. 36 - Setchen Invoice to Bowen Jr., # 8 Ex. 40 - Bowen NBL Contract, Aug. 3, 2018, # 9 Ex. 42 - Pacers Contract, Jul. 1, 2019, # 10 Ex. 44 - Pacers Contract, Nov. 27.2020)(Richardson, Matthew) (Entered: 04/30/2021) |
| 04/30/2021 | 251 | UNREDACTED DOCUMENT re 250 Reply to Response to Motion by Brian Bowen, II. (Attachments: # 1 Exhibit April 12, 2021 Ltr from W. Taft)(Ram, Colin) (Entered: 04/30/2021) |
| 04/30/2021 | 250 | REPLY to Response to Motion re 211 MOTION to Compel *Adidas America, Inc.* Response filed by Brian Bowen, II. (Attachments: # 1 Exhibit April 12, 2021 Ltr from W. Taft, # 2 Exhibit Zion Armstrong Depo Excerpts) Refiled for event type 5/3/2021.(jpet, ) (Entered: 05/03/2021) |
| 05/03/2021 | 252 | MOTION for Protective Order by Adidas America Inc. Response to Motion due by 5/17/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 - Brian Bowen Jr.'s First Request for Admission to adidas America, # 2 Exhibit 2 - adidas Responses to Brian |

| | | |
|---|---|---|
| | | Bowen Jr. Request for Admission, # 3 Exhibit 3 - Email from W.H. Taft to W.M. McLeod and C.V. Ram, Apr. 18, 2021)No proposed order.(Richardson, Matthew) (Entered: 05/03/2021) |
| 05/05/2021 | 253 | **TEXT ORDER The parties are hereby advised that counsel shall be prepared to address all outstanding discovery motions at the May 10 hearing. An accelerated briefing schedule will not be imposed. Directed by Honorable Joseph F Anderson, Jr on 5/5/21. (mflo, ) (Entered: 05/05/2021)** |
| 05/10/2021 | 254 | REPLY by Adidas America Inc to 203 Status Report *adidas's Response to Bowen, Jr.'s Notice Regarding adidas's Interrogatory Responses*. (Attachments: # 1 Exhibit 1- adidas's Second Amended Responses to Plaintiff's Brian Bowen, Jr.'s First Set of Interrogatories) (Richardson, Matthew) (Entered: 05/10/2021) |
| 05/10/2021 | 255 | **Minute Entry. Proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing held on 5/10/2021 ; Court heard oral arguments on the following motions and will file a written order ; re 237 MOTION for Protective Order *on Non-Party Subpoenas to Bank of America and Bank of the West* filed by Christopher Rivers, 223 MOTION to confirm confidentiality designations and for protective order filed by Adidas America Inc, 211 MOTION to Compel *Adidas America, Inc.* filed by Brian Bowen, II, 241 MOTION to Seal *Exhibits to Its Reply in Support of adidas's Motion for Summary Judgment on RICO Standing* filed by Adidas America Inc, 252 MOTION for Protective Order filed by Adidas America Inc. Court Reporter Karen Andersen. (mflo, ) (Entered: 05/11/2021)** |
| 05/11/2021 | 256 | RESPONSE in Opposition re 237 MOTION for Protective Order *on Non-Party Subpoenas to Bank of America and Bank of the West* Response filed by Brian Bowen, II.Reply to Response to Motion due by 5/18/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Oregon Sec of State record, # 2 Exhibit Apr 4 2021 email from Rivers' counsel, # 3 Exhibit Rivers and Pendleton email, # 4 Exhibit Placeholder (ADID...89454), # 5 Exhibit TD Bank Records (redacted), # 6 Exhibit Synchrony Bank letter (redacted), # 7 Exhibit Placeholder (ADID...473))(Ram, Colin) (Entered: 05/12/2021) |
| 05/12/2021 | 257 | UNREDACTED DOCUMENT re 256 Response in Opposition to Motion,, by Brian Bowen, II. (Attachments: # 1 Exhibit Ex. 4 ADID 89454, # 2 Exhibit Ex. 5 TD Bank Excerpts, # 3 Exhibit Ex. 6 Synchrony Letter, # 4 Exhibit Ex. 7 ADID 00472 - written warning)(Ram, Colin) (Entered: 05/12/2021) |
| 05/16/2021 | 258 | REPLY to Response to Motion re 237 MOTION for Protective Order *on Non-Party Subpoenas to Bank of America and Bank of the West* Response filed by Christopher Rivers. (Attachments: # 1 Exhibit A - 2021.05.09 Lindholm email)(Manning, Cory) (Entered: 05/16/2021) |
| 05/17/2021 | 259 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. motion held on 5.10.21, before Judge Joseph Anderson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 6/7/2021. Redacted Transcript Deadline set for 6/17/2021. Release of Transcript Restriction set for 8/16/2021. (kand, ) (Entered: 05/17/2021) |
| 05/17/2021 | 260 | UNREDACTED DOCUMENT re 258 Reply to Response to Motion, by Christopher Rivers. (Manning, Cory) (Entered: 05/17/2021) |
| 05/17/2021 | 261 | **TEXT ORDER It is hereby ordered that the Dispositive Motions deadline is** |

- 33 -

| | | |
|---|---|---|
| | | extended to June 1, 2021. All other deadlines remain in place. **Directed by Honorable Joseph F Anderson, Jr on 5/17/21.** (mflo, ) (Entered: 05/17/2021) |
| 05/19/2021 | 262 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. motion held on 5.10.21, before Judge Joseph Anderson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 6/9/2021. Redacted Transcript Deadline set for 6/21/2021. Release of Transcript Restriction set for 8/17/2021. (Attachments: # 1 Supporting Documents nonparty order form)(kand, ) (Entered: 05/19/2021) |
| 05/19/2021 | 263 | Letter from Matthew Richardson to withdraw confidentiality designations on one document. (Richardson, Matthew) (Entered: 05/19/2021) |
| 05/20/2021 | 264 | NOTICE of Intent to Request Redaction by Matthew T Richardson re 259 Transcript,, (Richardson, Matthew) (Entered: 05/20/2021) |
| 05/26/2021 | 265 | **MEMORANDUM OPINION AND ORDER GRANTING 212 MOTION for Summary Judgment *ON RICO STANDING* filed by James Gatto; GRANTING 210 MOTION for Summary Judgment *ON RICO STANDING* filed by Merl Code, Christian Dawkins; GRANTING 207 MOTION for Summary Judgment *on RICO STANDING* filed by Christopher Rivers; GRANTING 205 MOTION for Summary Judgment *on RICO STANDING* filed by Adidas America Inc as a matter of law. Court grants summary judgment on behalf of the nonmoving defendants Gassnola and Sood and Plaintiff's claims are dismissed, with prejudice, in their entirety. Signed by Honorable Joseph F Anderson, Jr on 5/26/21.** (mflo, ) (Entered: 05/26/2021) |
| 06/01/2021 | 266 | STIPULATION re 116 Answer to Amended Complaint, Crossclaim *Joint Stipulation to Dismiss Adidas America, Inc.'s Crossclaims* by Adidas America Inc. (Richardson, Matthew) (Entered: 06/01/2021) |
| 06/07/2021 | 267 | **ORDER The Court grants Adidas's Motion to Confirm the Confidential Designation of Certain Documents as stated in the order and all remaining motions are rendered as moot. finding as moot 211 Motion to Compel Adidas America Inc by Brian Bowen, II; finding as moot 213 Motion for Summary Judgment on RICO Standing by Brian Bowen, Sr.; granting 223 Motion to confirm confidentiality designations by Adidas America Inc; finding as moot 237 Motion for Protective Order on Non-Party Subpoenas to Bank of America and Bank of the West; finding as moot 241 Motion to Seal Exhibits to its Reply in Support of Adidas's Motion for Summary Judgment on RICO Standing by Adidas America Inc; finding as moot 252 Motion for Protective Order by Adidas America Inc. Signed by Honorable Joseph F Anderson, Jr on 6/7/21.**(mflo, ) (Entered: 06/07/2021) |
| 06/07/2021 | 268 | JUDGMENT: IT IS ORDERED AND ADJUDGED that summary judgment is hereby entered in favor of defendants, Adidas America, Inc., James Gatto, Merl Code, Christian Dawkins, Munish Sood, Thomas Gassnola, and Christopher Rivers against plaintiff, Brian Bowen, II as to all claims and this case is dismissed with prejudice.<br><br>IT IS FURTHER ORDERED AND ADJUDGED that cross-claimant, Munish Sood shall take nothing from cross defendant Brian Bowen, Sr., these claims are dismissed with prejudice. (mflo, ) (Entered: 06/07/2021) |
| 06/16/2021 | 269 | BILL OF COSTS by Adidas America Inc.Objections to Bill of Costs deadline 6/30/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. |

|  |  | P. 6. (Attachments: # 1 Memo in Support, # 2 Exhbit 1- Itemized Costs and Supporting Documents, # 3 Exhibit 2 - Plaintiff's Answers to adidas America's First Set of Interrogatories)(Richardson, Matthew) (Main Document 269 replaced on 6/17/2021 so as to flatten PDF) (ahil) (Entered: 06/16/2021) |
|---|---|---|
| 06/16/2021 | 270 | BILL OF COSTS by Christopher Rivers.Objections to Bill of Costs deadline 6/30/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Invoices, # 2 Exhibit B - Pl's Answers to Df adidas First Interrogatories (served 05.04)) Please see additional attachments at 271 . (Moran, Wesley) Modified on 7/6/2021 to edit text and create link (ahil). (Entered: 06/16/2021) |
| 06/17/2021 | 271 | Additional Attachments to Main Document 270 Bill of Costs,. First attachment description: Bill of Costs form . (Moran, Wesley) (Entered: 06/17/2021) |
| 06/17/2021 | 272 | BILL OF COSTS by James Gatto.Objections to Bill of Costs deadline 7/1/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Memo in Support, # 2 Exhibit Exhibit A - Deposition Invoice and Receipt)(Barbier, Deborah) (Entered: 06/17/2021) |
| 06/30/2021 | 273 | OBJECTIONS by Brian Bowen, II to 269 Bill of Costs, 272 Bill of Costs, 270 Bill of Costs,. (Attachments: # 1 Exhibit Itemization of Adidas Costs, # 2 Exhibit Itemization of Rivers Costs)(Ram, Colin) (Entered: 06/30/2021) |
| 07/06/2021 | 274 | MOTION for Reconsideration re 265 Order,,, Terminate Motions,, by Brian Bowen, II. Response to Motion due by 7/20/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit June 2019 Hrg'g Transcript, # 2 Exhibit Setchen Depo Transcript, # 3 Exhibit Retainer Agreement, # 4 Exhibit Bowen II Depo Transcript, # 5 Exhibit March 1, 2021 email)No proposed order.(McLeod, W) (Entered: 07/06/2021) |
| 07/06/2021 | 275 | NOTICE OF APPEAL as to 265 Order,,, Terminate Motions,, by Brian Bowen, II. - Filing fee $ 505, receipt number 0420-9942711. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Ram, Colin) (Entered: 07/06/2021) |
| 07/07/2021 | 276 | REPLY by Adidas America Inc to 269 Bill of Costs, . (Attachments: # 1 Exhibit A- Brian Bowen, Jr.'s Deposition Excerpt, # 2 Exhibit B - Brian Bowen, Jr.'s Answers to adidas' Interrogatories)(Richardson, Matthew) (Entered: 07/07/2021) |
| 07/07/2021 | 277 | REPLY by Christopher Rivers to 270 Bill of Costs, . (Moran, Wesley) (Entered: 07/07/2021) |
| 07/08/2021 | 278 | Transmittal Sheet for Notice of Appeal to USCA re 275 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mflo, ) (Entered: 07/08/2021) |
| 07/12/2021 | 279 | REPLY by James Gatto to 272 Bill of Costs, . (Barbier, Deborah) (Entered: 07/12/2021) |
| 07/20/2021 | 281 | RESPONSE in Opposition re 274 MOTION for Reconsideration re 265 Order,,, Terminate Motions,, Response filed by Adidas America Inc.Reply to Response to Motion due by 7/27/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Setchen Deposition, # 2 Exhibit B - U of L Deposition, Rivers Notice, # 3 Exhibit C- Bowen Sr. Deposition)(Richardson, Matthew) (Entered: 07/20/2021) |
| 07/20/2021 | 282 | UNREDACTED DOCUMENT re 281 Response in Opposition to Motion, by Adidas America Inc. (Richardson, Matthew) (Entered: 07/20/2021) |

| 07/20/2021 | 283 | RESPONSE in Opposition re 274 MOTION for Reconsideration re 265 Order,,, Terminate Motions,, Response filed by James Gatto.Reply to Response to Motion due by 7/27/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Exhibit A - Setchen Depo, # 2 Exhibit Exhibit B - Bowen Jr Depo, # 3 Exhibit Exhibit C - Bowen Sr. Depo)(Barbier, Deborah) (Entered: 07/20/2021) |
|------------|-----|---|
| 07/21/2021 | 284 | RESPONSE in Opposition re 274 MOTION for Reconsideration re 265 Order,,, Terminate Motions,, Response filed by Christopher Rivers.Reply to Response to Motion due by 7/28/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Moran, Wesley) (Entered: 07/21/2021) |
| 07/27/2021 | 285 | REPLY to Response to Motion re 274 MOTION for Reconsideration re 265 Order,,, Terminate Motions,, Response filed by Brian Bowen, II. (McLeod, W) (Entered: 07/27/2021) |
| 08/20/2021 | 286 | **MEMORANDUM OPINION AND ORDER denying 274 MOTION for Reconsideration re 265 Order filed by Brian Bowen, II Signed by Honorable Joseph F Anderson, Jr on 8/20/21.(mflo, ) (Main Document 286 replaced on 8/20/2021) (mflo, ). (Entered: 08/20/2021)** |
| 09/02/2021 | 287 | **ORDER Granting in part and denying in part 269 Bill of Costs, filed by Adidas America Inc; Granting in part and denying in part 272 Bill of Costs, filed by James Gatto; Granting and denying in part 270 Bill of Costs, filed by Christopher Rivers. Signed by Honorable Joseph F Anderson, Jr on 9/2/21. (mflo, ) (Entered: 09/02/2021)** |
| 09/02/2021 | 288 | Costs Taxed in amount of $ 20,222.69 against plaintiff, Brian Bowen, II for defendant Adidas America Inc. (mflo, ) (Entered: 09/02/2021) |
| 09/02/2021 | 289 | Costs Taxed in amount of $ 5,972.00 against Brian Bowen, II for defendant, Christopher Rivers. (mflo, ) (Entered: 09/02/2021) |
| 09/02/2021 | 290 | Costs Taxed in amount of $ 1,133.00 against Brian Bowen, II for defendant, James Gatto. (mflo, ) (Entered: 09/02/2021) |
| 09/15/2021 | 291 | Subsequent NOTICE OF APPEAL as to 286 Order on Motion for Reconsideration, by Brian Bowen, II . Filing fee $ 505, receipt number 0420-10074559. Appeal Record due by 9/30/2021. (Ram, Colin) (Entered: 09/15/2021) |
| 09/16/2021 | 292 | Transmittal Sheet for Notice of Appeal to USCA re 291 Subsequent Notice of Appeal The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mflo, ) (Entered: 09/16/2021) |
| 09/21/2021 | 294 | ORDER of USCA The court consolidates Case No. 21-1764 and Case No. 21-2029 as to 275 Notice of Appeal, filed by Brian Bowen, II, 291 Subsequent Notice of Appeal filed by Brian Bowen, II (mflo, ) (Entered: 09/21/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/09/2021 13:45:31 | | |
| **PACER Login:** | tl0027 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:18-cv-03118-JFA |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**- 36 -**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

**COLUMBIA DIVISION**

| | | |
|---|---|---|
| BRIAN BOWEN II, | ) | C/A No.: 3:18-3118-JFA |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| ADIDAS AMERICA, INC.; | ) | |
| JAMES GATTO; MERL CODE; | ) | |
| CHRISTIAN DAWKINS; MUNISH | ) | |
| SOOD; THOMAS GASSNOLA; and | ) | |
| CHRISTOPHER RIVERS | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................... 1

II. JURISDICTION AND VENUE................................................................................. 3

III. PARTIES ................................................................................................................... 4

IV. FACTUAL BACKGROUND .................................................................................... 7

    A.  THE NCAA'S $20,000,000,000 PRODUCT........................................................ 7

    B.  AMATEURISM IS THE CORE OF THE NCAA'S PRODUCT............................ 9

    C.  THE $25 BILLION SNEAKER INDUSTRY ...................................................... 13

        i.      Origins of the Sneaker Industry ........................................................... 13

        ii.     Adidas Infiltrates Amateur Athletics ................................................... 18

        iii.    The Outsized Influence of Adidas-Sponsored Grassroots Basketball ............................ 21

    D.  THE "UNIVERSITY OF ADIDAS AT LOUISVILLE"................................... 24

V. SDNY CRIMINAL INVESTIGATION ................................................................. 27

VI. OVERVIEW OF DEFENDANTS' RACKETEERING ACTIVITY ................................. 31

    A.  THE ADIDAS "BLACK OPS" BRIBERY ENTERPRISE........................................ 31

    B.  THE ADIDAS BRIBERY ENTERPRISE ENGAGED IN A PATTERN OF RACKETEERING
        ACTIVITY ................................................................................................... 40

        i.      Racketeering Activity Involving North Carolina State University ................... 50

        ii.     Racketeering Activity Involving the University of Kansas ............................... 55

        iii.    Racketeering Activity Involving the University of Miami ............................... 64

        iv.     Racketeering Activity Involving the University of Louisville

            that Injured Plaintiff ............................................................................. 66

VII. MONEY LAUNDERING CONSPIRACY IN FURTHERANCE OF THE ENTERPRISE'S
    PREDICATE ACTS ................................................................................................. 87

COUNT I ......................................................................................................................... 95

COUNT II ........................................................................................................................ 98

COUNT III..................................................................................................................... 100

COUNT IV ..................................................................................................................... 102

RELIEF REQUESTED................................................................................................... 103

DEMAND FOR JURY TRIAL ...................................................................................... 104

Plaintiff Brian Bowen II ("Brian") by and through his undersigned counsel, brings this action against Adidas America, Inc., James Gatto, Merl Code, Munish Sood, Christopher Dawkins, Thomas Gassnola, and Christopher Rivers and alleges violations of the federal Racketeering Influenced and Corrupt Organizations Act.  In support of his claims, Plaintiff hereby alleges as follows:

## I.     <u>INTRODUCTION</u>

1.     This action arises from a criminal bribery and fraud scheme spearheaded by Adidas America, its employees and consultants, numerous AAU and NCAA Division I men's basketball coaches, and certain financial intermediaries that exists to infiltrate amateur athletics by preying upon the families of top-ranked high school student-athletes in order to get their children to play basketball at Adidas-sponsored universities.

2.     This criminal enterprise has but a single motive: profit.  Profit for Adidas by annually poaching the country's top high school basketball recruits and chaining them to the Adidas-brand through increased market share in the ultra-competitive $25 billion athletic shoe market.  Profit for the co-conspirators and would-be agents who launder and funnel Adidas's bribe money through non-profit entities to secure commitments from top high school basketball recruits to attend Adidas sponsored universities.

3.     All of this profit comes at the expense of Plaintiff Brian Bowen and other student-athlete victims who, by virtue of the criminal scheme directed by Adidas and its lieutenants, lost their eligibility to play college basketball, lost their eligibility to receive financial aid necessary to continue their education, and lost the singular opportunity to develop physically and athletically into NBA draft picks at a NCAA Division I men's basketball program.

1

4.     The criminality and fraudulent conduct of the Defendants resulted in student athletes being exploited during their collegiate basketball career—once they commit to an Adidas sponsored university those students are duty bound to wear Adidas gear and to allow Adidas to market their image and likeness for corporate profit for free.

5.     Many of the families of student-athletes preyed upon by Adidas and its criminal enterprise are unsophisticated and come from poor or modest backgrounds.  Through exploitation of their social inequity and lack of representation, they became pawns of Defendants and unwittingly put their children's education and promising athletic careers in jeopardy.

6.     The purpose of this action is to hold Adidas America, a unit of a large, multi-national corporation based in Germany, and its criminal co-conspirators liable for the harm they have wrought on the life and career of Brian Bowen II.

7.     Brian came to the University of Louisville with a bright future and three reasonable expectations: (1) to further develop his God-given talents as a basketball player by participating in competitive college basketball at one of the top programs in the country under the guidance of a coach with one of the best records in NCAA history; (2) to further pursue his long-standing commitment to academic study with a level of discipline that set him apart in the eyes of college basketball coaches; and (3) to advance to the NBA at a time of his choosing based upon projections as to which round of the draft he would be selected.

8.     For Brian and other top high school basketball players, the NCAA is the proving ground for the NBA.  Top collegiate programs like the University of Louisville offer a unique, exceptional product, providing their athletes with the opportunity to compete at the highest level of college sports, often in front of large crowds and television audiences.  Top high school prospects at these top programs enjoy state-of-the-art training facilities, elite coaching, athletic

trainers, medical treatment, and nutritionists rivaling that of many professional teams. Members of the University of Louisville's men's basketball team, for example, practice and play in the $238 million athletic facility known as the KFC Yum! Center—a venue with a seating capacity larger than any NBA arena.

9.    The quality of competition offered by NCAA Division I men's basketball is superior to that found in other basketball leagues outside of the NBA, including minor league basketball and foreign professional leagues. Indeed, courts examining the college athletics market have found that "very few athletes talented enough to play . . . Division I basketball opt not to attend." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1056 (9th Cir. 2015).

10.    These benefits notwithstanding, on information and belief, injustices are routinely committed against Division I student-athletes. While some attempt to characterize a student-athlete's goals of academics and athletics as a binary choice, in reality the goals of reaching one's aptitude in the classroom and on the basketball court are parallel endeavors that are not mutually exclusive. When and where an athlete will be drafted by a professional sports team is determined by many factors that are outside of the athlete's control. What is within the athlete's control is timing his decision to forego NCAA eligibility and enter the NBA draft when his stock is at its peak. Defendants robbed Brian of control over his education and career.

## II.    <u>JURISDICTION AND VENUE</u>

11.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

12.    This Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. §§ 1965(a), (b), and (d) because Defendants Adidas America, Inc. and Merl Code reside in, are found in, have an agent in, and/or transact affairs in the District of South Carolina and the Court may exercise nationwide jurisdiction over the other named Defendants where the "ends of justice" require.  Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial.

13.    Venue is proper in this judicial district pursuant to 18 U.S.C. §§ 1965(a), (b), and (d) and 28 U.S.C. § 1391(b) for all Defendants because Defendant Adidas America, Inc. has an agent located at 2 Office Park Court, Suite 103, Columbia, South Carolina 29223 and transacts its affairs in this district, because Defendant Merl Code resides in the District of South Carolina, and because a substantial part of the events or omissions giving rise to this action occurred in the District of South Carolina.

### III.    PARTIES

14.    Plaintiff Brian Bowen II is a citizen of the United States and resident of Columbia, South Carolina.  In 2017, he was a McDonald's All-American high school basketball player, widely ranked as a five-star recruit, and was one of the most sought-after college basketball prospects in the United States.

15.    Defendant Adidas America, Inc. ("Adidas") is an athletic apparel company headquartered in Portland, Oregon.  Adidas sponsors numerous high school basketball programs, NCAA Division I college athletic programs, and professional athletes.  Adidas employs hundreds of individuals in South Carolina, from where it distributes approximately 80% of its North American sales.  Adidas directs all U.S.-based operations on behalf of Adidas A.G., a joint stock corporation organized and existing under the laws of the Federal Republic of Germany.

16.    Defendant James Gatto, on information and belief, is citizen of the United States and a resident of Oregon.  Gatto has worked for Adidas for over twenty years and, at all relevant times, served as its Director of Global Sports Marketing – Basketball.  In this role, Gatto is responsible for overseeing Adidas's high school and college basketball programs.  On September 25, 2017, Gatto was arrested and charged in a criminal complaint with three counts of wire fraud and one count of money laundering by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise described below.  *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).  At all relevant times, Gatto was acting within the scope of his employment with Adidas.

17.    Defendant Merl Code, on information and belief, is citizen of the United States and a resident of South Carolina.  At all times relevant to this complaint, Code served as consultant to Adidas and was also affiliated with various high school and college basketball programs sponsored by Adidas.  On September 25, 2017, Code was arrested and charged in a criminal complaint with two counts of wire fraud, one count of wire fraud conspiracy, and one count of money laundering conspiracy by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise described below.  *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).  According to Code, his participation in this scheme was "both directed and encouraged by Adidas."

18.    Defendant Christian Dawkins, on information and belief, is a citizen of the United States and a resident of Michigan.  Dawkins is a self-proclaimed athlete advisor and was formerly team director of the Adidas-sponsored AAU basketball team known as Dorian's Pride, a team on which Plaintiff Bowen played during his middle school years.  On September 25, 2017, Dawkins was arrested and charged in a criminal complaint with twelve felony counts, including bribery

5

conspiracy, wire fraud, and money laundering conspiracy by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise described below. *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).

19.    Defendant Munish Sood, on information and belief, is a citizen of the United States and a resident of New Jersey.  He is the founder and chief investment officer of Princeton Advisory Group, a firm that provides investment management services to institutional clients and family offices and, on information and belief, has in excess of $600 million under management.  Through his position as head of an investment firm, Sood helped Adidas funnel its bribe payments and was complicit in facilitating the use sham invoices to disguise those bribe payments on Adidas's books and records.  As set forth below in Section V, Sood is also a long-time associate of the confidential witness who disclosed the Adidas bribery scheme to federal law enforcement authorities.  On September 25, 2017, Sood was arrested and charged in a criminal complaint with twelve felony counts, including bribery conspiracy, wire fraud, and money laundering conspiracy by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise.  *See United States v. James Gatto et al.*, No. 1:17-cr-00686-LAK (S.D.N.Y.).  On August 27, 2018, Sood pleaded guilty to felony conspiracy to commit bribery, honest services fraud and Travel Act offenses; payment of bribes to an agent of a federally funded organization; and wire fraud conspiracy and entered into a non-prosecution agreement with the government on other charges related to his participation in the scheme, including making false statements to law enforcement officials immediately following his arrest.

20.    Defendant Thomas Joseph "T.J." Gassnola, on information and belief, is a citizen of the United States and a resident of Massachusetts.  At all relevant times, Gassnola was a paid outside consultant to Adidas America and reported to Defendant James Gatto.  Gassnola's work

as a consultant to Adidas included building relationships with college basketball programs, high school teams, and student-athlete recruits, for which he received over a half million dollars in compensation and fraudulent expense reimbursements.  Gassnola was also team director of the Adidas-sponsored AAU basketball team known as the New England Playaz, a program that received approximately $150,000 in sponsorship money from Adidas.   On March 30, 2018, Gassnola was arrested and charged in a criminal complaint with one count of conspiracy to commit wire fraud by the U.S. Attorney for the Southern District of New York stemming from his role in the Adidas Bribery Enterprise.  *See United States v. Thomas Gassnola*, No. 1:18-cr-00252-VM (S.D.N.Y.).  Gassnola pleaded guilty to the charge and is cooperating with the government.

21.    Defendant Christopher Rivers, on information and belief, is citizen of the United States and resides in Oregon.  Rivers has been employed by Adidas America since 2009 as Senior Player Relations Manager for Adidas's basketball division.  On information and belief, Rivers is responsible for Adidas's relationship with AAU and high school basketball teams and has authority to decide which of those teams will receive Adidas sponsorship money and merchandise.

## IV.   FACTUAL BACKGROUND

### A.   The NCAA's $20,000,000,000 Product

22.    The National Collegiate Athletic Association ("NCAA") is a non-profit organization that regulates amateur athletics at over 1,200 member colleges and universities.  Its membership is divided into three divisions: Division I includes approximately 350 college and universities, representing the nation's largest academic institutions by student population and which enjoy the largest athletic budgets; Division II includes small to medium size schools with smaller athletic budgets; and Division III includes smaller schools that do not offer or permit

athletic scholarships. Each division is further divided into conferences, within which NCAA member institutions play many of their games.

23.    Intercollegiate athletics, particularly at the Division I level, is a multi-billion-dollar industry providing enormous revenue and publicity for the NCAA, its member schools, and its conferences.

24.    Division I men's basketball is by far the largest revenue generator for the NCAA. According to the NCAA, "[t]elevision and marketing rights fees, primarily from the Division I men's basketball championship, generate the majority of our revenue. Championship ticket sales provide most of the remaining dollars."[1]

25.    In fiscal year 2017, the NCAA generated over $1.05 *billion* in revenue—almost all of which came from a multi-year broadcasting rights agreement for Division I men's basketball games with CBS Sports and Turner Broadcasting System, Inc.

26.    In 2010, CBS Sports and Turner Broadcasting entered an agreement with the NCAA to pay $10,800,000,000 for the exclusive television and multimedia broadcasting rights to the annual, three-week long Division I men's basketball national championship known as "March Madness" through 2024. The NCAA later extended its agreement with CBS and Turner through 2032 for an additional $8,800,000,000.

27.    The value of this almost $20 billion broadcasting agreement stems from the incredible popularity of college basketball in the United States. In 2018, over 97 million people in the U.S. watched the NCAA men's basketball national championship tournament, while an estimated 20% of the entire U.S. population filled out March Madness tournament brackets in hopes of picking a winner. Among the reasons consumers are attracted to amateur collegiate

---

[1]    *See* NCAA, Where Does the Money Go?, http://www.ncaa.org/about/resources/finances

sports, according to the NCAA, is "the purity of the athletic competition relative to professional sports."[2]

28.    No corporate entities benefit more from the vast popularity of college basketball than the athletic apparel industry.  According to market research from Bloomberg, the three largest athletic apparel companies (Nike, Adidas and Under Armour) stood to gain almost $1.6 billion worth of free television exposure by sponsoring teams participating in the 2017 NCAA men's basketball national championship tournament, assuming the brand logos emblazoned on team uniforms and shoes remained visible to viewers for only 20% of broadcasted game time.  The more often the shoe company logos appear on television, the more valuable the apparel sponsorship becomes.

**B.    Amateurism is the Core of the NCAA's product**

29.    The NCAA seeks to preserve amateurism in intercollegiate athletics through an extensive set of rules set forth in its constitution, bylaws, regulations, manuals, rule interpretations, and policy statements.  These rules govern all aspects of athletics, from eligibility standards for prospective students wishing to participate in college sports to the number of daily meals and snacks that college teams can provide to their players.

30.    For prospective college athletes, the NCAA rules and regulations on amateurism are far-reaching and effectively govern their day-to-day lives.  The eligibility rules dictate the games and tournaments in which high school-age and younger student-athletes can participate; what prize money they can or cannot accept; what teams they can or cannot play for or associate with; what persons they may or may not seek academic or athletic advice from; what tutoring or mentoring they may receive and from whom; what expenses they may accept in connection with

---

[2]    *See In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Antitrust Litig.*, MDL Dkt. No. 4:14-md-025410CW (N.D. Cal. Aug. 27, 2018) (ECF No. 993 at 2) (Defendants' Opening Statement).

athletic participation; what academic courses they must take in order to satisfy collegiate academic eligibility; and what financial assistance they may receive, in what form, and from whom.

31.    When it comes to student-athlete recruitment, the NCAA controls who prospective student-athletes and their parents can communicate with, as well as the timing of recruitment, the size and shape of the recruiting materials, and the opportunities for campus visits.  Student-athletes who are recruited to universities in violation of NCAA rules are at risk of being declared ineligible to participate in athletics.  Prospective student-athletes, their families, and coaches therefore must attest to the recruit's amateur status and are prohibited from receiving any benefits, including money, travel, clothing or other merchandise, directly or indirectly from a financial advisor or an agent (which is defined broadly to include anyone "who, directly or indirectly . . . seeks to obtain any type of financial gain or benefit  . . . from a student-athlete's potential earnings as a professional athlete.").  *See, e.g.*, NCAA Bylaw § 12.01.1 ("Only an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport."); §13.01.1 ("The recruitment of a student-athlete by a member institution or any representative of its athletics interests in violation of the [NCAA's] legislation . . . <u>shall result in the student-athlete becoming ineligible</u> to represent that institution in intercollegiate activities.") (emphasis added); § 13.2.1 ("An institution's staff member or any representative of its athletics interests shall not be involved, directly or indirectly, in making arrangements for or giving or offering to give any financial aid or other benefits to a prospective student-athlete or his or her relatives or friend."); § 16.01.1 ("A student-athlete shall not receive any extra benefit. Receipt by a student-athlete of an award, benefit or expense allowance not authorized by NCAA legislation <u>renders the student-athlete ineligible</u> for athletics competition in the sport for which the improper award, benefit or expense was received") (emphasis added); § 16.02.3 ("An extra benefit is any special arrangement by an

10

institutional employee or representative of the institution's athletics interests to provide a student-athlete or the student-athlete family member or friend a benefit not expressly authorized by NCAA legislation").

32.     Despite imposing significant limitations on prospective student athletes, the NCAA affords college athletic programs substantial leeway in finding talented players. Member schools are allowed to award up to thirteen athletic full scholarships in Division I basketball and can begin recruiting student-athletes *years* before they can matriculate. College coaches run camps and clinics for young children, and NCAA member institutions make scholarship offers to student-athletes as early as middle school.

33.     For young grade school children who hope to one day compete on the college basketball court, the NCAA rules go even further, permitting Division I men's basketball coaches to scout promising basketball talent while those kids are still in elementary school. *See* NCAA Bylaw 13.1.7.16.

34.     Once students-athletes matriculate at an NCAA school, the NCAA, though its member institutions, continues to impose a wide variety of conditions on student athletes. For example, student-athletes may not receive compensation beyond educational expenses approved by the NCAA; they may not retain an agent to guide them in exploration of future professional sports careers; they must meet minimum requirements for educational progress; and they are strictly limited in receiving compensation for non-athletic services that might be understood to reflect on their athletic ability. Student-athletes are also required to attest annually to their amateur status. Parents of student-athlete recruits are also required to sign similar statements attesting to their child's amateur status.

35.     The degree to which these NCAA rules permeate the lives of student-athletes in the name of amateurism is evident in reports of rule violations.  In 2013, for example, the University of Oklahoma reported to the NCAA that "[t]hree current student-athletes received food in excess of NCAA regulation at a graduation banquet" because "[t]he players were provided pasta in excess of the permissible amount allowed."  As punishment, the three offending Oklahoma football players were "required to donate $3.83 each (the cost of the pasta serving) to a charity of their choice in order to be reinstated."[3]

36.     Despite the NCAA's capacity to enforce rule violations against athletes, it has struggled since its inception to effectively and consistently police its amateurism rules against outside influences.  Indeed, there has long been an intense competition among colleges to field the best athletic teams.  In the early 1920s, it was common place for colleges to pay their athletes under the table in a variety of creative ways; a 1929 study found that 81 out of 112 schools surveyed provided some sort of improper inducement to their athletes.  *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1054 (9th Cir. 2015).  In 1948, the NCAA sought to strengthen its enforcement capabilities by adopting the "Sanity Code" – a set of rules that prohibited schools from providing student-athletes with financial aid that was based on athletic ability and not available to other students.  The Sanity Code also created a new Compliance Committee that could terminate an institution's NCAA membership.  *See* Daniel E. Lazaroff, *The NCAA in Its Second Century: Defender of Amateurism or Antitrust Recidivist*, 86 OR. L. REV. 329, 333 (2007).  Since the Sanity Code days, the NCAA has struggled in its efforts to effectively and consistently enforce its rules and regulations over amateur athletics.

---

[3]        *See* Ryan Aber, *OU Releases List of Self-Reported NCAA Violations*, NEWSOK, Feb. 18, 2014, *available at* https://newsok.com/article/3934985/ou-releases-list-of-self-reported-ncaa-violations

37.    Notably absent from any of the NCAA rules or regulations is any proscription or limitation on the amount of money that large corporate interests can pour into college sports and university athletic programs.  Though the NCAA concedes that "corporations are willing to pay premium prices for the opportunity to put their products before the eyes of an enormous audience,"[4] it has failed to implement any meaningful restrictions on corporate interests despite its constitutional mandate to protect student-athletes "from exploitation by professional and commercial enterprises."[5]

38.    As a result, large corporations in general, and Adidas more particularly, stand to benefit from associating their brands with talented student-athletes and are free to use their power, money, and influence in the world of basketball to coerce young athletes and their families into eligibility-destroying conduct, but suffer no penalty for doing so.

39.    The NCAA's ineffective enforcement scheme was, at all times relevant hereto, known by and exploited by the Defendants.

**C.    The $25 billion Sneaker Industry**

**i.    Origins of the Sneaker Industry**

41.    In the world of basketball, Adidas's three-stripe logo is everywhere.  From high school leagues and college teams to the NBA, Adidas has poured billions into sponsorships of individual ball players and teams over the past decade in a drive to gain market share in the hyper-competitive athletic shoe market.

---

[4]    NCAA TASK FORCE ON COMMERCIAL ACTIVITY IN DIVISION I INTERCOLLEGIATE ATHLETICS, FINAL REPORT SUPPLEMENT NO. 6 ADDENDUM TO DIVISION I BOARD OF DIRECTORS 3 (2009).

[5]    NAT'L COLLEGIATE ATHLETIC ASS'N, CONSTITUTION § 2.9.

13

42.     Dubbed the "sneaker industry," this market is dominated by three main players: Nike, Under Armour, and Adidas.  These companies amassed over $25 billion in sales in 2013, and revenue today continues to skyrocket.

43.     The largest driver of sneaker sales in the U.S. are consumers in the 18 to 34-year-old demographic.  In 2014, they accounted for over $21 billion in footwear sales and continue to drive tremendous demand today.  Yet, the sale of sneakers was not always a multi-billion-dollar enterprise.

44.     The origins of the sneaker culture date back to the 1920s, when a charismatic young basketball player named Chuck Taylor joined forces with the Converse Rubber Shoe Company, an outfit best known at the time for its rubber galoshes.  Taylor became a part-time salesman and part-time player-coach for the company's club basketball team.  Travelling around the country, Taylor taught young kids the game of basketball while wearing the company's rubber-soled canvas lace-up.  After he suggested adding ankle support to the shoe, the Converse All Star was born.  Not long after, Taylor signed a contract with Converse to add his name to the shoe, and in 1934 the All Star became known as the Chuck Taylor All Star, thus marking the first athlete endorsement of a shoe.  It has been estimated that 60% of Americans have owned at least one pair of "Chucks" in their lifetime.



*Converse "Chuck Taylor" All Star circa 1957*

45.     As it turns out, Chuck Taylor was not a terribly talented basketball player, but he knew how to pitch shoes to the young kids who watched him play.  His legacy, and Converse's market share in basketball, dominated for decades.  By the 1970s, legendary college coaches such as Kentucky's Joe B. Hall and North Carolina's Dean Smith had outfitted their teams in All Stars, thus proving to the sneaker industry the profitability of identifying shoes with star players.

46.     Adidas, on the other hand, struggled to gain market share in the lucrative and growing U.S. sneaker market during the 1950s and 1960s; however, on information and belief, over time it came to recognize the profits that could flow from associating an athletic shoe with an individual player.

47.     In 1971, Adidas's original tennis shoe was renamed and rebranded as the "Stan Smith" after the acclaimed tennis champion Stan Smith, who at that time was ranked No. 1 in the world.  For Adidas, associating its tennis shoe with an individual player became a market opener in the U.S. that would pay dividends for years.  Since its introduction, Adidas has sold 30 million pairs of Stan Smith sneakers.

48.     From the 1970's through the present, Adidas embarked on a marketing strategy to increase corporate profits by pairing an athlete's likeness with their product. This market strategy was so profitable for Adidas that it later ventured outside the sports market with the same profitable strategy, signing sneaker endorsement deals with popular musicians and celebrities such as Pharrell Williams and Kanye West.

Adidas's "Pharrell Williams Solarhu Tennis V2 Shoe"



Adidas's "Kanye West Yeezy Boost 350"



49.     Converse and Adidas's success with branding their products with a specific athlete was not lost on the sneaker industry. In 1977, a small-time basketball promoter named Sonny Vaccaro emerged on the scene and approached Nike's marketing team with a plan to displace

Converse's reign over the college market. It has been reported that Mr. Vaccaro would later travel around the country offering college coaches $2,000 contracts to become Nike "consultants" with the promise of free shoes to the players on their teams if they accepted.

50.     By 1979, Nike had signed up more than 50 college basketball coaches as consultants. When Sports Illustrated's NCAA tournament issue came out on March 26, 1979, it featured on the cover a young Indiana State University player named Larry Bird. He was wearing a pair of Nike's.

51.     Sonny Vaccaro would become a prominent figure in the sneaker industry. In the 1980s, he pushed Nike to sign a bet-the-company shoe deal with college all-star Michael Jordan. Jordan wore Converse shoes while playing for the University of North Carolina and preferred Adidas. But Adidas reportedly had little interest in pursuing Jordan, so he signed with Nike. Although Jordan's initial endorsement agreement with Nike allowed the company to cancel the contract if sales of Air Jordan-branded shoes did not reach $4 million by the third year, Nike ended up selling $70 million worth of Air Jordans in their first two months on the market. Such is the power of athletic endorsements.[6]

52.     In 1987, Nike expanded its relationship with college athletic programs. According to Vaccaro, "the world changed" when the University of Miami called and asked him if Nike would be willing to sign a first-of-a-kind "all-school" deal to sponsor every varsity athlete on campus. Vaccaro quickly agreed and immediately telephoned Nike co-founder Phil Knight to share the news, telling him: "This is it, we hit the motherload. Now we own the school."[7]

---

[6]     Darren Rovel, *Michael Jordan's Agent Tries to Set Record Straight on Original Nike Deal*, ESPN.COM, May 4, 2016, *available at* http://www.espn.com/nba/story/_/id/15463041/michael-jordan-agent-tries-set-record-straight-original-nike-deal

[7]     Matthew Kish, *Sonny Vaccaro, the University of Miami and the $250 million Shoe Business*, PORTLAND BUS. J., Dec. 18, 2014, *available at* https://www.bizjournals.com/portland/blog/threads_and_laces/2014/12/sonny-vaccaro-the-university-of-miami-nike-adidas.html

17

53.    Vaccaro later recounted the power of an all-school sneaker sponsorship in an interview with the New York Times:

> Now all the major schools are all-school deals with one shoe company.  That gives them control over everything.  You do an all-school deal, the president signs off, the athletic director, the coach — you own everything in that school.[8]

54.    In 1991, Vaccaro left Nike to join Adidas.  Two years later, he hired a young college graduate with a marketing degree named James Gatto.

### ii.    Adidas Infiltrates Amateur Athletics

55.    The branding on a sneaker of a single marquee pro basketball player, such as LeBron James or Stephan Curry, can net a shoe company more than a $1 billion annually.

56.    According to one of Adidas's chief competitors in the sneaker industry, Skechers, "the market for basketball shoes is driven as much by brand perception, attitude, and style as it is by shoe performance.  The ability to develop 'street credibility' by having talented young players and trendsetters wear a company's shoes can make or break a brand's reputation."[9]

57.    To be in a position to sign such a star player who can produce that kind of revenue, however, a sneaker company must start early and cast a wide net.  Upon information and belief, Adidas recognized that without infiltrating high school amateur athletics it would lose out on significant revenues and sales.

58.    Amateur athletics and the NCAA product provide Adidas with higher profit margins because, on information and belief, Adidas does not have to compensate amateur athletes

---

[8]    Marc Tracy & Rebecca Ruiz, *In College Basketball Scandal, Follow the Money (and the Shoes)*, N.Y. TIMES, Sept. 28, 2017, at A1, *available at* https://www.nytimes.com/2017/09/27/sports/ncaabasketball/adidas-pitino-louisville.html

[9]    *Skechers v. Adidas America, Inc.*, No. 2:18-cv-03882 (C.D. Cal. May 9, 2018) (ECF 1 ¶ 3.)

for wearing its brand but can instead aggressively promote them wearing its products. By doing this, Adidas generates money off of young players as amateurs and, later, when they turn pro.

59.    Beginning in high school, on information and believe, Adidas quickly began promoting its relationship with Brian, including but not limited to featuring promotional photos of him on its website wearing its logo, which it continued to do as of the date Plaintiff filed his original complaint.



60.    Plaintiff is informed and believes many responsible, for-profit corporations would classify Adidas's infiltration of amateur athletics and use of an individual athlete without compensating him as nothing more than exploitation. For Adidas, however, it was business as usual. Perhaps the profits were so lucrative Adidas and its executives convinced themselves that exploiting amateur athletes like Brian for profit is acceptable much the same way plantation owners convinced themselves that slave labor was acceptable.

61.    Nike, for example, has dominated the sneaker industry for decades with a reported 90% share of the market. It spends billions on athlete endorsements. Its Jordan brand alone enjoys

more than twenty times Adidas's share of the basketball market.  Simply put, Nike's investment brings it a higher profile, which translates to more space on retail shelves and more opportunities to put its trademarked "swoosh" on television.  Nike knows that fans want what their favorite players wear.

62.    For years, Adidas has been chasing the Nike rabbit in a race to grab market share but has consistently come up short.

63.    In 2006, for example, Adidas plunged nearly half a billion dollars into a sponsorship agreement with the NBA in hopes of dominating the professional ranks.  But the deal had a major flaw: Adidas could place its logo on players' warm-up gear, but not on their uniforms.  So when the television cameras were turned on, Adidas's logo was left hanging in the locker room.

64.    In 2012, Adidas tried again to make a run at Nike by signing the biggest player endorsement contract in the history of sports.  The fourteen year, $185 million deal with Chicago Bulls all-star Derrick Rose included precedent-setting payouts: $12 million in annual retainers; up to $6.25 million in annual royalties; up to $4.8 million in appearance fees annually; use of a private aircraft; $250-$300k annually in "consulting fees" to Rose's older brother; $50-75k annually in "consulting fees" to Rose's childhood friend; and a pledge by Adidas to contribute $150,000 annually to the AAU basketball team of Rose's choice.[10]

65.    Adidas inked the deal with Rose on February 24, 2012.  Sixty-four days later, Rose tore his ACL and missed the entire 2012-13 season.  A second knee injury had him sidelined for all but ten games the following season.  And his alleged conduct off the court landed him in criminal and civil jeopardy.  Consequently, Adidas was forced to take a loss on the deal.  In 2012

---

[10]    Jon Wertheim, *Why is Adidas Still Paying Derrick Rose Superstar Money?*, SPORTS ILLUSTRATED, Feb. 6, 2018, *available at* https://www.si.com/nba/2018/02/06/derrick-rose-adidas-sneaker-contract-details-cavaliers-knicks-bulls

and 2013, Adidas sold only $65 million of Rose sneakers—one-fifth of what Nike's LeBron James sneakers sold in 2013 alone and far less than what it agreed to pay Rose. Though much has been written about Rose's "stunning decline" in the world of basketball, Adidas remains on the hook to him through September 30, 2025.

66.    Following these and other setbacks, in June 2014 Adidas America brought in a new CEO, Mark King. In short order, the company announced that it was walking away from the NBA sponsorship and would redeploy its money to the high school and college basketball markets.

67.    Chris Grancio, Adidas's global basketball general manager, made it known that the company was "going to invest more money in basketball over the next five years that we ever have," explaining that the company's new strategy boils down to getting more Adidas shoes on the feet of "high school kids." According to Grancio, "[w]e haven't been able to elevate our brand for the basketball consumer that we're targeting. We ultimately decided that we would change our investment strategy and invest more players on the court." [11]

### iii.    The Outsized Influence of Adidas-Sponsored Grassroots Basketball

68.    Long before top basketball players reach college-age, they are showered with "money, swag, and perks" by the sneaker industry through participation in "summer basketball" or "grassroots" leagues sponsored by the Amateur Athletic Union ("AAU") and major sneaker companies.[12]

69.    Though AAU basketball has existed in some form for over a century, its influence over college basketball recruiting can be traced to two watershed events: (1) Congress's passage

---

[11]    Matthew Kish, *Adidas Drops Bid to Extend NBA Deal, Redraws Strategy*, PORTLAND BUS. J., Mar. 16, 2015, *available at* https://www.bizjournals.com/portland/blog/threads_and_laces/2015/03/exclusive-adidas-drops-nba-bid-redraws-basketball.html

[12]    Tracy & Ruiz, *supra* note 8.

of the Amateur Sports Act in 1978, which removed from the AAU's purview any governance role over international Olympic teams, forcing it to refocus its efforts on youth sports; and (2) the restructuring of the NCAA's college basketball recruiting calendar, which put an emphasis on summer basketball leagues over traditional high school basketball programs whose seasons typically end in March.

70.    Recognizing the importance of the summer basketball leagues in identifying and recruiting future NBA stars, the sneaker companies quickly moved to dominate the space by sponsoring summer camps and tournaments for middle schoolers and high school players so that their affiliated college and NBA teams could do one-stop shopping for players.

71.    According to USA Basketball, the organization that sponsors the men's and women's U.S. National and Olympic basketball teams, summer basketball has become "crucial" to college recruiting because "coaches only get so many opportunities to see a player perform" given the strict recruiting calendar mandated under NCAA rules.  Consequently, "[e]vent organizers like the AAU, Nike or Adidas line up its biggest tournaments to take place during the NCAA evaluation period, with the AAU calling summer hoops 'the place to be.'  For teenagers in pursuit of a college basketball scholarship, being at 'the place to be' isn't an option—it's a must."[13]

72.    In the words of college basketball scout Tom Konchalski, "If you're not on the shoe company circuit, it's hard to get recruited at the highest level.  It's very difficult."[14]

73.    For Adidas, sponsoring summer league camps and programs gives it the opportunity to build relationships with young players and college coaches, further ingratiating its

---

[13]    Ryan Wood, *Why Summer Basketball Is Crucial to Recruiting*, USA BASKETBALL, Apr. 12, 2012, https://www.usab.com/youth/news/2012/04/why-summer-basketball-is-crucial-to-recruiting.aspx

[14]    Tracy & Ruiz, *supra* note 8.

brand into players' lives at an early age and using that relationship to leverage a player's college recruiting decisions.  Adidas's Junior Gauntlet summer league, for example, showcases young boys in the 5th through 8th grades.  As one sportswriter explained:

> For the most part, this is how the college basketball/sneaker industry operates now: Youth basketball players are put on sneaker-driven AAU travel teams, and then outfitted with a sneaker brand up through middle school and high school. The college basketball offers roll in for the star players. But when it comes time for the player to pick a school, they usually align with the sneaker brand that has been with them since the beginning. It's not about the university; but rather the sneaker brand that represents the basketball team.[15]

74.    Though the dominance of sneaker industry money in summer league youth basketball and recruiting has been widely reported, the NCAA is effectively powerless to regulate summer leagues unaffiliated with any of its member institutions.  In 2018, the Rice Commission issued a call for reform:

> While an elite basketball player is in high school, he will virtually always develop a relationship with a non-scholastic basketball team and coach and with an apparel company – most likely one of Nike, Adidas or Under Armour. Specifically, apparel companies sponsor elite high school teams that participate in NCAA-certified and other events around the country, including all-star games, camps, and other so-called elite experiences. . . . By funding non-scholastic basketball, the apparel companies receive valuable input about their products, important exposure and credibility through their products' use, and an opportunity to form early relationships with future college and professional athletes. In connection with participating in these events and experiences, elite players (and their families) may receive luxury travel, gear and other benefits. Sometimes the apparel companies pay the non-scholastic basketball coaches for working with these teams and/or participating in their events.
>
> In addition to coaching, experience, gear and travel, these non-scholastic basketball teams and events offer players exposure, including to Division I coaches. For example, Division I coaches attend and recruit at the NCAA-certified events which are held in April and July each year. Many summer coaches have ongoing relationships with Division I coaches. They can thus bring "their" players to the

---

[15]    Jason McIntyre, *The FBI Just Blew Up the College Basketball-AAU Sneaker Industry: Fraud, Corruption, Bribery*, THEBIGLEAD.COM, Sept. 26, 2017, *available at* https://thebiglead.com/2017/09/26/the-fbi-just-blew-up-the-college-basketball-aau-sneaker-industry-fraud-corruption-bribery/

attention of Division I coaches and potentially influence players to attend particular schools, including schools where "their" apparel company is a sponsor.[16]

**D.    The "University of Adidas at Louisville"[17]**

75.    Within a few months of the start of Mark King's tenure as Adidas CEO, the company began signing universities to aggressive all-school sponsorships. Its race to capture market share culminated in one of the most expensive corporate sponsorships in the history of college sports: the University of Louisville.

76.    Adidas and the University of Louisville began their relationship in 1998, when Adidas agreed to give the university's athletic department a small discount on apparel: for every two pairs of Adidas shoes purchased at retail, Adidas marked down the third pair 20 percent.

77.    Over the years, Adidas would find value in its relationship with Louisville. In March 2001, Louisville hired Rick Pitino to coach its men's basketball team. At the time, Pitino was the 16th all-time winning coach in college history. Within a few seasons, Pitino coached Louisville to their first Final Four appearance in almost two decades, creating buzz for the basketball team and raising the public profile of its athletics department. In 2013, Pitino coached Louisville to the NCAA National Championship. The following year, Adidas announced a $39 million branding contract with Louisville.

78.    Within a couple of years, however, Louisville's basketball program would become embroiled in scandals, leading Louisville to preemptively ban its men's basketball team from any post-season play in the 2016 ACC conference championship and NCAA tournament. The NCAA

---

[16]    Commission on College Basketball, Report and Recommendations to Address the Issues Facing College Basketball Report 25 (2018) ("Rice Commission Report").

[17]    Steve Fainaru & Mark Fainaru-Wada, *How a Mid-level School Became the University of Adidas at Louisville*, ESPN THE MAGAZINE, Dec. 25, 2017, *available at* http://www.espn.com/espn/otl/story/_/id/21710106/louisville-athletic-director-tom-jurich-leveraged-big-deals-build-university-sports-powerhouse-only-watch-burn-amid-charges-excess

later ordered Louisville to vacate records of every game it won from the 2011-12 through 2014-15 seasons and all of its NCAA tournament appearances during that period, including its 2012 and 2013 trips to the Final Four and 2013 National Championship.

79.    Just months after the NCAA imposed these sanctions, Adidas and Louisville announced what would be described as "one of the richest sponsorships deals in college athletics." Louisville's athletic director called it "unprecedented for Adidas," while Adidas CEO King labeled it "one of our largest ever investments in sport in America."

80.    Under the terms of the deal, Adidas would pay the athletic department $160 million over ten years, including $79 million in cash, making it the biggest NCAA sponsorship deal ever for Adidas and the fourth largest all-school deal in college athletic history.  Adidas's senior director of sports marketing, Chris McGuire, touted it as Adidas's "largest commitment in the college space."

81.    The agreement provided a six-fold increase in the cash paid annually by Adidas to Louisville's athletic department—from a maximum base compensation of $1,575,000 for the 2017-18 season to $10,000,000 for the 2018-19 season.

82.    Adidas's $160 million deal with the University of Louisville bought itself extreme control over the school's student-athletes.  (*See* Ex. 1).  As an example, the contact cedes approval of certain *medical decisions* to Adidas when there is a possibility that a player's treatment might obscure the company's logo on the basketball court.  To illustrate, if a player's ankle requires taping (a treatment known as "spatting"), Adidas is afforded the right of first refusal should the tape cover up the Adidas logo on the player's shoe.   As author and journalist Michael Sokolove explained:

> Spatting refers to ankle taping, except that the tape goes around the shoe
> and over the sock.  It is more like bracing. As many as half the players in

> the NFL have their ankles spatted every game. Many athletic trainers
> believe in it, and some studies have shown that it cuts down on the
> occurrence of ankle sprains. . .[18]

The Adidas contract called for penalties to Louisville for multiple occurrences of "unauthorized"

spatting, including a loss of up to 25% of contract payments in a given year if spatting occurs

during the NCAA tournament. And, if a player or trainer chose to tape an ankle for medical

reasons, Louisville must "afford Adidas the opportunity to remedy the problem." The contract

also provides that if a player experiences a medical problem related to his shoe, Adidas must have

an opportunity to remedy it before the player is allowed to wear a non-Adidas sneaker.

> In the event any team member shall at any time suffer any physical injury,
> pain, or discomfort attributed to the use of Adidas shoes due to a bona fide
> medical condition as evidenced by a certification by the Team's physician
> which is serious enough to affect the athlete's performance, then University
> shall so advise Adidas and afford Adidas the opportunity to remedy the
> problem.

83. As record-setting a deal as this was, it was negotiated in almost complete secrecy.

On information and belief, Louisville' athletic director, Tom Jurich, met quietly with two senior

Adidas executives, Chris McGuire and Jim Murphy, over a period of months to hammer out the

terms. Neither Louisville's President, Dr. Gregory Postel, nor the University of Louisville Athletic

Association's Board of Directors, which governs the athletic department, were consulted or

notified about it. According to Dr. Postel, he and board members only learned of the record-setting

all-school sneaker deal *after* it was publicly announced by the athletic department.

84. When later asked by reporters if the Adidas money was "tainted by the alleged role

of Adidas executives in the pay for play scheme," that is, Defendants' racketeering activity, Postel

replied, "[i]f it's any way tainted, we want no part of it."

---

[18]    Michael Sokolove, THE LAST TEMPTATION OF RICK PITINO: A STORY OF CORRUPTION, SCANDAL, AND THE
BIG BUSINESS OF COLLEGE BASKETBALL (Penguin Press 2018).

## V.   SDNY CRIMINAL INVESTIGATION

85.    On September 26, 2017, federal authorities arrested Adidas executives Gatto and Code, along with financier Sood and would-be agent Dawkins, and unsealed three criminal complaints charging them, four NCAA Division I men's basketball coaches, and two other co-conspirators with years-long criminal fraud and corruption schemes involving bribery of college basketball coaches by Adidas executives and the funneling of illicit and improper payments to the families of student-athlete recruits in violation of NCAA rules.

86.    The criminal complaints and subsequent indictments followed a three-year investigation of the sneaker industry by the U.S. Department of Justice believed to have started in 2014.  The investigation was reportedly sparked by the disclosure of wide-spread corruption in the world of college basketball by a Pittsburgh-based financial advisor named Marty Blazer.  Blazer was under investigation by the Securities and Exchange Commission for defrauding clients and had also been caught up in a separate investigation in North Carolina regarding payments made to student-athlete football players.  Facing up to 67 years in prison on criminal fraud charges, Blazer offered to provide investigators with a roadmap to corruption in college basketball.  Blazer's cooperation had him "flying or driving across the country -- Atlanta, Las Vegas, Miami, New York, South Carolina, New Jersey, West Virginia, Alabama -- to meet with coaches, parents, players, FBI agents and, eventually, executives with Adidas."[19]

87.    On information and belief, the FBI also intercepted and recorded approximately 6,670 telephone calls by and among Defendants Gatto, Code, Sood, Dawkins, Gassnola and others related to the bribery scheme.  In total, prosecutors identified approximately 49 relevant calls

---

[19]    Paula Lavigne, *How One Man's Hollywood Flop Set Off NCAA Basketball's Biggest Scandal*, ESPN.COM, Mar. 14, 2018, *available at* http://www.espn.com/espn/story/_/id/22748218/how-one-man-hollywood-flop-set-ncaa-basketball-biggest-scandal

lasting three hours and twenty minutes on Gatto's wiretap; 303 relevant calls lasting forty-six hours on Code's wiretap; 86 relevant calls lasting eight hours on Sood's wiretap; and 554 relevant calls lasting seventy-seven hours on Dawkins's wiretap.

88.    Utilizing the information provided by Blazer and other informants, undercover agents, and the wiretaps, the FBI closed in on the Adidas's executives and co-conspirators.

89.    Prosecutors would discover two related bribery schemes.  In the first, "college basketball coaches took cash bribes from athlete advisors, including business managers and financial advisors, in exchange for using their influence over college players under their control to pressure and direct those players and their families to retain the services of the advisors paying the bribes."

90.    In the second scheme—which is central to this action—prosecutors alleged that Adidas's employees, "working in connection with corrupt advisors, funneled bribe payments to high school-aged players and their families to secure those players' commitments to attend universities sponsored by [Adidas], rather than universities sponsored by rival athletic apparel companies."

91.    The government's criminal complaint charged Gatto, Code, Dawkins, Augustine, and Sood with two counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of money laundering conspiracy.  (*See* Ex. 2.)

92.    In announcing defendants' arrests, the Acting U.S. Attorney for the Southern District of New York, Joon Kim, characterized the behavior of these defendants as "circling blue-chip prospects like coyotes" and exploiting "the hoop dreams of student-athletes across the country, treating them as little more than opportunities to enrich themselves through bribery and fraud schemes."

93.     FBI Assistant Director William Sweeney, Jr. described the defendants' "corrupt practice in which highly rated high school and college basketball players <u>were steered</u> toward lucrative business deals with agents, advisors, and an international athletics apparel company [Adidas]." (emphasis added).  He also described how Adidas-sponsored NCAA Division I and AAU coaches "created a pay-to-play culture, agreeing to provide access to their most valuable players while also <u>effectively exerting their influence over them</u>."

94.     Federal prosecutors summarized the criminal scheme in the image below:



95.     A grand jury subsequently indicted Gatto, Code, and Dawkins on November 7, 2017 for conspiracy to commit wire fraud based on the conduct outlined in the criminal complaint.

96.    On April 10, 2018, a grand jury returned a superseding indictment against Gatto, Code, and Dawkins, charging them each with one count of conspiracy to commit wire fraud and two counts of wire fraud.

97.    Two weeks later, Adidas announced the resignation of its CEO, Mark King, after only four years on the job.  Adidas's co-head of Adidas's North American operations, Zion Armstrong, replaced King.

98.    On August 14, 2018, a grand jury returned a second superseding indictment, again charging Gatto, Code, and Dawkins with one count of conspiracy to commit wire fraud and two counts of wire fraud for their role in funneling improper payments to the families of student-athlete recruits for the benefit of Adidas and others.

99.    During its criminal investigation, prosecutors issued subpoenas to Defendant Adidas, the NCAA, and the University of Louisville.  In response to those subpoenas, Adidas produced over 89,000 pages of responsive material, including email correspondence and text messages involving various Adidas employees; the University of Louisville produced over 33,000 pages of responsive material, including email correspondence and text messages involving university employees; and the NCAA produced approximately 1,000 pages of responsive materials.

100.    In addition to the University of Louisville, grand jury subpoenas were also sent to other Adidas-sponsored universities, including North Carolina State University, the University of Kansas, and the University of Maryland.  The January 8, 2018 subpoena issued to the University of Kansas, for example, demanded "[a]ll communications between any member of the Kansas Athletic Department, including the coaching staff of the Kansas men's basketball team, and: (i) James Gatto, a/k/a/ "Jim" [Adidas's head of global sports marketing – basketball]; (ii) Christopher

Rivers [Adidas's director of global basketball sports marketing]; (iii) Thomas ("TJ") Gassnola [director of an Adidas-sponsored AAU team]; (iv) Merl Code [Adidas consultant], and (v) any other representative of Adidas."

101.    In October 2018, the criminal cases against Defendants Gatto, Code, and Dawkins were tried in U.S. District Court.  Following a two-and-a-half-week jury trial, the three defendants were convicted on all charges: including all wire fraud conspiracy and substantive wire fraud counts.  At defendants' sentencing, the Hon. Lewis Kaplan, the district court judge overseeing the criminal trial, observed that "probably the worst victim, most seriously injured victim of the Louisville scheme was Tug Bowen."

102.    Plaintiff is informed and believes that the publicly disclosed revelations from the federal criminal prosecution against Gatto, Code, and Dawkins have only scratched the surface of Defendants' criminal conduct—and that of the entire sneaker industry—and therefore will seek discovery to ascertain the full nature and extent of the illegal scheme perpetrated on Adidas's behalf by all members of the racketeering enterprise.

## VI.    OVERVIEW OF DEFENDANTS' RACKETEERING ACTIVITY

### A.    The Adidas "Black Ops" Bribery Enterprise

103.    At all times relevant to this Complaint, Adidas America, together with its executives and agents James Gatto and Chris Rivers; consultants Merl Code and T.J. Gassnola; Christian Dawkins, financier Munish Sood, and various NCAA coaches and Adidas-sponsored AAU team directors, collectively constitute an "enterprise," as defined in Title 18, United States Code § 1961(4), that is, a group of individuals and entities associated in fact (hereinafter the "Adidas Bribery Enterprise").

104.    The principal purpose of the Adidas Bribery Enterprise is to help Adidas artificially grow and preserve market share in the ultracompetitive sneaker industry by infiltrating high school level and Division I men's basketball through bribery and illegal acts, including by funneling Adidas money to predominantly underprivileged parents of prospective student-athletes in order to coerce commitments from their children to play Division I men's basketball at Adidas-sponsored universities so those schools could field the best teams in the NCAA and showcase the Adidas brand to millions of fans.  Through this exploitation of the young players' images and likenesses to consumers wishing to purchase shoes and apparel worn by their favorite teams and players, Adidas profited.

105.    Adidas personnel have admitted as much.  During opening statements in his criminal trial, Defendant Gatto, through counsel, acknowledged the purpose of this scheme:

- "[F]rom Jim [Gatto's] perspective, this is a win-win-win situation.  It's a win for the universities who end up with top-ranked players who hopefully lead the universities to basketball glory.  It's a win for Jim's employer, Adidas, which is the corporate sponsor of these universities and which would benefit from being associated with a winning basketball team." (Gatto Opening Crim. Tr. 68:20-69:3.)[20]

- "[T]he evidence will show that these kids bring in millions of dollars in revenue."  (Gatto Opening Crim. Tr. 69:12-13.)

- "[A] successful basketball program is the equivalent of a winning lottery ticket."  (Gatto Opening Crim. Tr. 70:11-12.)

- "[E]ach of the apparel companies, Nike, Under Armour, Adidas, they are able to sell millions of dollars in merchandise—t-shirts, jerseys, sneakers, you name it.  The kids on the court, however, the ones whose blood, sweat and tears is making this game a billion dollar industry, they are not allowed to earn a dime."   (Gatto Opening Crim. Tr. 71:12-17.)

- "Now, to be fair, Adidas is not sponsoring these universities out of the goodness of its corporate heart.  The better that one of these colleges does

---

[20]        References to the Gatto Opening and Code Opening transcripts are from the first day of the jury trial, October 2, 2018, in the matter *United States v. Gatto et al.*, No. 17-cr-00686-LAK (S.D.N.Y. 2018).

on the basketball court, the better it is for Adidas, which gets to be associated with a winning team and in the end hopefully sell more sneakers." (Gatto Opening Crim. Tr. 81:5-9.)

- "And we are going to be straight with you here. If a basketball coach went to Jim [Gatto] and told him that he really wanted a particular kid on that team and he asked Jim to make that happen, Jim understood, Jim understood that to mean that Adidas should help the kid's family out financially, if that's what they wanted." (Gatto Opening Crim. Tr. 81:24-82:4.)

106.    Merl Code, through his counsel, also conceded the benefits of the scheme during his opening statement in his criminal trial:

> "The shoe company gets substantial exposure if the shoe company's team does well in the NCAA tournament, and the university gets substantial funds by being sponsored by the shoe company. So just as a winning team at Duke or Kentucky can be a walking, talking ad for Nike, a Final Four and a national championship team at Louisville can do the exact same thing for Adidas." (Code Opening Crim. Tr. 101:4-10.)

107.    Upon information and belief, the Adidas Bribery Enterprise participants operated in a cohesive manner, with members working together in a coordinated manner for years to further the Enterprise's goals. By banding together to prop up the Adidas brand through deceptive and illegal conduct, the Enterprise participants stood to grow their own power and influence in college basketball.

108.    Each member of the Enterprise had a hand in directing and participating in its criminal conduct:

    a. The <u>Adidas Participants</u> (Adidas, Gatto, Code, Rivers, and other unidentified Adidas employees and agents), on information and belief, funded the Enterprise, directed its illegal market share strategy, and facilitated the creation and reimbursement of sham invoices, with Adidas providing money for bribes and Defendant Gatto serving as the field marshal of the Enterprise's operations by approving bribe requests coming in from other Enterprise participants, managing

33
- 71 -

its on- and off-the-books budget, and arranging for Adidas money to be laundered through other participants. Defendant Code assisted Gatto and served as one of several financial intermediaries between Adidas and the coerced student-athletes and families. Defendant Rivers, along with "Senior Executive-1," an unidentified Adidas executive referenced in an FBI affidavit, also directed Adidas's bribery scheme and directly paid money to players. Other unidentified Adidas Participants include company executives, employees and agents who facilitated the fraudulent payments from Adidas's treasury by budgeting and approving bribery payment requests, drafting payment instruments and/or ordering wire transfers, and recording false entries on Adidas's financial ledgers in order to cover up the true purpose of the funds, such as accountants, internal auditors, basketball program personnel, and marketing personnel.

b. The <u>Athlete Advisor Participants</u> include Defendants Sood and Dawkins, who on information and belief, served as liaisons with the families of targeted student-athletes, pressured them to sign with specific Adidas-sponsored AAU and Division I teams, laundered Adidas's money so it would appear untraceable in the hands of the coerced student-athletes and families, and served as bagmen.

c. The <u>Division I Basketball Participants</u> include certain NCAA Division I men's basketball coaches at Adidas-sponsored universities, acting in their individual capacities, including coaches at the University of Louisville, University of Kansas, North Carolina State University, and elsewhere. On information and belief, these participants helped create and grow the market for Adidas bribes and coercion by requesting assistance from the Enterprise in recruiting talented young basketball

players to their teams through bribes to their families. In doing so, these participants acted against the interests of their respective employers, the universities. Though these coaches are popular sports figures at their universities, none were authorized by their respective universities to solicit bribe payments from other Enterprise Participants for the benefit of recruiting players. To the contrary, on information and belief, each was under a contractual obligation at all relevant times to refrain from engaging in any conduct that would violate NCAA rules or conduct that otherwise was not fully aligned with the interests of the universities they served. Division I Basketball Participants include the following non-defendant co-conspirators:

i.   Kenny Johnson, at all relevant times, was an assistant basketball coach at the University of Louisville, where his responsibilities included recruiting high school athletes to play basketball for Louisville. Prior to joining Louisville, Coach Johnson served as the recruiting coordinator and assistant basketball coach for Adidas-sponsored Indiana University. On information and belief, Coach Johnson was aware of and participated in the payment of bribe money to Plaintiff's father.

ii.  Jordan Fair, at all relevant times, was an assistant basketball coach at the University of Louisville, where his responsibilities included recruiting high school athletes to play basketball for Louisville. Prior to his promotion to assistant coach, Coach Fair served as a program assistant for Louisville's men's basketball team, where his duties included assisting in on-campus recruiting for players. On information and belief, Coach Fair attended at least

one meeting with Enterprise members during which they discussed the bribery scheme.

iii.    Bill Self is the head men's basketball coach at the University of Kansas.  On information and belief, Coach Self was aware of a bribe payment made to the legal guardian of Kansas recruit Silvio De Sousa by Adidas and communicated with Defendants Gatto and Gassnola about it.

iv.    Kurtis Townsend is an assistant head men's basketball coach at the University of Kansas.  On information and belief, Coach Townsend was aware of a bribe payment made to the legal guardian of Kansas recruit Silvio De Sousa by Adidas and communicated with Defendants Gatto and Gassnola about it.

v.    Orlando Early, at all relevant times, was an assistant head men's basketball coach at North Carolina State University.   On information and belief, Coach Early accepted a bribe payment from Adidas on behalf of the father of NC State recruit Dennis Smith, Jr.

d. The AAU Basketball Participants include AAU high school basketball teams sponsored by Adidas and their team directors, coaches, and administrators. On information and belief, these participants, including Defendant Gassnola, helped create and grow the market for Adidas bribes and coercion by identifying talented young basketball players to target and to steer them to other Enterprise participants. AAU Basketball Participants include the following non-defendant co-conspirators:

i.    1 Family, on information and belief, is an Adidas-sponsored AAU basketball team based in Florida and is registered as a charitable organization under Section 501(c)(3) of the Internal Revenue Code.

36

ii.    Jonathan Brad Augustine who, at all relevant times, served as director of the 1 Family basketball team and as President of the team's 501(c)(3) charitable organization, whose stated purpose is to provide assistance to high school athletes to help them "grow, develop and achieve in the classroom as well as to secure a scholarship to attend an accredited college or university."

iii.    Karolina Khaos, on information and belief, is an Adidas-sponsored AAU basketball team based in South Carolina and is registered as a charitable organization under Section 501(c)(3) of the Internal Revenue Code.

iv.    New England Playaz, on information and belief, is an Adidas-sponsored AAU basketball team based in Massachusetts and is registered as a charitable organization under Section 501(c)(3) of the Internal Revenue Code.

109.    Within Adidas, the criminal Enterprise was referred to interchangeably as "Black Ops," "Black Ops Soul Patrol," and "underground stuff."

110.    Defendant Chris Rivers discussed Black Ops in a February 17, 2015 email sent to Gatto, Gassnola and other Adidas employees, including individuals in the company's marketing and grassroots basketball division, subject "adidas Soul Patrol aka BlackOpp's Update #1," where he wrote:

> I am requesting that after every trip a short written recap be sent to Jim [Gatto] and myself.  I am not concerned with the format, although later in the year I will formalize, but it is important that we have notes on who we are seeing and how each of these touch points will help us in the short- and long-term future. . . .
>
> Please don't include any confidential "Black Opp's" information but make sure there is enough detail that validates the money we spent, in addition to demonstrating how we are building relationships that will help us in the draft signing process. . . .

> I would like to submit a presentation that demonstrates the great work we
> have been doing in the field. We have been killing it and <u>upper management
> should be aware</u>.

(emphasis added). Rivers then directed the recipients to provide him "information" that "demonstrates the moves we are making," such as the "Top 30 families" and "Top 30 high school players you have met with in the 2016, 2017, and 2018 classes."

111.    In testimony at the criminal trial of Gatto, Code, and Dawkins, T.J. Gassnola confirmed that Rivers's statement regarding "confidential 'Black Opp's' [*sic*] information" was a coded reference meaning "payments to players and families of players" and that Rivers made clear to Adidas employees that he "didn't want any proof of" such payments in writing.

112.    Gassnola testified that members of Black Ops included not only the named recipients of River's email at Adidas, but others including an AAU team director from Compton, California.

113.    The Enterprise operated continuously, targeting each new class of prospective Division I men's basketball players on an annual basis with the same or similar criminal acts of racketeering in furtherance of its goals. The activities of the Enterprise are so entwined in Adidas's course of securing market share in the sneaker industry that the company, according to prosecutors, maintained a "multimillion-dollar budget" for bribe payments and, in a few instances when funds ran low, had to postpone bribe payments until the company's next fiscal year.

114.    The Adidas Bribery Enterprise constituted an ongoing organization whose members functioned as a continuing unit, separately and distinctly from its individual members, for the common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in and, as set forth herein, its activities affected, interstate commerce.

115.    Because the members of the Adidas Bribery Enterprise were aware that their conduct would render the student-athlete victims ineligible to play Division I basketball and because the means and methods of the enterprise were criminal in nature, they committed to carrying out their illegal conduct in secret.

116.    By banding together to prop up the Adidas brand through deceptive and illegal conduct, all of the Enterprise participants stood to gain financially: the Adidas Participants gained market share and increased top-line revenue for Defendant Adidas, allowing the individual Adidas Participants to ensure their value to the company, secure enhanced performance-based compensation as a result, and, upon information and belief, in some instances divert Adidas bribe money for personal use; the Athlete Advisor participants gained leverage over student-athletes and recruits through their close association with Adidas and the Division I/AAU Basketball Participants such that they could successfully persuade and pressure student-athletes to commit to retaining their professional services upon turning pro; the AAU Basketball Participants gained leverage over high school players through their close association with Adidas, enhancing their reputations as feeder programs for top Adidas-sponsored Division I teams and, upon information and belief, also diverted Adidas bribe money for personal use; while the Division I Basketball Participants gained by securing the country's top high school basketball players to their college teams, thus enhancing their professional reputations and perceived value as top NCAA coaches, leading to enhanced compensation from Division I programs.

117.    To further their corrupt ends, the Defendants and their co-conspirators provided one another with mutual aid and protection. Members of the Enterprise engaged in conduct designed to prevent the detection of their illegal activities, including through clandestine meetings in

discreet locations, such as on a yacht and in a Las Vegas hotel room, and communicating in code and on untraceable "burner" cell phones.

**B.    The Adidas Bribery Enterprise Engaged in a Pattern of Racketeering Activity**

118.    In the world of men's college basketball, there is immense competition among Division I schools to attract top-level talent to their programs.  Schools compete for such talent by providing superior athletic-related services to their players to help them develop into professional athletes: hall of fame coaches, multi-million-dollar basketball arenas, televised games, competitive schedules in competitive athletic conferences, nutritionists, dieticians, and strength trainers among other offerings.

119.    In a world free from corruption, there are only two stakeholders in this marketplace: the high school student-athlete searching for the best basketball fit and the university that recruits him to its team.

120.    Adidas is well aware that in a world free from corruption it has no seat at the table when it comes to high school players choosing which schools to commit their amateur athletic services.  This reality did not suit Adidas well because it has long-known that there are millions of dollars to be made off the backs of top-level college basketball players.  In a lawsuit it filed against the NCAA, the company candidly discussed why sponsoring amateur college athletics is critical to its business and, more particularly, why placing its three-stripe logo on college athletes is so important to its ability to generate revenue:

> [S]ponsorship arrangements are a critical component of adidas' marketing strategy, and that of its competitors.  By supplying its products to college teams and coaches, Adidas ensures that its brand (its collective trademarks, logos, and image or identity) is associated with sports and athletes in general, as well as with particular teams and individual athletes and coaches.  This association drives demand in the market for adidas' athletic footwear and apparel in several ways.  First, the fact that the brand is worn by collegiate athletes in actual competition "authenticates" the brand as a high quality athletic brand, with products that serve the high performance needs of these athletes.  Second, the visibility of adidas'

trademarks on the playing field – in a Tennessee vs. Nebraska football game, for example – translates into public exposure that is in fact more valuable than traditional commercial advertising in terms of marketing value and effectiveness.  And third, the use of particular apparel styles and designs by teams and coaches generates demand for those particular apparel styles and designs.  Thus, for example, when a teenager sees his or her favorite college team or athlete wearing a particular adidas jersey, he or she is more inclined to go to a store to try and purchase that garment, or to try and persuade his or her high school team to purchase that uniform. . . . <u>For all of these reasons, adidas spends millions of dollars a year on sponsorship agreements and other promotional arrangements in order to ensure that its trademarks appear on the uniforms and footwear of the top college and university teams in each of the sports to which adidas markets products.</u>

*See Adidas v. Nat'l Collegiate Athletic Ass'n*, No. 98-cv-02510-GTV, Dkt. 1 ¶¶ 7-8 (D. Kan. filed Nov. 12, 1998) (emphasis added).

121.    Indeed, at the college level, student-athletes possess three key assets that Adidas and its co-conspirators sought to procure: (1) the players' amateur athletic services/eligibility; (2) the legal agreement that every top player signs with their Division I university binding that player to the team (and, therefore, the team's apparel sponsor); and (3) the player's image and likeness.

122.    Defendants know that a student-athlete's athletic services/eligibility, collegiate contract, and image and likeness represent real value to top players.  Who and where those players commit their collegiate athletic careers will have a tremendous impact on their development into professional NBA players.  These players understand that under NCAA rules once they enroll at a university they are precluded from playing basketball for any another university without first sitting out a year of athletic eligibility—unlike non-student-athletes who are free to transfer schools at any time without penalty.

123.    Defendants understand these NCAA rules intimately. Each of them knows that bribing the families of college athletes renders those players ineligible under NCAA bylaws.[21]

---

[21]  *See* NCAA Bylaws §§ 12.01.1, 12.1.2, 12.11.1, 13.01.1, 13.2.1, 14.5.1, 15.5.5.1, 16.01.1, 16.02.3, 16.02.4, and 17.02.1.  Copies of these bylaws have previously been filed with the Court as an exhibit, *see* ECF No. 56-1, which Plaintiff incorporates herein.

*See, e.g.*, Defendant Code's sentencing memorandum in *United States v. Gatto et al.* (*see Bowen* ECF No. 56-4) ("Like many others, [Code] understood he was violating the NCAA's rules."); statement by Defendant Gassnola at his March 30, 2018 plea hearing ("I knew these payments would render the athletes ineligible to receive scholarships from these universities, and further knew these payments would be concealed from the universities.  At the time I did this, I knew this was illegal, and I took the steps to conceal this."); statement by Defendant Sood's at his August 27, 2018 plea hearing ("I believe that . . . receipt of those payments by the players and/or their families could make the players ineligible."); *see also* Adidas Sponsorship Agreement with the University of Louisville (Ex. 1 at 13) (reserving the right to terminate the agreement if "[a]ny coach or Team is suspended or otherwise subjected to major disciplinary action by the NCAA."); Adidas's motion for preliminary injunction in *Adidas v. Nat'l Collegiate Athletic Ass'n*, No. 98-cv-02510-GTV (*see Bowen* ECF No. 56-8) ("Member Institutions are governed by an elaborate Constitution and Operating and Administrative Bylaws involving dozens of sports competition from archery to volleyball" and that the bylaws govern matters "such as a student's eligibility and rules of the game").

124.    Defendants also know that if they fail to secure top talent to Adidas-sponsored Division I schools, they will have no chance of bringing that player to the Adidas brand.  In Defendant Code's words, once a player goes to a Nike-sponsored university, "I promise you I won't get him back."

125.    As for the players' images and likenesses, Adidas paid $160 million to the University of Louisville for the right to place its brand on the players for profit—something the student-athletes are prohibited from doing themselves under NCAA bylaws—and then defrauded

the targeted players of their right to control which university and, therefore, which apparel sponsor would benefit from their image and likeness.

126.    Defendants purposefully targeted the country's top high school boys basketball players because of their immense monetary value to Adidas as they developed into college and professional players.  These young students were the most sought after five-star college recruits in the nation.  Unlike other students, these five-star recruits did not need to sell potential schools on their value; rather, some of the most famous names in college basketball from blue blood basketball programs chased after these players hoping to land them on their rosters.  Signing any one of these top players to their college teams could spell millions of dollars in additional revenue for their athletic departments through increased television viewership and tournament bids not to mention the prestige of having recruited and coached the next generation of professional NBA players.

127.    Indeed, the expert proffered by Gatto in his criminal trial, Daniel Rascher, concluded that "a 'five-star athlete is responsible for approximately 8.2% of a university's revenue from men's basketball."  With respect to the University of Louisville, Rascher calculated that it would have received $3,604,760 in value from Brian's participation on the team.  *See United States v. Gatto*, No. 17-cr-00686-LAK, ECF No. 211 at 5-6 (S.D.N.Y. filed Sept. 26, 2018).

128.    Thus, college coaches at the top Division I men's basketball programs spare no effort or expense to secure these players' commitments.  In 2015, for example, NC State's head coach Mark Gottfried landed in a helicopter outside of Dennis Smith, Jr.'s high school on the first day of the NCAA recruiting period.  According to media reports, "Mark Gottfried didn't just drive to see these players—he procured a helicopter from an NC State booster so he could travel in style,

and also show Smith and [another recruit] how important they are to him. Naturally, this drew a lot of attention, both locally and nationally, which is entirely the point.[22]

129.     Brian, too, received constant attention from Division I coaches during his senior year of high school. Coaches from top programs repeatedly contacted him and his family with the universal message that a year on their team would launch him into the NBA:

- "Great seeing you this evening my man. Would love to coach you. Can make all of your dreams come true"

- "Let me coach for one year"

- "Come to a place where you can be the man. System will help you get to the league after one year. . . . [player name redacted] will be a top 10 pick. That can be you next year."

Current college players and graduates playing in the NBA also reached out to Brian to encourage him to consider their schools. And, like other top high school players, Brian's recruitment by the Division I teams was closely monitored by the sports media.

130.     Because of the high revenue-generating potential of recruiting top players to teams with the largest fan bases, the Adidas Bribery Enterprise was specific as to gender, sport, and talent—it did not target women's basketball, men's squash, or average basketball players. It focused on bringing top players to Adidas's top flagship basketball programs: Louisville, Kansas, NC State, and the University of Miami. As explained by Adidas's Merl Code in a recorded conversation with undercover FBI agents:

[T]he smaller schools that are mid-tier schools. They're not going to recruit the elevated kids. And so there's not going to be a lot of resources from a company standpoint that we'll put into helping them recruit. Because if we lose East Carolina. So what. You lose Kansas or Indiana, it's a big deal.

---

[22] *See* https://www.backingthepack.com/nc-state-basketball-recruiting/2015/9/9/9298755/mark-gottfried-helicopter-dennis-smith-jr-bam-adebayo-nc-state-basketball-recruiting

131.    In order to execute this scheme and secure these players' commitment to Adidas-sponsored schools—and, therefore, secure their amateur athletic services, images, and likenesses for the Adidas brand—Defendants engaged in a scheme to defraud the student-athletes into falsely believing that a particular Adidas-sponsored school they were steered toward was the best basketball fit for them and their professional careers over all others when, in fact, committing to those schools would result in their ineligible to participate in sports under NCAA rules.  To accomplish their scheme, Defendants leveraged pre-existing relationships forged between the high school players' families and their AAU coaches and others whom those families trusted.  For Brian, this meant leveraging the services of Christian Dawkins—an individual from Brian's hometown of Saginaw, Michigan who had known Brian and his father for years and whom Brian trusted.

132.    By leveraging his family's relationship with Dawkins, and by Dawkins leveraging Brian's father through bribery, Defendants caused Brian to commit to the University of Louisville's men's basketball team knowing that it would result in Brian losing his NCAA eligibility.  Had Brian not attended Louisville, no bribe money would have been paid and Brian's eligibility would have remained intact at whatever school he attended.

133.    Defendants likewise intended that the other student-athlete recruits targeted in their scheme remain unaware of the bribe payments and their fraudulent scheme so they too would play for Adidas-sponsored teams.

134.    Defendants also sought to defraud the Adidas-sponsored universities into believing that the players recruited through their bribery scheme were eligible to play on the NCAA-sanctioned teams and, therefore, eligible to receive athletic scholarships when, in fact, they were not.

135.    Under NCAA bylaws, Adidas is a representative of its sponsored-universities' athletic interests (commonly known as a "booster").  *See* NCAA Bylaw § 13.02.15 ("A 'representative of the institution's athletic interests' is an individual, independent agency, corporate entity (e.g., apparel or equipment manufacturer) . . . [that] promot[es] the institution's intercollegiate athletic program . . . [or has] made financial contributions to the athletics department . . . [or has] been involved otherwise in promoting the institution's athletics program."). Thus, by participating in and funding the Adidas Bribery Enterprise, Adidas, Gatto, Rivers, Code, and Gassnola also rendered the recruited student-athletes ineligible under additional provisions of the NCAA bylaws.  *See* §13.01.1 ("The recruitment of a student-athlete by a member institution or any representative of its athletics interests in violation of the [NCAA's] legislation . . . shall result in the student-athlete becoming ineligible to represent that institution in intercollegiate activities.") (emphasis added); § 13.2.1 ("An institution's staff member or any representative of its athletics interests shall not be involved, directly or indirectly, in making arrangements for or giving or offering to give any financial aid or other benefits to a prospective student-athlete or his or her relatives or friend."); § 16.01.1 ("A student-athlete shall not receive any extra benefit. Receipt by a student-athlete of an award, benefit or expense allowance not authorized by NCAA legislation renders the student-athlete ineligible for athletics competition in the sport for which the improper award, benefit or expense was received") (emphasis added); § 16.02.3 ("An extra benefit is any special arrangement by an institutional employee or representative of the institution's athletics interests to provide a student-athlete or the student-athlete family member or friend a benefit not expressly authorized by NCAA legislation").  By engaging in the bribery scheme that rendered the student-athletes ineligible under NCAA bylaws, these particular defendants intended to and actually deprived each of the four schools discussed below, and more particularly the

46

University of Louisville, of their honest and faithful services as representatives of those universities' athletic interests.

136.    Because of the geographic disparity among members of the Enterprise—Adidas, Gatto, and Rivers in Oregon; Code in South Carolina; Gassnola in Massachusetts; Sood in New Jersey; Dawkins in Michigan and Georgia; the AAU teams in South Carolina, Massachusetts, and Florida; and the universities in Kentucky, Kansas, North Carolina, and Florida; Defendants coordinated, planned, and executed their criminal bribery scheme through extensive use of interstate wire communications and money laundering. Each email, text message, and telephone call made in furtherance of the bribery scheme, and each electronic transfer of funds between Adidas and the various bank accounts controlled by Defendants, is a separate violation of the federal wire fraud statute and, as such, each are separate predicate acts of wire fraud in furtherance of Defendants' racketeering activity.

137.    Each of the predicate acts of racketeering was part of a scheme to defraud the student-athlete victims and the relevant universities in several ways. First, using interstate wire communications, Defendants intended to and in fact defrauded the unsuspecting student-athletes, including Plaintiff, by destroying their NCAA eligibility and by depriving them of significant and necessary information regarding their loss of eligibility, and causing them to lose the concomitant rights and benefits they were to have received as student-athletes including the professional development necessary to prepare for careers in the NBA. In each instance, Defendants knowingly deprived the prospective-athletes, including Plaintiff, of their NCAA eligibility by engaging in the bribery scheme; knowingly caused these students, including Plaintiff, to submit false certifications regarding their NCAA eligibility to their universities; and knowingly caused these students, including Plaintiff, to enter into student-athlete financial aid agreements binding them to the

Adidas-sponsored universities.  In doing so, Defendants created a risk of tangible economic harm to the student-athletes, including Plaintiff, and interfered with their right to control their assets and career path, including but not limited to decision-making about which university to attend to receive their education, whether to accept an athletic scholarship offer from a particular university, and whether and when to forego playing in the NCAA and enter the NBA draft.

138.    Second, Defendants and, more particularly Adidas and its employees and consultants, including Gatto, Rivers, Code, and Gassnola, devised and intended a scheme to defraud the Adidas-sponsored universities of the right to their honest and faithful services as representatives of their athletic interests by stripping the targeted student-athletes recruited to their teams of their NCAA eligibility to play Division I college basketball and by using interstate wire communications in furtherance of their scheme in violation of 18 U.S.C. § 1343.

139.    Third, because the bribe payments rendered the affected student-athletes ineligible to participate in Division I athletics under NCAA rules, Defendants conspired to conceal the bribery scheme from the universities, thereby causing them to provide or agree to provide athletic-based scholarships and financial aid under false and fraudulent pretenses.  In doing so, the Defendants knowingly interfered with the universities' ability to control their assets, including decision-making about the distribution of their limited athletic scholarships; and created a risk of tangible economic harm to the universities, such as the possible disgorgement of profit-sharing by the NCAA, monetary fines, restrictions on athlete recruitment and the distribution of athletic scholarships, the potential ineligibility of the universities' basketball teams to compete in NCAA programs in general (also known as the NCAA "death penalty"), and the ineligibility of Division I student-athletes in particular.  Defendants did so in violation of 18 U.S.C. § 1343 by conspiring, devising and executing a scheme to defraud and to obtain money and property from the

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 110 of 412

3:18-cv-03118-JFA    Date Filed 08/23/19    Entry Number 84    Page 51 of 106

universities, to wit, athletic scholarships awards to the targeted student-athletes, and by using interstate wire communications in furtherance of this scheme.

140.    Fourth, the Defendants knowingly conspired to engage in money laundering in furtherance of their bribery scheme.  Specifically, Defendants Adidas, Rivers, Gatto, Code, Dawkins, Gassnola, and Sood did knowingly and willfully combine, conspire, confederate, and agree with each other, with co-conspirators Augustine, Johnson, the New England Playaz, 1 Family, and the Karolina Khaos, and with other persons unknown to Plaintiff to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957—namely: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity—that is, wire fraud and tax fraud—knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

141.    As a consequence of these criminal acts, the student-athletes who had no knowledge of the fraudulent bribery scheme, such as Plaintiff Bowen, stood to lose, and did in fact lose, their eligibility to continue as student-athletes at NCAA institutions, lost the opportunity to develop and showcase their basketball skills and athleticism in NCAA games and tournaments in a manner that would significantly enhance their marketability to NBA teams, and lost precious competitive playing time to develop into professional athletes in the NBA (a league with an average career length of less than five years), thus minimizing their lifetime earning potential by tens of millions

of dollars by, among other things, reducing the amount of time they would play under league maximum contracts.

142.    Both the harm to the universities and the harm to unsuspecting student-athletes was the intended consequence of the scheme.  Defendants needed the universities and their athletic arms to unwittingly award athletic scholarships to these highly sought-after student-athletes in order to induce them to commit to their teams without the knowledge that Defendants' scheme rendered them ineligible under NCAA rules.  Defendants likewise needed the unsuspecting student-athlete recruits to accept those high-value scholarship offers so that they would commit to playing basketball at Adidas-sponsored schools instead of at schools where they may have had better pre-professional athletic and academic opportunities or on professional teams.

### i.    Racketeering Activity Involving North Carolina State University

143.    In 2015, the Enterprise targeted Dennis Smith, a young basketball recruit who had committed to play men's basketball for North Carolina State University ("NC State"), a Division I school sponsored by Adidas.  Smith was one of the top high school players in North Carolina and had played on an Adidas-sponsored AAU basketball team while in high school.  He was also a featured player at the Adidas Uprising tournament in California, where Adidas invites the top high school players from around the country to come play and showcase their skills.

144.    Per Gassnola's testimony at the criminal trial of Gatto, Code, and Dawkins, Adidas made two payments to secure Smith to the Adidas brand.  The first, in early 2015, was made after Gassnola learned from a sports agent that Smith, who at the time was in high school, was "considering moving grassroots labels and was going to go from an Adidas team to a Nike team." Gassnola testified that he "relayed that conversation to Chris Rivers at Adidas."  According to Gassnola, he, Rivers, and an Adidas marketing director then traveled to Fayetteville, NC on

January 20, 2015 to watch Smith play and to meet with Smith's father and trainer. While there, according to Gassnola, Rivers and Smith's father had a private conversation after which Rivers reported that "he had taken care of it, that the kid was going to stay with an Adidas program, Team Loaded, and that he would play the following year with us."

145.    Thereafter, on February 15, 2015, Defendant Adidas entered into an agreement with Gassnola and his AAU team, the New England Playaz, in which the company agreed to pay him $60,000 in 2015 and $65,000 in 2016.  As consideration, Gassnola agreed to "owe[] adidas a fiduciary duty of loyalty."  (*See* Ex. 3 at 12.)  No other financial payments to Gassnola were outlined in this agreement, which was executed on behalf of Adidas by Chris McGuire, Head of Sports Marketing, and Adidas's general counsel.

146.    The second payment, in the fall of 2015, came after Gassnola learned from Orlando Early, an assistant men's basketball coach at NC State coach (referred to in the government's superseding indictment as Coach-4), that Smith was not happy with his decision to commit to NC State and was considering de-committing before the start of the 2016-17 college basketball season. As Gassnola explained during the criminal trial of Gatto, Code, and Dawkins:

> Orlando Early reached out to me that there were some issues surrounding Dennis and the people around him.  There were certain things that were promised to the family, from who I don't know, but there was a lot of minutia around it, and he just seemed uncomfortable and he was having some issues with keeping that situation together.

147.    Based on that concern, the Enterprise planned, discussed, and engaged in the following acts using interstate wire communications, which Gassnola testified to during the criminal trial:

> a.    Gassnola told Coach Early that he would pay $40,000 to Dennis Smith, Sr. to ensure his son's commitment to NC State.

51

b.      On October 30, 2015, Gassnola, based in Massachusetts, withdrew $40,000 in cash from the New England Playaz AAU team account at Berkshire Bank.  (*See* Ex. 4.)

c.      On November 1, 2015, Gassnola purchased a ticket on Delta Air Lines and flew the next day from Hartford, Connecticut to Raleigh, North Carolina with the cash.

d.      On November 2, 2015, Gassnola drove to Coach Early's home in a rental car and delivered the bribe money.

e.      According to Gassnola, Coach Early told him that he would pass the $40,000 bribe to Shawn Farmer, Smith's Jr.'s personal trainer, who would in turn give the money to Smith Sr.

f.      Gassnola issued an invoice to Adidas dated November 1, 2015 for $30,000 on behalf of the New England Playaz so that Adidas would have a pretext to provide reimbursement for the $40,000 paid to Smith's father.  (*See* Ex. 5.)  On November 5, 2015, Gatto emailed this invoice to an Adidas accountant with his approval to make payment.  (*Id.*)  On November 12, 2015, Defendant Adidas deposited $30,000 from its corporate account into the New England Playaz account via ACH electronic bank transfer in partial reimbursement of the bribe paid to Smith's father.  (*See* Ex. 4.)

g.      On November 11, 2015, Smith signed a National Letter of Intent committing himself to NC State under penalty of forfeiting his first year of athletic eligibility if he had knowledge that his parent falsified any part of the letter of intent.  (*See* Ex. 6.) The same day, Smith executed a financial aid agreement with NC State in which he falsely and unwittingly certified through his acceptance of the terms of the scholarship that he met "all applicable NCAA, conference, and institutional

regulations to be eligible for financial aid" when, in fact, he did not due to bribes paid to his father.

h.     On December 17, 2015, Smith electronically signed a Student-Athlete Statement with NC State in which he certified his eligibility for an athletic scholarship, including a certification whether in the past year he "or any member of [his family] [had] been paid money, borrowed money, or received any benefit of any kind form an athletics booster, sports agent, runner, or financial advisor," to which Smith unwittingly and falsely responded "no." (*See* Ex. 7.)

i.     Thereafter, Smith enrolled at NC State on an athletic scholarship and played on the school's Division I men's basketball team during the 2016-17.  Smith played in 32 televised NC State games wearing Adidas-branded gear.

148.     The $40,000 payment to Smith's father from Adidas was designed to be concealed from Smith Jr., the NCAA and officials at NC State, in order for the scheme to succeed and for Smith, Jr. to appear to be eligible to receive an athletic scholarship.  In furtherance of this scheme, Adidas, Gatto, Rivers, Gassnola and other Enterprise participants caused Smith Jr. to unwittingly make false certifications to NC State on December 17, 2015 regarding his amateur status and for NC State to award scholarship money to an ineligible student-athlete under false pretenses thus interfering with the school's ability to award scholarship funds in a manner consistent with NCAA rules. These certifications included a certification by Dennis Smith, Jr. as to his amateur status and compliance with NCAA amateurism rules and, on information and belief, a false certification by Coach Early regarding his knowledge of recruiting violations.  NC State's compliance director, Carrie Doyle, testified at Gatto's criminal trial that if the university "had found out about [the

bribery scheme] before we had issued the financial aid and it was determined to be valid and true information, we would never have provided the athletics scholarship" to Smith, Jr.

149.    Following the $40,000 payment to Smith, Adidas executives, including Gatto and Rivers, discussed a potential shoe endorsement deal with Smith Jr.

150.    In June 2017, Smith entered the NBA draft, played for the Dallas Mavericks for two years, and now plays basketball for the New York Knicks.  Smith's long-term value to Adidas as a sponsored athlete was based, in part, on his high visibility and position as a point guard.  Yet his unexpected signing of a $2 million sneaker deal with Under Amour in summer 2017 proved to be "a straight-up coup for Under Armour" and a huge loss to Adidas.  According to SBNation:

> Smith should've been a no-brainer for any of the big companies.  He ended up being a late lottery pick at No. 9, but he's one of the most athletic players in the draft class as a guard.  Sneaker companies want to sign guards because of how often they have the ball.  All eyes are always on them.
>
> . . . .
>
> Adidas has been there every step of the way for Smith, and it was expected that they'd have a bit of pull on him because of their past together.  That obviously turned out not to be the case.  Smith's lottery position didn't exactly help his cause, but Adidas missed out on an opportunity to sign one of the better talents in the draft class.  <u>It hurts them a bit more because now they're on the outside looking in with this class.</u>[23]

151.    On July 4, 2017, after Smith Jr. signed the sneaker endorsement deal with Under Armour, Gassnola sent a text message to Gatto, stating, "Wish you would tell Dennis to beat it. The disrespect is out of line."

---

[23]      Michael D. Sykes, II, *Dennis Smith, Jr. Spurns Adidas and Nike to join Under Armour*, SBNATION.COM, Aug. 8, 2017, *available at* https://www.sbnation.com/2017/8/8/16112342/dennis-smith-jr-under-armour-shoe-deal (emphasis added).

ii.    **Racketeering Activity Involving the University of Kansas**

152.    Between 2015 and 2017, Adidas continued funneling bribe payments to secure student-athletes' attendance at Adidas-sponsored universities in violation of federal wire fraud, money laundering, and sport bribery statues.

153.    On information and belief, in or around October 2016 and continuing into at least November 2017, Gatto, Adidas, and Gassnola conspired to illicitly transfer approximately $90,000 from Adidas to the mother of Billy Preston, a five-star recruit and McDonald's All-American high school basketball player, to secure his commitment to attend the University of Kansas—a Division I school sponsored by Adidas.

154.    On information and belief, the agreement to funnel payments to Preston's mother was made by Defendants Gatto, Adidas, Gassnola and others shortly after Preston unofficially committed to the University of Kansas.  These Defendants agreed to conceal the source of payments by causing the money to be transferred indirectly to Preston's mother from Adidas through a series of installment payments from Gassnola's AAU team.  At Gatto's direction, Gassnola submitted sham invoices to Adidas requesting the funds using interstate wire communication, which Adidas provided knowing that the money would be used to bribe Preston's mother to secure his commitment to the University of Kansas. According to Gassnola's testimony and related evidence, the Enterprise planned, discussed, and engaged in the following acts using interstate wire communications:

> a. On September 30, 2016, Preston made an official recruiting visit to the University of Kansas and also attended the opening night of the Kansas men's and women's basketball practice on October 1 known as "Late Night at the Phog."  Jim Gatto and T.J. Gassnola also attended the event, as did Preston's mother.

b. That evening, Gassnola met with Preston's mother in his room at the Olead Hotel and instructed her not to accept any offers of money from anyone other than Adidas. He then then offered her a bribe of $90,000 to ensure Preston would play for the University of Kansas men's basketball team.

c. The following morning, as Gassnola and Gatto were travelling to the airport, Gassnola recounted his conversation with Preston's mother. Gatto instructed Gassnola to move forward with the payments.

d. Gassnola subsequently emailed an invoice dated October 15, 2016 to Gatto in order to secure the first installment of the bribe payment. (*See* Ex. 8.) To paper over the true purpose and recipient of the funds, Gatto and Gassnola agreed to describe the payment on the invoice for $50,000 as a "Basketball Team Tournaments Fee" for Gassnola's AAU team, the New England Playaz.

e. On October 18, 2016, Gatto approved the invoice for payment (*see id.*) and on October 21 Adidas America wired $50,000 into the New England Playaz bank account. (*See* Ex. 9.)

f. On October 31, 2016, Gassnola withdrew the $50,000 Adidas payment from the team's account (*see id.* at 2) and, according to his testimony in the criminal trial, on or about November 1, 2016, he personally delivered $30,000 to Preston's mother at a hotel room in Manhattan, New York.

g. On November 9, 2016, Preston and his mother signed certain paperwork submitted to the University of Kansas in connection with Preston's intention to enroll and accept an athletic scholarship from the school. In particular, Defendants caused Preston to falsely and unwittingly certify through his acceptance of the terms of this

scholarship that he met "eligibility requirements for participation and financial aid established by" the NCAA and University of Kansas when, in fact, he did not due to the November 1 bribe payment to his mother. (*See* Ex. 10.)

h. On January 1, 2017, Adidas renewed its sponsorship agreement with the New England Playaz, with Gassnola continuing to serve as a consultant and continuing to "owe[] adidas a fiduciary duty of loyalty." (*See* Ex. 11.) Adidas's Head of Sports Marketing and General Counsel executed the agreement on behalf of the company. Paragraph VI of the agreement caps the total amount of "travel allotment" that may be paid to Gassnola and his team at $70,000 each contract year, payable March 15, with "any expenses incurred above and beyond the allotted amount" to be the sole responsibility of Gassnola.

i. Three days later, Gassnola submitted to Gatto an invoice dated January 4, 2017 in the amount of $90,000 and addressed it to Adidas's accounts payable department in Portland. To conceal the true purpose and recipient of the funds, Gatto and Gassnola described the payment on the invoice as "2017 1st Quarter Consultant Fee and T & E for 1st Quarter 2017." On January 9, 2017, Gatto forwarded the invoice to Gerald Adams, Adidas's Director of Finance, who approved the invoice for payment. (*See* Ex. 12.)

j. On January 18, 2017, Adidas wired $90,000 to the New England Playaz bank account at Berkshire Bank, a portion of which was intended for Preston's mother. (*See* Ex. 13.)

k. On January 19, 2017, Gassnola withdrew $27,500 of those funds in cash. (*Id.*) He testified that he then met Preston's mother in a room at the SLS Las Vegas Hotel,

where he was staying from January 19 to 22, and gave her an envelope containing $20,000 in cash from Adidas. Gassnola testified that he kept the remaining $7,500 for gambling and shopping expenses.

l. On February 24, 2017, Gassnola instructed his fiancée, Danielle LaBarre, to wire $20,000 to Preston's partner, Timcha Kirby. Gassnola told his fiancée to describe the payment on the wire transfer as "basketball camp." LaBarre sent the wire to Kirby the same day per Gassnola's instruction. (*See* Ex. 14.)

m. Gassnola testified that he told Gatto about the $20,000 payment to Kirby, and they agreed to use another sham invoice to secure the funds to reimburse Gassnola. Gassnola subsequently sent Gatto an invoice from himself, dated May 1, 2017, requesting payment from Adidas to the New England Playaz account at Berkshire Bank for a $70,000 "tournament activation fee." (*See* Ex. 15.) Gassnola testified that this description was false and that he, Gatto, and Adidas intend a portion of that money to be paid to Preston's mother. On May 23, 2017, Gatto emailed his approval of this invoice to a representative in Adidas's basketball marketing group with the instruction to "[l]et me know if any issues." (*Id.* at 2.)

n. On May 31, 2017, Adidas sent an electronic bank transfer for $70,000 to the New England Playaz bank account at Berkshire Bank, a portion of which was intended for Preston's mother. (*See* Ex. 16.)

o. On June 14, 2017, Gassnola wired $15,000 from the New England Playaz account at Berkshire Bank to Preston's mother. (*See id.* and Ex. 17.) Gassnola testified that he discussed this payment with Gatto.

      p. Adidas would make one more payment to Preston's mother: in a text message sent Sept. 22, 2017, Gassnola informed Preston's mother: "Have money for you, 4K. Gonna send late today early tomorrow when I get out of atl."

155.    In and around August 2017, Adidas and other members of the Enterprise conspired to secure through bribery the commitment of yet another top-rated high school basketball player to the University of Kansas, Silvio De Sousa.

156.    On August 8, 2017, University of Kansas assistant men's basketball coach Kurtis Townsend forwarded to Gassnola the contact information for De Sousa's legal guardian, Fenny Falmagne. The next morning, at 10:22 a.m., Gassnola texted Kansas head coach Bill Self with a request: "Hall of Famer. When you have 5 minutes and your alone. Call me p." Two hours later, at 11:43 a.m., Coach Self called Gassnola on the telephone and they spoke for five minutes and six seconds.

157.    Later on August 9, 2017, beginning at 5:24 p.m., Gassnola and Coach Townsend exchanged the following text messages:

      a. Gassnola to Townsend at 5:24 p.m.: "Hit me when u can"

      b. Townsend to Gassnola at 6:08 p.m.: "Coach self just talked to fenny let me know how it goes."

      c. Gassnola to Townsend at 6:08 p.m.: "I call no answer"

      d. Gassnola to Townsend at 6:08 p.m.: "I'll do it again now"

      e. Townsend to Gassnola at 6:08 p.m.: "He was on with us."

158.    At the time, De Sousa's legal guardian, Fenny Falmagne, had informed Gassnola that he had received an illicit $60,000 payment from an unidentified booster for the University of Maryland in return for a commitment to steer De Sousa to play basketball there (the University of Maryland has an apparel contract with Under Armour). De Sousa's guardian explained to

Gassnola, on information and belief, that De Sousa preferred to attend the University of Kansas, but in order to do so the guardian would need to repay the illicit payments to the University of Maryland booster.

159.    Later on the evening of August 9, 2017, Gassnola and Coach Self exchanged the following text messages:

   a.  Gassnola to Self at 9:33 p.m.: "I talked with Fennie"

   b.  Self to Gassnola at 9:34 p.m.: "We good?"

   c.  Gassnola to Self at 9:34 p.m.: "Always. That's was light work.  Ball is in his court now."

   d.  Self to Gassnola at 9:34 p.m.: "Spoke to Sean.  All good."  [According to prosecutors, Coach Self was referring to Kansas deputy athletic director Sean Lester.]

   e.  Gassnola to Self at 9:35 p.m.: "Will it be done by Tuesday Deadline ?"

   f.  Self to Gassnola at 9:35 p.m.: "From what I was told yes"

   g.  Gassnola to Self: "Great. Thank u boss"

160.    At the time of the above exchange, Kansas and Adidas were in the midst of negotiating an extension of Adidas's apparel sponsorship agreement with the university.  On information and belief, Coach Self linked in his discussion with Gassnola the help that he was getting from Adidas to bring him players such as De Sousa to the school's extension of Adidas's sponsorship agreement.

161.    On August 16, 2017, Coach Townsend forwarded to Gassnola a text message he received from Fenny Falmagne.  The forwarded text message was a conversation Falmagne had with his boss, Jon Lasko.  Lasko is a board member of the Under Armour-sponsored AAU team called the Florida Vipers.  De Sousa was a player on the Florida Vipers team.

a. In the original message to Falmagne, Lasko writes: "Fenny, I am in Indiana and Coach Ostrum asked me for an update. They are super willing to do what it takes to recruit Silvio. Is that something of interest for us?" [Ostrum is an associate head coach of the Indiana University men's basketball team.]

b. Falmagne forwarded the message from Lasko to Coach Townsend and explained: "Coach, that's my boss. Still pushing the issue, coach."

c. Coach Townsend then forwarded the message to Gassnola. Gassnola asked Townsend to explain its context. Townsend replied, "He needs to get out from under this guy. Doesn't mean anything, I was sending you what he sent me" (emphasis added). On information and belief, "get out from under this guy" was a reference to Lasko (the board member of the Under Armour sponsored AAU team) and the attempt to pay back the University of Maryland booster.

162.    On August 19, 2017, Gassnola and Coach Self exchanged more text messages. On information and belief, Coach Self was reiterating his request for the Enterprise's assistance in securing top recruits to his team as a condition for his support of Adidas's sponsorship agreement with Kansas:

a. Gassnola to Coach Self at 2:52 p.m.: "Hall of famer. Thank you for the help with Getting this extension done. Thx brotha"

b. Self to Gassnola at 2:53 p.m.: "I'm happy with adidas. Just got to get a couple of real guys."

163.    In response to the above discussions between Gassnola and the Kansas coaches, the Enterprise executed another criminal conspiracy involving wire fraud to secure De Sousa's commitment to the University of Kansas. Based on evidence and testimony from the trial of Gatto, Code, and Dawkins, the Enterprise planned, discussed, and engaged in the following acts using interstate wire communications in furtherance of that conspiracy:

a. After speaking with De Sousa's guardian, Gassnola informed Gatto of the situation regarding the need to repay $60,000 "to get Silvio's guy out from under his deal they had with this booster from Maryland." Gassnola testified that he told Gatto "what it was going to cost and what we had to do to get it done."

61

b.  On Saturday, August 26, 2017, De Sousa and Falmagne made what the media
described as a "surprise" official recruiting visit to the University of Kansas.  Later
that day, Coach Townsend forwarded to Gassnola a text message he received from
Falmagne which read: "We are good to go  We will commit tomorrow"

c.  On Sunday, August 27, 2017, De Sousa orally committed to play basketball at the
University of Kansas.

d.  On Monday, August 28, 2017, Gassnola sent a text message to Gatto stating, "Silvio
De Sousa commits to KU today."

e.  On Wednesday, August 30, 2017, De Sousa officially signed with the University
of Kansas.  Sports journalists covering college basketball described De Sousa's
decision not to attend the University of Maryland and, instead, commit to Kansas
as a surprise: "His visit came out of nowhere and the whole process of recruiting
him was shorter than most.  But that was all of the time Class of 2018, five-star big
man Silvio De Sousa needed to discover that Kansas was the right place for him."[24]

f.  On Thursday, August 31, 2017 at 4:21 p.m., Coach Self and Defendant Gatto had
a five-minute telephone conversation.  The call was wiretapped by the FBI, but due
to a technical issue the conversation apparently was not recorded.

g.  On September 11, 2017 at 10:56 p.m., Gatto spoke with Gassnola by telephone.
During the call, Gassnola told Gatto "I gotta send this guy another 20 grand out on
Wednesday," referring to Fenny Falmagne, "because I gotta get him out from under
this Under Armour deal." (emphasis added).  Gatto and Gassnola then discussed

---

[24]      Mark Tait, *KU Lands Commitment from 5-Star, 2018 Power Forward Silvio De Sousa*, KUSPORTS.COM,
Aug. 30, 2017, *available at* http://www2.kusports.com/news/2017/aug/30/sources-ku-lands-commitment-5-star-
2018-power-forw/

how Adidas and Gatto would reimburse Gassnola for making the $20,000 payment. They also discussed Gassnola's expenses, including discussions regarding Black Ops "underground" payments and whether to include those in Gassnola's expense reports. Gassnola told Gatto, "Well, what I'm going to do for you, because – I'm going to break all my expenses in the next month and I'll email so you have it. So, everything I've done this year . . . not the underground stuff, but everything else I've done." Gatto replied, "Put it all down, put everything down, man." Gassnola testified during the criminal trial that his reference to "underground stuff" meant "payments to families of players."

h. Gassnola also testified that he did not discuss the payment with anyone at Kansas "because Silvio would have been deemed ineligible and it wouldn't have helped at all."

i. Less than two weeks later, on September 22, 2017, Adidas publicly announced the extension of its sponsorship agreement with the University of Kansas.[25] Under the terms of the deal, Adidas would continue providing Kansas student-athletes with Adidas-branded footwear, uniforms, apparel, and accessories through 2031. The $191 million deal is the second largest Adidas sponsorship in college sports, and the largest in terms of total dollars paid to a school.

j. On November 8, 2017, De Sousa and his guardian each signed certain paperwork submitted to the University of Kansas in connection with De Sousa's intention to enroll and acceptance of an athletic scholarship from the school. In particular, De

---

[25]    Press Release, Adidas America, Inc., Adidas and University of Kansas Announce an Extension in Their Long-term Partnership (Sept. 22, 2017), *available at* https://news.adidas.com/US/Latest-News/adidas-and-university-of-kansas-announce-an-extension-in-their-long-term-partnership/s/75f006e9-ed57-4ba1-b3fe-ddc1372145ff

Sousa falsely and unwittingly certified through his acceptance of the terms of the scholarship that he met the "eligibility requirements for participation and financial aid established by" the NCAA and University of Kansas when, in fact, he did not due to the arrangement to bribe his legal guardian. (*See* Ex. 18.)

164.    The payments made by Adidas to Billy Preston's mother and Silvio De Sousa's guardian were designed by Defendants to be concealed from those student-athletes and from the NCAA and officials at the University of Kansas, among others, for the scheme to succeed and for the student-athletes to appear eligible to receive an athletic scholarship. In furtherance of this scheme, Adidas, Gatto, Gassnola and other members of the Enterprise caused or intended to cause others to make false certifications to the University of Kansas and the NCAA about the existence of the payments and known violations of NCAA rules, and for the University of Kansas to award scholarship money to Adidas-sponsored athletes under false pretenses and to interfere with the university's ability to award scholarship funds in a manner consistent with NCAA rules. These certifications included the above-cited certifications by Billy Preston and Silvio De Sousa as to their amateur status and compliance with NCAA amateurism rules and, on information and belief, false certifications by Coach Self and Coach Townsend regarding their knowledge of potential recruiting violations. University of Kansas compliance officials testified at the Gatto trial that the university would not have offered athletic scholarships had it been aware of the bribery scheme.

**iii.    Racketeering Activity Involving the University of Miami**

165.    Upon information and belief, beginning in July 2017, Enterprise members Gatto, Code, Augustine, Dawkins, and unknown others, conspired to illicitly funnel approximately $150,000 from Adidas to the family of another student-athlete who was a top high school basketball player in an effort to secure his commitment to play basketball at the University of

Miami.  On information and belief, the Enterprise engaged in the following acts in furtherance of that conspiracy:

    a.  On August 9, 2017, Dawkins and Code discussed by telephone a plan to pay money to the family of the high school recruit in order to secure his commitment to play basketball at the University of Miami.  During the call, Dawkins and Code discussed the fact that a coach at the University of Miami would need to telephone Gatto as part of the scheme.  Dawkins told Code on the call that the Miami coach "knows something gotta happen for it to get done."

    b.  A few days later, on August 11, 2017, Gatto and Code spoke by telephone twice about an alleged request from the University of Miami coach that Adidas pay $150,000 to the high school recruit in order to prevent him from committing to a different university sponsored by a rival athletic apparel company that supposedly offered to pay him $150,000.  During the initial call at 4:37 p.m., Code told Gatto, "we've got another Louisville situation" and that Miami coaches wanted to recruit this high school player to join its 2018 team.  Gatto confirmed that he had already learned about the request from coaches at Miami for assistance in securing the particular high school player's commitment to attend the University of Miami, and told Code that he had already spoken to the Miami coach about the player.  During the second call at 4:50 p.m., Gatto indicated Adidas's willingness to pay money to the recruit's family to secure his commitment to Miami, but with respect to the $150,000 sum, Gatto asked Code to try to negotiate the price down to $100,000. (*See* Ex. 19.)

65

c. When Code asked Gatto for approval on the payment, Gatto replied, "Well, let me talk to [Chris] Rivers on some things and then, you know, obviously, like you said, we don't need an answer today, but, I mean, if I, if I have to pay it out in '18, that's fine . . ." (*Id.*)

d. After discussing whether to make the payment in 2017 or 2018, Code replied, "You just talk to [Chris] Rivers, and hit me back, and let me know kind of what, what you, what you, what you think is the best course of action.  And then, I'll see what, what I can do with the numbers."  (*Id.*)

e. Gatto responded, "Yeah. Just try, try to get it to—what did we do with Bowen? 100?"  Code answered, "Yep."  (*Id.*)

f. The University of Miami played 32 games during the 2017-18 season.  Each of these games was publicly announced prior to its occurrence.

**iv.     Racketeering Activity Involving the University of Louisville that Injured Plaintiff Brian Bowen**

166.    By Spring 2017, the Enterprise's scheme to funnel bribe payments to secure student-athletes' attendance at Adidas-sponsored universities escalated to larger dollar amounts.

167.    By May 2017, Brian had not yet decided where he would attend college and play Division I basketball.

168.    Brian was a highly sought-after college prospect, having received approximately 25 scholarship offers from Division I programs because he performed in the classroom, on the court and was relentless in his pursuit to maximize his God-given athletic ability.

169.    Under NCAA rules recruits like Brian are only allowed five (5) official visits to Division I schools.  For many high school students, five official visits would be sufficient to allow them to make the best athletic and academic decision for their future.  For Brian, however, this

rule handicapped him in his ability to fully assess each of the many schools that had offered him a full scholarship.

170.    By his senior year of high school, Brian narrowed down his college choices to twelve major Division I programs, referred to by many as his "semifinals" list:



171.    Like all players, he knew could only commit his amateur athletic services and eligibility to one university and, therefore, it was important to find the program with the best basketball fit where he could develop as an athlete prior to entering the NBA draft.

172.    In Spring 2017, the Oregon Ducks made a historic run to the Final Four on the back of a 33-6 record.  The Ducks, however, fell short of playing for the national championship by losing to the University of North Carolina in a 77-76 thriller.  At the conclusion of its Final Four run, Oregon had no men's basketball scholarships available to offer to the next year's class.  That changed weeks later, however, after Oregon players Dillon Brooks, Jordan Bell and Tyler Dorsey declared for the NBA draft.

173.    Therefore, on May 8, 2017, Brian and his mother made an unofficial visit to the University of Oregon, a Nike-sponsored school, where he was offered a full scholarship and was told that he would be the focal point of the program going forward if he accepted.

174.    Unbeknownst to Brian, prior to his visit to Oregon, the Defendants had targeted him for their bribery scheme in an effort to obtain his amateur athletics services/eligibility for an Adidas-sponsored school, to make money off of his image and likeness while an amateur, and to secure him to a lucrative endorsement deal with Adidas once he entered the NBA.

175.    On May 18, 2017 at 3:52p.m.Dawkins sent Merl Code a text message asking, "Any Adidas schools that make sense for Bowen?"

176.    The same day, May 18, Code forwarded to Gatto an email sent earlier in the day to Chris Rivers by an individual in South Carolina that included information required to set up the AAU team, Karolina Khaos, as a vendor in Adidas's payment system.  (*See* Ex. 20.)

177.    On May 22, 2017, at 12:47 p.m. ET, Code texted Dawkins: "Don't send Bowen to Oregon!!!! Call me"  (*See* Ex. 21.)

178.    One minute later, at 12:48 p.m. ET, Code and Dawkins spoke via cell phone for 12 minutes.

179.    The next day, May 23, 2017 at 6:43p.m., Dawkins texted Brian and offered himself as a sounding board and advisor on his college decision: "Let me know if u have any questions or want to know anything background wise about the coaches or players before u make a final decision …whatever u do u will kill it!!"  Dawkins had obtained Brian's cell phone number from his father and, in the months prior, had been periodically reaching out to Brian to offer congratulations and words of encouragement on his college basketball recruitment in an effort to gain his trust.

180.    Later that evening, May 23 at 10:23p.m., Dawkins sent a text to the University of Louisville's head coach, Rick Pitino: "Would you have any interest in Brian Bowen or are you done recruiting?" Pitino responded, "We would love to have him."

181.    On May 26, 2017, at 8:50 p.m., Dawkins sent a text message to Code asking, "Is [Chris] rivers going to be in atl as well? Need to talk to him on this bowen/Lville situation."

182.    On May 27, 2017, Gatto left a voicemail for Coach Pitino: "Coach, Jim Gatto with Adidas. Hope all is well. Um, sorry to bother you over the weekend, but I just got a call about a player I want to discuss with you." (*See* Ex. 22.) Two minutes later, at 1:21 p.m. ET, Gatto spoke briefly with Coach Pitino. Immediately after his call with Coach Pitino, at 1:23 p.m. ET Gatto spoke with Code on the telephone for two minutes. At 4:05 p.m., Dawkins and Code spoke again on the telephone for three minutes.

183.    The following day, May 28, 2017, Brian and his family travelled to Kentucky to visit the University of Louisville. Brian approached the visit just as he had his other college visits: to determine if UofL was a good basketball fit and whether the athletic-based services it offered justified him entering into an agreement to play basketball for the Cardinals.

184.    Dawkins accompanied the family on their visit to Louisville's campus the next day, May 29. Unbeknownst to Brian, he was there on behalf of and in furtherance of the Adidas bribery scheme.

185.    Defendants knew, of course, that if either Brian or the University of Louisville discovered their bribery scheme, Brian would not be playing basketball for Adidas-sponsored Louisville.

186.    Consequently, Dawkins deceived Brian and the University of Louisville into believing he was accompanying Brian and his family on their visit as a friend and former AAU

coach when he was actually there on behalf of Defendants and in furtherance of their bribery scheme. (*See* Ex. 23.) (Dawkins identified on UofL's visit record as Brian's "AAU coach" and listed in Louisville's recruiting program as his "friend").)

187.    Brian's visit to Louisville's campus was highly structured to expose him to the most important athletic-related benefits he would receive at Louisville while preparing for a career in the NBA.  Aside from visiting with Coach Pitino and his assistants, Brian's visit included a tour of the YUM center where he would play before a televised audience of millions and meetings with the team's nutritionist and strength and conditioning coach.  So important were these athletic benefits to Brian that UofL scheduled an hour of his recruiting visit with the school's Director of Sports Nutrition and a half hour with the basketball strength training coach.  (*See id*.)  For Brian, who stands 6 feet 7 inches tall but at the time weighed only 195 pounds, his nutrition and muscle development were particularly critical to preparing him for the NBA, where players weigh an average of 250 pounds.

188.    During Brian's visit to Louisville, the athletic department informed him that he was eligible to play Division I basketball and offered him a spot on the basketball team.  Brian believed the coaches and athletic department officials he had met, as well as those with him on his visit, including Dawkins, were acting in good faith.  So he relied on UofL's representations regarding his NCAA eligibility to play basketball there while Dawkins, who was aware of the eligibility determination and scholarship offer, remained silent about the bribery scheme.  Rather, during the visit, Dawkins recommended to Brian that UofL was a good basketball fit and the right place for him to commit his amateur athletic services.

189.    Indeed, Dawkins and the other Defendants were aware that major Division I programs such as Louisville's treat their limited four-year scholarships as precious commodities

given the enormous revenue that is generated by college basketball programs. Louisville has been ranked by Forbes as the most valuable college basketball team in America, averaging annual revenues of $52 million and profits of $30 million during the 2014-15 to 2016-27 seasons. Its current profits eclipse that of the NBA's Cleveland Cavaliers, Oklahoma City Thunder, and Charlotte Hornets.

190.    Dawkins and the other Defendants knew that if UofL officials became aware of their bribery scheme and discovered he was on campus in furtherance of it, the school would not extend a scholarship offer to Brian. Consequently, Dawkins deliberately concealed the scheme and his role in it so that Louisville would formally offer a scholarship and its program's athletic related services to Brian.

191.    Late that evening, May 29, 2017 at 10:40p.m. ET, Dawkins reported back to Code in a text message: "Tell Jim [Gatto]. Let's get it done. I have to discuss with you the set up n the a.m."

192.    The following day, May 30, 2017, Defendants Gatto, Code, Gassnola, and Dawkins further coordinated the scheme over the telephone:

      a.    At 1:14 p.m. ET, Gatto and Code spoke via telephone for two minutes.

      b.    At 2:33 p.m. ET, Code and Dawkins spoke via telephone for one minute.

      c.    At 4:39 p.m. ET, Dawkins sent Code a text message stating, "Hit u when I get from around tugs." Dawkins was telling Code that he would call him once he was no longer in Plaintiff's presence.

      d.    At 5:19 p.m. ET, Code and Gassnola spoke via telephone for twenty-two minutes.

      e.    At 6:06 p.m. ET, Gatto and Gassnola spoke via telephone for four minutes

      f.    At 9:45 p.m. ET, Code and Dawkins spoke via telephone for fifteen minutes.

     g.   At 11:49 p.m. ET, Code and Dawkins spoke again via telephone for four minutes.

193.   On May 31, 2017, Gatto, Code, Gassnola and Dawkins continued coordinating in furtherance of the scheme:

     a.   At 10:31 a.m. ET, Gatto and Code spoke via telephone for thirteen minutes.

     b.   At 11:05 a.m. ET, Dawkins sent a text message to Code: "The deal is pretty much done. Just need to get everything lined up with Gatto and we can get scholarship papers signed. I can hold off Oregon, I'm pretty sure."

     c.   Immediately after receiving Dawkins' text, Code called Dawkins at 11:05 a.m. ET and they spoke on the telephone for three minutes.

     d.   At 11:13 a.m. ET, Code sent Dawkins a follow-up text message: "It's done. We just need to get the LOI [letter of intent] signed, not just the scholarship papers." Although the deadline for a college basketball recruit to sign a "letter of intent" had long since passed, Code wanted Brian to sign such a letter because doing so would commit him in writing to the University of Louisville (and, therefore, Adidas) and would prevent all other coaches from recruiting him. According to the NCAA, "[s]igning a National Letter of Intent ends the recruiting process because participating schools are prohibited from recruiting student-athletes who have already signed letters with other participating schools. . . . If a student-athlete signs a National Letter of Intent with one school but attends a different school, he or she loses one full year of eligibility and must complete a full academic year at the new school before being eligible to compete."[26]

     e.   At 5:39 p.m. ET, Gatto and Gassnola spoke via telephone for twelve minutes.

     f.   One minute after his call with Gatto ended, at 5:52 p.m ET, Gassnola sent a text message to Code and Dawkins stating, "I need to speak with both of y asap." (*See* Ex. 24.)

     g.   At 6:04 p.m. ET, Gassnola and Code spoke via telephone for eight minutes.

     h.   Minutes after their call finished, at 6:20 p.m. ET Gassnola sent a text message to Code stating, "By the way. The Bowen thing looks good for us Perception wise I think." Code immediately replied, "I think it's great for us!!!" (*See* Ex. 25.)

     i.   At 6:55 p.m. ET, Code and Dawkins spoke via telephone for seven minutes.

---

[26] *See* http://www.ncaa.org/student-athletes/future/recruiting

j.    At 8:03 p.m. ET, Code sent a text message to Dawkins stating, "Let me know when u speak to Jim [Gatto] and how the conversation turned out!!!"

k.    At 8:04 p.m. ET, Dawkins replied to Code's text message: "Going to call TJ [Gassnola] then jim [Gatto]."

l.    At 8:31 p.m. ET, Gassnola sent a text message directive to Dawkins, "Bowen needs to commit this evening."

194.    Because Defendants sensed an urgency in getting Brian to accept UofL's offer, they also communicated directly with his mother in an effort to achieve the scheme's purpose knowing that she and Brian have a close, trusting relationship and knowing that she had absolutely no knowledge of the Adidas bribery scheme.   In furtherance of the scheme, Dawkins made the following lies and misrepresentations to her via text messages:

a.    At 9:34 p.m., Dawkins texted: "I don't think he should make a decision based on a shoe company.  None of them are paying him.  That part isn't the reason u pick."

b.    At 9:35 p.m., Dawkins texted again: "Louisville is probably the best all around situation."

c.    At 10:01 p.m., Dawkins texted again: "The fact of the matter [tomorrow] is June 1 lol . . . He's got to do something soon."

d.    At 10:26 p.m., Dawkins falsely explained to her that Louisville's coaches wanted Brian to enroll for classes by the following day in order to ensure he has an opportunity to workout with the team: "The only issue is they need to get him enrolled even if it's in one class by tomo to be able to start getting him prepared for one season. . . . They just need to get the class enrollment done.  That's why they are pressing.  It's their academic people on their case."

195.    At 12:19 a.m. ET on June 1, 2017, Dawkins informed Gassnola via text message, "He's going to go to Louisville. He committed to them tonight."

196.    The next morning, June 1, 2017, Gatto spoke with Gassnola and Code on the telephone.  At 12:21 p.m. ET, Gatto then called Coach Pitino and left him a voicemail: "Coach, Jim Gatto. Hope all is well. Checking in.  Heard the good news. Um, it's going to be great, and

73

I'm excited for you guys." (*See* Ex. 26.) Gatto made no mention of the bribe payment in his message to Coach Pitino.

197.    Later that day, June 1, Brian entered into a student-athlete financial aid contract with the University, which included terms and conditions regarding his amateur status and eligibility. (*See* Ex. 27.) This legally binding contract represented, among other things, a property interest that Brian possessed and was entitled to enjoy free from the Defendants' interference or harm.

198.    On June 3, Brian announced publicly that he would attend the University of Louisville.

199.    On June 7, 2017, Brian signed and submitted to UofL a Student Athlete Statement Concerning Eligibility affirming his understanding of NCAA bylaws regarding student-athlete eligibility and amateur status, attesting to his compliance with those bylaws, and his NCAA eligibility. (*See* Ex. 28.) A University of Louisville compliance official testified during the criminal trial of Gatto, Code, and Dawkins that the university would not issue a scholarship to any student who did not or would not sign this document.

200.    Each of the Defendants knew Brian would make the foregoing June 1 and June 7 certifications of amateurism and eligibility as part of his enrollment at Louisville and, therefore, withheld from him all knowledge regarding the bribery scheme in order to cause him to submit these certifications to UofL compliance officials.

201.    Indeed, Brian had no knowledge of the Adidas bribery scheme to lure him to Louisville until news of the government's investigation broke and he had no reason to believe that Adidas and its co-conspirators were engaged in criminal acts to secure his commitment to the University of Louisville. At no time ever had Plaintiff hired, authorized, or held out Dawkins, his

father, or anyone else to act in any capacity as a sports agent or to secure his admission to any university in exchange for any benefit. Had Brian known of Defendants' bribery scheme, he would have not committed to Louisville or any other Adidas-sponsored university because doing so would have rendered him ineligible to play Division I basketball and, thus, would have destroyed his singular opportunity to develop physically and athletically on a national stage in the NCAA proving ground while obtaining an education.

202. Upon information and belief, Adidas was expected to record the $100,000 payment to Brian's father "off the books," as that was the manner in which prior dealings with Defendant Code had been handled by Adidas. But prior to making the bribe payment, Gatto and Code needed to generate sham purchase orders and invoices to mask the illegal payments on Adidas's financial records so it could not be traced back to the company if it were to ever come to light.

203. On June 5, 2017, Code emailed Gatto a sham invoice dated June 8 from the Karolina Khaos AAU team based in South Carolina for $25,000 in "travel team expenses." (*See* Ex. 29.) Gatto approved this invoice for payment knowing it was false and sent it to Adidas's marketing finance department for processing.

204. On June 7, 2017, at 11:49a.m., Code sent a text message to Dawkins: "Gatto and I spoke. Call me."

205. On June 17, 2017, Code submitted to Gatto a personal invoice claiming a $50,000 "consulting fee" and $25,000 for "travel expenses." On June 19, Gatto emailed the invoice to Gerald Adams, Adidas's Director of Finance, and asked Adams's assistant to "process this one for Merl." On July 5, Gatto electronically approved the invoice and transmitted it to Chris McGuire, Adidas's Head of Sports Marketing, who approved it on July 7. McGuire then electronically

routed the invoice to Zion Armstrong, Adidas America's second-in-command, who approved the $75,000 payment to Code on July 14. (*See* Ex. 54.)

206.    On June 19, 2017, Gatto forwarded via email a second invoice from the Karolina Khaos AAU team for $5,000 to the Adidas marketing finance department for payment knowing it was false. Gatto told the recipient, "I sent you an invoice last week for them, was for something else. This is for some travel, can you please process this one as well."

207.    On June 20, 2017, Code, Dawkins, Sood, Sood's personal assistant, Marty Blazer (the FBI informant), and two undercover FBI agents known as "Jill Bailey" and "Jeff DeAngelo" met in New York. During the discussion, which was video recorded by the FBI, Code explained to the undercover agents the rationale behind the Adidas bribery scheme:

> You definitely want to have some control or some level of relationship at a particular school, because there are certain schools where we say 'can't go there.' Like Kentucky. You know, Oregon. Not going. You know what I mean? Like anytime I have my hands on a kid, no, you are not going. . . . So if I let my kid go to Kentucky, I promise you I won't get him back. If I let—Brian Bowen was going to Oregon and I was like he is not going to Oregon. Not getting him back.

208.    On June 22, 2017, the marketing finance department sent an email response to Gatto informing him that the Karolina Khaos team could not be found in the company's vendor payment system and that it would need to be registered as a vendor before its invoices could be processed. Gatto subsequently informed Code of the problem. (*See* Ex. 30.)

209.    On July 6, 2017, Code exchanged emails with Adidas's marketing finance department and forwarded a corrected version of the June 18 Karolina Khaos invoice for $30,000 that included the team's vendor number. In his email, Code falsely stated that he was submitting the revised invoice on behalf of Ricky Robertson because "[h]e's currently at work and has limited access to a computer." (*See* Ex. 31.)

210.    Because Code realized the revised sham invoice for $30,000 would not be processed quickly, Code asked Sood, Dawkins, and an unidentified FBI undercover agent referred to as Jeff DeAngelo, who was posing as a financial backer for a new sports management business that Dawkins and Sood were forming called Loyd Inc, to make an initial $25,000 payment to Brian's father on Adidas's behalf with the understanding that it would later be reimbursed by Adidas.  In particular, on July 7, 2017 at 11:14 a.m., Dawkins and Code discussed this plan on a telephone call that was picked up on the FBI's wiretap:

   a.  Code called to tell Dawkins that he had "bad news" about the payment from Adidas, explaining that "my group gets [] an email about the invoice" that "ask[s] for all these PO numbers and vendor numbers and blah blah blah blah blah."

   b.  Code explained that he had expected Gatto and Adidas to have handled the bribery payment "off the books," noting that Code's "group got paid off the books umm from the team perspective this year.  Rivs [Chris Rivers] just did it. . ."

   c.  Code then informed Dawkins that he had tried to submit a sham invoice to Adidas for the bribe payment, but when he submitted the invoice "for the whole Louisville situation," Adidas "didn't have any record of the organization in the system."  Code described how he would have to "create a vendor number" and then a "purchase order" to justify the request for bribe money.  Consequently, they would not have access to the funds for several weeks.

   d.  Code lamented to Dawkins that Gatto should have "flex[ed] his muscle and just push it though the system, but that's obviously not what's happening.  He's doing this legitimately."  Code then asked whether Dawkins could arrange for Sood or

DeAngelo to make an initial payment to Brian's father.  Code told Dawkins that Adidas would reimburse them for the initial payment.

e.  Immediately after speaking with Code, Dawkins called Sood at 12:00p.m. and asked for his advice on whether to request $25,000 from DeAngelo: "[D]o you think I can go to Jeff [DeAngelo] and say, listen I need 25-grand, I can give you 25 whole back in two weeks.  Do you think he'd do it?"  Sood replied, "It depends on how much more your going to ask for him today."

211.    On July 10, 2017, at 12:42 p.m., Code, Sood and DeAngelo spoke on a telephone call regarding the need for DeAngelo to fund the initial $25,000 payment.  (*See* Ex. 32.)  During the call, Code provided a lengthy explanation of how sham arrangements are the way Adidas masks payments to high-school athletes in order to get around NCAA rules. Code further admitted that the rationale behind Adidas making such payments was to ensure not only that a targeted high-school athlete would attend an Adidas-sponsored university, but also that the athlete would sign an endorsement deal with Adidas when he entered the NBA.  In particular:

a.  Code, Sood, and DeAngelo discussed the possibility that DeAngelo would "front" the money needed to make the first $25,000 payment because, according to Code, "long story short, it's gotta go through some, some processes [at Adidas] and steps and what have you, and it takes a while.   So we're talking another two to three weeks before it really runs through the corporate structure."

b.  Code suggested to Sood and DeAngelo that "for cleanliness and lack of questions," the bribe payment should be in cash.

c.  Code also confirmed the rationale for the bribe was to ensure that Brian would sign an endorsement contract with Adidas when he entered the NBA.

d.   DeAngelo agreed to front the initial $25,000 payment and Code confirmed that Adidas could reimburse the payment in "a number of ways. . . . If you don't care, then certainly it could be via check.  If you do care, it could be by other means."

e.   Code told Sood that Adidas could not reimburse Loyd Inc. directly, but the payment would have to be funneled through a "501(c)(3)" and then the 501(c)(3) organization would pass it to the next person: "So, so what will happen was it'll go to a—it's in process to go to a 501(c)(3). . . . And then that 501(c)(3) will then cut the check wherever you guys need it to be cut."

f.   Code also told Sood and DeAngelo that "you guys are being introduced to, you know, shoe wars and how stuff happens with kids and getting into particular schools and so this is kind of one of those instances where we needed to step up and help one of our flagship schools in Louisville, you know, secure a five star caliber kid. So obviously that helps, you know, our potential business in terms of, in terms of Adidas. . . . as an Adidas school."

g.   Highlighting Defendants' intent to defraud the young student-athletes and universities, Code explained that by funneling the money through third-party companies, Adidas was "not engaging in a monetary relationship with [an] amateur athlete," rather, "we're engaging in a monetary relationship with a business manager, and whatever he decides to do with it, that's between him and the [student-athlete's] family."  Code added, "we can't get involved directly in those kinds of situations and scenarios but certainly when it helps one of our flagship schools, you know, we're more apt to try to help that business manager or that

particular agent or – you know, because that's, you know, helps them and it helps us."

212.    On July 11, 2017, the undercover FBI agent known as Jeff DeAngelo traveled to Sood's office in Princeton, New Jersey and gave him an envelope containing $25,000 in cash. DeAngelo then sent a text message to Code that at 4:48 p.m stating: "Gave Munish the 25 today. He will handle delivery."

213.    Sood confirmed to Dawkins that he received the cash.  On July 12, 2017 at 11:32p.m., Dawkins sent Sood a text message stating, "OK cool.  Give him [Bowen, Sr.] 19,400. Put the rest n my acct."  (*See* Ex. 33.)  At 11:55p.m., Sood texted Dawkins, "19400 to dad, 2600 to cover flights and 3k into acct."  (*Id.*)

214.    On the evening of July 12 and the morning of July 13, 2017, Sood sent Bowen, Sr. six text messages to coordinate the cash drop. (*See* Ex. 34.)  Sood then drove to a parking lot of an office building in Florham Park, New Jersey to meet Bowen, Sr. and gave him $19,400 in cash. On his way there, at 11:14 a.m., Sood spoke to Dawkins on the telephone and made clear to him that he did not want to personally handle any more cash drops in the future.  (*See* Ex. 35 ("[L]et's try to avoid this sh** in the future").)

215.    During a telephone call on July 14, 2017 at 11:50 a.m. between Sood and Dawkins, Sood confirmed that he provided Brian's father the bribe money and expressed his belief that by doing so he had secured Brian's commitment to attend the University of Louisville and commitment to retain a new sports management company that Dawkins and Sood were forming.

    a.    During the call, Dawkins explained to Sood that if Brian was a "one and done" player, meaning that if he played only one year of Division I men's basketball

before entering the NBA draft, "he may be top 20" pick in the draft, but if Brian

played two years of Division I basketball he "should be a top ten pick."

    b.  Sood then told Dawkins that he scolded DeAngelo for communicating via text

        message: "I said, look, don't f***ing do this again. . . . I said don't text him . . .

        don't do this sh** over the phone. . . . So, I think we got that under control, I think

        that's okay now."

216.    On July 17, 2017, Code sent a text message to Ricky Robertson, team director of

the Karolina Khaos, inquiring whether he received payment on the sham invoices Code submitted:

"Did u get a payment confirmation email yet?"  Robertson replied, "No not yet."

217.    On July 24, 2017 at 1:11 p.m., federal authorities recorded a call between Code and

Dawkins discussing how Gatto and others at Adidas intended to reimburse the initial $25,000

installment of the bribe and make payment on the balance.  Dawkins was anxious about receiving

the funds from Adidas and told Code that he did not want anything "funky" to happen to it.  Code

agreed, telling Dawkins that he would speak to Defendant Gatto about it and "might have to lean

on Rivs [Chris Rivers]."  Code and Dawkins also discussed that Gatto and others at Adidas were

accounting for the unlawful bribe payment by booking it on Adidas's records as a payment to the

Karolina Khaos AAU team that is affiliated with Code.  When Dawkins expressed surprise that

Adidas was recording some of the bribe payments on its books at all, Code reassured him that

Gatto had identified it "as a payment to my team, to my organization, so it's on the books, [but]

it's not on the books for what it's actually for."  Later that day, at 5:35p.m., Code texted Dawkins:

"Spoke to Gatto. Everything is good."

218.    On July 25, 2017, Gatto sent several terse emails internally in an attempt to get the

$30,000 sham invoice from the Karolina Khaos paid.  In one of those email, Gatto wrote, "Olivia

and I have been having issues getting this paid, it has been over a month and Olivia has not received any responses per her inquiries."  Gatto then provided the "budget code" to be assigned to the payment.  (*See* Exs. 36, 37.)

219.    On July 26, 2017, Gatto received an email response from the sports marketing finance department indicating that the invoice had been approved and that the Karolina Khaos "should be seeing payment soon."  The email included a copy of the invoice indicating payment approval by Gatto and Lindsay Harksen, an Adidas finance manager.  (*See* Ex. 38.)

220.    On August 1, 2017, the Karolina Khaos AAU team received an incoming wire transfer of $30,000 from Adidas.  (*See* Ex. 39 at 2.)  The same day, a $25,000 check issued from the Wells Fargo bank account belonging to the Karolina Khaos AAU team was deposited into Dawkins's Loyd Inc. account at Bank of America.  In an apparent effort to obscure its illegal purpose, and at Code's direction, the memo line of the $25,000 check identified it as a payment for "consulting fees."  (*See* Ex. 40.)

221.    On August 3, 2017, Sood also drafted and deposited into the Loyd, Inc. account at Bank of America a check in the amount of $8,000 drawn from his FINRA-regulated investment management company, Princeton Advisory Group, Inc.  (*See* Ex. 41.)

222.    In a telephone call on August 16, 2017 at 8:03p.m, Dawkins confirmed to the undercover FBI agent known as Jill Bailey that Code had reimbursed Dawkins on behalf of Adidas through a payment to Sood and Dawkins's Loyd Inc. account.  During that call, Dawkins also told Bailey that he was in the process of signing family members who received Adidas bribe money to agreements because "I want to have this protected as possible across the board," adding that, "obviously, we've got to put funding out and some of the money can't be completely accounted for on paper because some of it is, whatever you want to call it, illegal . . ."

223.    On August 31, 2017, UofL men's basketball and athletic compliance officials certified the eligibility of the players on its men's basketball team, including Brian, pursuant to NCAA requirements.  (*See* Ex. 42.)  Each of the Defendants knew UofL team and compliance officials would be required to make this certification and, therefore, withheld from them information regarding the bribery scheme in order to effect the certification.

224.    In mid-September 2017, Gatto and Code discussed plans to create another sham invoice to cover a second $25,000 installment of the bribe payment that was to be made to Brian's father in November 2017.  On September 13, 2017, federal authorities recorded a telephone call between Gatto and Code in which they discussed plans for the additional bribe payments to be made by Adidas.  During that call, Gatto asked, "[W]hen's the next, ah, payment we've got to make for Bowen?"  Code responded, "because we said four, we did 25, so I will tell you probably November."  Gatto told Code to "get the invoice in now," adding that it's "probably going to take a month knowing our system . . . Let's just get that out of the way now and then we'll figure out the other fifty [thousand] in '18."  (*See* Ex. 43.)

225.    The next day, September 14, 2017, Code emailed Gatto a sham invoice from the Karolina Khaos dated September 18, 2017 for $25,000 in "November travel expenses" with the message: "Per our discussion I'm sending over the invoice requested for submission and processing."  (*See* Ex. 44.)  Twelve minutes later, Gatto forwarded the sham invoice to the assistant to Gerald Adams, Adidas's Director of Finance, with a request to process it for payment.  (*See* Ex. 45.)  Gatto again electronically entered his approval for payment of this invoice on September 18.  (*See* Ex. 46.)

226.    On September 20, 2017, Adidas wired $25,000 to the Karolina Khaos account at to cover the second installment of the bribe payment to Brian's father.  (*See* Ex. 39 at 6.)  The same

day, Code telephoned Ricky Robertson, the team director of the Karolina Khaos and instructed him to write a check for $25,000 from the Karolina Khaos account and deposit into the Bank of America account for Loyd, Inc., the company controlled by Sood and Dawkins.  (*See* Ex. 47.) Robertson did as he was instructed and texted Code a picture of the deposit slip.  (*See* Ex. 48.)

227.    Gatto and Code were arrested before the second bribe payment could be made.

228.    The agreed upon $100,000 series of payments to Brian's father from Adidas was specifically intended by Defendants to be concealed, including from Brian, the NCAA, and officials at the University of Louisville, for the scheme to succeed and for Brian to appear to be eligible to receive an athletic scholarship and compete on the team.

229.    In furtherance of this scheme, Adidas, Gatto, Rivers, Dawkins, Code, Sood, and Gassnola and other Enterprise participants knowingly made, intended to make, and caused and intended to cause others to make misrepresentations and material omissions in communications with Plaintiff and the University of Louisville personnel regarding the existence of the $100,000 bribe scheme in order to induce Louisville to award scholarship money and a position on its men's basketball team to Plaintiff under false pretenses, and to induce Plaintiff to accept Louisville's offer under false pretenses.

230.    As outlined above, these omissions of material fact occurred during each of Defendants' direct and indirect communications with Plaintiff, with Coach Pitino, and in the presence of UofL personnel during Plaintiff's unofficial visit.  By depriving both Plaintiff and the University of Louisville of the opportunity to weigh the true benefits and risks of offering/accepting a position on the team—i.e., that Plaintiff would be rendered ineligible under NCAA rules by Defendants' bribery scheme—Defendants harmed Plaintiff and the University of Louisville.  By withhold this material information in communications, these Defendants

specifically intended and, in fact, caused Brian to make false representations to Louisville on June 1 (student-athlete financial aid agreement) and June 7, 2017 (Student Athlete Statement Concerning Eligibility) regarding his amateur status and compliance with NCAA amateurism rules, and intended to and caused him to make a binding decision to commit to Louisville on June 1, knowing that their conduct, in fact, was violating NCAA rules and would render Brian ineligible.

231.    These Defendants also acted with the specific intent that UofL would award scholarship money to an athlete they knew would be ineligible under NCAA bylaws due to their conduct, thus depriving UofL of scholarship money, depriving it of the final position remaining on its basketball roster, and subject it to NCAA sanctions and penalties.

232.    At the criminal trial of Gatto, Code, and Dawkins, University of Louisville's Senior Associate Athletic Director for Compliance, John Carns, testified that one of the criteria for awarding an athletic scholarship is that the student-athlete has to meet "NCAA requirements [for] amateurism." Carns testified on October 3 and 4, 2018, that Louisville does not award scholarships to ineligible student-athletes "[b]ecause if they are ineligible to compete, you're using the scholarship for somebody that could be eligible." Further, he testified that Louisville would not have approved an athletic scholarship to Brian had they been made aware of the bribery scheme. Indeed, on September 27, 2017, the day after prosecutors and the FBI unsealed the criminal charges, Louisville's compliance department circulated an email internally confirming that "Brian is both ineligible to compete and ineligible to participate in practice, conditioning, weights, sports performance, skill instruction or any other countable activity."

233.    Upon information and belief, Brian Bowen was not the only student-athlete whom the Enterprise improperly sought to steer to the University of Louisville via the bribery scheme with the expectation that he would sign an endorsement deal with Adidas when he entered the

NBA.  On or about July 27, 2017, federal authorities recorded a meeting in a Las Vegas hotel room

between Jeff DeAngelo, Dawkins, co-conspirator Brad Augustine, an unidentified assistant

basketball coach for the University of Louisville ("Coach-1"), which on information and belief is

Jordan Fair, and FBI informant Marty Blazer, during which the five men discussed their plans to

bribe the family of a high school recruit who was playing for Augustine's "1 Family" AAU team

and expected to graduate in 2019.  As Dawkins explained, the money would "get this kid to,"

attend the University of Louisville with the expectation that "the kid will come back to us,"

referring to himself and the sports management business he was forming with of Sood.  Further,

on information and belief, during the Las Vegas meeting:

    a.   Dawkins noted that because Louisville was already on probation with the NCAA,

        they would have to be particularly careful with how they passed money to the high

        school recruit's family.  Coach Fair agreed, stating "we gotta be very low key."

    b.   Augustine stated that Adidas, which sponsored the second player's AAU team,

        would be supportive of the plan, while Dawkins concluded that their plan to funnel

        money to the high school player's family in exchange for the player's commitment

        to attend the University of Louisville and to sign with Dawkins and Adidas "works

        on every angle. We have Merl [Code] at [Adidas], we have Brad [Augustine] out

        with the kid," and, nodding at Coach Fair, "we have [the University of Louisville]."

    c.   Dawkins, DeAngelo, and Augustine then discussed the logistics of funneling bribe

        payments from Adidas to the recruit's family.  Augustine suggested the "easiest

        way" would be to send the money to a non-profit set up for Augustine's 1 Family

        team, but that he would also accept cash.  DeAngelo then handed Augustine an

        envelope containing $12,700 in cash and explained to Coach Fair that it would

"mak[e] [Louisville] and your program happy in the sense that the kid is . . . going to Louisville, and after Louisville, he's gonna come back to us."

    d.    After Coach Fair left the hotel room, Dawkins and the others spoke about the scheme to bribe Plaintiff Bowen's father.

234.    The University of Louisville played 33 games during the 2017-18 regular season.

## C.    <u>Money Laundering Conspiracy in Furtherance of the Enterprise's Predicate Acts</u>

235.    In executing the bribery scheme described above, the Adidas Bribery Enterprise participants conspired to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce involving the proceeds of specified unlawful activity—*i.e.*, wire fraud and tax fraud—knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of such unlawful activity and knowing that the funds involved represented proceeds of some form of unlawful activity.

236.    As set forth above, and on information and belief, the Enterprise has engaged in predicate acts of racketeering for years, including in the period when informant Marty Blazer first learned of the criminal conduct.

237.    Specifically, and in the words one of Adidas's sneaker industry competitors, "[A]didas achieved valuable marketing advantages as the players subject to its bribes wore [A]didas's products, impliedly suggesting that such products have superior style or performance characteristics. [A]didas thereby unfairly and illegally boosted its goodwill, image, and reputation and affected consumer preferences—both in the athletic performance and athletic fashion footwear markets and in the overall footwear market where both companies [Adidas and Skechers]

compete." *Skechers USA, Inc. v. Adidas America, Inc.*, No. 2:18-cv-03882, C.D. Cal. May 9, 2018 (ECF No. 1 ¶ 4).

238.    Upon information and belief, as a result of affecting consumer preferences through its unlawful bribery and market boosting efforts, Adidas generated additional proceeds from sales of apparel and footwear that it would not have received had it not engaged in the criminal acts of racketeering described herein—money that the Adidas Bribery Enterprise participants then converted to cash through their sham invoicing scheme and illegally directed to the next round of prospective student-athletes at Adidas-sponsored universities.

239.    To conceal its redeployment of these proceeds, the Enterprise laundered these funds through bank accounts controlled by AAU grassroots basketball teams affiliated with the Adidas brand and controlled by Defendants Code, Gassnola, and other AAU Basketball Participants.  The purpose of laundering the funds through AAU grassroots basketball teams was to conceal the source of the funds before they were delivered to families of student-athlete recruits so there would be no apparent linkage to Adidas.

240.    Among the AAU basketball teams that the Enterprise conspired to launder Adidas's proceeds through are the Karolina Khaos, based in South Carolina, the New England Playaz, based in Massachusetts, and 1Family, based in Florida.

241.    On information and belief, each of these teams are registered as tax-exempt charitable organizations under section 501(c)(3) of the Internal Revenue Code.

242.    For example, Defendants attempted to launder money to be paid to Plaintiff's father by creating and paying sham invoices ostensibly from the Karolina Khaos AAU team.  In June 2017, Ricky Robertson, the director of basketball operations for the Karolina Khaos and manager of its finances, met with Defendant Code at Robertson's church.  According to Robertson's

testimony at Code's criminal trial, during the meeting Code informed him that "there would be some extra money coming" into the team's bank account and to let Code know when the money arrived. Code did not inform Robertson of the purpose of the incoming funds.

243.    On June 5, 2017, Code sent an email to Gatto that included as an attachment an invoice from the Karolina Khaos for $25,000 in travel team expenses, which Gatto then approved and forwarded to Adidas's marketing finance department for payment. (Ex. 29.)

244.    On June 19, 2017, Gatto sent a second email to the marketing finance department with another invoice from the Karolina Khaos dated June 18 in the amount of $5000 for "July Travel Team Expenses." Gatto told the recipient, "I sent you an invoice last week for them, was for something else. This is for some travel, can you please process this one as well." (*See* Ex. 49.)

245.    On June 22, 2017, the marketing finance department sent an email response to Gatto stating, "I cannot find these guys in the system. We will need to set them up as a vendor. Do you need the forms?"

246.    On July 6, 2017, Merl Code sent an email to Adidas's basketball sports marketing department, copying Robertson, that included as an attachment an invoice labeled "Karolina Khaos, July travel expenses, Adidas invoice 2017." (*See* Ex. 50.) The invoice, dated June 18, 2017, indicated it was from the Karolina Khaos, care of Robertson, to Jim Gatto. The invoice included a false description of "July Travel Team Expenses" in the amount of $30,000. In fact, Robertson never requested a $30,000 payment from Adidas for July travel team expenses.

247.    In a July 6, 2017 email, Gatto and the marketing finance department discussed that Code combined the original $25,000 and $5,000 invoices together into a revised, single invoice for $30,000. (*See* Ex. 51.) Gatto signed and approved the revised $30,000 invoice for payment.

248.    On July 26, 2017, the marketing finance department emailed Gatto, "Sent it in today.  They should be seeing payment soon."  (*See* Ex. 38.)

249.    On August 1, 2017, Adidas deposited $30,000 into the Wells Fargo bank account of the Karolina Khaos AAU team.  Robertson did not know why Adidas deposited funds into his team's account.

250.    On the same day, and at Defendant Code's direction, Robertson wrote a check in the amount of $25,000 from the Karolina Khaos account to Loyd Inc.—a company created by Dawkins and Sood and the undercover FBI agents—and wrote "consulting fees" in the memo line of the check.  At the time he wrote the check, Loyd Inc. had never provided consulting services to the Karolina Khaos team.

251.    Robertson and Code exchanged text messages that day, including images of a receipt for the $25,000 check deposit into the Loyd Inc. account and information regarding when the funds deposited into the Loyd Inc. account would be available.

252.    On the same day, Code sent a text message to Dawkins that included an image of the deposit receipt into the Loyd Inc. bank account that Dawkins controlled.

253.    On the same day, and at Defendant Code's direction, Robertson withdrew $5,000 in cash from the Karolina Khaos account and delivered it to Code at a barber shop in Greenville, South Carolina.

254.    On September 13, 2017, as described above, Gatto and Code spoke on the telephone regarding a second invoice from the Karolina Khaos.  The following day, Merl Code sent an email to Gatto, copying Robertson, that included as an attachment an invoice labeled "Karolina Khaos, November travel expenses, Adidas invoice 2017."  In the email, Code wrote to Gatto: "Per our discussion, I'm sending over the invoice requested for submission and processing."

255.    The invoice, dated September 18, 2017, was marked from the Karolina Khaos to Jim Gatto.  The invoice included a false description of "November travel team expenses" in the amount of $25,000.  In fact, Robertson never requested a $25,000 payment for November travel team expenses, had no team travel planned in November 2017, and the team played no games in November 2017.  Gatto approved the invoice for payment.

256.    On September 20, 2017, Adidas deposited $25,000 into the Wells Fargo bank account of the Karolina Khaos AAU team.

257.    On or about September 20, 2017, Code and Robertson exchanged text messages in which Code asked Robertson, "Did you get a payment confirmation email" and Robertson replied, "No, not yet."  Code and Robertson also spoke on the telephone regarding the funds.

258.    On September 21, 2017, at Code's direction, Robertson drafted a check in the amount of $25,000 from the Karolina Khaos Wells Fargo account to Loyd Inc. and deposited the check at a local Bank of America branch.  (*See* Ex. 40.)

259.    On the same day, Code sent a text message to Dawkins that included an image of a receipt for the $25,000 deposit into the Loyd Inc. bank account that Dawkins controlled.  On information and belief, those funds were to be paid by Defendants to Plaintiff's father as the next installment of the $100,000 bribe and would have been paid but for Defendants' arrests on September 25, 2017.

260.    Another example of the Enterprise's money laundering activity in furtherance of its racketeering activity involves the New England Playaz AAU team controlled by Defendant Gassnola.  On information and belief, the contract between Adidas and the New England Playaz called for the team to receive $70,000 annually in bona fide sponsorship funds.  Between January

2016 and August 2017, however, Adidas funneled $761,810 through the team's bank account. (*See* Ex. 52.)  The following exemplar fictitious invoices were paid by Adidas:

    a.  October 15, 2016 invoice for $50,000 submitted to Adidas by Gassnola on behalf of the New England Playaz for tournament fees;

    b.  January 4, 2017 invoice for $90,000 submitted to Adidas by Gassnola on behalf of the New England Playaz for a first quarter 2017 consultant fee and first quarter travel and expenses;

    c.  May 1, 2017 invoice for $70,000 submitted to Adidas by Gassnola on behalf of the New England Playaz for a tournament fee.

261.    Gassnola also submitted sham invoices directly to Adidas for reimbursement to himself for consulting services and expenses, totaling $239,521.67 in a single period.  (*See* Ex. 53.)  Further examples of the wire fraud involving Adidas and the New England Playaz are set forth earlier in this Complaint.

262.    On information and belief, each of these invoices were reviewed and approved by the Adidas Participants, including Gatto, Rivers, and Code, and were in fact paid by Adidas.  On information and belief, the Adidas Participants were aware that the true purpose of these sham invoices payments was to secure funds for the Enterprise's racketeering activity and not for legitimate AAU team expenses.

263.    On information and belief, the money funneled through these sham invoices was directed to and made available for use by the Adidas Bribery Enterprise in its unlawful racketeering activity.

264.    On information and belief, one of the reasons the Enterprise was able to easily launder money from Adidas to the families was due to intentionally loose oversight and lack of

meaningful financial controls over Adidas's finances. Plaintiff is informed and believes that, within Adidas, the marketing finance department routinely approves for payment invoices that are marked with Defendant Gatto's signature, regardless of the dollar amount requested or the reasonableness of the expense.

265.    On information and belief, Adidas's U.S. sports marketing budget is intentionally inflated so that it includes funds to be used for the Enterprise's bribery scheme. These funds are allocated to the discretionary portion or "flex" portion of the basketball marketing budget. On information and belief, Adidas and its executives purposefully maintained a large, discretionary budget for its basketball marketing group in order to facilitate payment of the sham invoices.

266.    For example, although AAU basketball tournament fees average around $500, the marketing finance department approved sham invoices for tournament fees more than 100 times that amount, including the May 1, 2017 invoice from the New England Playaz for a $70,000 tournament fee.

267.    When such payments are approved for payment, Adidas's marketing finance department assigns the payment a budget code. On information and belief, this budget code is used to track and aggregate expenses by category for financial and tax reporting purposes. Thus, when payment on a fictitious invoice is assigned to a budget code reserved for a legitimate activity, Adidas's financial books and records are rendered inaccurate and unreliable.

268.    Further, on information and belief, when Adidas launders bribe money through the AAU teams and assigns a corresponding budget expense code to those funds as payments made to 501(c)(3) charitable organizations, an improper tax benefit is created, resulting in inflated earnings and a material understatement of the company's tax expense.

269.    Had Adidas properly recorded the bribe payments on its books, a tax on such payments would be due and owing.  On information and belief, however, Adidas knowingly improperly recorded its money laundering activity with the intent of avoiding such tax liabilities. As a consequence, the avoidance of tax liability made more funds available to be deployed for use by the Enterprise.

270.    Over the course of years and, on information and belief, after millions of dollars in bribe money has been laundered through the company by the Enterprise and improperly recorded on the company's books and records, Adidas's knowing participation in the racketeering activity likely had a material effect on the company's financial statements.

271.    Thus, on information and belief, through the fictitious invoicing scheme that is part and parcel of the Enterprise's racketeering activity, Adidas knowingly committed tax fraud, cheating the federal government out of significant tax revenue as well as causing the recipients of those funds, such as Dawkins, Gassnola and Code, to similarly underreport income for tax reporting purposes.

272.    But for the arrests of Defendants Gatto, Code, Dawkins and several of their co-conspirators, the Adidas Bribery Enterprise's scheme to exploit the careers of young basketball players in order to gain market share in the competitive sneaker industry would have continued indefinitely, as the illegal conduct engaged in by the Enterprise—namely wire fraud and money laundering—had been a consistent and successful tactic for Adidas for years and had no defined endpoint in sight.  By targeting the parents of young student-athletes, the Enterprise posed a special threat to their social well-being and that of their children.  Even those student-athletes whose eligibility was not impacted by the Adidas Bribery Enterprise but whose on-court performance and

records were inevitably altered by Adidas's unlawful influence on the college basketball games they played in, suffered a loss.

273.    The significance of the racketeering activity described herein, and the seriousness to which Defendants pursued this illegal scheme, is reflected in statements (perhaps hyperbole, but nonetheless disturbing) made by Defendants Dawkins and Code to undercover FBI agents in a meeting held in New York that was surreptitiously video recorded by the government (as depicted in the still image below):



Merl Code: "I'm surprised there aren't more murders in our space."

Christian Dawkins: "There really should be."

<div align="center">

**<u>COUNT I</u>**
**Violation of § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**Provisions of the Organized Crime Control Act of 1970**
**Against All Defendants**

</div>

274.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

275.    At all relevant times, Defendants were each "persons" within the meaning of 18 U.S.C. § 1961(3).

276.    At all relevant times, as described in above, the Adidas Participants, Athlete Advisor Participants, Division I Basketball Participants, and AAU Basketball Participants formed the Adidas Bribery Enterprise.

277.    At all relevant times, all Defendants were "persons . . . associated with" the Adidas Bribery Enterprise within the meaning of 18 U.S.C. § 1962(c).

278.    At all relevant times, the Adidas Bribery Enterprise was engaged in a pattern of activity that affected interstate commerce.

279.    At all relevant times, as described above, in furtherance and for the purpose of executing the described bribery scheme, the Defendants, acting personally or through their agents or co-conspirators, conducted the affairs of the Adidas Bribery Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  The goal of the racketeering activity was to conduct the affairs of the Adidas Bribery Enterprise in a manner that illegally and secretly funneled money to the families of prospective student-athletes, including Plaintiff's father. Defendants and their co-conspirators unlawfully sought to benefit from, and did benefited from, these illegal acts.

280.    The racketeering activity, consisting of predicate acts found in 18 U.S.C. § 1961(1), include repeated acts of wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 as well as aiding and abetting the commission of those predicate acts.  Each wiring communication incident to carrying out the fraudulent scheme—to or from Adidas, to or from the University of Louisville, to or from the parents or guardians of student-athletes, or by and among the conspirators—constituted a separate violation of the law.  Each use of the wires to transmit or exchange bribery payments

by and among the conspirators and to cover up the fraudulent scheme also constituted a separate violation of the law. And each such violation directly and proximately resulted in Plaintiff's loss of NCAA eligibility and concomitant foreseeable economic injury.

281.    Additional racketeering activity consists of violations of the federal money laundering statute, 18 U.S.C. §§ 1956 and 1957. Defendants knowingly and repeatedly used financial transactions to funnel bribe payments from Adidas to the families of student-athletes using proceeds of the Enterprise's unlawful activity. Defendants engaged in such financial transactions, many of which were in amounts greater than $10,000, with the intent to promote the carrying on of the Adidas Bribery Enterprise and with knowledge that the transactions were designed to conceal and disguise the nature, location, source, ownership and control of the money generated by Adidas through the Enterprise's unlawful activities. Additionally, Defendant Adidas knowingly participated in the money laundering activity with knowledge that by using sham invoices to facilitate bribe payments it was actively engaging in tax evasion and tax fraud. Each financial transaction using proceeds of the Enterprise's illegal conduct to bribe families of student-athletes constitutes a separate violation of the law. And each such money laundering violation made for the purpose of securing Plaintiff's attendance at the University of Louisville directly and proximately resulted in Plaintiff's loss of NCAA eligibility and directly and proximately caused foreseeable economic injury to Plaintiff.

282.    As a direct and proximate consequence of each of the predicate acts of racketeering activity outlined above and related to Plaintiff Brian Bowen, Plaintiff suffered damages, including but not limited to the following: (1) loss of eligibility to play Division I basketball at the University of Louisville; (2) suspension from the University of Louisville men's basketball team following the public disclosure of Defendants' criminal fraud; (3) forced removal from the University of

Louisville men's basketball team after it announced publicly via Twitter that "Brian Bowen will not play at the University of Louisville;" (4) concomitant financial and social costs arising from his removal from the University of Louisville's men's basketball team; (5) lost property interest in his Athletics Financial Aid Agreement for Student-Athletes with the University of Louisville; (6) costs incurred with applying for and trying out for other Division I men's basketball teams mid-season in hopes of continuing as a student-athlete at another NCAA institution, including relocation costs to South Carolina; (7) loss of eligibility to play Division I basketball at any NCAA member institution; (8) lost opportunity to enjoy the benefits and experience as a student-athlete at any NCAA member institution and associated impact on lifetime earnings; (9) loss of ability to develop basketball skills at the highest level of amateur competition as a Division I athlete; (10) lost opportunity to enter the NBA draft as a first or second round draft pick after only one or two years of experience playing Division I basketball and associated impact on his lifetime career earnings; (11) costs incurred with obtaining alternative employment as a professional basketball player in Sydney, Australia, including relocation costs; (12) attorney's fees and costs incurred by Plaintiff in connection with the federal government's investigation of Defendants' criminal conduct; and (13) attorney's fees and costs incurred in bringing this action.

## COUNT II
### Violation of § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO) Provisions of the Organized Crime Control Act of 1970 Against All Defendants

283.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

284.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

285.    As set forth above, Defendants violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Adidas Bribery Enterprise described previously through a pattern of racketeering activity.

286.    As demonstrated in detail above, beginning as early as 2014, Defendants, co-conspirators, and Enterprise participants agreed to join the conspiracy, agreed to commit and did commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

287.    As demonstrated in detail above, the Defendants agreed to conduct and participate in the conduct of the affairs of the Adidas Bribery Enterprise, directly and indirectly, through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961, said racketeering activity consisting of multiple acts of wire fraud under 18 U.S.C. § 1343 and multiple acts of money laundering under 18 U.S.C. §§ 1956 and 1957.

288.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of falsifying financial documents, laundering money, and planning and communicating about the conspiracy through interstate wire communications.

289.    The nature of the above-described acts in furtherance of the conspiracy gives rise to an inference that Defendants, co-conspirators and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were also aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity and were aware of the essential nature and scope of the Adidas Bribery Enterprise and intended to participate in it.

290.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(d), Plaintiff Bowen has been injured in his business and property as set forth more fully above in Count I.

### COUNT III

**Violation of § 1962(a) of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**Provisions of the Organized Crime Control Act of 1970**
**Against Defendant Adidas**

291.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

292.    This Count is against Defendant Adidas America, Inc.

293.    The Adidas Bribery Enterprise is an enterprise engaged in the pattern of racketeering activity described above and whose activities affect interstate commerce.

294.    Upon information and belief, Adidas used and invested income that was received from the pattern of racketeering activity engaged in by the Adidas Bribery Enterprise.

295.    Specifically, and in the words of one of Adidas's sneaker industry competitors, "[A]didas achieved valuable marketing advantages as the players subject to its bribes wore [A]didas's products, impliedly suggesting that such products have superior style or performance characteristics.  [A]didas thereby unfairly and illegally boosted its goodwill, image, and reputation and affected consumer preferences—both in the athletic performance and athletic fashion footwear markets and in the overall footwear market where both companies [Adidas and Skechers] compete."  *Skechers USA, Inc. v. Adidas America, Inc.*, No. 2:18-cv-03882 (C.D. Cal. May 9, 2018) (ECF No. 1 ¶ 4).

296.    Upon information and belief, as a result of affecting consumer preferences through its unlawful bribery and market boosting efforts, Adidas generated additional income from sales

of apparel and footwear that it would not have received had it not engaged in the criminal acts of racketeering described herein—income that the Adidas Bribery Enterprise participants then converted to cash through their sham invoicing scheme and illegally redeployed to the next round of prospective student-athletes at Adidas-sponsored universities.

297.    The amount of racketeering income that Adidas redeployed into the Enterprise is reflected in the off-the-books annual budget that it maintained for bribe payments and associated payoffs to facilitators and is believed to be in excess of millions of dollars annually.

298.    Plaintiff is informed and believes that illegal income generated through Defendants' racketeering activity in the years prior to his recruitment to the University of Louisville sustained the Adidas Bribery Enterprise in future recruiting seasons and, specifically, was used to fund the bribe payments directed towards his recruitment.

299.    As a direct and proximate result of Adidas's racketeering activities and violation of 18 U.S.C. § 1962(a), Adidas directly and proximately caused Plaintiff's loss of NCAA eligibility, thereby resulting in foreseeable economic injury to Plaintiff, including but not limited to the following: (1) loss of eligibility to play Division I basketball at the University of Louisville; (2) suspension from the University of Louisville men's basketball team following the public disclosure of Defendants' criminal fraud; (3) forced removal from the University of Louisville men's basketball team after it announced publicly via Twitter that "Brian Bowen will not play at the University of Louisville;" (4) concomitant financial and social costs arising from his removal from the University of Louisville's men's basketball team; (5) lost property interest in his Athletics Financial Aid Agreement for Student-Athletes with the University of Louisville; (6) costs incurred with applying for and trying out for other Division I men's basketball teams mid-season in hopes of continuing as a student-athlete at another NCAA institution, including relocation costs to South

Carolina; (7) loss of eligibility to play Division I basketball at any NCAA member institution; (8) lost opportunity to enjoy the benefits and experience as a student-athlete at any NCAA member institution and associated impact on lifetime earnings; (9) loss of ability to develop basketball skills at the highest level of amateur competition as a Division I athlete; (10) lost opportunity to enter the NBA draft as a first or second round draft pick after only one or two years of experience playing Division I basketball and associated impact on his lifetime career earnings; (11) costs incurred with obtaining alternative employment as a professional basketball player in Sydney, Australia, including relocation costs; (12) attorney's fees and costs incurred by Plaintiff in connection with the federal government's investigation of Defendants' criminal conduct; and (13) attorney's fees and costs incurred in bringing this action.

### COUNT IV
**Violation of § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**Provisions of the Organized Crime Control Act of 1970**
**Against Defendant Adidas**

300.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

301.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

302.    As set forth above, Defendant Adidas violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(a).  The object of this conspiracy has been and is to use or invest income derived from a pattern of racketeering activity in interstate commerce described above.

303.    As demonstrated in detail above, Defendant Adidas, along with its co-defendants, co-conspirators, and Enterprise participants intentionally conspired and agreed to directly and

indirectly use or invest income that it derived from a pattern of racketeering activity in interstate commerce.

304.    Defendant Adidas and its co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of falsifying financial documents, laundering money, and planning and communicating about the conspiracy through interstate wire communications.

305.    The nature of the above-described acts in furtherance of the conspiracy gives rise to an inference that Defendant Adidas, its co-defendants, co-conspirators and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(a), but they were also aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity and were aware of the essential nature and scope of the Adidas Bribery Enterprise and intended to participate in it.

306.    As a direct and proximate result of Defendant Adidas's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a), Plaintiff Bowen has been injured in his business and property as set forth more fully above in Count III.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully prays that this Court grants the following relief:

1.    Entering judgment in favor of the Plaintiff on all Counts in a final order against each of the Defendants;

2.    Enjoining Defendant Adidas and its employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling

entities, subsidiaries, and all other persons acting in concert or participation with it

from engaging in sponsorship of NCAA Division I men's basketball programs;

3.    Awarding Plaintiff actual damages, treble damages, injunctive and equitable relief,

forfeiture as deemed proper by the Court, and attorney's fees and all costs and

expenses of suit pursuant to Plaintiff's racketeering claims; and

4.    Awarding Plaintiff such other and further relief as may be just and proper under the

circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff, by counsel and pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

hereby demands a trial by jury in this action.

Dated: August 23, 2019                Respectfully submitted,

**MCLEOD LAW GROUP, LLC**

/s/ W. Mullins McLeod, Jr.
W. Mullins McLeod, Jr.  (Fed ID No. 7142)
Colin V. Ram (Fed ID No. 12958)
H. Cooper Wilson, III (Fed ID No. 10107)
P.O. Box 21624
Charleston, South Carolina 29413
Tel: (843) 277-6655
Fax: (843) 277-6660
*Attorneys for the Plaintiff Brian Bowen II*

## ENDORSEMENT/SPONSORSHIP AGREEMENT

This Endorsement/Sponsorship Agreement ("Agreement"), dated as of July 1, 2014, is hereby entered into between adidas America, Inc. ("adidas"), an Oregon corporation with its principal place of business at 5055 N. Greeley Avenue, Portland, Oregon 97217, and University of Louisville Athletic Association, Inc. ("University").

WHEREAS, the University operates an intercollegiate athletics program involving several sports.

WHEREAS, adidas wishes to supply adidas Products, as defined below, to the University's athletic programs; to acquire the designation for certain adidas Products as the official Products of the University in the designated categories; to secure the services of University's Athletic Program Staff to endorse and promote adidas' products; and to acquire certain endorsement rights from University.

WHEREAS, University wishes to grant such rights, authorize such services, and accept such benefits.

NOW, THEREFORE, in consideration of the premises and representation made herein, the parties agree as follows:

1.    **Definitions.**

The terms below are defined as follows:

A.    "adidas" means adidas, its Affiliates (defined below), and any successor company.

B.    "adidas Products" means all Products in connection with which, or upon which, the adidas Trademarks (defined below) appear.

C.    "adidas Trademarks" means any name, logo, symbol, trademark or service mark, or brand licensed, owned or controlled (at any time) by adidas, including but not limited to the adidas name, Trefoil, 3-Stripes mark, Sport Heritage logo, Sport Performance logo, and Sport Style Logo.

D.    "Affiliate" means any corporation, partnership, company or any other entity or person which controls, is controlled by, or is under common control with a party to this Agreement.

E.    "Athletic Program Staff" means any and all individuals employed by or directed to act on behalf of the University Athletic Programs (defined herein), included but not limited to staff, coaches, trainers, and strength and conditioning employees.

1 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029     Doc: 11     Filed: 12/15/2021     Pg: 166 of 412

USCA4 Appeal: 21-2029     Doc: 11     Filed: 12/15/2021     Pg: 167 of 412

F.     "Authentic Competition Apparel" shall mean all on-field, on-court, sideline, courtside, competition or practice apparel that is worn or used by Athletic Program Staff, Coaches or Teams (and any replica(s) thereof), including but not limited to uniforms, courtside jackets and sweaters, game-day warm-ups, basketball shooting shirts, football player capes, headwear (including wool and fitted caps), windsuits, rainsuits, and sideline or courtside pants, shorts or shirts.

G.     "Coach(es)" means the individual(s) employed by the University during the Contract Term to act as head coach or assistant coach of each University Athletic Program (defined herein).

H.     "Coach Endorsement" means the name, nickname, initials, autographs, voice, facsimile signature, photograph, likeness, character, image or facsimile image, video and film portrayals of Coach, and other similar means of endorsement which are considered standard in the sports marketing industry.

I.     "Contract Territory" means the entire world.

J.     "Contract Year" means any twelve-month period from July 1 to June 30 during the Contract Term.

K.     "Competitor" means any person, entity or organization who or which, now or in the future, manufactures, markets, licenses, produces and/or distributes products or services within the same or similar product categories as any Products, including but not limited to Nike, Converse, Hurley, Under Armour, Puma, Reebok, and New Balance, and any affiliate(s) or subsidiary(ies) of such party).

L.     "Licensed Products" means all Products that bear the Marks (defined herein).

M.     "Marks" means and includes all names, logos, trademarks, and/or symbols owned by or proprietary to University, as designated in Exhibit A.

N.     "Net Sales" (i) shall consist of the sum of wholesale and retail sales, whereas wholesale shall mean gross revenues from all sales of Products by adidas Group companies to third party customers (excl. sales of adidas own retail stores) reduced only by excise or indirect taxes (e.g. VAT and turnover taxes), returns as credited to third party customers, usual cash, trade and sales discounts and allowances, insurance cover and freight out if invoiced separately. The retail sales of the Products will be calculated based on the retail quantities of Products sold in adidas own retail stores times the average wholesale price over all Products sold via wholesale distribution channels during the respective reporting period. (ii) The calculation of retail sales of Products based on the average wholesale price will apply as soon as the technical system environment at adidas provides the information of units sold per article

2 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 168 of 412

via adidas own retail stores. (iii) Until then, "Net Sales" shall mean gross revenues from all sales of Products (sold via wholesale and retail distribution channels) by adidas Group companies to third party customers reduced only by excise or indirect taxes (e.g. VAT and turnover taxes), returns as credited to third party customers, usual cash, trade and sales discounts and allowances, insurance cover and freight out if invoiced separately.

O.    "Products" means all apparel, footwear and accessories of an athletic, athleisure and casual nature, including but not limited to Authentic Competition Apparel, Performance Apparel, all sports equipment adidas currently produces or licenses including, but not limited to, protective eyewear, sunglasses, eyewear with performance attributes, watches and inflatables/balls, and, subject to Section 6.H, all other sports equipment that adidas does not currently produce or license but that may be added to its Product lines at any time during the Contract Term ("Additional Equipment").

P.    . "Performance Apparel" means all apparel with unique fabrications (e.g., compression, tight or padded apparel) and/or fabrications (e.g., moisture wicking) that assists the wearer during wear and/or use.

Q.    "Team" means the group of students that comprises the personnel of each University Athletic Program (defined herein).

R.    "University Athletic Program(s)" means and includes the following organized intercollegiate men's and women's teams and individual sports sponsored by the University: Basketball, Football, , Golf, Soccer, Swimming/Diving, Tennis, Cross Country, Track, Softball, Volleyball, Field Hockey, Lacrosse, Rowing, Cheerleading/Dance and all other NCAA sponsored sports, and any other sports University may add.

S.    "University Endorsement" means "University of Louisville" "Louisville Cardinals" and all other names, logos, trademarks, depictions, and/or symbols associated with the University as set forth in Exhibit A in connection with the marketing, advertising, or sale of adidas Products.

2.    Term.  This Agreement shall remain in full force and effect from July 1, 2014 until June 30, 2018 unless sooner terminated in accordance with the terms and conditions of this Agreement (the "Contract Term").  This Agreement shall be interpreted in its entirety and not as a series of one-year agreements.  Upon mutual agreement of the parties, the Contract Term may be extended by one Contract Year (i.e., the Contract Term may be extended to June 30, 2019), so long as such extension is agreed to in writing by July 1, 2016.

3.    Base Compensation.

3 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

A. Subject to the provisions of subsection 3.B, 3.C and 6.C below and University's fulfillment of its obligations hereunder, adidas shall pay to the University annual Base Compensation in the amount designated below. Each Contract Year's Base Compensation shall be payable in equal semi-annual payments on August 15 and February 15 of each Contract Year.

| Contract Year | Base Compensation |
|---|---|
| 2014/2015 | $ 1,510,000 |
| 2015/2016 | $ 1,525,000 |
| 2016/2017 | $ 1,540,000 |
| 2017/2018 | $ 1,555,000 |
| 2018/2019 | $ 1,575,000* |

* Only applicable if the Contract Term is extended under Section 2.

The annual Base Compensation for each Contract Year includes any amounts payable to any University Coach pursuant to an adidas personal services agreement. Any amount of Base Compensation paid by adidas to any University Coach shall relieve adidas of such corresponding obligation to University under this Agreement.

B. If, for any reason, University is placed on probation by the NCAA, resulting in the prohibition of television appearances by University's Football or Basketball Teams, adidas shall have the right to reduce by one-half (1/2) the Base Compensation due hereunder for any period of probation.

C. If, for any reason, University is no longer a member of a BCS (or its successor) conference, then adidas shall have the right to equitably reduce the Base Compensation paid to University under this Agreement based on the loss of exposure as a result of such loss of membership.

4. <u>Incentive Compensation and Activation Amounts.</u>

A. adidas shall pay University bonus amounts set forth on Exhibit B in any Contract Year if University achieves any such during such Contract Year and exclusively wears and/or uses adidas Products during such achievement. Any bonus amounts paid by adidas to any University Coach shall relieve adidas of such corresponding obligation to University under this Agreement.

B. adidas shall make the following annual activation investments, either directly to mutually agreed upon vendors on behalf of University and/or payments directly to University via project invoicing, in the amount designated below. Such funds shall be used for mutually agreed upon activations (e.g., internship program).

| Contract Year | Activation Investment |
|---------------|----------------------|
| 2014/2015 | $ 440,000 |
| 2015/2016 | $ 455,000 |
| 2016/2017 | $ 475,000 |
| 2017/2018 | $ 500,000 |
| 2018/2019 | $ 530,000* |

\* Only applicable if the Contract Term is extended under Section 2.

Any activation investments or activation funds paid by adidas to any third party shall relieve adidas of such corresponding obligation to University under this Agreement.

5.    **Product Support.**

A.    For each Contract Year, adidas agrees to supply University, at no cost, an allotment of adidas Products in the amount designated below, for use by the designated University Athletic Programs for team allotments, camps and clinics, and staff/coaches personal allotments. The dollar amount of adidas Products provided to University shall be measured at adidas standard wholesale prices. All Products to be supplied by adidas under this Agreement shall be delivered F.O.B. to University at no charge.

| Contract Year | Product Allotment |
|---------------|-------------------|
| 2014/2015 | $ 1,865,000 |
| 2015/2016 | $ 2,275,000 |
| 2016/2017 | $ 2,425,000 |
| 2017/2018 | $ 2,615,000 |
| 2018/2019 | $ 2,780,000* |

\* Only applicable if the Contract Term is extended under Section 2.

adidas agrees that University may carry forward up to One Hundred Thousand Dollars ($100,000) worth of adidas Products (at adidas standard wholesale prices) from one Contract Year to the next subsequent Contract Year only; provided, however, that University shall not carry forward any adidas Products from the last Contract Year of the Contract Term.

University agrees that all other adidas Products shall continue to be purchased from adidas at wholesale cost minus 10%.

5 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 170 of 412

During each Contract Year, adidas agrees to supply the following adidas Products to specific University Teams, at no cost (the "Specific Product Allotment"):

| Football |
| --- |
| Strategy jerseys, pants, gloves, base layer, accessories, cleats |
| **Men's Basketball** |
| Home/Away/Alternate/Conference Uniform game jerseys & shorts |
| **Women's Basketball** |
| Home/Away/Alternate jersey & Shorts |
| **Baseball** |
| Alternate jersey/pant |

During any Contract Year, the parties may mutually agree to allocate any unused Specific Product Allotment (if any) for product initiatives, post-season bowl, March Madness, or CWS uniforms/shoe.

Any amount of adidas Products provided by adidas to any University Coach shall relieve adidas of such corresponding obligation to University under this Agreement. University understands and agrees that it shall not resell any Products supplied to University by adidas, other than an annual commemorative merchandise auction or the equipment room's annual liquidation sale.

B.    adidas agrees that all Products supplied hereunder for use by University Athletic Programs will comply with the provisions of NCAA regulations 12.5.4 of the then current NCAA Manual and any subsequent versions regarding manufacturer's logos and trademarks.    Notwithstanding the foregoing, if any governing body that has jurisdiction over University, including the NCAA or governing athletic conference of which University is a member, enacts, replaces or amends any regulations, rules or restrictions applicable to manufacturer's logos or trademarks (including but not limited to NCAA Regulation 12.5.4) and adidas' logo or trademark display rights are adversely diminished, restricted or limited by such regulation, rule or restriction, then adidas shall have the right to equitably reduce the Base Compensation paid to University under this Agreement based on the extent of such diminishment, restriction or limitation, or terminate the Agreement as provided in Section 12.

6.    Use of adidas Products.

A.    University shall make available to each Team the Products supplied by adidas, and shall require that each Team wear and/or use exclusively such adidas Products whenever participating in Team activities, including practices, games, clinics, and other University functions for which University ordinarily and usually supplies Products to the Teams.    At all such functions, University shall prohibit the Team

6 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 171 of 412

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 172 of 412

members from wearing Products manufactured by companies other than adidas, or any such Products which have been altered to resemble adidas Products. University acknowledges that University's obligation that each Team exclusively wear and/or use adidas Products, as identified by adidas, shall be a material term of this Agreement. adidas acknowledges that Teams may be required to wear Competitor headwear and t-shirts during NCAA or conference championship locker room celebration moments ("Celebration Products") and such wearing Celebration Products shall not be a breach of this Agreement.

B.    University acknowledges that "spatting," taping, or otherwise covering up any portions of any adidas logo or trademark on athletic footwear supplied by adidas (collectively, "Spatting") is inconsistent with the purpose and terms of this Agreement. University agrees that it will not permit such "spatting" or taping unless it has been medically prescribed and adidas has been so advised.

C.    adidas agrees to work with any Team member experiencing problems in connection with the fit or performance of adidas shoes. In the event any Team member shall at any time suffer any physical injury, pain, or discomfort attributed to the use of adidas shoes due to a bona-fide medical condition as evidenced by a certification by the Team's physician which is serious enough to affect the athlete's performance, then University shall so advise adidas and afford adidas the opportunity to remedy the problem. If adidas is unable to provide such Team member with adidas shoes that can be worn reasonably satisfactorily, then adidas shall waive the exclusivity requirement of this Section 6 in such a specific case until adidas can remedy the problem, provided however, that such Team member shall completely cover all non-adidas logos, trademarks and brand indicia of any non-adidas shoes while wearing such non-adidas shoes. adidas further acknowledges that regardless of its efforts to provide Team members with suitable adidas shoes, it may be medically necessary in certain circumstances for a player to "spat" or tape his feet and/or ankles to allow such player to remain in competition, without opportunity for such notice to adidas (i.e., in-game injury). Such medically necessary procedure, should it occur, shall not constitute a breach of this Section 6. University agrees that University and its Coaches shall use its best efforts to eliminate the need for any unauthorized Spatting in the event it occurs during the term of this Agreement. If in accordance with the foregoing University is unable or unwilling to discontinue any pattern or practice of Spatting, then adidas shall have the option to immediately terminate this Agreement or, if such spatting concerns Team members of the football, basketball (men's or women's), or baseball Team, reduce the Base Compensation due hereunder as follows:

| | % Reduction Amount |
|---|---|
| First occurrence of Spatting* | adidas shall first provide University with a written warning concerning Spatting (provided that if such Spatting occurs during a bowl, tournament or other post-season game, then a warning is not |

7 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 173 of 412

| | |
|---|---|
| | required hereunder and adidas may exercise any of its rights as contained herein without giving such warning) |
| Second occurrence of Spatting* | 10% of annual Base Compensation for Contract Year in which such Spatting occurred. |
| Third occurrence of Spatting* | 15% of annual Base Compensation for Contract Year in which such Spatting occurred. |
| Third occurrence of Spatting*+ | 25% of annual Base Compensation for Contract Year in which such Spatting occurred. |

* cumulatively applied over the Contract Term
+ whether a first, second or third occurrence of Spatting, if Spatting occurs during a bowl, tournament or other post-season game, then the 25% reduction amount shall apply.

D.    University agrees to require its Athletic Program Staff to wear adidas Products exclusively during the Contract Term when acting in their official capacities as Coach or staff in activities where athletic or athleisure attire is appropriate, including but not limited to, practices and games, sports camps, being filmed on motion picture or video tape, and posing for photographs. The Athletic Program Staff shall not, during the course of its employment responsibilities, wear, use or in any way promote Products manufactured by or identifiable with any competitor of adidas. University acknowledges that University's obligation that its Athletic Program Staff exclusively wear and/or use adidas Products, as identified by adidas, shall be a material term of this Agreement. adidas hereby acknowledges that the wearing of other than athletic or athleisure shoes and apparel by any coach or staff in connection with their official duties as coach or staff of a University Athletic Program shall not constitute a breach of this Section 6. University shall not enter into or approve any endorsement contract between a member of the Athletic Program Staff and a competitor of adidas, and shall exercise its best efforts to prevent any member of the Athletic Program Staff from entering into such a contract.

E.    University agrees that it shall not permit the trade name, trademark, logo, or any other identification of any person, company, or business entity other than adidas, the University, or, subject to adidas' reasonable right of approval, any recognized governing athletic conference of which University is a member, to appear on adidas Products worn or used by Coaches, Staff or Team members. University agrees that in no event shall the trade name, trademark, logo, or other identification of any manufacturer or seller of Products other than adidas be permitted to appear on any such adidas Products.

6 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

F.    University agrees that at any sports camp or clinic it conducts or sponsors under the direction and supervision of any Coach, it will not sponsor, co-sponsor, or endorse Products manufactured or sold by any Competitor.

G.    To the extent permitted by Kentucky Law, adidas shall not be liable to University for any injury or damage suffered from wearing or using adidas Products, except injury or damage resulting from adidas' negligent or willful acts.

H.    University agrees that Exhibit C provides adidas with a listing of all agreements between University (or any of its Coaches) and third parties with respect to Additional Equipment that exist as of July 1, 2014 (each an "Existing Agreement"). University further agrees that with respect to Additional Equipment for which there is an Existing Agreement or the agreement with FootJoy for certain women's golf Products, without first providing written notice to adidas and providing adidas with the opportunity to match any third party offer for such Additional Equipment or women's golf Products and include such Additional Equipment or women's golf Products in the definition of Products, neither University (nor any of its Coaches) shall: (i) extend or renew any Existing Agreement or renewal of an existing agreement; or (ii) enter into a new agreement for Additional Products or women's golf Products with any third party after July 1, 2014.  If University (or any of its Coaches) is not party to an Existing Agreement for Additional Equipment and adidas provides University with notice of its good faith intent to produce or license such Additional Equipment, then provided the University makes a good faith determination (for a product it currently uses) that the equipment is of a quality equal to or better than the current sports equipment used by University, and for a new product, that the quality meets the highest industry standards, then such Additional Equipment shall be included in this Agreement.

7.    **Endorsement Rights.**

A.    University grants to adidas the right and license during the Contract Term to use the University Endorsement within the Contract Territory in connection with the advertisement, promotion, and sale of adidas Products.  Except as otherwise provided herein, University retain all rights in and to University's name and endorsement.

B.    adidas shall have the exclusive right throughout the Contract Term to advertise, publicly represent, market, and otherwise promote the fact that it is the exclusive supplier to University of the designated Products, including by identifying or referring to its Products as the "official [designated Product(s)] of University of Louisville" or similar representations.

C.    University, on behalf of the Coach of each University Athletic Program, grants to adidas the exclusive right and license during the Contract Term and within the Contract Territory to use the Coach Endorsement in connection with the advertisement, promotion and sale of Products. Each Coach shall retain all other rights in and to his or her name and endorsement, and neither University nor any Coach shall be prevented

9 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 174 of 412

USCA4 Appeal: 21-2029   Doc: 11   Filed: 12/15/2021   Pg: 175 of 412

from using, permitting, or licensing others to use his or her name or endorsement in connection with the advertisement, promotion, or sale of any product or service other than Products.

D. Any use by adidas of the University Endorsement or the Coach Endorsement must be approved in advance by University, which approval shall not be unreasonably withheld.

8. **Promotional Appearances.**

A. If requested to do so by adidas, University shall make the Coach of each University Athletic Program available for up to two (2) appearances per Contract Year (except that University shall make the Coach of the men's basketball University Athletic Program available for up to three (3) appearances per Contract Year) in connection with the advertisement, promotion and sale of adidas Products. Such appearances may include, but are not limited to, appearances at clinics, celebrity events, and other public appearances. Except as provided below, neither University nor the Coach shall receive additional compensation for the appearances, it being understood and agreed to by the parties that the consideration for said appearances is encompassed by the compensation provided for in Section 3 above.

B. For each appearance described in subsection 8.A. above:

1. adidas agrees to pay all reasonable out-of-pocket expenses incurred by University and/or the Coach in connection with such appearance;

2. adidas shall give University at least thirty (30) days notice of the time and place adidas desires the Coach to appear;

3. adidas shall not schedule any appearance at a time which would conflict with the Coach's performance of his or her obligations as a college coach; and

4. No single appearance shall exceed twenty-four (24) hours in duration, exclusive of travel time, unless agreed upon to the contrary in advance.

9. **Licensed Products.**

A. University shall enter into or shall cause its licensing agent(s) to enter into and maintain in full force and effect during the Term, a retail license(s) granting adidas: (x) the exclusive right throughout the Contract Territory to manufacture and sell Authentic Competition Apparel that features the University Endorsement through any channel of retail distribution; (y) the non-exclusive right to manufacture and sell throughout the Contract Territory Products (other than Authentic Competition Apparel) that feature the University Endorsement through any channel of retail distribution; and (z) the exclusive right throughout the Contract Territory (except for Louisville

10 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 176 of 412

Slugger's/Hillerich Bradsby's right to manufacture and sell the three (3) models of close-back headwear worn on-field by University's men's baseball Team (whether fitted or flex fit)) to manufacture and sell close-back headwear (whether fitted or flex fit) that features the University Endorsement through any retail location or distribution channel (including but not limited to any brick and mortar shop, catalog, the Internet or University's bookstore(s)) owned or controlled by the University. University further agrees that: (i) the royalty rate payable by adidas with respect to any such license(s) shall not exceed fourteen percent (14%) of Net Sales; (ii) adidas Products shall be the exclusive Authentic Competition Apparel, Performance Apparel and close-back headwear (whether fitted or flex fit) (except for Louisville Slugger's/Hillerich Bradsby's right to manufacture and sell the three (3) models of close-back headwear worn on-field by University's men's baseball Team (whether fitted or flex fit)) sold through any retail location or distribution channel (including but not limited to the brick and mortar shops, catalogs or the Internet) owned or controlled by the University's athletic department; (iii) University shall ensure that the University's bookstore(s) will purchase on an on-going basis a mutually agreed upon (but non-de minimis) portion of its inventory of t-shirts, fleece and headwear from adidas; (iv) that neither University nor its licensing agent(s) shall enter into any agreement or understanding with any Competitor to manufacture, develop, market, distribute, license or sell licensed products that feature the University Endorsement; (v) if University or its licensing agent(s) is (as of the effective date of this Agreement) party to any agreement with a Competitor to manufacture, develop, market, distribute, license or sell licensed products that feature the University Endorsement, then neither University nor its licensing agent(s) will renew or extend such agreement(s); (vi) no royalty shall be paid on Products provided by adidas under this Agreement; (vii) neither University nor its licensing agent(s) shall license any third party to manufacture or sell Products that are sport specific Products or that copy or resemble adidas Products; and (viii) adidas will be recognized and classified as University's provider for all Products for University Athletic Programs special events (e.g., Midnight Madness). adidas acknowledges that Celebration Products may be manufactured and sold by a Competitor pursuant to an NCAA Celebration Products licensing program and such manufacturing and sales of Celebration Products shall not be a breach of this Agreement.

Each Contract Year, adidas agrees to pay University a guaranteed minimum royalty in the amount set opposite each such Contract Year:

| Year | Guaranteed Minimum Royalty |
|------|---------------------------|
| 2014/2015 | $ 235,000 |
| 2015/2016 | $ 245,000 |
| 2016/2017 | $ 255,000 |
| 2017/2018 | $ 265,000 |
| 2018/2019 | $ 275,000* |

---

11 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 177 of 412

\* Only applicable if the Contract Term is extended under Section 2.

The royalty owed by adidas to University pursuant to this Section 9.A. shall be applied against the above guaranteed minimum royalty amounts.

B.      adidas and the University agree that the sale of products, except those directly supplied to the University under this Agreement, shall be subject to licensure by the University and royalty payments by adidas.

C.      University acknowledges and agrees that adidas shall not be required to make royalty payments or donations on Licensed Products supplied directly to University under the terms of this Agreement.

D.      Throughout the Contract Term, adidas shall remain a current licensee in good standing of the University as administered by University's Office of Trademark Licensing or its designee.  Notwithstanding the foregoing, University retains all license rights not granted herein.

E.      For the sake of clarity, if there is any conflict between the terms and conditions of this Agreement and any agreement between adidas (or its Affiliates) and University's licensing agent(s), then University acknowledges, and agrees to instruct its licensing agent(s), that the terms of this Agreement shall control.

10.      **Disparagement of Products.**  University shall not, during the Contract Term and for a period of two (2) years following the termination or expiration of this Agreement, disparage the adidas brand name, adidas Products, or adidas.  This paragraph shall survive the termination or expiration of this Agreement.

11.      **Promotional Obligations of University.**  University shall fulfill the additional promotional obligations as set forth in Exhibit D, attached hereto and incorporated by reference.

12.      **Rights of Termination.**

A.      adidas shall have the right to terminate this Agreement immediately upon written notice to University in the event that:

1.      Members of any Team fail to wear or use adidas Products as required herein, or wear adidas Products altered, spatted, or taped in violation of the provisions of Section 6 hereof, provided, however, that adidas shall have first issued written notice to University of any such violation of the provisions of Section 6, which violation shall then recur during the same Contract Year;

12 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

2.    Any Coach fails to perform any material obligations provided for in this Agreement and University fails to cause such Coach to cure such breach (if curable) within ten (10) days of University's receipt of written notice from adidas;

3.    The NCAA, or any other governing body of intercollegiate sports, prohibits any Team members from wearing adidas athletic footwear displaying the adidas name or any adidas trademark or logo;

4.    Any coach or Team is suspended or otherwise subjected to major disciplinary action by the NCAA; or

5.    University or the Football or either Basketball coach attracts publicity which in the good faith and reasonable judgment of adidas based on objective facts has an adverse effect upon the status or reputation of University/Coach, the value of University to adidas, or adidas.

C.    The University shall have the right to terminate this Agreement immediately upon written notice to adidas in the event that:

1.    adidas is adjudicated insolvent or declares bankruptcy; or

2.    adidas breaches any material terms of this Agreement and fails to cure such breach within forty-five (45) days of written notice from University; or

3.    adidas fails to make payment to the University of any sum due to this Agreement within sixty (60) days following adidas' receipt of such written notice from the University that such payment is due.

D.    In the event of any termination by adidas pursuant to this Section 12, University shall not be entitled to any further compensation hereunder, except any unpaid Base Compensation (as reduced by any amounts paid or payable to any University Coach pursuant to an adidas personal services agreement which relieved adidas of such corresponding obligation to University under this Agreement as provided herein) earned prior to the effective date of termination, pro-rated and calculated to the effective date of termination. Alternatively, adidas shall have the right to receive from University reimbursement for Base Compensation, if any and as reduced by any amounts paid or payable to any University Coach pursuant to an adidas personal services agreement which relieved adidas of such corresponding obligation to University under this Agreement as provided herein, paid in excess of the amount to which University would be entitled if the Base Compensation were pro-rated over the Contract Year, calculated to the effective date of termination. Any such payment shall be due within thirty (30) days of the date of termination.

13.    **Unique Services/Assignability.**  University acknowledges that the endorsement and promotional services provided to adidas under this Agreement are special and unique and that loss of such services may cause irreparable harm to adidas.

13 – ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 178 of 412

Accordingly, University shall not delegate the obligations of this Agreement. Neither party may assign this Agreement without the express written approval of the other party; provided, however, that adidas may assign its rights under this Agreement to any corporation, partnership or other entity or person which controls, is controlled by, or is under common control with adidas.

14. **Confidentiality.** University acknowledges that the contents of this Agreement contain certain confidential matters, including proprietary and commercial information belong to adidas. Other than regular open records requests compliance, University shall not disclose the terms of this Agreement to any third party without adidas' prior written consent, unless University is required by law to do so. Notwithstanding the foregoing, University may disclose the terms hereof to its professional, financial and similar advisors provided that such other persons or firms are bound by agreement or law not to further disclose such information to any third party.

15. **Dispute Resolution.** The parties agree that any dispute concerning the interpretation, construction, or breach of this Agreement shall be submitted to a mediator agreed upon by the parties for nonbinding confidential mediation at a mutually agreeable location. Unless otherwise required by law, neither party shall disclose any aspect of the dispute or the mediation without the other party's prior written consent. If the parties fail to resolve their dispute through mediation, then the parties agree that the dispute shall be submitted to a court of competent jurisdiction. The rights and obligations of the parties shall be determined in accordance with the laws of the Commonwealth of Kentucky.

16. **University/adidas Relationship.** Each party's performance of services hereunder is in its capacity as an independent contractor. Accordingly, nothing contained in this Agreement shall be construed as establishing an employer/employee, partnership or joint venture relationship between University and adidas. University shall be solely responsible for the payment of all taxes on any compensation received under this Agreement. Provided, however, the University shall only be responsible for taxes imposed directly upon it.

17. **Waiver.** Failure of either party to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or otherwise limit the parties right to subsequently enforce such provision.

18. **Right of First Dealing and First Refusal.** Beginning one hundred eighty days (180) days before the beginning of the last Contract Year, University shall periodically meet with adidas to negotiate in good faith the renewal of this Agreement ("First Dealing Period"). Said First Dealing Period shall extend for a period of ninety (90) days. The parties shall not be obligated to enter into an agreement if they cannot settle on mutually satisfactory terms during the First Dealing Period. University shall not (nor shall University permit University's agents, attorneys, accountants, representatives or employees to) engage in discussions or negotiations with any third party regarding

14 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 179 of 412

University's wearing, sponsoring, promoting, advertising or endorsing, or providing consulting or similar services with respect to, any Products after the Contract Term at any time during the Contract Term until the conclusion of the First Dealing Period. Following the conclusion of the First Dealing Period and continuing through June 30, 2018 (or June 30, 2019, if the Contract Term is extended under Section 2), University agrees to refrain from entering into an endorsement or similar agreement with any Competitor without first giving adidas an opportunity to enter into an agreement with University for such rights on the terms and conditions proposed by such Competitor that are material, measurable and matchable terms and conditions ("Third Party Terms"). University shall provide adidas in writing (on third party letterhead, unaltered and unredacted) with the Third Party Terms it receives. adidas shall have thirty (30) days from its receipt of such Third Party Terms to match or better such Third Party Terms. If adidas matches or betters such Third Party Terms, then University will enter into a new agreement with adidas on such Thirty Party Terms, the better terms and other standard adidas terms and conditions. If adidas fails to match or better such Third Party Terms, then University shall enter into an agreement with such third party on the Third Party Terms that adidas failed to match or better.

19.    **Notices.** All notices and statements provided for herein shall be in writing and shall be given in writing by overnight delivery (e.g., Fed Ex or UPS) and shall be deemed given upon receipt. A party may change its address by giving notice thereof to the other party as provided herein.

To University:            **University of Louisville Athletics**
                          **2100 S. Floyd St., Suite E301**
                          **Louisville, KY 40292**
                          **Attn: Athletic Director**

to adidas:                **adidas America, Inc.**
                          ~~**5055 N. Greeley Avenue**~~
                          **Portland, OR 97217**
                          **Attn: Legal Department**
                          **Fax No.: (971) 234-4420**

20.    **Entire Agreement; No Third Party Beneficiaries.** This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof and cannot be amended or modified except by an agreement in writing, signed by an authorized representative of each of the parties. All previous understandings or agreements between the parties shall have no further force and effect. This Agreement is solely for the benefit of the parties hereto and is not intended to (and does not) confer upon any person or entity other than the parties hereto any rights or remedies hereunder or otherwise. This Agreement may be modified, amended, or waived only by a written agreement signed by an authorized representative of each of the parties.

15 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

21.   Severability.  Every provision of this Agreement is severable.  If any term or provision hereof is held to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not effect the validity of the remainder of this Agreement or any other provision.

22.   Indemnification.   Any liability of the University to indemnify adidas shall be in accordance with Kentucky Revised Statutes KRS 44.070 to 44.160 (Board of Claims Act) and KRS 45A.245 through 45A.275 (Control Claims Act).

adidas shall defend, indemnify and hold harmless the University, its trustees, officers, employees and agents from and against all losses and expenses (including reasonable cost of attorney's fees) by reason of liability imposed by law upon adidas for damages because of bodily injury, including death,  personal injury, including data loss at any time resulting there from, sustained by any person or persons including adidas' employees, or on account of damage to property, including loss of use thereof, arising out of or in consequence of the negligent or intentional action or omission, or willful misconduct of adidas, provided however, that nothing contained herein shall require adidas to indemnify the University for such injuries to persons or damage to property arising out of, or in consequence to the negligent or intentional action, omission or willful misconduct of the University, its officers, employees and agents.

23.   Conflict of Interest. Firms are required to disclose any potential conflict of interest.  If the owner of the firm is related to a University of Louisville employee, that relationship must be disclosed in writing. Definition of Related Person:  Related person to a University employee means a spouse or dependent child of such employee.

The term extends to other individuals sharing the same household as well as sibling, parents and non-dependent children (including step and in-law variations of those relationships) in circumstances where the University employee has actual knowledge that such relative is likely to or will benefit from a particular University transaction.

IN WITNESS WHEREOF, the undersigned authorized representatives of the parties have duly executed this Agreement as of the date first above written.

adidas:

By: _____
Chris McGuire,
Director of Sports Marketing

By: _____
Paul Ehrlich,
General Counsel

University of Louisville Athletic Association, Inc.:

By: _____
Tom Jurich,
Vice President/Athletics Director

16 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 181 of 412



**Exhibit A**
**UNIVERSITY MARKS**



17 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

## Exhibit B
## INCENTIVE COMPENSATION

**Bonus Plan: Football**

| | |
|---|---|
| College Football National Champions | $300,000^ |
| College Football playoff semifinal game participant | $100,000^ |
| ACC Conference Champions | $50,000 |
| ACC or any National Coach of the Year | $50,000 |
| Top 10 ranking (Conclusion of Post-Season) | $50,000 |

**Bonus Plan:  Men's Basketball**

| | |
|---|---|
| NCAA Champions | $300,000^ |
| Final Four Participant | $150,000^ |
| Elite 8 | $75,000^ |
| Sweet 16 | $50,000^ |
| ACC Regular Season Champs | $25,000 |
| ACC Conference Champions | $50,000 |
| NCAA or ACC Coach of the Year | $15,000 |

**Bonus Plan:  Women's Basketball**

| | |
|---|---|
| NCAA Champions | $200,000^ |
| NCAA Final Four Participant | $50,000^ |
| Elite 8 | $25,000^ |
| ACC Regular or Tournament Conference Champions | $20,000 |
| NCAA or ACC Coach of the Year | $15,000 |

**Other:  Olympic Sports**

| | Tier 1 # | Tier 2 ^ |
|---|---|---|
| Team National Champions | $25,000^ | $10,000 |
| NCAA Final Four or CWS of given sport | $15,000^ | $7,500 |
| ACC Conference Champions (team) | $10,000 | $5,000 |

^Non-Cumulative Per Applicable Grouping (i.e., only the highest incentive will be paid).

# Tier1 = Baseball, Lacrosse, Softball, Volleyball, Men's Soccer
^ Tier2 = Women's Soccer, Field Hockey, Track&Field/Cross Country, Swim/Dive, Cheer/Dance, Golf (Men's & Women's), Tennis

18 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029      Doc: 11      Filed: 12/15/2021      Pg: 183 of 412

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 184 of 412

## Exhibit C
## EXISTING AGREEMENTS

Louisville Slugger / Hillerich Bradsby for 60 bats and three (3) models of close-back headwear 200 total worn on-field by University's men's baseball Team (whether fitted or flex fit); plus fielding gloves, batting gloves, catching gear, helmets, and bat bags.

STX Lacrosse equipment
- 40 Custom Complete sticks with handle and STX pocket of choice
- 36 Protective eyewear
- 5 Goalie sticks

Field gloves, Sets of goalie equipment (Set includes: GK gloves, chest protector, shin guards, throat protector and goalie pants), dozen yellow lacrosse balls (1 case), Women's coach's clipboards, Shooting nets, string kits, Ball bags

Rowing equipment – Pocock/Nike boat shoes, Boathouse/JLDesigns gear (through adidas), heart rate monitors, 2XU/Skins compression, Oakley eyewear from student-athlete personal use

Swimming suits – TYR company (regular season)

University of Louisville Golf Club pro shop – various apparel & non-apparel

19 – ENDORSEMENT/SPONSORSHIP AGREEMENT

## Exhibit D
## PROMOTIONAL OBLIGATIONS

As the exclusive footwear, apparel and accessories product supplier of UNIVERSITY, each Contract Year UNIVERSITY shall provide adidas with the following promotional benefits at no additional cost to adidas except as otherwise indicated:

(a)    UNIVERSITY Advertisements for adidas.  Representatives of UNIVERSITY and adidas will cooperate to produce agreed copy to be published, displayed, or announced as described below at UNIVERSITY expense each Contract Year:

1)    UNIVERSITY shall provide adidas with one full page of advertising space in the UNIVERSITY football program for the company's camera-ready advertisement, as well as an appropriately sized space in other event programs as available.

3)    UNIVERSITY shall provide adidas with one (1) 30 second advertisement during any radio broadcast of regular season games in the sports of football, men's basketball, and women's basketball, and baseball as the exclusive provider of Products for the UNIVERSITY team.

(b)    adidas shall receive tickets to home games, neutral site games, post-season games that University plays in, and parking passes as indicated below:

| Program | No. Tickets |
|---|---|
| Football (home) | 12 and 2 parking passes |
| Men's Basketball (home) | 8 |
| Women's Basketball | 4 (prime locations) |
| Baseball, if applicable | 4 (prime locations) |
| Volleyball | 4 (prime locations) |
| Soccers & All Remaining Sports | 4 to each home game or event |
| Football (bowl) | 8 |
| Men's Basketball (tournament) | 6  ACC tournament<br>4  2nd/3rd Round NCAA<br>6 Sweet16/Elite8 NCAA<br>8  Final Four |
| Women's Basketball (tournament) | 4 each round of play |
| CWS Baseball (tournament) | 4 each round of play |

20 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

| Volleyball (tournament) | 4 each round of play |
|---|---|

(c)    A hospitality event for football and basketball adidas Game-day ticket holders (which may include, for example, a welcome reception, any catering to be at adidas' expense, and/or tour of facilities).

(d)    The opportunity to stage one (1) pre-game promotional event and/or contest around designated home games/competitions.

(e)    Reasonable access to Intercollegiate Athletic Program activities, where appropriate, for the purpose of shooting game photos or game footage and/or conducting and taping post-game interviews.

(f)    adidas shall be permitted, upon its reasonable request, to use mutually agreed upon UNIVERSITY facilities in connection with mutually agreed community based programs and events held by adidas.

(g)    In addition to the above, UNIVERSITY shall afford adidas advance notice and the opportunity to consider participation in any and all additional appropriate advertising opportunities, in any media, made available by UNIVERSITY during the Term, with incremental investments facilitated through UNIVERSITY'S multimedia partner.

(h)    One prominently visible signage available at each venue of a Team, including at the recently built Soccer Stadium.

21 -- ENDORSEMENT/SPONSORSHIP AGREEMENT

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 186 of 412

October 30, 2014

University of Louisville Athletics
2100 S. Floyd St., Suite E301
Louisville, KY 40292
Attn: Athletic Director

Dear University of Louisville,

I am writing in connection with the Endorsement/Sponsorship Agreement ("Agreement"), dated as of July 1, 2014 entered into between adidas America, Inc. ("adidas") and University of Louisville Athletic Association, Inc. ("University").

In addition to the terms and conditions of the Agreement, adidas agrees that on January 15, 2015 it shall make a one-time payment to University in the amount of eighty-five thousand dollars ($85,000) to subsidize University internship programs. A breach by either party of their obligations pursuant to this letter agreement shall be deemed a breach by that party of the Agreement.

Sincerely,

Chris McGuire
Director, adidas Sports Marketing

UNDERSTOOD AND AGREED:

UNIVERSITY

By: Thomas Jurich, VP/AD
Date: 10/30/14

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 187 of 412

**AMENDMENT NO. 1 TO THE**

**ENDORSEMENT/SPONSORSHIP AGREEMENT**

This Amendment No. 1 to the Endorsement/Sponsorship Agreement (the "Amendment") is made and entered into as of July 1, 2018 (the "Effective Date"), by and between adidas America, Inc. ("adidas"), an Oregon corporation with its principal place of business at 5055 N. Greeley Avenue, Portland, Oregon 97217, and University of Louisville Athletic Association, Inc. ("University").

**BACKGROUND**

adidas and University are parties to the Endorsement/Sponsorship Agreement entered into as of July 1, 2014 (the "Agreement"). The parties desire to amend the Agreement as follows:

**TERMS AND CONDITIONS**

1. Section 1.K. of the Agreement shall be deleted in its entirety and replaced by the following:

""Competitor" means Nike, Reebok, Puma, Under Amour, New Balance, Li-Ning, Asics, Anta, Russell, Columbia, Starter and Hurley, and their respective parents, subsidiaries and affiliates."

2. Section 1.P. of the Agreement shall be deleted in its entirety and replaced by the following:

""Performance Apparel" means all apparel with unique fabrications (e.g., compression, tight or padded apparel) and/or fabrications (e.g., moisture wicking) that assists the wearer during wear and/or use, specifically excluding, but not limited to, any golf polo manufactured by Antigua, Cutter & Buck, and Peter Millar and any other mutually agreed on manufacturers."

3. Section 2 of the Agreement shall be deleted in its entirety and replaced by the following:

*Page 1 of 11*
*adidas Confidential*

USCA4 Appeal: 21-2029     Doc: 11     Filed: 12/15/2021     Pg: 188 of 412

"This Agreement shall remain in full force and effect from July 1, 2018 until June 30, 2028 unless sooner terminated in accordance with the terms and conditions of this Agreement (the "Contract Term").  This Agreement shall be interpreted in its entirety and not as a series of one-year agreements."

4.  Section 3.A. of the Agreement shall be deleted in its entirety and replaced by the following:

"Subject to the provisions of subsection 3.B, 3.C and 6.C below and University's fulfillment of its obligations hereunder, adidas shall pay to the University annual Base Compensation in the amounts designated below.  Each Contract Year's Base Compensation shall be payable in equal semi-annual payments on August 15 and February 15 of each Contract Year.

| Contract Year | Base Compensation |
|---|---|
| 2018/2019 | $ 10,000,000 |
| 2019/2020 | $ 10,000,000 |
| 2020/2021 | $ 10,000,000 |
| 2021/2022 | $ 7,000,000 |
| 2022/2023 | $ 7,000,000 |
| 2023/2024 | $ 7,000,000 |
| 2024/2025 | $ 7,000,000 |
| 2025/2026 | $ 7,000,000 |
| 2026/2027 | $ 7,000,000 |
| 2027/2028 | $ 7,000,000 |

The annual Base Compensation for each Contract Year includes any amounts payable to any University Coach pursuant to an adidas personal services agreement.  Any amount of Base Compensation paid by adidas to any University Coach shall relieve adidas of such corresponding obligation to University under this Agreement.

5.  Section 4.B. of the Agreement shall be deleted in its entirety and replaced by the following:

"No later than May 1 of each Contract Year (beginning in 2018/2019 Contract Year), adidas and University shall mutually agree on a written strategic plan concerning the allocation and use of the below annual activation fund for the following Contract Year. adidas shall timely (based on the payment terms of such invoice) make the following annual activation investments, either directly to mutually agreed upon vendors on behalf of University and/or payments directly to University via project invoicing, in the amount designated below.  Such funds shall be used for mutually agreed upon activations,

*Page 2 of 11*
*adidas Confidential*

Pg: 189 of 412    Filed: 12/15/2021    Doc: 11    USCA4 Appeal: 21-2029

including but not limited to the University/adidas internship program, agencies and adidas strategic brand initiatives.

| Contract Year | Activation Investment |
|---------------|----------------------|
| 2018/2019 | $ 3,000,000 |
| 2019/2020 | $ 3,000,000 |
| 2020/2021 | $ 3,000,000 |
| 2021/2022 | $ 1,000,000 |
| 2022/2023 | $ 1,000,000 |
| 2023/2024 | $ 1,000,000 |
| 2024/2025 | $ 1,000,000 |
| 2025/2026 | $ 1,000,000 |
| 2026/2027 | $ 1,000,000 |
| 2027/2028 | $ 1,000,000 |

Any activation investments or activation funds paid by adidas to any third party shall relieve adidas of such corresponding obligation to University under this Agreement."

6. The following shall be added as Section 4.C. to the Agreement:

"University shall have the option for P3 and EXOS (provided that adidas has a relationship with such entity) to provide consulting services to University. adidas shall pay P3 and EXOS for all such services mutually agreed on by adidas and University.

7. The following shall be added as Section 4.D. to the Agreement:

"Based on the demand for University Products and adidas' customary retail policies and procedures regarding range assortment and product selection, adidas shall offer for sale University Products in adidas owned retail stores nationwide and include applicable point of sale materials. adidas agrees that it will use commercially reasonable efforts to involve University in adidas strategic brand initiatives throughout the Term and notify University of such initiatives as soon as reasonably practicable. Further, based on University's on-field performance, national marketability, and adidas' national category and brand initiatives, during each Contract Year, adidas will use commercially reasonable efforts to incorporate University into adidas national marketing opportunities, including but not limited to national advertising opportunities (e.g., brand or multi-property campaigns on TV, in print, retail or internet)."

*Page 3 of 11*
*adidas Confidential*

Filed: 12/15/2021     Pg: 190 of 412     USCA4 Appeal: 21-2029     Doc: 11

**8.** Section 5.A. of the Agreement shall be deleted in its entirety and replaced by the following:

"For each Contract Year, adidas agrees to supply University, at no cost, an allotment of adidas Products in the amount designated below, for use by the designated University Athletic Programs for team allotments, camps and clinics, and staff/coaches personal allotments.  The dollar amount of adidas Products provided to University shall be measured at adidas standard retail prices (except where otherwise denoted).  All Products to be supplied by adidas under this Agreement shall be delivered F.O.B. to University at no charge.

| Contract Year | Product Allotment |
|---|---|
| 2018/2019 | $ 6,000,000 |
| 2019/2020 | $ 6,000,000 |
| 2020/2021 | $ 6,100,000 |
| 2021/2022 | $ 6,100,000 |
| 2022/2023 | $ 6,100,000 |
| 2023/2024 | $ 6,200,000 |
| 2024/2025 | $ 6,200,000 |
| 2025/2026 | $ 6,200,000 |
| 2026/2027 | $ 6,200,000 |
| 2027/2028 | $ 6,200,000 |

Starting in the 2018/2019 Contract Year, adidas agrees that University may carry forward up to One Hundred Fifty Thousand Dollars ($150,000) worth of adidas Products (at adidas standard retail prices (except where otherwise denoted)) from one Contract Year to the next subsequent Contract Year only (e.g., carry over $150,000 from the 2018/2019 Contract Year to the 2019/2020 Contract Year); provided, however, that University shall not carry forward any adidas Products from the last Contract Year of the Contract Term. Additionally, for each new Athletic Program added to University's Athletic Department, the Product allotments under this section shall increase by one hundred thousand dollars ($100,000) for each Contract Year.

University agrees that all other adidas Products shall continue to be purchased from adidas at wholesale cost minus 10%.

During each Contract Year, University shall have the right to allocate a mutually agreed on portion of the above Product Allotment for adidas brand initiatives/moments, including but not limited to brand initiatives/moments such as post-season bowl, March Madness or CWS uniforms/shoes, and any of the following:

| Football |
|---|
| Strategy jerseys, pants, gloves, base layer, accessories, cleats |
| |

*Page 4 of 11*
*adidas Confidential*

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 192 of 412

| Men's Basketball |
| --- |
| Home/Away/Alternate/Conference Uniform game jerseys & shorts |

| Women's Basketball |
| --- |
| Home/Away/Alternate jersey & shorts |

| Baseball |
| --- |
| Alternate jersey/pant |

Any amount of adidas Products provided by adidas to any University Coach shall relieve adidas of such corresponding obligation to University under this Agreement. University understands and agrees that it shall not resell any Products supplied to University by adidas, other than an annual commemorative merchandise auction or the equipment room's annual liquidation sale.

For the sake of clarity, the above amounts include inflatables for footballs and basketballs, and may subsequently include volleyballs and hardgoods for softball, baseball and lacrosse as mutually agreed to by the parties. University agrees to use good faith efforts to make adidas the exclusive provider to all University Athletic Programs, subject to its existing contractual arrangements with third parties and Section 6.H and Exhibit C of the Agreement."

9. The following shall be added as Section 7.E. to the Agreement:

"Any use of a University student-athlete's name, image, likeness, avatar, and/or appearance in connection with any adidas advertisement, communication (including social media), release, promotion, and/or sale of adidas products shall be pre-approved by University in compliance with NCAA Division I Bylaw 12.5. adidas acknowledges that impermissible use of a University student-athlete's name, image, likeness, avatar, and/or appearance may cause the student-athlete to be declared ineligible to compete for University. University retains the exclusive rights to modify or reject any proposed use of a University student-athlete's name, image, likeness, avatar, and/or appearance in relationship to this Agreement."

10. Section 9.A. shall be deleted in its entirety and replaced with the following:

"University shall enter into or shall cause its licensing agent(s) to enter into and maintain in full force and effect during the Term, a retail license(s) granting adidas: (x) the exclusive right throughout the Contract Territory to manufacture and sell Authentic Competition Apparel that features the University Endorsement through any channel of retail distribution; and (y) the non-exclusive right to manufacture and sell throughout the Contract Territory Products (other than Authentic Competition Apparel) that feature the University Endorsement through any channel of retail distribution. University further agrees that: (i) the royalty rate payable by adidas with respect to any such license(s) shall not exceed fifteen percent (15%) of Net Sales; (ii) adidas Products shall be the exclusive Authentic Competition Apparel and Performance Apparel sold through any

*Page 5 of 11*
*adidas Confidential*

retail location or distribution channel (including but not limited to the brick and mortar shops, catalogs or the Internet) owned or controlled by the University's athletic department; (iii) that neither University nor its licensing agent(s) shall enter into any agreement or understanding with any Competitor to manufacture, develop, market, distribute, license or sell licensed products that feature the University Endorsement; (iv) if University or its licensing agent(s) is (as of the effective date of this Agreement) party to any agreement with a Competitor to manufacture, develop, market, distribute, license or sell licensed products that feature the University Endorsement, then neither University nor its licensing agent(s) will renew or extend such agreement(s); (v) no royalty shall be paid on Products provided by adidas under this Agreement; (vii) neither University nor its licensing agent(s) shall license any third party to manufacture or sell Products that copy or resemble adidas Products; and (vi) adidas will be recognized and classified as University's provider for all Products for University Athletic Programs special events (e.g., Midnight Madness).  Provided that all Products do not include any Competitor logos, adidas acknowledges that Celebration Products may be manufactured and sold by a Competitor pursuant to an NCAA Celebration Products licensing program, or similar licensing program by the Atlantic Coast Conference, and such manufacturing and sales of Celebration Products shall not be a breach of this Agreement.  adidas acknowledges that it shall not be a breach of this Agreement for Centerplate to act as an authorized adidas retailer.

Each Contract Year, adidas agrees to pay University a guaranteed minimum royalty in the amount set opposite each such Contract Year:

| Contract Year | Minimum Guaranteed Royalty |
|---|---|
| 2018/2019 | $ 450,000 |
| 2019/2020 | $ 450,000 |
| 2020/2021 | $ 450,000 |
| 2021/2022 | $ 450,000 |
| 2022/2023 | $ 450,000 |
| 2023/2024 | $ 450,000 |
| 2024/2025 | $ 450,000 |
| 2025/2026 | $ 450,000 |
| 2026/2027 | $ 450,000 |
| 2027/2028 | $ 450,000" |

11. The following shall be added as Section 12.E. of the Agreement:

"(1)  The parties agree that University will be an elite adidas university program when compared to other adidas university programs measured by: (a) any ranking system included in other adidas university program agreements; and (b) when University is compared to other adidas university programs during each comparable Contract Year, how much (i) cash is received during such Contract Year, (ii) product is received during such Contract Year, and (iii) marketing support is received during such Contract Year. If University is not an elite adidas university program (including but not limited to if

*Page 6 of 11*
*adidas Confidential*

University is not an elite adidas university program because adidas includes any national ranking system in any other adidas university program agreements), then adidas shall notify University as soon as reasonably practicable and University shall enter into good faith negotiations with adidas to remedy such issue. The parties shall not be obligated to remedy such issue if they cannot settle on mutually satisfactory terms. If the parties cannot mutually agree on terms to remedy such issue within thirty (30) calendar days of entering into such good faith negotiations, then (within ten (10) calendar days of the conclusion of such good faith negotiations) University may terminate the Agreement. If the conclusion of such good faith negotiations is prior to November 1 of such Contract Year, then such termination shall be effective as of the conclusion of the then current Contract Year and if the conclusion of such good faith negotiations is on or after November 1 of such Contract Year, then such termination shall be effective as of the conclusion of the following Contract Year. Upon such notification to terminate (in either event), University may immediately enter into negotiations with a Competitor for an agreement that would be effective no sooner than the conclusion of such Contract Year or such following Contract Year, respectively. For the sake of clarity, it shall not be a breach of this Agreement if University is not an elite adidas university program.

(2)  Notwithstanding the foregoing, if University determines (in good faith and based on objective evidence) that it is not being compensated as an elite adidas university program, then University shall enter into good faith negotiations with adidas to remedy such issue. The parties shall not be obligated to remedy such issue if they cannot settle on mutually satisfactory terms. If the parties cannot mutually agree on terms to remedy such issue within thirty (30) calendar days of entering into such good faith negotiations, then (within ten (10) calendar days of the conclusion of such good faith negotiations) University may terminate the Agreement. If the conclusion of such good faith negotiations is prior to November 1 of such Contract Year, then such termination shall be effective as of the conclusion of the then current Contract Year and if the conclusion of such good faith negotiations is on or after November 1 of such Contract Year, then such termination shall be effective as of the conclusion of the following Contract Year. Upon such notification to terminate (in either event), University may immediately enter into negotiations with a Competitor for an agreement that would be effective no sooner than the conclusion of such Contract Year or such following Contract Year, respectively. For the sake of clarity, it shall not be a breach of this Agreement if University is not an elite adidas university program."

**12.** Section 18 of the Agreement shall be deleted and replaced with the following:

"**Right of First Dealing/Matching Rights.**  Beginning one hundred eighty (180) days before the beginning of the last Contract Year (i.e., January 1, 2027), University shall periodically meet with adidas to negotiate in good faith the renewal of this Agreement ("First Dealing Period"). Said First Dealing Period shall extend for a period of ninety (90) days. The parties shall not be obligated to enter into an agreement if they cannot settle on mutually satisfactory terms during the First Dealing Period. University shall not (nor shall University's Athletic Department) permit its respective agents, attorneys, accountants, representatives or employees to) engage in discussions or negotiations

*Page 7 of 11*
*adidas Confidential*

Filed: 12/15/2021    Pg: 194 of 412    Doc: 11    USCA4 Appeal: 21-2029

with any third party regarding University wearing, sponsoring, promoting, advertising or endorsing, or providing consulting or similar services with respect to, any Products after the Contract Term at any time during the Contract Term until the conclusion of the First Dealing Period. Following the conclusion of the First Dealing Period and continuing through June 30, 2028, Athletics agrees to (and that University will) refrain from entering into an endorsement or similar agreement with any Competitor without first giving adidas an opportunity to enter into an agreement with University for such rights on the terms and conditions proposed by such Competitor that are material, measurable and matchable terms and conditions ("Third Party Terms"). University shall provide adidas in writing (on third party letterhead, unaltered and unredacted) with the Third Party Terms it receives. adidas shall have thirty (30) days from its receipt of such Third Party Terms to match or better such Third Party Terms. If adidas matches or betters such Third Party Terms, then University will enter into a new agreement with adidas on such Thirty Party Terms, the better terms and other standard adidas terms and conditions. If adidas fails to match or better such Third Party Terms, then University shall enter into an agreement with such third party on the Third Party Terms that adidas failed to match or better."

13. EXHIBIT B of the Agreement shall be deleted in its entirety and replaced with the following:

## "EXHIBIT B
## INCENTIVE COMPENSATION

**Bonus Plan: Football**

| | |
|---|---|
| College Football National Champions | $300,000^ |
| College Football playoff semifinal game participant | $100,000^ |
| Conference Champions | $50,000 |
| College Football Coach of the Year | $25,000 |

**Bonus Plan:  Men's Basketball**

| | |
|---|---|
| NCAA Champions | $300,000^ |
| Final Four Participant | $150,000^ |
| Conference Champions | $50,000 |
| NCAA Coach of the Year | $25,000 |

**Bonus Plan:  Women's Basketball**

| | |
|---|---|
| NCAA Champions | $200,000 |
| NCAA Final Four Participant | $75,000 |
| Conference Champions | $25,000 |
| NCAA Coach of the Year | $25,000 |

*Page 8 of 11*
*adidas Confidential*

- 172 -

Filed: 12/15/2021    Pg: 195 of 412    Doc: 11    USCA4 Appeal: 21-2029

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 196 of 412

^Non-Cumulative Per Applicable Grouping (i.e., only the highest
incentive will be paid)."

**14.** EXHIBIT C of the Agreement shall be deleted in its entirety and replaced with the following:

### "Exhibit C
### EXISTING AGREEMENTS

Baseball & Softball - Wilson/Louisville Slugger/Hillerich Bradsby: gloves, bats, close-back headwear, catching gear, helmets, catching gear and bat bags.
Golf – TaylorMade (various golf specific hard goods)
Lacrosse – STX sticks - STX sticks, protective eyewear, field gloves, goalie gear, lacrosse balls, shooting nets, string kit, stick bags, head gear, coaches' clip boards.
Rowing – Pockock/Nike boat shoes, Heart Rate monitors, 2XU/Skins Compression, Oakley eyewear
Swimming & Diving – TYR (in water gear)
Volleyball – Molten Volleyballs
University of Louisville Golf Club – various apparel & non-apparel"

**15.** Section 3(b) of EXHIBIT D of the Agreement shall be deleted in its entirety and replaced with the following:

**"Football**
- Field Level Suite at North End Zone of Football Stadium (includes 18 season tickets in suite; option for up to 8 Standing Room Only tickets per game; 6 suite passes; and 4 premium parking passes).
- 4 home regular season tickets (non-suite tickets).
- 4 sideline passes for home football games, when requested. Best efforts to provide 4 sideline passes for away football games, when requested.
- 8 tickets away or neutral site regular season games
- 16 tickets ACC Championship game
- 16 non-CFP bowl game
- 16 tickets CFP game, best efforts to provide 4 Field passes

**Men's Basketball**
- 12 home regular season tickets (8 4 of which will be in lower level club) -- includes 2 parking passes for all home games.
- Best efforts to provide away tickets upon request.
- 12 ACC conference tournament tickets (8 4 lower level/4 8 upper level)
- NCAA March Madness: 1st and 2nd Rounds - 8 tickets unless location is less than 300 miles from University, then 4. Sweet 16 - 8 tickets unless location is less than 300 miles from University, then only 6.
- 12 ACC conference tournament tickets (8 4 lower level/4 8 upper level)

*Page 10 of 11*
*adidas Confidential*

- 20 Final Four tickets (Semi-final/Championship) (8 prime location/12 others)
- 8 tickets/passes Men's basketball private practice for sponsors

**Women's Basketball**
- 8 prime location tickets for regular season home games & all post season. (1 parking pass for regular season home games)

**Baseball**
- 8 prime location tickets for regular season home games & all Post-season

**Other sports**
- 4 prime location tickets for regular season & Post-season upon request"

**In Witness Whereof**, the parties have entered into this Amendment as of the Effective Date written above. All terms and conditions of the Agreement not amended herein will remain in full force and effect.

**ADIDAS**                                              **UNIVERSITY**

By: _____          By: _____
Chris McGuire,                                          Tom Jurich
Senior Director of Sports Marketing       Vice President/Director of Athletics

_____
Approved as to form by adidas Legal Dept.

Approved:  _Edward Diskant/Russell Capone/Robert Boone/____
           EDWARD B. DISKANT/RUSSELL CAPONE/ROBERT BOONE/NOAH
           SOLOWIEJCZYK
           Assistant United States Attorneys

Before:    THE HONORABLE JAMES L. COTT
           United States Magistrate Judge
           Southern District of New York

                                          17 MAG 7120

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**
                                  :
     - v. -                       :    Violations of
                                  :    18 U.S.C. §§ 1343,
JAMES GATTO                       :    1349, 1956(h), and 2
  a/k/a "Jim,"                    :
MERL CODE,                        :
CHRISTIAN DAWKINS,                :
JONATHAN BRAD AUGUSTINE, and      :    COUNTY OF OFFENSE:
MUNISH SOOD,                      :    NEW YORK
                                  :
                  Defendants.     :
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JOHN VOURDERIS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

                       COUNT ONE
                 (Wire Fraud Conspiracy)

     1.   From at least in or about May 2017, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE,
CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit wire fraud in violation of Title
18, United States Code, Section 1343.

     2.   It was a part and object of the conspiracy that JAMES
GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD
AUGUSTINE, and MUNISH SOOD, the defendants, and others known and

unknown, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause
to be transmitted by means of wire and radio communication in
interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme
and artifice, in violation of Title 18, United States Code,
Section 1343, to wit, GATTO, CODE, DAWKINS, AUGUSTINE, SOOD and
others known and unknown, including basketball coaches employed
by University-6 and University-7,[1] participated in a scheme to
defraud, by telephone, email, and wire transfers of funds, among
other means and methods, University-6 and University-7 by making
and concealing bribe payments to high school student-athletes
and/or their families in exchange for, among other things, the
student-athletes' commitment to play basketball for University-6
and University-7, thereby causing the universities to agree to
provide athletic scholarships to student-athletes who, in truth
and in fact, were ineligible to compete as a result of the bribe
payments.

        3.    It was a further part and object of the conspiracy
that JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS,
JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, and
others known and unknown, willfully and knowingly, having
devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, would
and did transmit and cause to be transmitted by means of wire

---

[1] In addition to the scheme to defraud described herein, the
investigation has revealed another scheme whereby athlete
advisors make direct bribe payments to coaches at universities
in exchange for those coaches' agreement to influence and steer
players under their control to retain the relevant athlete
advisors.  That additional scheme is the subject of two related
Complaints also unsealed today. *See United States* v. *Chuck
Connors Person, et al.*, 17 Mag. ___, and *United States* v. *Lamont
Evans, et al.*, 17 Mag. _____.  All universities and players
referenced in this Complaint and the two related Complaints have
been numbered sequentially. Accordingly, the players referenced
in this Complaint begin with "Player-10," and the universities
referenced in this Complaint begin with "University-6."

2

and radio communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose
of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343, to wit, GATTO, CODE, DAWKINS,
AUGUSTINE, SOOD and others known and unknown, including
basketball coaches employed by University-6 and University-7,
participated in a scheme to defraud, by telephone, email, and
wire transfers of funds, among other means and methods,
University-6 and University-7 by making and concealing bribe
payments to high school student-athletes and/or their families
in exchange for, among other things, the student-athletes'
commitment to play basketball for University-6 and University-7,
which deprived University-6 and University-7 of their right to
control the use of their assets, including the decision of how
to allocate a limited amount of athletic scholarships, and
which, if revealed, would have further exposed the universities
to tangible economic harm, including monetary and other
penalties imposed by the National Collegiate Athletic
Association (the "NCAA").

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Wire Fraud)

4.    From at least in or about May 2017, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE,
CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the
defendants, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, and attempting to do
so, transmitted and caused to be transmitted by means of wire
and radio communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose
of executing such a scheme and artifice, to wit, GATTO, CODE,
DAWKINS, AUGUSTINE, SOOD and others known and unknown, including
basketball coaches employed at University-6 and University-7,
participated in a scheme to defraud, by telephone, email, and
wire transfers of funds, among other means and methods,
University-6 and University-7 by making and concealing bribe
payments to high school student-athletes and/or their families
in exchange for, among other things, the student-athletes'

3

commitment to play basketball for University-6 and University-7, thereby causing the universities to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the bribe payments.

(Title 18, United States Code, Sections 1343, 1349, and 2.)

## COUNT THREE
(Wire Fraud)

5.    From at least in or about May 2017, up to and including in or about September 2017, in the Southern District of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, to wit, GATTO, CODE, DAWKINS, AUGUSTINE, SOOD and others known and unknown, including basketball coaches employed by University-6 and University-7, participated in a scheme to defraud, by telephone, email, and wire transfers of funds, among other means and methods, University-6 and University-7 by making and concealing bribe payments to high school student-athletes and/or their families in exchange for, among other things, the student-athletes' commitment to play basketball for University-6 and University-7, which deprived the universities of their right to control the use of their assets, including the decision of how to allocate a limited amount of athletic scholarships, and which, if revealed, would have further exposed the universities to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Sections 1343, 1349, and 2.)

## COUNT FOUR
(Money Laundering Conspiracy)

6.    From at least in or about May 2017, up to and including in or about September 2017, in the Southern District

4

of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE,
CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to violate Title 18, United States Code,
Section 1956(a)(1)(B)(i).

    7.    It was a part and object of the conspiracy that JAMES
GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, JONATHAN BRAD
AUGUSTINE, and MUNISH SOOD, the defendants, and others known and
unknown, knowing that the property involved in a financial
transaction represented the proceeds of some form of unlawful
activity, would and did conduct and attempt to conduct a
financial transaction, which in fact involved the proceeds of
specified unlawful activity, to wit, the wire fraud offenses
alleged in Counts One, Two, and Three of this Complaint, with
the intent to promote the carrying on of that specified unlawful
activity, in violation of Title 18, United States Code, Section
1956(a)(1)(A)(i).

        (Title 18, United States Code, Section 1956(h).)

    The bases for deponent's knowledge and for the foregoing
charges are, in part, as follows:

    8.    I am a Special Agent with the FBI, and I have been
personally involved in the investigation of this matter, which
has been handled by Special Agents of the FBI and Criminal
Investigators in the United States Attorney's Office for the
Southern District of New York (the "USAO"). I have been employed
by the FBI since 2014. I and other members of the investigative
team have experience in fraud and corruption investigations and
techniques associated with such investigations, including
executing search warrants, financial analysis, wiretaps, and
working with informants.

    9.    This affidavit is based in part upon my own
observations, my conversations with other law enforcement agents
and others, my examination of documents and reports prepared by
others, my interviews of witnesses, and my training and
experience. Because this affidavit is being submitted for the
limited purpose of establishing probable cause, it does not
include all of the facts that I have learned during the course
of the investigation. Where the contents of documents, including

5

emails, and the actions, statements and conversations of others
are reported herein, they are reported in substance and in part,
except where specifically indicated otherwise.

## I.   OVERVIEW OF THE INVESTIGATION

10.   The charges in this Complaint result from a scheme
involving bribery, corruption, and fraud in intercollegiate
athletics. Since 2015, the FBI and USAO have been investigating
the criminal influence of money on coaches and athletes who
participate in intercollegiate basketball governed by the NCAA.
As relevant here, the investigation has revealed multiple
instances of bribes paid by athlete advisors, including
financial advisors and business managers, as well as high-level
apparel company employees, and facilitated by coaches employed
by NCAA Division I universities, to student-athletes playing at
or bound for NCAA Division I universities, and the families of
such athletes, in exchange for a commitment by those athletes to
matriculate at a specific university and a promise to ultimately
sign agreements to be represented by the bribe-payors once the
athletes enter the National Basketball Association ("NBA").
Moreover, the investigation has revealed that scheme
participants take steps to conceal the illegal payments,
including by (i) funneling them to athletes and/or their
families indirectly through surrogates and non-profit
institutions controlled by the scheme participants; and (ii)
making or intending to make misrepresentations to the relevant
universities regarding the involvement of student-athletes and
coaches in the violation of NCAA rules.

11.   In particular, the investigation has revealed that
JAMES GATTO, a/k/a "Jim," the defendant — a high-level executive
of a global athletic apparel company ("Company-1") — and MERL
CODE, the defendant – an individual affiliated with Company-1
and its high school and college basketball programs — conspired
with coaches for universities sponsored by Company-1 to make
payments to high school basketball players and/or their families
in exchange for commitments by those players to attend and play
for the Company-1-sponsored university, and to sign with
Company-1 upon turning professional. In addition, CHRISTIAN
DAWKINS, MUNISH SOOD, and JONATHAN BRAD AUGUSTINE, the
defendants, brokered and facilitated the corrupt payments, in
exchange for a promise that the players also would retain the
services of DAWKINS, a business manager, and SOOD, a financial

6

advisor, upon turning professional. As set forth in more detail below, in or around 2017, GATTO, CODE, DAWKINS, AUGUSTINE, and SOOD agreed to pay bribes to at least three high school basketball players and/or their families in the following manner:

    a.    First, GATTO, CODE, DAWKINS and SOOD worked together to funnel $100,000 from Company-1 to the family of a high school basketball player ("Player-10") in exchange for Player-10's commitment to play at an NCAA Division I university whose athletic programs are sponsored by Company-1 ("University-6"), and in further exchange for a commitment from Player-10 to retain DAWKINS and SOOD, and to sign with Company-1, once Player-10 joined a professional basketball league.

    b.    Second, DAWKINS and AUGUSTINE agreed to facilitate payments to the family of another high school basketball player ("Player-11") in exchange for Player-11's commitment to play at University-6 and ultimately to retain DAWKINS's services.

    c.    Third, GATTO, CODE, DAWKINS, and AUGUSTINE agreed to make payments of as much as $150,000 from Company-1 to another high school basketball player ("Player-12") in order to secure Player-12's commitment to play at an NCAA Division I university whose athletic programs are also sponsored by Company-1 ("University-7"). In exchange for the $150,000 payment, Player-12 similarly was expected to commit to retaining DAWKINS's services and signing with Company-1 once Player-12 joined a professional basketball league.

    12.    The scheme described herein served to defraud the relevant universities in several ways. First, by virtue of accepting and concealing payments that, if uncovered, would render them ineligible to participate in Division I basketball, the student-athletes and/or their family members conspired with coaches and apparel company executives to obtain athletic-based financial aid for the student-athletes from NCAA Division I universities through false and fraudulent means. Indeed, for the scheme to succeed and the athletic scholarships to be awarded such that the athletes could play at a NCAA Division I university, the student-athletes and coaches described herein must falsely certify to the universities that they are unaware of any rules violations, including the illegal payments. Second,

7

- 182 -

the scheme participants further defrauded the universities, or attempted to do so, by depriving the universities of significant and necessary information regarding the non-compliance with NCAA rules by the relevant student-athletes and coaches.  In doing so, the scheme  participants interfered with the universities' ability to control their assets and created a risk of tangible economic harm to the universities, including, among other things, decision-making about the distribution of their limited athletic scholarships; the possible disgorgement of certain profit-sharing by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; and the potential ineligibility of the university's basketball team to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular.

## II.    THE NCAA AND RELEVANT NCAA RULES

13.  Based on my participation in this investigation, my review of publicly available information, and my conversations with other law enforcement agents who have reviewed such information, I have learned the following:

a.    The NCAA is a non-profit organization headquartered in Indianapolis, Indiana, that regulates athletics for over 1,000 colleges and universities, conferences, and other associations.  NCAA member schools are organized into three separate divisions: Division I, Division II, and Division III.  University-6 and University-7 are in NCAA's Division I, which is the highest level of intercollegiate athletics sanctioned by the NCAA.

b.    Division I schools typically have the biggest student bodies, manage the largest athletics budgets and offer the most athletic scholarships.  Among other things, Division I schools must offer a minimum amount of financial assistance (in the form of scholarships) to their athletes; however, the NCAA sets a maximum number of scholarships available for each sport that a Division I school cannot exceed.  Currently, teams may offer no more than 13 athletic scholarships for the 2017-2018 men's basketball season.

14.  The official rulebook governing Division I schools is the NCAA Division I Manual (the "Manual"), which is published

8

annually and which contains the NCAA Constitution and its
operating bylaws (the "Bylaws"). Based on my review of the
Manual, I have learned the following, in relevant part:

      a.   Among the NCAA's core principles for the conduct
of intercollegiate athletics is a directive that "[s]tudent-
athletes shall be amateurs in an intercollegiate sport;" and
that "student-athletes should be protected from exploitation by
professional and commercial enterprises." The Constitution
further states that "an institution found to have violated the
[NCAA]'s rules shall be subject to disciplinary and corrective
actions as may be determined by the [NCAA]."

      b.   Consistent with the NCAA's core principles, any
financial assistance to student-athletes other than from the
university itself or the athletes' legal guardians is prohibited
without express authorization from the NCAA. In addition,
neither student-athletes, prospective student athletes, nor
their relatives can accept benefits, including money, travel,
clothing, or other merchandise, directly or indirectly from
outside sources such as agents[2] or financial advisors. A
student-athlete is rendered "ineligible" to participate in
Division I sports if the athlete is recruited by a university or
any "representative of its athletics interests" in violation of
NCAA rules.

      c.   Coaches and other team staff at NCAA Division I
schools also are subject to various prohibitions, including (i)
facilitating contact between student-athletes and agents or
financial advisors; and (ii) receiving compensation directly or
indirectly from outside sources with respect to any actions
involving the student-athletes.

    15.   Based on my review of the NCAA Constitution and its

---

[2] The NCAA Division I Bylaws define an "agent" broadly as "any
individual who, directly or indirectly, . . . seeks to obtain
any type of financial gain or benefit . . . from a student
athlete's potential earnings as a professional athlete."
Specifically included in the definition of "agent" is, among
others, "a certified contract advisor, financial advisor,
marketing representative, brand manager or anyone who is
employed or associated with such persons."

9

Bylaws, I have learned that student-athletes, coaches, and staff members of athletics departments must complete annual certifications regarding their knowledge of NCAA rules violations, and, in the case of student-athletes, their continued eligibility to participate in NCAA-sponsored sports. In particular:

a.    On an annual basis, a student-athlete must "sign a statement . . . in which the student-athlete submits information related to eligibility, recruitment, financial aid, [and] amateur status," which is known as the "Student-Athlete Statement." In the Student-Athlete Statement, the student-athlete represents, among other things, that "[a]ll information provided to the NCAA . . . and the institution's admissions office is accurate and valid, including . . . [his] amateur status" and that the student-athlete has "reported to [his] director of athletics . . . any violations of NCAA regulations involving [him] and [his] institution." Furthermore, in signing the Student-Athlete Statement, the Student-Athlete certifies that "to the best of [his] knowledge, [he] has not violated any amateurism rules," and has "not provided false or misleading information concerning [his] amateur status to the NCAA . . . or the institution's athletics department."

b.    Coaches and staff members must certify annually that they have reported to their university any knowledge of violations of NCAA rules involving their institution.

c.    In addition, the Bylaws prohibit student-athletes, coaches and staff members of athletics departments from "knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation."

16.    As set forth in the Bylaws, violations of NCAA rules by a university or any individual may lead to penalties including, but not limited to, limitations on a university's "participation in postseason play in the involved sport"; financial penalties including "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary distribution by" the NCAA; "limitations

on the number of financial aid awards that may be provided" by the university to student-athletes; and recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes.

### III.    <u>RELEVANT INDIVIDUALS AND ENTITIES</u>

#### A. The Athletic Apparel Company ("Company-1")

17. Based on my participation in this investigation, including my review of publicly available information, I have learned that Company-1 is a multinational corporation that designs and manufactures shoes, clothing, and accessories for multiple sports, including basketball. Company-1 sponsors numerous high school, college, and professional basketball programs, including a program for amateur pre-college athletes, and sponsors the athletic programs of a number of universities that regularly have top-ranked Division I men's basketball teams, including University-6 and University-7.

#### B. JAMES GATTO, a/k/a "Jim"

18. Based on my participation in this investigation, including my review of publicly available information, and my review of calls and conversations recorded as a part of this investigation, I have learned that JAMES GATTO, a/k/a "Jim," the defendant, is the head of Global Sports Marketing - Basketball for Company-1. In that capacity, GATTO appears to oversee significant components of Company-1's high school and college basketball programs, including facilitating payments to players and their families as a part of the schemes described herein.

#### C. MERL CODE

19. Based on my participation in this investigation, including my review of publicly available information, and my review of calls and conversations recorded as a part of this investigation, I have learned that MERL CODE, the defendant, is affiliated with Company-1 and its high school and college basketball programs, and participated in organizing some of the payments made from Company-1 to players and their families as a part of the schemes described herein. Prior to joining Company-

11

1, CODE worked as the Director of Elite Youth Basketball for a
rival athletic apparel company.

### D. CHRISTIAN DAWKINS

20.    Based on my review of publicly available
information, and my review of calls and conversations recorded
as a part of this investigation, among other sources, I know
that CHRISTIAN DAWKINS, the defendant, was an employee of a
sports management company based in New Jersey ("SMC-1") between
in or about 2015 until in or about May 2017.  Although DAWKINS is
not a registered agent[3], the investigation has revealed that
DAWKINS's job at SMC-1 primarily consisted of recruiting
athletes as clients and maintaining client relationships for the
firm.  In or about May 2017, SMC-1 terminated DAWKINS in
connection with DAWKINS's alleged misuse of an athlete's credit
card to pay for expenses from a ride services company without
the athlete's authorization.  Since that time, as detailed below,
DAWKINS has endeavored, with the assistance of other scheme
participants, to start his own sports management business.

### E. JONATHAN BRAD AUGUSTINE

21.    Based on my review of publicly available information
and my review of calls and conversations recorded as a part of
this investigation, I know that JONATHAN BRAD AUGUSTINE, the
defendant, is the Program Director for an amateur, high school-
aged basketball team sponsored by Company-1 that participates in
the "AAU," an amateur basketball league.  AUGUSTINE is also the
President of a Florida-based registered 501(c)(3) charitable
organization whose stated purpose is to provide mentoring and
assistance to high school athletes to help them "grow, develop
and achieve in the classroom as well as to secure a scholarship
to attend an accredited college or university."

---

[3] Based on my review of publicly available sources, I am aware
that becoming a registered sports agent with the NBA requires
approval by the NBA Players Association, the payment of annual
fees, and successful completion of a written examination.  Only
individuals who have met these requirements may recruit or
represent NBA players.

12

- 187 -

### F. MUNISH SOOD

22.    Based on my participation in this investigation, including my review of publicly available information, I have learned that MUNISH SOOD, the defendant, is the founder of an investment services company ("the Investment Company") and serves as its Chief Investment Officer. The Investment Company was founded in or about 2002 to provide investment management services to institutional and family office clients. SOOD is a registered investment advisor. Based on my conversations with a cooperating witness who has been providing information to law enforcement as a part of this investigation ("CW-1"),[4] I have learned that CW-1 met SOOD in or about 2011 or 2012, and that SOOD and CW-1 have known and worked with each other for several years.

### G. University-6

23.    Based on my review of publicly available information, I have learned that University-6 is a public research university located in Kentucky. With approximately 22,640 students and over 7,000 faculty and staff members, it is one of the state's largest universities. University-6 fields approximately 21 varsity sports teams in NCAA Division I competition, including men's basketball.

---

[4] Based on my participation in the investigation, including my debriefings of CW-1, I am aware that CW-1 ran a business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment related services to CW-1's clients, including athletes. Information provided by CW-1 has been corroborated by, among other things, recorded conversations, electronic communications, and surveillance by law enforcement. CW-1 began cooperating with the Government in or about November 2014. All of CW-1's activities with respect to the defendants described in this Complaint were conducted at the direction of law enforcement. In or about September 2017, CW-1 pleaded guilty to securities fraud, wire fraud, aggravated identity theft, and making false statements pursuant to a cooperation agreement with the Government. On or about May 6, 2016, CW-1 agreed to settle civil charges filed by the Securities and Exchange Commission relating to CW-1's violations of certain securities laws.

13

24.  I know from publicly available information that, in
each year relevant to this Complaint, University-6 received
funds from the federal government in excess of $10,000 per year.

### H. University-7

25.  Based on my review of publicly available information,
I have learned that University-7 is a private research
university located in Florida.  With approximately 16,000
students and over 2,600 faculty members, it is one of the
state's largest universities.  University-7 fields approximately
15 varsity sports teams in NCAA Division I competition,
including men's basketball.

26.  I know from publicly available information that, in
each year relevant to this Complaint, University-7 received
funds from the federal government in excess of $10,000 per year.

### IV.  ALLEGATIONS INVOLVING UNIVERSITY-6

27.  As set forth in more detail herein, beginning in
approximately May 2017, and continuing into at least September
2017, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS,
and MUNISH SOOD, the defendants, and others known and unknown,
conspired to illicitly funnel approximately $100,000 from
Company-1 to the family of Player-10, an All-American high
school basketball player; to assist one or more coaches at
University-6 in securing Player-10's commitment to play at
University-6, a school sponsored by Company-1; and to further
ensure that Player-10 ultimately retained the services of
DAWKINS and SOOD and signed with Company-1 upon entering the
NBA.  The bribe money was structured in a manner so as to conceal
it from the NCAA and officials at University-6 by, among other
things, having Company-1 wire money to third party consultants
who then facilitated cash payments to Player-10's family.
Further, the scheme could only succeed, and Player-10 could only
receive an athletic scholarship from University-6, if the scheme
participants, including one or more coaches at University-6,
made false certifications to University-6.

28.  I am also aware from my participation in this
investigation that the agreement to make payments to the family
of Player-10 was formulated in or around May 2017, after most of
the top high school recruits from the Class of 2017 had already

14

- 189 -

committed to various universities and when, according to public
reporting, Player-10, who was considered one of the top recruits
nationally in his class, had indicated a desire to attend a
number of rival schools, and not University-6.  Based on publicly
available information, I am aware that, on or about June 3,
2017, or almost immediately after the illicit bribe scheme set
forth herein was agreed to, Player-10 publicly announced his
intention to enroll at University-6.  Contemporaneous press
accounts described the announcement as a "surprise commitment"
that "c[ame] out of nowhere" and a "late recruiting coup" for
coaches at University-6.[5]

### A. The Defendants Agree to Pay Player-10's Family $100,000 to Matriculate at University-6, and Conceal the Payments Through an Entity Set Up by DAWKINS

29.  Based on my participation in this investigation,
including my review of telephone calls over a cellular telephone
used by CHRISTIAN DAWKINS, the defendant, that were intercepted
pursuant to judicial authorization (the "Dawkins Wiretap"), and
my discussions with other law enforcement officers, I have
learned that in or around May of 2017, at the request of at
least one coach from University-6, DAWKINS, JAMES GATTO, a/k/a
"Jim," MERL CODE, MUNISH SOOD, the defendants, and others agreed
to funnel $100,000 (payable in four installments) from Company-1
to the family of Player-10.  Shortly after the agreement with the
family of Player-10 was reached in late May and early June,
Player-10 publicly committed to University-6.

30.  I have further learned that,[6] prior to paying Player-

---

[5] Based on my review of publicly available information, I have
learned that Player-10 is listed on the roster for the 2017-2018
University-6 men's basketball team.

[6] Except as otherwise indicated, the bases for my knowledge of
the facts described in this Complaint are my participation in
this investigation; my training and experience; my discussions
with CW-1, and undercover law enforcement agents who
participated in the investigation; and my review of the entirety
of each recorded telephone call or meeting cited herein, and,

15

10's family, JAMES GATTO, a/k/a "Jim," and MERL CODE, the
defendants, first needed time to generate a sham purchase order
and invoice ostensibly to justify using Company-1 funds since
they could not lawfully pay the family of Player-10 directly and
risk that such prohibited payments be revealed. Accordingly, in
or around July 2017, CHRISTIAN DAWKINS, the defendant, working
with CODE, arranged for MUNISH SOOD, the defendant, and an FBI
undercover agent ("UC-1") posing as a financial backer for
DAWKINS's and SOOD's new sports management business, to make an
initial $25,000 payment to Player-10's family on Company-1's
behalf, to be later reimbursed by Company-1. In particular, on
or about July 7, 2017, DAWKINS and CODE had the following
discussion in a telephone call that was intercepted by the
Dawkins Wiretap:

       a.    CODE told DAWKINS that he had "bad news" about
the payments from Company-1 to Player-10's family, adding that
"my group gets [] an email about the invoice" that "ask[s] for
all these PO numbers and vendor numbers and blah blah blah blah
blah," referring to the document generated internally at
Company-1 meant to explain the $100,000 being allocated to pay
the family of Player-10. CODE then explained to DAWKINS that he
had expected JAMES GATTO, a/k/a "Jim," the defendant, and
Company-1 to have handled the payment "off the books," noting
that CODE's "group" had received payments that year that "didn't
go through the system."

       b.    CODE then informed DAWKINS that he had tried to
submit an invoice to Company-1 for the $100,000 payment, routed
through CODE's consulting company, but that when he submitted
the invoice "for the whole [University-6] situation," Company-1

---

where available, a transcript of the call or meeting. For every
instance in which I offer my interpretation of language used
during a recorded telephone call or meeting, that interpretation
is based on my training, experience, and participation in this
investigation, my review of the larger universe of recorded
telephone calls and meetings in addition to those contained
herein, and my discussions with CW-1 and the undercover law
enforcement agents.

16

"didn't have any record of [CODE's] organization in the system."
CODE described how he would have to "create a vendor number" for
his company and then a "purchase order" to justify the $100,000
payment, and, accordingly, they would not have access to the
funds for several weeks.  CODE lamented to DAWKINS that GATTO had
not just "flex[ed] his muscle and push[ed] it through the
system, but that's obviously not what's happening," and asked
whether DAWKINS could arrange for SOOD or UC-1 to provide the
initial payment to Player-10's father ("Father-2")[7] because
Father-2 had been pressuring them for the money.  CODE also said
that SOOD or UC-1 ultimately would be reimbursed for the initial
payment to Father-2.

    31.  On or about July 10, 2017, MERL CODE and MUNISH SOOD,
the defendants, spoke with UC-1 in a telephone call that was
recorded by UC-1 at the direction of law enforcement.[8]  During
the call, CODE, SOOD and UC-1 discussed the need for UC-1 to
fund the initial $25,000 payment to Father-2, and CODE explained
how athletic apparel companies masked other, similar payments to
high school athletes.  In particular, during the July 10 call the
following, among other things, was discussed:

        a.  CODE, SOOD and UC-1 discussed the possibility
that UC-1 would put up, or "front," the money needed to make the
first $25,000 payment to Player-10's family because, according
to CODE, "long story short, it's gotta go through some processes
[at Company-1] and steps and what have you, and it takes a
while, so we're talking another two to three weeks before it
really runs through the corporate structure.  And the dad's
expectations were that Christian [DAWKINS] was going to be able

─────────────

[7] A related Complaint, *United States* v. *Chuck Connors Person, et
al.*, 17 Mag. ____, references a "Father-1" who is a different
individual.

[8] Based on my participation in this investigation and my review
of a recording made by UC-1 of the meeting, I know that on June
20, 2017, CHRISTIAN DAWKINS, the defendant, introduced CODE to
SOOD and UC-1 during a meeting in New York, New York, and that
during this meeting, DAWKINS, CODE, SOOD and UC-1 discussed, in
sum and substance and in part, their plan to make payments to
college basketball players and coaches, including CODE's utility
to the scheme as an insider of Company-1.

17

to help him do some things a month ago." CODE further explained
that CHRISTIAN DAWKINS, the defendant, had called him and asked
him to make sure that SOOD and UC-1 "were aware of the
situation" and had asked them to provide the funds "with the
understanding that they will be reimbursed" by Company-1. CODE
further suggested to SOOD and UC-1 that "for cleanliness and
lack of questions," the money transfer to Father-2 should be in
cash. He then confirmed that the rationale for paying Father-2
was to ensure that Player-10 would sign with DAWKINS and
Company-1 when he entered the NBA. On the call, UC-1 agreed to
lend DAWKINS and CODE the initial $25,000 payment for Player-
10's family, and CODE confirmed that "reimbursement" to UC-1 by
Company-1 could happen in "a number of ways."

        b.    CODE also told SOOD and UC-1 that "you guys are
being introduced to . . . how stuff happens with kids and
getting into particular schools and so this is kind of one of
those instances where we needed to step up and help one of our
flagship schools in [University-6], you know, secure a five star
caliber kid. Obviously that helps, you know, our potential
business . . . and that's an [Company-1-sponsored] school."
Highlighting CODE's desire to disguise the fact that Company-1
funds ultimately would be used for the $100,000 payment to
Father-2, CODE further stated that by funneling the payments to
student-athletes through third-party companies, Company-1 was
"not engaging in a monetary relationship with an amateur
athlete, we're engaging in a monetary relationship with a
business manager, and whatever he decides to do with it, that's
between him and the family." CODE added that "we can't get
involved directly in those kinds of situations and scenarios."

### B. DAWKINS, SOOD and UC-1 Pay Father-2 An Initial $25,000

    32.    On or about July 11, 2017, UC-1 traveled from New
York, New York to the office of MUNISH SOOD, the defendant, in
Princeton, New Jersey. During the meeting, which UC-1 recorded,
UC-1 provided SOOD with $25,000 in cash intended for Father-2,
who, according to SOOD and CHRISTIAN DAWKINS, the defendant,
would be flying to the New York City area to receive it.

    33.    On or about July 13, 2017, CHRISTIAN DAWKINS, the
defendant, participated in a telephone call with a male who I
believe, based on my participation in the investigation and the
context of the call, was Father-2. During the call, which was

18

intercepted over the Dawkins Wiretap, Father-2 stated that he
was renting a car to travel to meet MUNISH SOOD, the defendant.
DAWKINS told Father-2 that SOOD had $19,500 for Father-2, and
that DAWKINS would take care of "everything else."

34.    On or about July 14, 2017, CHRISTIAN DAWKINS and
MUNISH SOOD, the defendants, participated in a telephone call
that was intercepted over the Dawkins Wiretap.  During the call,
DAWKINS and SOOD discussed the meeting with Father-2, and SOOD
confirmed that he had given Father-2 the cash, adding that SOOD
believed they had secured Player-10's commitment to attend
[University-6] and ultimately to retain DAWKINS and the new
sports management company he was forming with SOOD, among
others.  DAWKINS responded, "that kid could come over my house,
and have a key.  Like that's what I do."  DAWKINS further stated
that if Player-10 was "one and done," meaning that if Player-10
played one year of collegiate sports before entering the NBA
draft, "he may be top 20," but that if Player-10 played
collegiate basketball for two years, he "should be a top ten
pick."

## C. The Delay in Securing $100,000 From Company-1 to Pay
## Player-10's Family and GATTO's Concealment of the True
## Purpose of the Funds

35.    On or about July 24, 2017, CHRISTIAN DAWKINS and MERL
CODE, the defendants, spoke on a telephone call that was
intercepted over the Dawkins Wiretap.  During the call, DAWKINS
expressed concern with the delay by CODE and JAMES GATTO, a/k/a
"Jim," the defendant, in securing the $100,000 in funds from
Company-1 to pay Player-10 and his family, telling CODE that he
did not want anything "funky" to happen to the funding because
DAWKINS did not have $100,000 of his own money to pay Player-10.
CODE agreed, telling DAWKINS that he might have to "lean on" a
senior executive at Company-1 ("Senior Executive-1") "and some
of his side hustle off the book shit" in order to finance the
payments.  CODE and DAWKINS then discussed how GATTO and others
at Company-1 were accounting for the unlawful transfer of funds
to Player-10's family by booking it on Company-1's records as a
payment to an outside organization affiliated with CODE.  When
DAWKINS expressed surprise that GATTO was putting the payments
on Company-1's books at all, CODE confirmed that GATTO had
identified it "as a payment to my team, to my organization, so

19

- 194 -

it's on the books, [but] it's not on the books for what it's
actually for."[9]

### D. The July 27 Meeting: DAWKINS, AUGUSTINE, UC-1, CW-1 and a University-6 Coach Discuss Payments from Company-1 to Another High School Basketball Player

36.    On or about July 27, 2017, CHRISTIAN DAWKINS and
JONATHAN BRAD AUGUSTINE, the defendants, met in a hotel room in
Las Vegas, Nevada, with CW-1, UC-1 and an assistant coach from
University-6 ("Coach-1") (the "July 27 Meeting"). Prior to the
meeting, the FBI placed video recorders inside of the hotel
room; UC-1 also recorded the meeting. Based on my participation
in the investigation, including my review of the recordings of
the July 27 Meeting, as well as my debriefing of CW-1, I am
aware that at the July 27 Meeting, the following was discussed,
in sum and substance, and in part:

    a.    DAWKINS explained to the group that "the player
we're talking about tonight is [Player-11] with [University-6],"
and noted that DAWKINS had dealt with coaches at University-6 on
the recruitment of Player-10. DAWKINS then laid out the plan to
funnel money to the family of Player-11, a high school
basketball player who was expected to graduate in 2019, stating
that "the mom is like . . . we need our fucking money. So we got
to be able to fund the situation," adding "we're all working
together to get this kid to [University-6]. Obviously, in turn,

_____

[9] Based on my participation in this investigation, I am aware
that GATTO and CODE started making plans in mid-September 2017
to submit another false and fraudulent invoice to Company-1 for
the second $25,000 payment due to Father-2 in November 2017. In
particular, on or about September 13, 2017, GATTO and CODE spoke
on a telephone call that was intercepted pursuant to a
judicially authorized wiretap on a cellphone used by CODE (the
"Code Wiretap"). On the call, GATTO asked CODE, "When's the next
uhh payment we gotta make for uhh [Player-10]?" and CODE
responded that they had agreed to make four payments of $25,000
each, "so I would tell you probably November." GATTO then told
CODE that they should "get the invoice in now," adding that
"it's probably going to take a month, haha, in our system . . .
Let's just get that out of the way now." GATTO noted that they
would "figure out the other fifty in '18."

20

the kid will come back to us," referring to himself and the business he was forming with the help of MUNISH SOOD, the defendant, and UC-1.

  b. Noting that University-6 was already on probation with the NCAA, DAWKINS indicated that they would have to be particularly careful with how they passed money to Player-11 and his family. Coach-1 agreed, stating "we gotta be very low key." DAWKINS added, "The biggest thing is just making sure that every month Brad [AUGUSTINE] gets what he needs" in order to funnel the payments to Player-11 and his family. AUGUSTINE noted that Company-1, which sponsored his amateur team, would be supportive of their recruitment efforts, and confirmed that "all my kids will be [Company-1] kids." DAWKINS concluded that their plan to funnel money to Player-11 and/or his family in exchange for Player-11's commitment to attend University-6 and to sign with DAWKINS and Company-1 "works on every angle. We have Merl [CODE, the defendant] at [Company-1], we have Brad [AUGUSTINE] out with the kid, and we have [University-6]," nodding at Coach-1.

  c. DAWKINS, AUGUSTINE, and UC-1 then discussed the logistics of how to get their share of the funding from DAWKINS and UC-1 to AUGUSTINE each month without the payments being detected. AUGUSTINE suggested that the "easiest way" would be to send the money to AUGUSTINE's "non-profit for the grassroots team," although AUGUSTINE confirmed that he also would accept cash. UC-1 then handed AUGUSTINE an envelope containing $12,700 in cash, which DAWKINS explained "will take care of July, of August." UC-1 suggested to Coach-1 that the payment would "mak[e] [University-6] and your program happy in the sense that the kid is . . . going to [University-6], and after [University-6], he's gonna come back to us."

  d. At the meeting, AUGUSTINE stated that he expected Company-1 to fund at least a portion of the future payments to Player-11 and/or his family because, referring to a coach for the University-6 men's basketball team ("Coach-2"), "no one swings a bigger dick than [Coach-2]" at Company-1, adding that "all [Coach-2 has to do] is pick up the phone and call somebody, [and say] these are my guys, they're taking care of us." DAWKINS, UC-1, and Coach-1 then discussed ensuring that Player-11 ultimately signed with DAWKINS upon entering the NBA, and Coach-1 explained that "[Coach-2] is not a guy to have his own agent already set up" so that it would fall upon Coach-1 and

21

another assistant coach at University-6 to steer the athletes to
certain advisors. With respect to Player-11, AUGUSTINE noted
that "on my end, when I send my kids to college, before I send
them, I'm having that conversation," and "with [Player-11], this
is done."

        e.    Shortly thereafter, Coach-1 left the room, and
DAWKINS, AUGUSTINE, UC-1 and CW-1 proceeded to discuss the
Player-10 scheme described in paragraphs 27 to 35, *supra*, and,
in particular, the involvement of Coach-2 in securing funding
from Company-1 for Player-10's family. DAWKINS, who had been
negotiating directly with Player-10's family, noted that
Company-1 had originally agreed to pay a "certain number" to
Player-10's family, but that a rival athletic apparel company
was "coming with a higher number," such that DAWKINS needed to
"get more" from Company-1 to secure Player-10's commitment to
attend University-6. DAWKINS then said that he had spoken with
Coach-2 about getting additional money for Player-10's family
and informed Coach-2 that "I need you to call Jim Gatto, [the
defendant,] who's the head of everything" at Company-1's
basketball program.

    37.    Based on my review of call records, I am aware that on
or about May 27, 2017, JAMES GATTO, a/k/a "Jim," the defendant,
had two telephone conversations with a phone number used by
Coach-2. Based on the same, I am aware that on or about June 1,
2017, GATTO had a third telephone conversation with the same
phone number used by Coach-2. As noted above, two days later, on
or about June 3, 2017, Player-10 officially committed to
University-6 in return for the commitment by GATTO and Company-1
to pay $100,000 to his family.

### E. DAWKINS Explains to UC-2 the Different Schemes to Defraud Engaged in by the Defendants

    38.    In or around June 2017, UC-1, acting at the direction
of law enforcement, introduced another FBI undercover agent
("UC-2") as a business associate of UC-1 who, along with UC-1,
would be involved in providing the funding needed by CHRISTIAN
DAWKINS, the defendant, to set up a new sports management
company after DAWKINS was fired from SMC-1, as is described
above. On or about August 8, 2017, UC-1 called DAWKINS and,
during the call, which UC-1 recorded, UC-1 informed DAWKINS that
UC-1 would be traveling internationally for the next month but

22

- 197 -

that both CW-1 and UC-2 would be available to meet with coaches and/or players in UC-1's absence, and to continue to fund payments per their prior discussions.

39.    Accordingly, on or about August 16, 2017, CHRISTIAN DAWKINS, the defendant, spoke with UC-2 on a telephone call that was recorded by UC-2 to explain to UC-2 the status of the various schemes, including the scheme to make the payments to Player-10 and Player-11 and their families described above, as well as additional payments DAWKINS and UC-2 would need to make in the upcoming weeks.  In particular, based on my review of a recording of the August 16 call and my discussions with UC-2, I have learned that DAWKINS and UC-2 discussed the following, in substance and in part:

    a.    DAWKINS confirmed that he had facilitated the first $25,000 payment[10] to Player-10 and that MERL CODE, the defendant, had reimbursed DAWKINS on behalf of Company-1 through a payment to DAWKINS's "Loyd Inc. account."  DAWKINS also explained to UC-2 that they would need additional money for "two particular kids, one was [Player-10] who we're already involved with, we already got him done, so basically we just need to take care of his dad with two grand monthly" adding "I gotta just figure out how we get the two grand to him every month."  With respect to the second athlete, Player-11, DAWKINS told UC-2 that University-6 would need to get "five grand" to JONATHAN BRAD AUGUSTINE, the defendant, by August 25 so that AUGUSTINE could pass it on to Player-11's family.

    b.    DAWKINS further explained to UC-2 that AUGUSTINE was an important asset to the scheme because he runs a "big time AAU grassroots program" and has "two kids that have a chance to both be 'one and done' kids. . . . one's name is [Player-12], [Player-12] is like the number seven ranked player in the country, and one is named [Player-11], who is also top ten in the country. [Player-11] is the kid who [University-6] is basically wanting to get financed right now, via Brad.  So we're giving Brad five a month for [Player-11's] mom's bills and that

---

[10] As is described above, at DAWKINS's suggestion, CODE asked UC-1 to provide the funds for the initial $25,000 payment to Father-2, informing UC-1 that UC-1 later would be reimbursed for these funds.

23

kind of stuff." As noted above, AUGUSTINE is the Program
Director for an amateur AAU basketball team; I have confirmed
from publicly available information that Player-11 played for
AUGUSTINE's AAU team.

       c.    DAWKINS also proposed to UC-2 that they fund
AUGUSTINE's non-profit organization, which had the potential to
generate multiple top-level basketball players for DAWKINS's
company, adding that "everything that can be put into his
nonprofit is a write off, obviously, a tax deduction" so "it's
not just like a normal payment to player" and could "be of
benefit to everybody across the board."

       d.    DAWKINS told UC-2 that he was in the "process of
signing people to agreements," including the family members of
the student-athletes to whom they were funneling money, because
"I want us as protected as possible across the board," adding
that "obviously, we have to put funding out, and obviously some
of it can't be completely accounted for on paper because some of
it is, whatever you want to call it, illegal."

### F. Financial Records Show That Company-1 Funds Were Used to Reimburse DAWKINS for the $25,000 Payment to Father-2

    40.   I have reviewed banking records for an account
belonging to "Loyd, Inc.," a company that I believe is owned by
CHRISTIAN DAWKINS, the defendant (the "Loyd Account"). From
those records I have learned that, on or about August 1, 2017,
DAWKINS deposited a $25,000 check into the Loyd Account. The
memo line on the check read "consulting fees."

    41.   Based on my review of financial records for the
account associated with the $25,000 check, I have learned that:

       a.    The $25,000 check was issued from a bank account
held in the name of an individual ("Individual-1") and an AAU
basketball program ("AAU Program-1"). Based on my review of
publicly available sources, I have determined that AAU Program-1
is sponsored by Company-1.

       b.    On or about August 1, 2017, the bank account held
in the name of Individual-1 and AAU Program-1 received an
incoming transfer of $30,000 from an account associated with a

24

Company-1 entity based in North America.

### G. The Defendants Continue to Pay AUGUSTINE and Father-2 As Part of the Scheme

42.   Based on my participation in this investigation, including my discussions with UC-2, I am aware that, on or about August 23, 2017, UC-2 met with MUNISH SOOD, the defendant, in Manhattan, New York, in order to provide SOOD with a cash payment of $20,000. The meeting was recorded by UC-2. Prior to the meeting, CHRISTIAN DAWKINS, the defendant, and UC-2 had discussed, on a call that was recorded by UC-2, among other things, that $5,000 of this money would be provided by SOOD to JONATHAN BRAD AUGUSTINE, the defendant, and that $2,000 of this money would be provided by SOOD to Father-2 as part of the agreement to pay Player-10 and/or his family in order to ensure that Player-10 would retain DAWKINS's new company in the future.[11]

### V.   ALLEGATIONS INVOLVING UNIVERSITY-7

43.   As set forth in more detail herein, beginning in approximately July 2017, and continuing into at least September 2017, JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, and JONATHAN BRAD AUGUSTINE, the defendants, and others known and unknown, conspired to illicitly funnel approximately $150,000 from Company-1 to Player-12, another top high school basketball player expected to graduate in 2018, to assist one or more coaches at University-7 in securing Player-12's commitment to  play at University-7, and to further ensure that Player-12 ultimately signed with DAWKINS and with Company-1 upon entering a professional league. Moreover, because Company-1 could not make the payments to Player-12 or his family directly, GATTO, CODE, DAWKINS, and AUGUSTINE planned to conceal the payments by funneling them through CODE, DAWKINS and AUGUSTINE, as well as

_____

[11] As discussed on the call, DAWKINS relayed that the remainder of the $20,000 would be paid to other individuals not relevant to this Complaint.

25

**- 200 -**

an amateur basketball team controlled by AUGUSTINE.

### A. CODE and DAWKINS Discuss the Involvement of University-7 Coaches in Funneling Payments to Player-12

44.  On or about August 9, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, discussed — on a telephone call intercepted over the Dawkins Wiretap — paying Player-12 and/or his family at the request of at least one coach at University-7 ("Coach-3"). During the call, DAWKINS and CODE discussed the involvement of Coach-3 in ensuring that Company-1 would funnel payments to Player-12 in order to secure Player-12's commitment to play at University-7. In particular, on the call, DAWKINS told CODE that, according to JONATHAN BRAD AUGUSTINE, the defendant, "[Coach-3] knows everything," and that they could "start the process" to funnel the payments to Player-12 in order to ensure that Player-12 would commit to attend University-7 upon his graduation in 2018. With respect to the need to funnel money to Player-12, DAWKINS further informed CODE that Coach-3 "knows something gotta happen for it to get done," and CODE replied that he had just left a message for JAMES GATTO, a/k/a "Jim," the defendant, regarding the payment.

### B. The Defendants Discuss a $150,000 Payment to Player-12 to Ensure That Player-12 Would Choose University-7 Over a Rival University

45.  On or about August 11, 2017, JAMES GATTO, a/k/a "Jim," and MERL CODE, the defendants, spoke twice on telephone calls that were intercepted pursuant to the Code Wiretap. During those calls, GATTO and CODE discussed, among other things, Coach-3's request to GATTO that Company-1 make a $150,000 payment to Player-12 in order to prevent Player-12 from committing to attend another NCAA Division I university sponsored by a rival athletic apparel company that allegedly had offered Player-12 a substantial sum of money. In particular, I have learned that:

   a.   On their initial call that day, CODE and GATTO discussed funneling payments from Company-1 to Player-12 in order to influence Player-12's decision to attend University-7, a school sponsored by Company-1. In particular, on the call, CODE informed GATTO that they had "another [University-6] situation" — referring to the scheme described above in

26

paragraphs 27 to 35 involving Player-10 and University-6 —
adding, "except it's with [University-7] this time." When GATTO
inquired whether University-7 was "hot," CODE explained that
"[University-7] wants this kid named [Player-12]." GATTO
confirmed that he knew already about University-7's request for
Player-12, and told CODE that he had spoken to Coach-3,[12] who had
"just asked about the kid and then he said supposedly the kid
was having a meeting with" Senior Executive-1 at a Company-1
sponsored program geared toward high school amateur athletes
that occurred between on or about August 3 and August 7, 2017.

        b.    On a second call later the same day, CODE
discussed with GATTO, in sum and substance, and in part, the
involvement of CHRISTIAN DAWKINS and JONATHAN BRAD AUGUSTINE,
the defendants, in the scheme to facilitate payments to Player-
12 in order to secure Player-12's commitment to attend
University-7. CODE explained that another Division I university
("University-4") was offering Player-12 $150,000 "and we're
trying to keep him from going to one of their schools."[13] CODE
further told GATTO that DAWKINS and AUGUSTINE had asked CODE
whether GATTO "would be able to keep him at [University-7]
because they really want the kid." GATTO confirmed that Player-
12 would be a rising senior in high school, and CODE assured
GATTO that the payments need not be "all in one lump sum. I can,
I can make it work . . .," further noting that this situation
was "not one of those where I need an answer today. You know
what I am saying? I just wanted to put it on your plate."

        c.    On the same call, GATTO inquired whether Company-
1 would "have to match the [University-4] deal?," and asked if
the payments could be pushed to 2018 noting "if I have to pay it
out in '18, that's fine" but adding "I just don't know if I, I
just don't know if I can do anything in '17 that's what I'm

_____

[12] Based on my review of call records for a cellphone used by
GATTO, I am aware that, on or about August 6, 2017 (a few days
before the call between CODE and GATTO discussed in this
paragraph), GATTO had two telephone calls with a cellphone
number believed to be used by Coach-3.

[13] Based on publicly available information, I am aware that the
University-4 athletic program, including its men's basketball
team, is sponsored by a rival athletic apparel company.

27

saying." Referring to the scheme involving Player-10 detailed above, GATTO further told CODE that he should "try to get it to, what did we do with [Player-10], a 100," which I believe is a reference to the $100,000 payment to Player-10. CODE replied that he was not sure "they'll take that much less but if I can take it down at least twenty five," to which GATTO responded, "Alright, well let's just see."

46.    I have reviewed a telephone call on or about August 12, 2017 between MERL CODE and CHRISTIAN DAWKINS, the defendants, that was intercepted pursuant to both the Dawkins Wiretap and the Code Wiretap. On the call, CODE relayed the substance of CODE's discussion with JAMES GATTO, a/k/a "Jim," the defendant, regarding payments by Company-1 to Player-12, including GATTO's request that CODE negotiate the $150,000 asking price set by Player-12. According to CODE, however, if "[University-4]'s willing to" pay the full $150,000, "then that's where the kid is going to go." Referring to GATTO's statement that he did not have sufficient funds to pay Player-12 in 2017, CODE stated that if Company-1 waited until January 2018 to commit to a payment amount, "by that point that number might be 200," *i.e.*, $200,000, adding that Company-1 "won't play if it's . . . at that level, we won't play." DAWKINS asked what would be the highest payment that GATTO and Company-1 would agree to, and CODE replied, "I think they do 150 if, if [Coach-3] stayed on it."

47.    On or about August 19, 2017, MERL CODE and JONATHAN BRAD AUGUSTINE, the defendants, spoke on a telephone call that was intercepted pursuant to the Code Wiretap. During the call, CODE informed AUGUSTINE that he would do what was necessary "to make sure that we secure[] the kid" but that "budget-wise, everything was kind of strapped for '17. . . So '18 puts us in a better place to have that conversation."

28

        WHEREFORE, deponent respectfully requests that warrants be
issued for the arrests of JAMES GATTO, a/k/a "Jim," MERL CODE,
CHRISTIAN DAWKINS, JONATHAN BRAD AUGUSTINE, and MUNISH SOOD, the
defendants, and that they be imprisoned or bailed, as the case
may be.


                            JOHN VOURDERIS
                            Special Agent
                            Federal Bureau of Investigation


Sworn to before me this
25th day of September, 2017


THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK


                              29

**ORIGINAL**

    **Endorsement, Sponsorship and Supplier Agreement -- AAU**    

**THIS ENDORSEMENT, SPONSORSHIP AND SUPPLIER AGREEMENT,** the adidas Standard Terms and Conditions and all Schedules hereto (collectively, the "Agreement") is made and entered into as of **February 15, 2015** (the "Effective Date") by and between adidas America, Inc., an Oregon corporation ("adidas") and **New England Playaz Basketball Club**, its coaches, staff and players and any current, new or additional basketball teams organized and/or sponsored by such team and their respective coaches, staff and players, by and through its Director **Thomas Gassnola** ("Consultant") (collectively, "Team"). Team organizes and operates an AAU basketball team in the State of **Massachusetts.** adidas desires to support Team and to have Team to, among other things, endorse adidas brand products and the adidas brand, and Team agrees to perform such obligations and grant such rights subject to the terms and conditions set out below. In consideration of the mutual promises, covenants and agreements expressed herein and for other good and valuable consideration, the receipt and adequacy of which the parties acknowledge, adidas and Team have agreed as follows:

I.    **Term**. This Agreement shall remain in full force and effect from the Effective Date through **December 31, 2016** (the "Term"), unless sooner terminated in accordance with the terms and conditions hereof. adidas may extend the term of this Agreement by **one (1)** (one-year) Contract Years (i.e. adidas may extend the Term through **December 31, 2017**) at its sole discretion. adidas shall give notice of its intent to exercise this option at least thirty (30) days prior to the natural termination of this Agreement.

II.    **Team Merchandise Allotment**. Each Contract Year and at no cost to Team, adidas shall provide **Sixty Thousand Dollars ($60,000)** worth of adidas Products (at retail value) for use by Team. adidas shall have sole discretion with respect to the styles and designs of adidas Products provided to Team. The delivery of the adidas Products required by this Section shall occur in accordance with adidas' customary seasonal product delivery cycles. During the Term, Team shall have the right to purchase other adidas basketball Products, at wholesale prices. All sales shall be subject to adidas' standard terms and conditions of sale and all adidas Products provided or purchased hereunder shall not be for resale.

III.    **Exclusivity & Loyalty**. Subject to the terms and conditions of this Agreement, Team agrees to exclusively wear, use and promote adidas

1

**GOVERNMENT EXHIBIT 1053**
S2 17 Cr. 686 (LAK)

FOIA Confidential Treatment Requested                ADID000000784

<u>adidas Standard Terms & Conditions</u>

1.    **Definitions.**  As used herein, the terms set forth below shall be defined as follows:

1.1 "adidas Products" means any Products bearing any adidas Trademarks.

1.2 "adidas Trademarks" means any name, logo, symbol, trademark or service mark, or brand owned, licensed or controlled by adidas (at any time), including but not limited to the adidas name, Trefoil, 3-Stripes mark, Sport Heritage logo, Sport Performance logo, Sport Style Logo and Sport Point.

1.3 "Advertising Appearance" means any appearance by Consultant to develop, create or produce marketing or advertising materials including, but not limited to, photo or production sessions related to posters, hang-tags, catalogs, brochures or in-store displays; and photo or production sessions related to television, radio, print, Internet, video, outdoor, billboard and wallboard advertisements, promotions or content.

1.4 "Affiliate" means adidas AG and any other company or entity owned or controlled by, controlling or under common control with, adidas AG or adidas.

1.5 "Team Endorsement" means the name of the Team and the name, nickname, initial, number, autograph, voice, facsimile signature, photograph, likeness, character image or facsimile image, Internet, video and film portrayals of Consultant, and any other means of endorsement which are used in the sports marketing industry.

1.6 "Celebration Apparel" means any Product that is worn while commemorating or recognizing Team's or Team's team's victory or achievement, including but not limited apparel Products that are worn in celebration or recognition ceremonies.

1.7 "Competitor" means any person, entity or organization other than adidas that develops, manufactures, distributes, markets, licenses or sells: (i) Products; or (ii) services that compete with adidas.

1.8 "Events" means those basketball competitions, programs, activities or events organized, sponsored, controlled or otherwise affiliated with the Team.

1.9 "Territory" means the universe.

1.10 "Contract Year" means each consecutive twelve (12) month period during the Term beginning on **January 1** and ending on **December 31**, except that the initial Contract Year shall begin on the Effective Date and end on December 31, 2015.

1.11 "Personal Appearance" means any appearance by Consultant other than an Advertising Appearance, but specifically excludes Team's competing in any adidas sponsored tournament or game, (e.g., attendance at in-store appearances, autograph sessions, clinics, celebrity events, other public appearances, adidas shareholder meetings, or meetings with representatives of adidas' major accounts).

1.12 "Products" mean all athletic, athleisure and casual footwear, apparel, accessories and equipment, including but not limited to bags, headbands, wristbands, water

5

bottles, headwear, socks, fragrances, toiletries, eyewear, sunglasses, watches and underwear.

1.13 "Flagship Programs" means four basketball teams that are designated by adidas each Contract Year. For the 2015 Contract Year, such teams are: Team Loaded –NC, Atlanta Celtics, Compton Magic, and Indiana Elite.

## 2. Obligations of Team.

2.1 Team Use of adidas Products.  At all times during the Term, Team shall exclusively wear, use and promote adidas Products throughout the Contract Territory whenever Team wears, uses or promotes Products, including but not limited to whenever Team: (i) is playing or coaching basketball (including but not limited to practices, games and exhibitions); (ii) is being filmed by promotional videotape or posing for photographs or otherwise engaged in promotional or other activities; (iii) attends or participates in any basketball event or training session whether as a player, spectator, television commentator or in any other capacity; (iv) appears in or is featured in any pre-arranged sporting, lifestyle or general interest articles or features in newspapers, magazines, Internet or other publications; (v) participates in any public appearance or interview, including but not limited to television and other press appearances in relation to both sporting and non-sporting events; or (vi) engages in sports or sports product promotional activities.

2.2 Team acknowledges that Team's obligation to exclusively wear adidas Products, as identified by adidas, shall be a material term of this Agreement.

2.3 Team shall not (nor allow any third party to) deface, cover, remove, black out or otherwise alter any physical adidas Product or part thereof, or any adidas Product or part thereof appearing in photographs, video or digital content. Team shall at all times keep the adidas Products supplied to Team in clean and good condition. Team shall take special care to

ensure the prominent visibility of the adidas Trademarks, particularly during promotional appearances and in the circumstances referred to in this Agreement.  Except as otherwise permitted by this Agreement, Team shall not wear, use or promote any Products with any name, symbol, logo, mark, patch or other identifier (other than the adidas Trademarks) on such Products.  Team shall not alter any non-adidas Products to resemble adidas Products.

2.4 Team shall give adidas reasonable notice of any material quality problems encountered with respect to any adidas Products supplied for Team's use, and Team shall cooperate and assist adidas in its efforts to correct any such problem.  Team shall from time to time, and upon adidas' request, provide adidas with information regarding Team's experience of using adidas Products and shall assist adidas in the design, research, development and user-testing of adidas products.

2.5 Consultant shall: (i) act diligently and faithfully as a promoter of adidas Products; (ii) recommend adidas Products whenever Consultant has the opportunity to do so; and (iii) refrain from doing anything which may harm the sale of adidas Products or adidas' reputation.

2.6 Team acknowledges and agrees that during the Term adidas will be Team's primary sponsor.  As such, to the extent Team enters into endorsement relationships with other companies, adidas will remain Team's top priority to the extent there are creative, schedule or other conflicts between Team's various sponsors.  When appearing in other sponsor's marketing activities (ads, events, etc.), Team will use best efforts to wear adidas Products.

2.7 Team shall not wear, promote, use or otherwise endorse any Product of a Competitor or any other goods or services of a Competitor.

6

ADID000000786

2.8 If Team creates or is directly or indirectly involved in the creation of an Internet website relating to Team, then Team: (i) shall provide a prominent link from such site to www.adidas.com; and (ii) if Team appears in/uses Products in any content on Team's website, then such Products shall exclusively be adidas Products.

3.    **Appearances.**

3.1 Consultant agrees to make the number of Personal Appearances and Advertising Appearances set forth in Section V of this Agreement. The parties agree that adidas will not pay Consultant additional compensation for any appearance made by Consultant pursuant to this Agreement.

3.2 Consultant shall coordinate with adidas all appearances requested hereunder. Consultant shall, upon request, give adidas written notice of Team's schedule for purposes of coordinating the scheduling of appearances and, without request, any changes thereto.

3.3 If Consultant arrives more than one (1) hour after the agreed upon arrival time for any appearance, then adidas may reduce the next Travel Allotment payment(s) payable to Team by an amount equal to any costs that adidas incurs as a result of such delay (unless the delay was caused by circumstances solely out of Consultant's control) or require immediate reimbursement of such amount from Team. In addition to the foregoing, if Consultant fails to make any confirmed appearance (and adidas reasonably determines that such failure to appear was unjustified (e.g., death of a family member is an example of a justified reason and missing a flight, over-sleeping or another commitment took priority are examples of unjustified reasons), then adidas may deduct twenty-five percent (25%) of the annual Travel Allotment due to Team from the next Travel Allotment payment(s) payable to Team or require immediate reimbursement of such amount from Team.

3.4 adidas shall pay all reasonable out-of-pocket expenses incurred by Team in connection with any Personal Appearances or Advertising Appearances, including but not limited to airfare, meals and lodging. Notwithstanding the foregoing, adidas shall not pay any expenses for any such appearance that is at a location coincident with Team's competition, practice, training or other promotional appearance related travel schedule.

4.    **Grant and Use of the Team Endorsement.**

4.1 Team grants to adidas: (i) the exclusive royalty-free right and license during the Term and throughout the Territory to the unlimited use (in any media now known or hereafter created) of the Team Endorsement (x) in and in connection with or relation to the development, manufacturing, marketing, advertisement, licensing, sale, distribution and promotion of Products and any adidas brands, and (y) to develop, manufacture, market, advertise, distribute, license, sell, promote and commercially exploit Products that include the Team Endorsement; and (ii) the non-exclusive right and license during the term and throughout the Territory to the unlimited use (in any media now known or hereafter created) of the Team Endorsement in and in connection with or in relation to posters, promotional products and other products designated by adidas.

4.2 All advertising and promotional materials produced under this Agreement shall be the sole property of adidas and shall be works made for hire and Team hereby assigns, all rights, title and interest in and to such materials to adidas. Team shall have no right, title or interest of any kind in or to such materials, nor shall Team be entitled to the payment of any amounts with respect thereto. Team waives any moral rights with respect to any advertising or promotional materials to the extent permitted by law. Team agrees that adidas shall be entitled to the unrestricted use

7

(without compensation) of any idea of Team in connection with this Agreement, including but not limited to advertising and/or development of Products Team agrees to indemnify adidas and its Affiliates against any losses, claims, costs or damages (including attorneys' fees) suffered by such party resulting from the use of the Team Endorsement.

4.3 Team agrees not to use, license or authorize any third party to use the adidas Trademarks, or to use the adidas Trademarks without prior written approval from adidas. Team further agrees that: (i) adidas may (at its own cost) file and maintain trademark applications/registrations for Products that include the Team Endorsement; (ii) adidas shall have the right (in its sole discretion, at its own cost and either in its own name or in the name of Team) to bring actions against third parties for infringement of such trademarks and to oppose conflicting trademark applications; and (iii) with respect to (i) and (ii), Team will sign such documents and provide information and assistance as adidas may request from time to time.

5.    **Representations, Warranties and Covenants**.   Team represents, warrants and covenants that:  (i) no rights or licenses with respect to Team Endorsement will be granted to any person or entity other than adidas during the Term in connection with the development, manufacturing, marketing, advertisement, promotion, licensing or sale of Products; (ii) Team is free to enter into this Agreement and to perform Team's obligations contemplated under this Agreement; (iii) Team is the sole owner of the promotional, endorsement and licensing rights granted to adidas under this Agreement and that Team has not granted (and will not grant) any right, license or privilege (or any option relating thereto) during the Term to any Competitor; (iv) Team has not entered (and will not enter) into any other agreement or understanding that will prevent or substantially impair the performance of Team's obligations

under this Agreement; (v) Team does not know of any existing health problem or medical condition which materially affects (or will materially affect) Team's ability to compete and train in first-class physical condition and will notify adidas if Team becomes aware of any such health problem or medical condition which subsequently arises during the Term; (vi) Team does not now, did not one (1) year prior to the Term, and shall not during the Term, use or possess any drugs or other substances, the use or possession of which is prohibited by applicable law, statute, regulation, or rule of any government, sports federation, or national or international sports organization with jurisdiction over Team or to which Team may directly or indirectly be subject to or belong, including but not limited to the AAU; (vii) Team shall not at any time during or after the Term of this Agreement disparage in any manner adidas, its Affiliates or their respective Products; (viii) Team shall cooperate (in good faith) with adidas in performing Team's obligations under this Agreement; (ix) it shall participate in national tournaments, including those designated by adidas; (x) without prior written approval, Team shall not provide any adidas Products (or other benefits provided hereunder) to any teams/programs not approved by adidas (e.g., high schools/grass roots programs, middle school programs or girls programs); (xi) it is not (and shall not be) in possession of a firearm in violation of any law; and (xii) without prior written approval, Team shall not host or sponsor any tournament, league or event.

6.    **Right of First Dealing and Matching Rights**.

6.1 Beginning sixty (60) days before the end of the Term until the expiration of this Agreement ("First Dealing Period"), Team shall periodically meet with adidas to negotiate in good faith the renewal of this Agreement. The parties shall not be obligated to enter into a new agreement if they cannot settle on mutually satisfactory terms during the First Dealing Period. During the Term, Team shall not (nor

8

FOIA Confidential Treatment Requested

- 209 -

ADID000000788

shall Team permit any third party to] enter into any agreement or engage in discussions or negotiations with any third party regarding Team's wearing, sponsoring, promoting, receiving, advertising or endorsing, or providing consulting or similar services with respect to, any Products ("Endorsement Rights").

6.2 Following the termination or expiration of this Agreement, Team will not enter into any agreement or understanding with any third party regarding Endorsement Rights without first giving adidas the opportunity to enter into an agreement with Team for such Endorsement Rights on the terms and conditions proposed by such third party that are material, measurable and matchable terms and conditions ("Third Party Terms"). Team shall provide adidas in writing (on third party letterhead, unaltered and unredacted) with the Third Party Terms Team receives. adidas shall have thirty (30) days from its receipt of such Third Party Terms to match or better such Third Party Terms. If adidas matches or betters such Third Party Terms, then Team will enter into a new agreement with adidas on such Thirty Party Terms, the better terms and other standard adidas terms and conditions. If adidas fails to match or better such Third Party Terms, then Team shall enter into an agreement with such third party on the Third Party Terms that adidas failed to match or better.

6.3 During the period that is from the termination or expiration of this Agreement until adidas matches or fails to match or better the Third Party Terms (the "Market Period"), Team shall comply with the obligations in Section 2.1. If adidas matches such Third Party Terms and Team is not in breach of Section 2.1, then for the term of the Market Period that is not included in the new agreement between Team and adidas (the "Compensation Period"), adidas shall pay Team based on the following formula: the annual Travel Allotment for the Contract Year in which the termination or expiration occurred shall be divided by three hundred sixty-five (365)

and the quotient thereof shall be multiplied by the number of days in the Compensation Period.

## 7. Right of Reduction/Proration of Travel Allotment/Team Merchandise Allotment.

7.1 If adidas believes that Team has breached this Agreement, then adidas may (in its discretion) immediately suspend all currently due and future payments hereunder effective upon written notice to Team of adidas' suspension of such amounts. Team acknowledges that adidas' suspension of payments hereunder does not relieve Team of any obligations hereunder.

7.2 If during any Contract Year, any third party enacts or enforces (or threatens to enforce) any rule, regulation, law or other restriction that directly or indirectly prevents adidas from exercising any material rights or Team from performing any material obligations under this Agreement, then adidas shall have the right to withhold the payment of any performance bonuses and reduce Team's annual Travel Allotment by fifty (50%) percent.

7.3 If during any Contract Year, Team fails (for any reason) to wear, use or exclusively promote the appropriate adidas Products (e.g, footwear, socks, and arm sleeves) as provided herein, then adidas shall have the right to withhold the payment of any performance bonuses and reduce Team's annual Merchandise Allotment by up to two thousand five hundred dollars ($2,500) per occurrence.

7.4 If adidas exercises any of the reduction or withholding rights in Sections 7.2 or 7.3, then Team forfeits such prorated amount and adidas shall have the right to withhold payment of any prorated amount from any future payments due to Team or Team shall pay adidas immediately upon adidas' request for such prorated amount.

9

## 8.    Termination.

8.1 adidas may terminate this Agreement at any time upon written notice to Team if Team (or as applicable Consultant): (i) is in material breach of this Agreement (including but not limited to any provision of Section 5); (ii) ceases to exist or compete; (iii) is convicted of, or pleads guilty or nolo contendere to, a felony; (iv) is convicted of, or pleads guilty or nolo contendere to, a misdemeanor, felony or charge involving moral turpitude or the purchase, sale, possession, or use of an illegal substance or prohibited substance; (v) is suspended or takes a leave of absence from Team because of alcohol or drug use or psychological/physiological problems; (vi) enters an alcohol, drug or psychological/physiological treatment program; (vii) attracts publicity which in the judgment of adidas has an adverse effect upon the status or reputation of Team, the value of Team to adidas, or adidas; (viii) for an aggregate or consecutive period of six (6) months or more during the Term, does not train and/or compete at a first class level acceptable to adidas or is otherwise inactive for any reason (including illness or injury); (ix) is determined by any government, sports federation, or national or international sports organization having jurisdiction over Team or to which Team may directly or indirectly be subject to or belong, including but not limited to AAU, to have used or possessed drugs or other substances in violation of the laws, statutes, regulations, or rules of such organization; (x) fails to abide by the laws, statutes, regulations, or rules of any government, sports federation, or national or international sports organization having jurisdiction over Team or to which Team may directly or indirectly be subject to or belong, including but not limited to AAU; (xi) is in possession of a firearm in violation of any law (xii) dies; (xiii) Consultant ceases for any reason to be coach of the Team; or (xiv) is provided 90 days' notice of adidas' intent to terminate this Agreement.

8.2 Team shall have the right to terminate this Agreement if: (i) adidas is adjudicated as insolvent, or declares bankruptcy; or (ii) adidas fails to make payment to Team of any sums due pursuant to this Agreement within sixty (60) days following the receipt by adidas of written notice from Team that such payment is past due. Team acknowledges that adidas has sixty (60) days to pay all invoices and that Team is required to send adidas a second notice (after the sixty (60) day period) stating that such payment is past due.

8.3 In addition to any rights and remedies adidas may have under this Agreement, at law or in equity, for each single case of a material breach of this Agreement, adidas shall be entitled to reduce Team's annual Travel Allotment up to 50% of the annual Travel Allotment payable at the time of the breach. Such amount may, at adidas' sole discretion, be deducted from any future payments due to Team or Team shall pay adidas immediately upon adidas' request for such amount.

## 9.    Rights Upon Termination.
Upon termination of this Agreement for any reason, adidas shall pay Team the balance, if any, of Travel Allotment for the then current Contract Year earned as of the effective date of termination based on the following formula: The total annual Travel Allotment for the Contract Year in which termination occurs shall be divided by three hundred sixty five (365), and the quotient thereof shall be multiplied by the number of days in that Contract Year which preceded the effective date of termination. Any payment of Travel Allotment for the Contract Year during which termination occurs shall be applied against adidas' obligation to pay Team the foregoing amount. If such calculation results in a negative number, then Team shall within fifteen (15) days following such termination remit such amounts to adidas. Notwithstanding the foregoing, if adidas suspends any payment(s) to Team pursuant to Section 7.1 and subsequently terminates this

10

Agreement or it expires prior to adidas' payment of any suspended payments, then adidas shall pay Team as follows: (i) with respect to any suspended payments of Travel Allotment for the Contract Year in which the suspension notice was given, adidas shall pay Team the amount that equals the annual Travel Allotment for such Contract Year divided by three hundred sixty-five (365) and then multiplying the quotient thereof by the number of days in such Contract Year that preceded the effective date of the suspension notice; (ii) with respect to any payments of Travel Allotment for the Contract Year(s) following the Contract Year in which the suspension notice was given, no amount; and (iii) provided that any payment of Travel Allotment for the Contract Year in which the suspension notice was given shall be applied against adidas' obligation to pay Team hereunder. For example: if, under an agreement that runs annually until December 31, 2011, Team's last Travel Allotment payment was made June 30, 2010, adidas' suspension notice was effective on July 15, 2010, and adidas terminates the agreement on July 27, 2010, then Team would receive Travel Allotment due for the period of July 1, 2010 through July 14, 2010, but Team would not receive any Travel Allotment due for the period from July 15, 2010 through July termination.

10.    **Rights Upon Expiration/Termination.** Upon expiration or termination of this Agreement, Team acknowledges that adidas shall: (i) in perpetuity, have the right to internal and external non-commercial use for reference, historic/informative, public display and inclusion in the adidas museum any Products, advertising or promotional materials which, include the Team Endorsement; (ii) for a period of six (6) months following the effective date of expiration or termination, have the right to continue to sell Products bearing the Team Endorsement; and (iii) for a period of sixty (60) days following the effective date of expiration or termination, have the right to use advertising and promotional materials bearing the Team Endorsement which were printed or ordered prior to the effective

date of expiration or termination.

11.    **Limitation of Liability.** Team, on behalf of Team, Team's heirs, successors and assigns, hereby releases adidas and its Affiliates and their respective employees, owners, agents, officers, directors and their successors in interest from all liability for injury, death, and property loss and damage that results from Team's participation in athletics and other recreational and competitive athletic activities, which relate to the use of any adidas Products or any activities related to Team's performance under this Agreement. ADIDAS SHALL NOT UNDER ANY CIRCUMSTANCES BE LIABLE TO TEAM, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT; NOR ANY LOSS OF BUSINESS OR LOSS OF PROFITS. Team voluntarily agrees to expressly assume all risks of injury and death that may result from participation in athletics and other recreational and competitive athletic activities, which relate in any way to the use of any adidas Product provided under this Agreement, or from any activities related in any way to performance under this Agreement

12.    **Confidentiality.** All terms of this Agreement are confidential and neither party shall disclose any term hereof without the prior written consent of the other party, unless disclosure is required by law. Team further agrees that Team may receive confidential information owned by, or proprietary to, adidas, including but not limited to information relating to adidas, adidas Products (including prototype products) and its marketing plans and strategies and Team shall not disclose such confidential information to any third party. Notwithstanding the foregoing: (i) either party may disclose the terms hereof to such party's professional, financial and similar advisors provided such other persons or firms agree not to disclose such information to any third party; and (ii) adidas shall have the right to disclose the terms of this Agreement to any of its Affiliates,

11

partners, distributors, manufacturers or licensees.

**13. Dispute Resolution/Injunctive Relief.** Excluding equitable relief as provided below, the parties agree that any dispute arising out of or related to this Agreement shall be submitted to a mutually agreed upon mediator for non-binding confidential mediation in Portland, Oregon. If the dispute cannot be resolved through mediation, it shall be submitted to final, binding and confidential arbitration before the Arbitration Service of Portland in Portland, Oregon. Team further acknowledges that the Team Endorsement and the services provided hereunder are special and unique, that the breach of this Agreement will cause irreparable harm to adidas and that adidas shall be entitled to injunctive relief to prevent Team from breaching or continuing to breach this Agreement. The parties agree that the procedures outlined in this Section are the exclusive methods of dispute resolution.

**14. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon. The parties hereby agree and consent to the exclusive jurisdiction and venue of any state or federal court located in Multnomah County, Oregon.

**15. Assignment/3rd Parties.** Neither party may assign this Agreement without the express written approval of the other party; provided that adidas may assign or sub-license this Agreement and its rights and obligations to Affiliates, and adidas or Affiliate partners, manufacturers, licensees and distributors, without the consent of Team. Team may not delegate the obligations of this Agreement. Except as expressly provided herein, nothing contained herein shall grant any third party, any rights or remedies under this Agreement.

**16. Infringement.** If adidas learns of any unauthorized use of the Team Endorsement or any use of any material that is (or may) infringe the publicity rights of Team, then Team grants adidas the right to take any action adidas deems

necessary (at its sole expense and by attorneys of adidas' choice), including suing for infringement and joining Team as a party. Team agrees to cooperate and assist adidas in any such action and that the monetary proceeds from any such action (including a settlement) will belong first to adidas to cover its expenses (including attorneys' fees), with the balance (if any) split equally between adidas and Team.

**17. Notices.** All notices or other communications provided for herein shall be given in writing by overnight delivery (e.g., Fed Ex or UPS) and shall be deemed given upon receipt, or refusal of receipt by Team. Notice shall be made to Team at the address above and to adidas at adidas America, Inc., 5055 N. Greeley Avenue, Portland, Oregon 97217, attn: General Counsel. A party may change its address by giving notice thereof to the other party.

**18. Entire Agreement.** This Agreement constitutes the entire understanding between the parties and cannot be amended or modified except by an agreement in writing signed by adidas and Team. All previous understandings or agreements between Team and adidas relating to the subject matter hereof shall have no further force and effect.

**19. Severability.** Every provision of this Agreement is severable. If any term hereof is held to be illegal or unenforceable for any reason, the other terms of this Agreement shall not be affected. Notwithstanding the foregoing, the parties shall negotiate (in good faith) and mutually agree upon the terms of a legal and enforceable provision to replace such term.

**20. Relationship of the Parties.** Team's performance of services for adidas hereunder is in Team's capacity as an independent contractor and nothing contained in this Agreement shall be construed to establish an employer/employee, partnership or joint venture relationship between Team and adidas. Team shall be solely responsible for the payment of all taxes on any compensation or products received

12

under this Agreement.

21.    **Waiver.**  The failure of either party to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or otherwise limit such party's right to subsequently enforce such provision.

22.    **Section Captions.**  Section and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent, intent or meaning of this Agreement or any provision hereof.

* * * END OF STANDARD TERMS AND CONDITIONS* * *

13

FOIA Confidential Treatment Requested

ADID000000793

<u>Schedule 1</u>

1.1.    Team grants to adidas the exclusive right and license during the Contract Term to serve as the exclusive "Official Sponsor" of the Team.

1.2.    Team hereby grants to adidas the right to use the slogans "Official Sponsor," "Official Outfitter" and "Official Footwear and Apparel Supplier" of Team and/or any of the Teams and/or any similar slogans (each a "Slogan") that adidas deems appropriate for use in the development, promotion, marketing and sale advertising of adidas Products during the Term.

1.3.    adidas shall be identified as the "Official Sponsor," or "Official Outfitter" or "Official Footwear and Apparel Supplier" within the Product Category in all brochures, flyers, programs and other promotional materials of any kind or description in any way produced by or associated with Team, any Events or the Teams through the use of Slogans.

1.4.    Consultant agrees that Team will participate in adidas' camps and tournaments upon request (e.g., Team must participate in UPRISING Summer Championships, at least two Gauntlet events and adidas UPRISING Gauntlet Finale, UPRISING All- American Camp if invited).Team is responsible for travel for all participants in non-adidas Nations events including camps and tournaments. In addition, Consultant will provide regional support for adidas events and adidas Nations (e.g., scouting).

1.5.    adidas shall have the right to place stadium–sized banners or other appropriate signage at all Events. adidas shall supply such banners or other signage and Team shall use its best efforts to place them in highly visible locations.

1.6.    At no cost to adidas, Team shall place an adidas trademark or logo (with the particular trademark or logo to be identified in each case by adidas) and/or Slogan on all printed materials used in connection with all Events and Team events, including all posters, programs, newspaper ads, direct mail flyers, and all other collateral materials that are produced by Team during the Term.  All existing stocks of all such printed materials referred to above in this same paragraph are exempt from this requirement. To the extent that Team advertises in magazines, Team shall also include an adidas trademark or logo (to be selected by adidas). The use and placement of such Slogan, trademark or logo shall be subject to adidas' prior approval, which Team shall seek from adidas before the use thereof. If adidas does not reject a proposed use within ten (10) days of being presented with such proposal, its consent to such use shall be deemed to have been given.

1.7.    During the Term, Team will use its best efforts to provide adidas with tickets to all Events or Team events at no cost. Team shall also use reasonable efforts to obtain parking passes and hospitality passes to the extent passes are necessary.

PDX 1188798v1 51391-112                                    1

FOIA Confidential Treatment Requested                                    ADID000000794

- 215 -

Products.  Consultant further agrees that Consultant owes adidas a fiduciary duty of loyalty, will work solely on behalf of adidas and its best interests, will not directly or indirectly aid, advise, assist, support or benefit any Competitor (including but not limited to wearing, sponsoring, promoting, receiving, advertising or endorsing any Competitor Products, providing consulting or other services to any Competitor, or directly or indirectly receiving any compensation from any Competitor) and will not engage in any act or omission that directly or indirectly conflicts with, weakens, undermines, circumvents or is otherwise inconsistent with the foregoing.  Team further agrees that if any adidas appearance or event (e.g., adidas basketball camp or tournament) conflict's with a Competitor event, Team will ensure that the Team (including but not limited to its top players) exclusively participates in the adidas appearance or event.

IV.     **Appearances**. Upon request by adidas and subject to the terms and conditions of this Agreement, Consultant shall be available in the Territory for a total of two (2) Personal Appearances and the number of Advertising Appearances necessary to satisfy adidas' advertising needs, either individually or as a part of a group, not to exceed eight (8) hours in duration per appearance (exclusive of travel time).

V.     **Sponsorship Rights & Benefits**.  During the Term, Team will provide adidas with the sponsorship rights and benefits contained on Schedule 1.

VI.     **Travel Allotment**. adidas shall pay Consultant the sum of **Sixty Thousand Dollars ($60,000)** for Contract Year one (2015) and **Sixty Five Thousand Dollars ($65,000)** for Contract Year two (2016), payable February 15 and June 15 of each Contract Year. Any expenses incurred above and beyond the allotted amount will be at the expense of the Consultant. If Consultant is requested by adidas to a meeting, adidas will provide all transportation, hotels and meals (excluding incidentals).

2

VII.  **Incentive Compensation.**  Subject to the terms and conditions of this Agreement, adidas shall pay Team the bonus(es) earned by Team (if any) for the achievements listed below.  All such payments shall be gross of taxes.

| Gauntlet Bonus Incentives: | |
|---|---|
| Win the adidas Gauntlet | $15,000* |
| Top 2 | $10,000* |
| Top 3-4 | $7,500* |
| Top 5-6 | $5,000* |
| Top 7-8 | $2,500* |
| Beat one of our Flagship Programs | $1,000* |
| Uprising Summer Championships: | |
| Win the Uprising Summer Championships | $15,000* |
| Top 2 | $10,000* |
| Top 3-4 | $7,500* |
| Top 5-6 | $5,000* |
| Top 7-8 | $2,500* |
| Beat one of our flagship programs | $1,000* |
| McDonald's All-American | |
| Per  McDonald's  All-American Selections: | $10,000 in adidas Product (at retail value) / per selection |

*Only the highest incentive will be paid (e.g. non-cumulative).

3

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

adidas                                    Team

BY:

Chris McGuire                             Thomas Gassnola, as director of Team
Head of Sports Marketing                  and in his individual capacity

                                          Address:

BY:

                                          Ludlow MA, 01056

Paul Ehrlich
General Counsel

4



**BERKSHIRE BANK**
America's Most Exciting Bank
P.O. Box 1308, Pittsfield, MA 01202

October 31, 2015
█████ 425  Page 4 of 4
NEW ENGLAND PLAYAZ INC

| Date | Description | Additions | Subtractions | Balance |
|------|-------------|-----------|--------------|---------|
| 10-30 | #Withdrawal | | -40,000.00 | 2,917.83 |
| | TLR 104 BR 1327 | | | |
| 10-31 | Ending totals | 56,900.00 | - 56,890.41 | $2,917.83 |

GOVERNMENT
EXHIBIT
306D-1
S2 17 Cr. 686 (LAK)

SDNY_00029335



**BERKSHIRE BANK**
America's Most Exciting Bank®
P.O. Box 1308, Pittsfield, MA 01202

November 30, 2015

▆▆▆425  Page 2 of 4
NEW ENGLAND PLAYAZ INC

| Date | Description | Additions | Subtractions | Balance |
|------|-------------|-----------|--------------|---------|
| 11-12 | #ACH Credit | 30,000.00 | | 31,520.77 |
| | ADIDAS INTERNATI 0010668408 151110 | | | |
| | 0010668408 | | | |

SDNY_00029337

# Thomas Gassnola

# INVOICE

New England Playaz

[REDACTED]

Ludlow, MA  01056

| | |
|---|---|
| **DATE:** | Nov 1,2015 |
| **INVOICE #** | 450 |
| **FOR:** | *scouting* |

**Bill To:**

599 004 392
622500
15B 12075

Jim Gatto
Adidas International Marketing BV
Hoogoorddreef 9
1101 BA Amsterdam

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Consultant Fee, travel expenses for October & November | $30,000.00 |
| | |
| Hampden bank | |
| 19 harrison ave springfield mass 01103 | |
| | |
| Bank Phone # 413-452-5151 | |
| Routing Number: [REDACTED] | |
| Account Number: [REDACTED] | |
| Swift code: NORHUS33 | |
| **TOTAL** | $30,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

**GOVERNMENT EXHIBIT 1116**

S2 17 Cr. 686 (LAK)

FOIA Confidential Treatment Requested

- 221 -

ADID000376560

| | |
|---|---|
| **From:** | "Gatto, Jim"<IMCEAEX-_O=ADSINT_OU=AM_CN=RECIPIENTS_CN=GATTOJIM@eurprd01.prod.exchangelabs.com> |
| **Sent:** | Thu, 5 Nov 2015 11:12:05 -0800 (PST) |
| **To:** | "Groot, Anja" <Anja.Groot@adidas-group.com> |
| **Subject:** | RE: TJ Invoice 11-1-15.xls |

Monday is fine.  Thank you

**From:** Groot, Anja
**Sent:** Thursday, November 05, 2015 11:10 AM
**To:** Gatto, Jim
**Subject:** RE: TJ Invoice 11-1-15.xls

Jim,

Is it okay if I book this on Monday so you approve it? it will go out for payment then.

It's my day off tomorrow. Otherwise is it possible to send it in pdf format and I can book it before Monday.

Thanks
Anja

**From:** Gatto, Jim
**Sent:** Thursday, November 05, 2015 6:37 PM
**To:** Groot, Anja
**Subject:** TJ Invoice 11-1-15.xls

Anja,

Can you submit this right away for payment.

15B12075

Thank you

Jim



**NORTH CAROLINA STATE UNIVERSITY**
**OFFICE OF SCHOLARSHIPS AND FINANCIAL AID**

GOVERNMENT
EXHIBIT
1908
S2 17 Cr. 686 (LAK)

November 11, 2015

## Athletically Related Financial Aid Agreement – Initial

**Name:** Dennis Smith, Jr.    **Sport:** Men's Basketball    **Period of Award:** 4 Academic Years
Your financial aid package is: 100% of an In-State Full Scholarship for the 2016-17, 2017-18, 2018-19, and 2019-20 academic years.

#### Eligibility of Student-Athlete for Financial Aid:

- A student-athlete must meet all applicable NCAA, conference and institutional regulations to be eligible for institutional financial aid.
- Institutional financial aid may be awarded for any term during which a student-athlete is in regular attendance as an undergraduate with eligibility remaining under NCAA Bylaw 12.8, or as a graduate eligible under NCAA Bylaw 14.6, or a former student-athlete under NCAA Bylaw 15.01.5.2.
- A student-athlete who withdraws from the institution may not receive financial aid during the remainder of the term (e.g., if scholarship money has already been disbursed, the student may have to return a portion of that disbursement if he/she withdraws mid-term).

#### Terms and Conditions of Institutional Financial Aid Award:

- Athletic scholarship awards are calculated based upon the published total cost of attendance (COA) for an academic year as defined by the NC State Office of Scholarships and Financial Aid (OSFA) as of August 1 of each year. Any adjustment to an individual's COA must first be approved by OSFA; funding with athletics' aid may then be considered by Athletics on a case-by-case basis. Any COA adjustment by OSFA does not obligate Athletics to fund that adjustment with athletics aid.
- Financial aid awarded by an institution to a student-athlete shall conform to the rules and regulations of NCSU, the NCAA and the ACC.
- Financial aid awarded to a prospect may not be conditioned on the recipient reporting in satisfactory physical condition. If a student-athlete has been accepted for admission and awarded financial aid, the institution shall be committed for the term of the original award, even if the student-athlete's physical condition prevents him or her from participating in intercollegiate athletics.
- If the student receives other institutional financial aid that increases the value of the equivalency counting toward NCAA team financial aid limitations, the other countable aid may be reduced or cancelled to maintain compliance with applicable NCAA rules. A student-athlete may only decline his/her athletics aid if the amount of the other institutional countable aid is larger.
- For those student-athletes who receive athletics scholarships and who also receive an outside award (not an institutional award), if approved, such award may be accepted by the student up to cost of attendance, when combined with all other sources of financial aid.

#### Period of Institutional Financial Aid Award:

- If a student's athletics ability is considered in any degree in awarding financial aid, such aid shall neither be awarded for a period less than one academic year nor for a period that would exceed the student's five-year period of eligibility.
- If the prospect does not gain admission to the university, this offer of financial aid becomes null and void.

#### Conditions of Reduction, Cancellation, Renewals and Non-renewals:

- Athletically related financial aid may be reduced or cancelled during the period of award if the recipient: renders himself or herself ineligible for intercollegiate competition; fraudulently misrepresents any information on an application, letter of intent or financial aid agreement; engages in serious misconduct warranting substantial disciplinary penalty; or voluntarily withdraws from a sport at any time for personal reasons.
- Athletically related financial aid may be increased for any reason at any time.
- Athletically related financial aid may not be decreased or canceled: on the basis of a student-athlete's athletics ability, performance or contribution to a team's success; because of an injury that prevents the recipient from participating in athletics; or for any other athletics reason.
- The Director of Scholarships and Financial Aid shall notify the student-athlete in writing of the opportunity for a hearing when institutional financial aid based in any degree on athletics ability is reduced, cancelled or not renewed.
- The decision to renew or not renew a student-athlete's athletically related financial aid <u>after the period</u> of the award has concluded cannot be a decision made based on any athletics reason.
- Athletically related financial aid may be decreased or cancelled <u>during the period</u> of the award, or decreased or not renewed <u>after the period</u> of the award, due to non-athletically related conditions (e.g., compliance with athletics department rules, policies and Student-Athlete Code of Conduct; departmentally approved team rules acknowledged by each student-athlete, and compliance with academic policies or standards [e.g., as outlined in the Student-Athlete Code of Conduct, which include, but are not limited to, adherence to the class attendance policy for student-athletes, attending all scheduled academic appointments with assigned Academic Coordinator, attending study hall, and/or tutorial appointments]).
- If this financial aid agreement is not signed and received by NC State within 30 days of the date of this document, this agreement becomes null and void. If a student would like to sign a valid agreement, a new financial aid agreement shall be created by the Head Coach and reissued.
- If the student-athlete does not enroll at the institution on the first day of classes for the semester in which the period-of-the award begins, this financial aid agreement becomes null and void, unless the Head Coach decides to honor the award.

Signed: *Krista Domnick*  (Digitally signed by Krista Domnick DN: cn=Krista Domnick, o=US, ou=Director, ou=Office of Scholarships & Financial Aid email=krista_Domnick@ncsu.edu Date: 2012.01.09 10:04:22 -05'00')    Director of Scholarships & Financial Aid

Signed: _____    Date: 11-11-15    Head Coach

Signed: _____    Date: 11-1-15    Student-Athlete

Office of Scholarships and Financial Aid • 2831 Thurman Drive Raleigh, NC 27695 • Phone: 919-515-2421 • Fax: 919-515-8422

*mjf 11/12/15*

# NLI    NATIONAL LETTER of INTENT

2016-2017

Name of Prospective Student-Athlete __SMITH JR.__        DENNIS
                         Last               First          Middle Initial

Permanent Address __FAYETTEVILLE__    __NC__    __28311__    __US__
                    City         State       Postal Code       Country

Prospective Student-Athlete's NCAA ID    __1501105472__     Date of Birth ▓▓▓▓▓▓▓
*(must be registered with the NCAA Eligibility Center and on the Institutional Request List)*

Submission of this NLI has been authorized by:

SIGNED *[signature]*
       Director of Athletics (or designee)         __11/11/2015__
                                   Date Issued to Prospective Student-Athlete

For Institutional Use Only:
Two-year college transfer ☐

__MEN'S BASKETBALL__    Two-year college expected graduation date _____
        Sport           (if required to graduate)

This is to certify my decision to enroll at _____ North Carolina State University
                                                   Name of Institution

I certify that I have read all terms and conditions included in this document. I have discussed them with the coach and/or other staff representatives of the institution named above, and I fully understand, accept and agree to be bound by them. I understand that signing this NLI is voluntary and I am not required to sign the NLI to receive athletics aid and participate in intercollegiate athletics. Additionally, I give my consent to the signing institution, to disclose to authorized representatives of its athletics conference, the NCAA and the NLI Office any documents or information pertaining to my NLI signing. Further, I give my consent to the NLI Office to disclose my name and personally identifiable information from my education records to a third party (including but not limited to the media) as necessary to correct any inaccuracies reported by the media or related to my NLI signing, without such disclosure constituting a violation of my rights, including my rights under the Family Educational Rights and Privacy Act.

If I falsify any part of this NLI, or if I have knowledge that my parent or legal guardian falsified any part of this NLI, I understand I shall forfeit the first year of my athletics competition at any NLI member institution.

My signature on this NLI nullifies any agreements, oral or otherwise, which would release me from the conditions stated within this NLI.

SIGNED *[signature]*      11-11-15      5:14 P.M.
     Prospective Student-Athlete Signature     Signing Date (Mth/Day/Yr)    Time (Circle - A.M. / P.M.)
                                                          *Do not sign prior to 7:00 a.m. (local time) on the initial signing date.*

Parent/ legal guardian signature required if prospective student-athlete has not reached his or her 21st birthday.

SIGNED *[signature]*      11/11/15      5:15
(Check one) ☑ Parent or ☐ Legal Guardian Signature    Signing Date (Mth/Day/Yr)    Time (Circle - A.M. / P.M.)
                                                          *Do not sign prior to 7:00 a.m. (local time) on the initial signing date.*

__Dennis C. Smith Sr.__    ▓▓▓▓▓▓    ▓▓▓▓▓▓
   Print Name of Parent/Legal Guardian    Telephone Number (including area code)    Email Address

Copyright @ National Letter of Intent

Rev. 10/01/2015

# Student-Athlete Statement - NCAA Division I 2015-2016

-----------------------------------------------------------------

| | |
|---|---|
| Academic Year: | 2015-16 |
| Sport: | Men's Basketball |
| Created: | 12/11/2015 |
| Created By: | Meeghan Ford |

-----------------------------------------------------------------

| | |
|---|---|
| **For:** | Student-athletes. |
| **Action:** | Sign and return to your director of athletics. |
| **Due date:** | Before your first competition each year. |
| **Required by:** | NCAA Constitution 3.2.4.6 and NCAA Bylaw 12.7.2. |
| **Purpose:** | To assist in certifying eligibility. |
| **Effective date:** | This NCAA Division I Student-Athlete Statement shall be in effect from the date this document is signed and shall remain in effect until a subsequent Division I Student-Athlete Statement form is executed. |

| | |
|---|---|
| Student-Athlete: | Dennis Smith Jr. |
| Name of your institution | North Carolina State University |

GOVERNMENT
EXHIBIT
1914
S2 17 Cr. 686 (LAK)

By signing this part of the form, you affirm the following:

Your institution has provided you a copy of the Summary of NCAA Regulations, or another outline or summary of NCAA legislation, or the relevant sections of the Division I Manual and that your director of athletics (or his or her designee) gave you the opportunity to ask questions about them.

You have knowledge of and understand the application of NCAA Division I bylaws related to eligibility, recruitment, financial aid, amateur status and involvement in gambling activities.

You are aware of the NCAA drug-testing program and that you have signed the current NCAA Drug-Testing Consent Form.

All information provided to the NCAA, the NCAA Eligibility Center and the institution's admissions office is accurate and valid, including ACT or SAT scores, high school attendance, completion of coursework and high school grades, as well as your amateur status.

You have reported to the director of athletics or his or her designee of your institution any violations of NCAA regulations involving you and your institution.

You affirm that you understand that if you sign this statement falsely or erroneously, you violate NCAA legislation on ethical conduct and you will further jeopardize your eligibility.

## Part I: Statement Concerning Eligibility.

By signing this part of the form, you affirm the following:

Your institution has provided you a copy of the Summary of NCAA Regulations, or another outline or summary of NCAA legislation, or the relevant sections of the Division I Manual and that your director of athletics (or his or her designee) gave you the opportunity to ask questions about them.

You have knowledge of and understand the application of NCAA Division I bylaws related to eligibility, recruitment, financial aid, amateur status and involvement in gambling activities.

You are aware of the NCAA drug-testing program and that you have signed the current NCAA Drug-Testing Consent Form.

All information provided to the NCAA, the NCAA Eligibility Center and the institution's admissions office is accurate and valid, including ACT or SAT scores, high school attendance, completion of coursework and high school grades, as well as your amateur status.

You have reported to the director of athletics or his or her designee of your institution any violations of NCAA regulations involving you and your institution.

You affirm that you understand that if you sign this statement falsely or erroneously, you violate NCAA legislation on ethical conduct and you will further jeopardize your eligibility.

| | |
|---|---|
| Name of student-athlete | Dennis Smith Jr. |
| Electronic Signature of Student-Athlete | dennis smith |
| Date of Signature | 12/17/2015 |

| Date of birth | ████████ |
|---|---|
| Age | 18 |
| Home address (street or PO Box) | ████████ |
| City | Fayetteville |
| State | NC |
| Zip Code | 28311 |
| Sport(s) | basketball |

**Part II: Buckley Amendment Consent.**

By signing this part of the form, you certify that you agree to disclose your education records.

You understand that this entire form and the results of any NCAA drug test you may take are part of your education records. These records are protected by the Family Educational Rights and Privacy Act of 1974 and they may not be disclosed without your consent.

You give your consent to disclose only to authorized representatives of this institution, its athletics conference (if any) and the NCAA, except as permitted in the Drug-Testing Consent form, the following documents:

1. This form;

2. Results of NCAA drug tests and related information and correspondence;

3. Results of positive drug tests administered by a non-NCAA national or international sports governing body;

4. Any transcript from your high school, this institution or any junior college or any other four-year institution you have attended;

5. Precollege test scores, appropriately related information and correspondence (e.g., testing sites, dates and letters of test-score certification or appeal) and, where applicable, information relating to eligibility for or conduct of nonstandard testing;

6. Graduation status;

7. Your social security number and/or student identification number;

8. Race and gender identification;

9. Diagnosis of any education-impacting disabilities;

10. Accommodations provided or approved and other information related to any education-impacting disabilities in all secondary and postsecondary schools;

11. Records concerning your financial aid; and

12. Any other papers or information pertaining to your NCAA eligibility.

You agree to disclose these records only to determine your eligibility for intercollegiate athletics, your eligibility for athletically related financial aid, for evaluation of school and team academic success, for awards and recognition programs highlighting student-athlete academic success (e.g., Elite 90), for purposes of inclusion in summary institutional information reported to the NCAA (and which may be publicly released by it), for NCAA longitudinal research studies and for activities related to NCAA compliance reviews and institutional performance program. You will not be identified by name by the NCAA in any such published or distributed information. This consent shall remain in effect as long as any issues regarding the purposes listed above exist.

You also agree that information regarding any infractions matter in which you may be involved may be published or distributed to third parties as required by NCAA policies, bylaws or procedures.

| | |
|---|---|
| Name of student-athlete | Dennis Smith Jr. |
| Electronic Signature of Student-Athlete | dennis smith |
| Date of Signature | 12/17/2015 |

**Part III: Affirmation of Status as an Amateur Athlete.**

You affirm that you have read and understand the NCAA amateurism rules.

By signing this part of the form, you affirm that, to the best of your knowledge, you have not violated any amateurism rules since you requested a final certification from the NCAA Eligibility Center or since the last time you signed a Division I student-athlete statement, whichever occurred later.

You affirm that since requesting a final certification from the NCAA Eligibility Center, you have not provided false or misleading information concerning your amateur status to the NCAA, the NCAA Eligibility Center or the institution's athletics department, including administrative personnel and the coaching staff.

| Name of student-athlete | Dennis Smith Jr. |
| --- | --- |
| Electronic Signature of Student-Athlete | dennis smith |
| Date of Signature | 12/17/2015 |

## Part IV: Results of Drug Tests.

**1. FUTURE POSITIVE TEST - ALL STUDENT-ATHLETES SIGN.**

Should I test positive for a substance banned by the NCAA and/or by a non-NCAA athletics organization, or violate a drug-testing protocol or fail to show for a drug test at any time after I sign this statement, I acknowledge I must report the results to my director of athletics.

| Name of student-athlete | Dennis Smith Jr. |
| --- | --- |
| Electronic Signature of Student-Athlete | dennis smith |
| Date of Signature | 12/17/2015 |

**2. POSITIVE TEST BY NCAA OR OTHER SPORTS GOVERNING BODY.**

| Select either a or b: | A. No Positive Drug Test: I affirm that I have never tested positive for a substance banned by the NCAA and/or by a non-NCAA athletics organization and have never violated a drug-testing protocol or failed to show for a drug test. |
| --- | --- |
| Name of student-athlete | Dennis Smith Jr. |
| Electronic Signature of Student-Athlete | dennis smith |
| Date of Signature | 12/17/2015 |

## Part V: Incoming Transfers - Previous Involvement in NCAA Rules Violation(s).

| Have you previously attended a four-year NCAA Divisions I, II or III institution? | No |
| --- | --- |

## Part VI: Incoming Freshmen - Affirmation of Valid ACT or SAT Score.

| Are you an incoming Freshman? | Yes |
| --- | --- |

Confidential Treatment Under Freedom of Information Act Requested by NC State    NCSU-0000080

You affirm that, to the best of your knowledge, you have received a validated ACT and/or SAT score. You agree that, in the event you are or have been notified by ACT or SAT of the possibility of an invalidated test score, you will immediately notify the director of athletics of your institution. You affirm that all information provided to the NCAA, the NCAA Eligibility Center and institution's admissions office is valid and accurate, including high school attendance, completion of coursework and high school grades. You affirm that you did not fraudulently earn your qualifying ACT or SAT score by having someone else take the test for you, copying answers from another person taking the test, etc.

| | |
|---|---|
| Name of student-athlete | Dennis Smith Jr. |
| Electronic Signature of Student-Athlete | dennis smith |
| Date of Signature | 12/17/2015 |

**Any questions regarding this form should be referred to your director of athletics or you may contact the NCAA at 317/917-6222.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Date | Step | Performed By | Action | Comments |
|---|---|---|---|---|
| 12/17/2015 12:08:54 | Initial Submission | Dennis Smith Jr. | APPROVE | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## AP, Invoices

| | |
|---|---|
| **From:** | Gatto, Jim |
| **Sent:** | Tuesday, October 18, 2016 4:12 PM |
| **To:** | Janes, Edwin |
| **Subject:** | TJ Invoice US 10-15-16.xls |
| **Attachments:** | TJ Invoice US 10-15-16.xls |

Please process for payment

601000 6038 62782005

Thanks - Jim

GOVERNMENT
EXHIBIT
**1023**
S2 17 Cr. 686 (LAK)

1

# Thomas Gassnola

INVOICE

New England Playaz
219 Reservoir Road
Ludlow, MA  01056

**DATE:** October 15, 2016
**INVOICE #** 900
**FOR:** *Consultant*

**Bill To:**
adidas
Accounts Payable
5055 N. Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| Basketball Team Tournaments Fee | $50,000.00 |
| | |
| Hampden bank | |
| 19 harrison ave springfield mass 01103 | |
| | |
| Bank Phone # 413-452-5151 | |
| Routing Number: 211870977 | |
| Account Number: 9000320425      04273610 | |
| Swift code: NORHUS33 | |
| | |
| **TOTAL** | $50,000.00 |



**America's Most Exciting Bank®**
P.O. Box 1508, Pittsfield, MA 01202

October 31, 2016

████ 425   Page 3 of 4
NEW ENGLAND PLAYAZ INC

| Date | Description | Additions | Subtractions | Balance |
|---|---|---|---|---|
| 10-21 | #ACH Credit | 50,000.00 | | 70,406.87 |
| | ADIDAS AMERICA I 2700107273 161021 | | | |
| | 2700107273 | | | |



**GOVERNMENT EXHIBIT**
**306A-1**
S2 17 Cr. 686 (LAK)

SDNY_00029385

- 233 -



**BERKSHIRE BANK**
America's Most Exciting Bank·
P.O. Box 1506, Pittsfield, MA 01202

October 31, 2016
████ 425  Page 4 of 4
NEW ENGLAND PLAYAZ INC

| Date | Description | Additions | Subtractions | Balance |
|---|---|---|---|---|
| 10-31 | #Withdrawal | | -50,000.00 | 15,120.52 |
| | TLR 105 BR 1327 | | | |
| 10-31 | **Ending totals** | **62,809.09** | **- 90,382.18** | **$15,120.52** |

**CHECKS**

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 1007 | 10-12 | 565.00 | 1009 | 10-19 | 500.00 |
| 1008 | 10-24 | 40.00 | | | |

SDNY_00029386

FOIA Confidential Treatment Requested



**UNIVERSITY OF KANSAS**
**ATHLETIC MULTI-YEAR**
**FINANCIAL AID AGREEMENT**



November 9, 2016

Billy Preston

Tuition Group:  Standard - NR

Dear Billy,

This is to certify that the **University of Kansas** will award you athletic financial aid in the following amount(s):

## Sport:  Men's Basketball

| Type of Award: | Initial Tender | | Total Amount of Award 2017-2018: | 100% |
|---|---|---|---|---|
| Residency: | Non-Resident | | Total Amount of Award 2018-2019: | 100% |
| Period of Award: | August 2017 - May 2021 | | Total Amount of Award 2019-2020: | 100% |
| | *Summer Aid not included & must be awarded separately. | | Total Amount of Award 2020-2021: | 100% |

The Athletic Grant-in-Aid Agreement is based on the university's official cost of attendance for each academic year.  The KU Financial Aid & Scholarships office determines the cost of attendance by July 1 or each academic year.  Athletic aid awards will be adjusted accordingly and dollar figures will be provided once the appropriate year's rates are finalized.

Recommended:  _Sheahon Zenger_    Date  11/9/16
Sheahon Zenger, Director of Athletics

Approved:  _Brenda Maigaard_    Date  11/9/16
Brenda Maigaard, Director of Financial Aid

NCAA rules restrict the total amount of an athletic grant-in-aid to the value of tuition & fees, room, board, books, and other expenses related to attendance as determined by the institution, otherwise known as the cost of attendance.  My athletic grant-in-aid award will be based on the university's official cost of attendance as of July 1 of each academic year.  If I receive a cost of attendance adjustment, my athletic aid will not be altered.  If I receive an institutional or outside scholarship or other financial aid during the academic year, I am required to notify the Assistant Athletics Director for Student Services and the KU Financial Aid & Scholarships office and provide the contact information of the awarding agency and the amount of the award.  If necessary, those funds may replace a portion of my athletic aid to remain in compliance with NCAA, Big 12 Conference, and federal financial aid rules.

My athletic aid shall not be reduced or cancelled during the period of this award as long as I remain eligible in accordance with NCAA, Big 12 Conference, and University of Kansas rules and guidelines.
My athletic aid will not be reduced or cancelled during the period of the award on the basis of my athletic ability; performance; contribution to my team's success; due to an injury or illness that prevents me from participating in athletics; or for any other reason based upon athletics.  In the event that I incur an injury during the period of the award in the supervised conduct of my sport of such severity that the team physician deems it inadvisable for me to continue to participate, the continuation of this grant will be considered on the basis of academic and conduct standards without reference to my ability to compete in athletics.

(over)

Page 1 of 2

**GOVERNMENT
EXHIBIT
1820**
S2 17 Cr. 686 (LAK)

DOJ-KU-001805

FOIA Confidential Treatment Requested

**Conditions of this Athletic Scholarship**
I understand that to qualify for this athletic aid, I **must**:

- Fulfill the admission requirements of the University of Kansas.
- Meet and maintain the eligibility requirements for athletic participation and financial aid established by the National Collegiate Athletic Association (NCAA), the Big 12 Conference, and/or the University of Kansas.
- Meet the athletic and academic expectations, including all ethical conduct provisions, as presented by my coach, the University of Kansas Athletic Department, and the University of Kansas.

I am aware that, in accordance with NCAA Bylaw 15.3.5.1, the amount of this athletic aid **may** be immediately reduced or cancelled during the period of the award if:

- I become ineligible for intercollegiate competition.
- I omit or give false information on my admission application, national letter of intent, athletics financial aid agreement, or other financial aid applications.
- I engage in serious misconduct that brings disciplinary action from the University of Kansas.
- I voluntarily withdraw from my sport for personal reasons at any time.
- I violate NCAA, Big 12 Conference, and/or departmental rules & policies.
- I violate the Student-Athlete Code of Conduct, Jayhawk Honor Code, and/or written team rules.
- I violate the University of Kansas Athletics Department's drug testing policy.
- I violate any University of Kansas academic policies.
- I fail to adhere to academic standards as outlined for me by Student-Athlete Support Services or my head coach; including, but not limited to: failure to take examinations, failure to complete an excessive number of academic assignments, and failure to attend an excessive number of classes.
- I do not successfully pass all attempted credits or maintain a minimum cumulative GPA of 2.0.
- I earn my undergraduate degree from the University of Kansas.
- I exhaust my eligibility in this sport.
- I fail to participate in required team practices, medical rehabilitation treatment, or other team activities.
- I fail to adhere and abide by non-athletic performance related rules and policies as set forth by the Athletics Department and my sport program (e.g., hosting duties).

I am also aware that my athletic aid **must** be reduced or cancelled if:

- I sign a professional sports contract for my sport.
- I accept money or the promise of money for the use of my athletics skill or participation in my sport.
- I agree to be represented by an agent and/or receive benefits from an agent.
- I receive other aid that causes me to exceed my individual limit or team limit.

Please indicate your acceptance of this Athletic Financial Aid Agreement by signing and dating below.

Signed _____    Date  11/9/16 _____
       *Student-Athlete*

Signed _____    Date _____
       *Parent (if student-athlete is not 18 or older)*

**PLEASE RETURN ONE SIGNED COPY TO:**
**Beth Swank, Assistant Athletics Director for Student Services**
**Kansas Athletics**
**1651 Naismith Drive**
**Lawrence, KS 66045**
**FAX: 785-864-5289**
**bethswank@ku.edu**

v.10/16

Page 2 of 2

DOJ-KU-001806

**- 236 -**

FOIA Confidential Treatment Requested

# NLI — NATIONAL LETTER of INTENT

**2017-2018**

Name of Prospective Student-Athlete __PRESTON__ (Last)    __BILLY__ (First)    Middle Initial

Permanent Address __EULESS__ (City)    __TX__ (State)    __76039__ (Postal Code)    __US__ (Country)

Prospective Student-Athlete's NCAA ID __1609578458__
(must be registered with the NCAA Eligibility Center and on the Institutional Request List)    Date of Birth ████

Submission of this NLI has been authorized by:

SIGNED _[signature]_
Director of Athletics (or designee)    11/09/2016    Date Issued to Prospective Student-Athlete

**MEN'S BASKETBALL** — Sport

For Institutional Use Only:
Two-year college transfer ☐
Two-year college expected graduation date _____
(if required to graduate)

This is to certify my decision to enroll at    **University of Kansas**
Name of Institution

I certify that I have read all terms and conditions included in this document. I have discussed them with the coach and/or other staff representatives of the institution named above, and I fully understand, accept and agree to be bound by them. I understand that signing this NLI is voluntary and I am not required to sign the NLI to receive athletics aid and participate in intercollegiate athletics. Additionally, I give my consent to the signing institution, to disclose to authorized representatives of its athletics conference, the NCAA and the NLI Office any documents or information pertaining to my NLI signing. Further, I give my consent to the NLI Office to disclose my name and personally identifiable information from my education records to a third party (including but not limited to the media) as necessary to correct any inaccuracies reported by the media or related to my NLI signing, without such disclosure constituting a violation of my rights, including my rights under the Family Educational Rights and Privacy Act.

If I falsify any part of this NLI, or if I have knowledge that my parent or legal guardian falsified any part of this NLI, I understand I shall forfeit the first year of my athletics competition at any NLI member institution.

My signature on this NLI nullifies any agreements, oral or otherwise, which would release me from the conditions stated within this NLI.

SIGNED _[signature]_ Prospective Student-Athlete Signature    11-9-16 Signing Date (Mth/Day/Yr)    3:45 Time (Circle – A.M. P.M.) Do not sign prior to 7:00 a.m. (local time) on the initial signing date.

Parent/legal guardian signature required if prospective student-athlete has not reached his or her 21st birthday.

SIGNED _[signature]_ (Check one) ☑ Parent or ☐ Legal Guardian Signature    11-9-16 Signing Date (Mth/Day/Yr)    4:30 Time (Circle – A.M. P.M.) Do not sign prior to 7:00 a.m. (local time) on the initial signing date.

_Nichelle Nicole Player_ Print Name of Parent/Legal Guardian    ████ Telephone Number (including area code)    everybodyluvsnicole@gmail.com Email Address

Copyright @ National Letter of Intent    NLI    Rev. 10/01/2016

DOJ-KU-001807

- 237 -



**Endorsement, Sponsorship and Supplier Agreement -- AAU**



**THIS ENDORSEMENT, SPONSORSHIP AND SUPPLIER AGREEMENT,** the adidas Standard Terms and Conditions and all Schedules hereto (collectively, the "Agreement") is made and entered into as of **January 1, 2017** (the "Effective Date") by and between adidas America, Inc., an Oregon corporation ("adidas") and **NE Playaz Basketball Program**, its coaches, staff and players and any current, new or additional basketball teams organized and/or sponsored by such team and their respective coaches, staff and players, by and through its Director **Thomas Gassnola** ("Consultant") (collectively, "Team"). Team organizes and operates an AAU basketball team in the State of **Massachusetts.** adidas desires to support Team and to have Team to, among other things, endorse adidas brand products and the adidas brand, and Team agrees to perform such obligations and grant such rights subject to the terms and conditions set out below. In consideration of the mutual promises, covenants and agreements expressed herein and for other good and valuable consideration, the receipt and adequacy of which the parties acknowledge, adidas and Team have agreed as follows:

I.    **Term**. This Agreement shall remain in full force and effect from the Effective Date through **December 31, 2018** (the "Term"), unless sooner terminated in accordance with the terms and conditions hereof.

II.    **Team Merchandise Allotment**. Each Contract Year and at no cost to Team, adidas shall provide **seventy-five thousand dollars ($75,000)** worth of adidas Products (at retail value) for use by Team. adidas shall have sole discretion with respect to the styles and designs of adidas Products provided to Team. The delivery of the adidas Products required by this Section shall occur in accordance with adidas' customary seasonal product delivery cycles. During the Term, Team shall have the right to purchase other adidas basketball Products, at wholesale prices. All sales shall be subject to adidas' standard terms and conditions of sale and all adidas Products provided or purchased hereunder shall not be for resale.

III.    **Exclusivity & Loyalty**. Subject to the terms and conditions of this Agreement, Team agrees to exclusively wear, use and promote adidas Products. Consultant further agrees that Consultant owes adidas a fiduciary duty of loyalty, will work solely on behalf of adidas and its best interests, will not directly or indirectly aid, advise, assist, support or benefit any Competitor (including but not limited to wearing, sponsoring, promoting, receiving,

1

GOVERNMENT
EXHIBIT
1145
S2 17 Cr. 686 (LAK)

advertising or endorsing any Competitor Products, providing consulting or other services to any Competitor, or directly or indirectly receiving any compensation from any Competitor) and will not engage in any act or omission that directly or indirectly conflicts with, weakens, undermines, circumvents or is otherwise inconsistent with the foregoing. Team further agrees that if any adidas appearance or event (e.g., adidas basketball camp or tournament) conflict's with a Competitor event, Team will ensure that the Team (including but not limited to its top players) exclusively participates in the adidas appearance or event.

IV.    **Appearances**. Upon request by adidas and subject to the terms and conditions of this Agreement, Consultant shall be available in the Territory for a total of two (2) Personal Appearances and the number of Advertising Appearances necessary to satisfy adidas' advertising needs, either individually or as a part of a group, not to exceed eight (8) hours in duration per appearance (exclusive of travel time).

V.    **Sponsorship Rights & Benefits**. During the Term, Team will provide adidas with the sponsorship rights and benefits contained on Schedule 1.

VI.    **Travel Allotment**. adidas shall pay Consultant the sum of **seventy thousand dollars ($70,000)** each Contract Year, payable March 15. Any expenses incurred above and beyond the allotted amount will be at the expense of the Consultant. If Consultant is requested by adidas to a meeting, adidas will provide all transportation, hotels and meals (excluding incidentals).

2

FOIA Confidential Treatment Requested    ADID000013862

VII.    **Incentive Compensation.**  Subject to the terms and conditions of this Agreement, adidas shall pay Team the bonus(es) earned by Team (if any) for the achievements listed below.  All such payments shall be gross of taxes.

| Achievement | Cash Bonus | Retail Product Bonus |
|---|---|---|
| Has a player that participates in the McDonalds All-American Game | N/A | $5,000 |
| Program has a senior ranked in the Top 40 by one of the National Media Outlets (ESPN, Scout, Rivals, or 247 Sports) on October 1st | N/A | $2,500 |
| Program has a junior ranked in the Top 30 by one of the National Media Outlets (ESPN, Scout, Rivals, or 247 Sports) on October 1st | N/A | $1,500 |
| 17U team goes undefeated during the April adidas Gauntlet circuit | $5,000 | $2,500 |
| 17U team goes undefeated during the adidas Gauntlet Finale | $2,500 | $2,500 |
| 16U team goes undefeated during the adidas Gauntlet Finale | $1,000 | $2,500 |
| 17U team goes undefeated during the adidas Summer Championships | $5,000 | $2,500 |
| 16U team goes undefeated during the adidas Summer Championships | $2,500 | $1,000 |
| 17U team goes undefeated the entire month of July | $10,000 | $10,000 |

*Only the highest incentive will be paid (e.g. non-cumulative).

3

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

adidas                                          Team

BY:

_____        _____

Chris McGuire                           **Thomas Gassnola, as director of Team**
Head of Sports Marketing                **and in his individual capacity**

                                        Address:

BY:

_____        _____

                                        _____
Paul Ehrlich
General Counsel

4

FOIA Confidential Treatment Requested                              ADID000013864

adidas Standard Terms & Conditions

1.    **Definitions.**  As used herein, the terms set forth below shall be defined as follows:

1.1 "adidas Products" means any Products bearing any adidas Trademarks.

1.2 "adidas Trademarks" means any name, logo, symbol, trademark or service mark, or brand owned, licensed or controlled by adidas (at any time), including but not limited to the adidas name, Trefoil, 3-Stripes mark, Sport Heritage logo, Sport Performance logo, Sport Style Logo and Sport Point.

1.3 "Advertising Appearance" means any appearance by Consultant to develop, create or produce marketing or advertising materials including, but not limited to, photo or production sessions related to posters, hang-tags, catalogs, brochures or in-store displays; and photo or production sessions related to television, radio, print, Internet, video, outdoor, billboard and wallboard advertisements, promotions or content.

1.4 "Affiliate" means adidas AG and any other company or entity owned or controlled by, controlling or under common control with, adidas AG or adidas.

1.5 "Team Endorsement" means the name of the Team and the name, nickname, logo, mascot, initial, number, autograph, voice, facsimile signature, photograph, likeness, character image or facsimile image, Internet, video and film portrayals of Consultant, and any other means of endorsement which are used in the sports marketing industry.

1.6 "Celebration Apparel" means any Product that is worn while commemorating or

recognizing Team's or Team's team's victory or achievement, including but not limited apparel Products that are worn in celebration or recognition ceremonies.

1.7 "Competitor" means any person, entity or organization other than adidas that develops, manufactures, distributes, markets, licenses or sells: (i) Products; or (ii) services that compete with adidas.

1.8 "Events" means those basketball competitions, programs, activities or events organized, sponsored, controlled or otherwise affiliated with the Team.

1.9 "Territory" means the universe.

1.10 "Contract Year" means each consecutive twelve (12) month period during the Term beginning on **January 1** and ending on **December 31**.

1.11 "Personal Appearance" means any appearance by Consultant other than an Advertising Appearance, but specifically excludes Team's competing in any adidas sponsored tournament or game, (e.g., attendance at in-store appearances, autograph sessions, clinics, celebrity events, other public appearances, adidas shareholder meetings, or meetings with representatives of adidas' major accounts).

1.12 "Products" mean all athletic, athleisure and casual footwear, apparel, accessories and equipment, including but not limited to bags, headbands, wristbands, water bottles, headwear, socks, fragrances, toiletries, eyewear, sunglasses, watches and underwear.

5

1.13 "Flagship Programs" means four basketball teams that are designated by adidas each Contract Year. For the 2015 Contract Year, such teams are: Team Loaded –NC, Atlanta Celtics, Compton Magic, and Indiana Elite.

## 2. Obligations of Team.

2.1 Team Use of adidas Products. At all times during the Term, Team shall exclusively wear, use and promote adidas Products throughout the Contract Territory whenever Team wears, uses or promotes Products, including but not limited to whenever Team: (i) is playing or coaching basketball (including but not limited to practices, games and exhibitions); (ii) is being filmed by promotional videotape or posing for photographs or otherwise engaged in promotional or other activities; (iii) attends or participates in any basketball event or training session whether as a player, spectator, television commentator or in any other capacity; (iv) appears in or is featured in any pre-arranged sporting, lifestyle or general interest articles or features in newspapers, magazines, Internet or other publications; (v) participates in any public appearance or interview, including but not limited to television and other press appearances in relation to both sporting and non-sporting events; or (vi) engages in sports or sports product promotional activities.

2.2 Team acknowledges that Team's obligation to exclusively wear adidas Products, as identified by adidas, shall be a material term of this Agreement.

2.3 Team shall not (nor allow any third party to) deface, cover, remove, black out or otherwise alter any physical adidas Product or part thereof, or any adidas Product or part thereof appearing in photographs, video or digital content. Team shall at all times keep the adidas Products supplied to Team in clean and good condition. Team shall take special care to ensure the prominent visibility of the adidas Trademarks, particularly during promotional appearances and in the circumstances referred

to in this Agreement. Except as otherwise permitted by this Agreement, Team shall not wear, use or promote any Products with any name, symbol, logo, mark, patch or other identifier (other than the adidas Trademarks) on such Products. Team shall not alter any non-adidas Products to resemble adidas Products.

2.4 Team shall give adidas reasonable notice of any material quality problems encountered with respect to any adidas Products supplied for Team's use, and Team shall cooperate and assist adidas in its efforts to correct any such problem. Team shall from time to time, and upon adidas' request, provide adidas with information regarding Team's experience of using adidas Products and shall assist adidas in the design, research, development and user-testing of adidas products.

2.5 Consultant shall: (i) act diligently and faithfully as a promoter of adidas Products; (ii) recommend adidas Products whenever Consultant has the opportunity to do so; and (iii) refrain from doing anything which may harm the sale of adidas Products or adidas' reputation.

2.6 Team acknowledges and agrees that during the Term adidas will be Team's primary sponsor. As such, to the extent Team enters into endorsement relationships with other companies, adidas will remain Team's top priority to the extent there are creative, schedule or other conflicts between Team's various sponsors. When appearing in other sponsor's marketing activities (ads, events, etc.), Team will use best efforts to wear adidas Products.

2.7 Team shall not wear, promote, use or otherwise endorse any Product of a Competitor or any other goods or services of a Competitor.

2.8 If Team creates or is directly or indirectly involved in the creation of an Internet website relating to Team, then Team: (i) shall provide a prominent link from such site to

6

FOIA Confidential Treatment Requested

ADID000013866

www.adidas.com; and (ii) if Team appears in/uses Products in any content on Team's website, then such Products shall exclusively be adidas Products.

**3.**    **Appearances.**

3.1 Consultant agrees to make the number of Personal Appearances and Advertising Appearances set forth in Section V of this Agreement. The parties agree that adidas will not pay Consultant additional compensation for any appearance made by Consultant pursuant to this Agreement.

3.2 Consultant shall coordinate with adidas all appearances requested hereunder. Consultant shall, upon request, give adidas written notice of Team's schedule for purposes of coordinating the scheduling of appearances and, without request, any changes thereto.

3.3 If Consultant arrives more than one (1) hour after the agreed upon arrival time for any appearance, then adidas may reduce the next Travel Allotment payment(s) payable to Team by an amount equal to any costs that adidas incurs as a result of such delay (unless the delay was caused by circumstances solely out of Consultant's control) or require immediate reimbursement of such amount from Team. In addition to the foregoing, if Consultant fails to make any confirmed appearance (and adidas reasonably determines that such failure to appear was unjustified (e.g., death of a family member is an example of a justified reason and missing a flight, over-sleeping or another commitment took priority are examples of unjustified reasons), then adidas may deduct twenty-five percent (25%) of the annual Travel Allotment due to Team from the next Travel Allotment payment(s) payable to Team or require immediate reimbursement of such amount from Team.

3.4 adidas shall pay all reasonable out-of-pocket expenses incurred by Team in connection with any Personal Appearances or Advertising Appearances, including but not limited to airfare, meals and lodging. Notwithstanding the foregoing, adidas shall not pay any expenses for any such appearance that is at a location coincident with Team's competition, practice, training or other promotional appearance related travel schedule.

**4.**    **Grant and Use of the Team Endorsement.**

4.1 Team grants to adidas: (i) the exclusive royalty-free right and license during the Term and throughout the Territory to the unlimited use (in any media now known or hereafter created) of the Team Endorsement (x) in and in connection with or relation to the development, manufacturing, marketing, advertisement, licensing, sale, distribution and promotion of Products and any adidas brands, and (y) to develop, manufacture, market, advertise, distribute, license, sell, promote and commercially exploit Products that include the Team Endorsement; and (ii) the non-exclusive right and license during the term and throughout the Territory to the unlimited use (in any media now known or hereafter created) of the Team Endorsement in and in connection with or in relation to posters, promotional products and other products designated by adidas.

4.2 All advertising and promotional materials produced under this Agreement shall be the sole property of adidas and shall be works made for hire and Team hereby assigns, all rights, title and interest in and to such materials to adidas. Team shall have no right, title or interest of any kind in or to such materials, nor shall Team be entitled to the payment of any amounts with respect thereto. Team waives any moral rights with respect to any advertising or promotional materials to the extent permitted by law. Team agrees that adidas shall be entitled to the unrestricted use (without compensation) of any idea of Team in connection with this Agreement, including but not limited to advertising and/or development of

7

·Products Team agrees to indemnify adidas and its Affiliates against any losses, claims, costs or damages (including attorneys' fees) suffered by such party resulting from the use of the Team Endorsement.

4.3 Team agrees not to use, license or authorize any third party to use the adidas Trademarks, or to use the adidas Trademarks without prior written approval from adidas. Team further agrees that: (i) adidas may (at its own cost) file and maintain trademark applications/registrations for Products that include the Team Endorsement; (ii) adidas shall have the right (in its sole discretion, at its own cost and either in its own name or in the name of Team) to bring actions against third parties for infringement of such trademarks and to oppose conflicting trademark applications; and (iii) with respect to (i) and (ii), Team will sign such documents and provide information and assistance as adidas may request from time to time.

## 5.    Representations,    Warranties    and Covenants.    Team represents, warrants and covenants that:  (i) no rights or licenses with respect to Team Endorsement will be granted to any person or entity other than adidas during the Term in connection with the development, manufacturing,   marketing,   advertisement, promotion, licensing or sale of Products; (ii) Team is free to enter into this Agreement and to perform Team's obligations contemplated under this Agreement; (iii) Team is the sole owner of the promotional, endorsement and licensing rights granted to adidas under this Agreement and that Team has not granted (and will not grant) any right, license or privilege (or any option relating thereto) during the Term to any Competitor; (iv) Team has not entered (and will not enter) into any other agreement or understanding that will prevent or substantially impair the performance of Team's obligations under this Agreement; (v) Team does not know of any existing health problem or medical condition which materially affects (or will

materially affect) Team's ability to compete and train in first-class physical condition and will notify adidas if Team becomes aware of any such health problem or medical condition which subsequently arises during the Term; (vi) Team does not now, did not one (1) year prior to the Term, and shall not during the Term, use or possess any drugs or other substances, the use or possession of which is prohibited by applicable law, statute, regulation, or rule of any government, sports federation, or national or international   sports   organization   with jurisdiction over Team or to which Team may directly or indirectly be subject to or belong, including but not limited to the AAU; (vii) Team shall not at any time during or after the Term of this Agreement disparage in any manner adidas, its Affiliates or their respective Products; (viii) Team shall cooperate (in good faith) with adidas in performing Team's obligations under this Agreement; (ix) it shall participate in national tournaments, including those designated by adidas; (x) without prior written approval, Team shall not provide any adidas Products (or other benefits   provided   hereunder)   to   any teams/programs not approved by adidas (e.g., high schools/grass roots programs, middle school programs or girls programs); (xi) it is not (and shall not be) in possession of a firearm in violation of any law; and (xii) without prior written approval, Team shall not host or sponsor any tournament, league or event.

## 6.    Right of First Dealing and Matching Rights.

6.1 Beginning sixty (60) days before the end of the Term until the expiration of this Agreement ("First Dealing Period"), Team shall periodically meet with adidas to negotiate in good faith the renewal of this Agreement. The parties shall not be obligated to enter into a new agreement if they cannot settle on mutually satisfactory terms during the First Dealing Period. During the Term, Team shall not (nor shall Team permit any third party to) enter into any agreement or engage in discussions or negotiations with any third party regarding

8

·Team's wearing, sponsoring, promoting, receiving, advertising or endorsing, or providing consulting or similar services with respect to, any Products ("Endorsement Rights").

6.2 Following the termination or expiration of this Agreement, Team will not enter into any agreement or understanding with any third party regarding Endorsement Rights without first giving adidas the opportunity to enter into an agreement with Team for such Endorsement Rights on the terms and conditions proposed by such third party that are material, measurable and matchable terms and conditions ("Third Party Terms"). Team shall provide adidas in writing (on third party letterhead, unaltered and unredacted) with the Third Party Terms Team receives. adidas shall have thirty (30) days from its receipt of such Third Party Terms to match or better such Third Party Terms. If adidas matches or betters such Third Party Terms, then Team will enter into a new agreement with adidas on such Thirty Party Terms, the better terms and other standard adidas terms and conditions. If adidas fails to match or better such Third Party Terms, then Team shall enter into an agreement with such third party on the Third Party Terms that adidas failed to match or better.

6.3 During the period that is from the termination or expiration of this Agreement until adidas matches or fails to match or better the Third Party Terms (the "Market Period"), Team shall comply with the obligations in Section 2.1. If adidas matches such Third Party Terms and Team is not in breach of Section 2.1, then for the term of the Market Period that is not included in the new agreement between Team and adidas (the "Compensation Period"), adidas shall pay Team based on the following formula: the annual Travel Allotment for the Contract Year in which the termination or expiration occurred shall be divided by three hundred sixty-five (365) and the quotient thereof shall be multiplied by the number of days in the Compensation Period.

7.    **Right of Reduction/Proration of Travel**

**Allotment/Team Merchandise Allotment.**

7.1 If adidas believes that Team has breached this Agreement, then adidas may (in its discretion) immediately suspend all currently due and future payments hereunder effective upon written notice to Team of adidas' suspension of such amounts. Team acknowledges that adidas' suspension of payments hereunder does not relieve Team of any obligations hereunder.

7.2 If during any Contract Year, any third party enacts or enforces (or threatens to enforce) any rule, regulation, law or other restriction that directly or indirectly prevents adidas from exercising any material rights or Team from performing any material obligations under this Agreement, then adidas shall have the right to withhold the payment of any performance bonuses and reduce Team's annual Travel Allotment by fifty (50%) percent.

7.3 If during any Contract Year, Team fails (for any reason) to wear, use or exclusively promote the appropriate adidas Products (e.g, footwear, socks, and arm sleeves) as provided herein, then adidas shall have the right to withhold the payment of any performance bonuses and reduce Team's annual Merchandise Allotment by up to two thousand five hundred dollars ($2,500) per occurrence.

7.4 If adidas exercises any of the reduction or withholding rights in Sections 7.2 or 7.3, then Team forfeits such prorated amount and adidas shall have the right to withhold payment of any prorated amount from any future payments due to Team or Team shall pay adidas immediately upon adidas' request for such prorated amount.

8.    **Termination.**

8.1 adidas may terminate this Agreement at any time upon written notice to Team if Team (or as applicable Consultant): (i) is in material breach of this Agreement (including but not limited to any provision of Section 5); (ii) ceases

9

'to exist or compete; (iii) is convicted of, or pleads guilty or nolo contendere to, a felony; (iv) is convicted of, or pleads guilty or nolo contendere to, a misdemeanor, felony or charge involving moral turpitude or the purchase, sale, possession, or use of an illegal substance or prohibited substance; (v) is suspended or takes a leave of absence from Team because of alcohol or drug use or psychological/physiological problems; (vi) enters an alcohol, drug or psychological/physiological treatment program; (vii) attracts publicity which in the judgment of adidas has an adverse effect upon the status or reputation of Team, the value of Team to adidas, or adidas; (viii) for an aggregate or consecutive period of six (6) months or more during the Term, does not train and/or compete at a first class level acceptable to adidas or is otherwise inactive for any reason (including illness or injury); (ix) is determined by any government, sports federation, or national or international sports organization having jurisdiction over Team or to which Team may directly or indirectly be subject to or belong, including but not limited to AAU, to have used or possessed drugs or other substances in violation of the laws, statutes, regulations, or rules of such organization; (x) fails to abide by the laws, statutes, regulations, or rules of any government, sports federation, or national or international sports organization having jurisdiction over Team or to which Team may directly or indirectly be subject to or belong, including but not limited to AAU; (xi) is in possession of a firearm in violation of any law (xii) dies; (xiii) Consultant ceases for any reason to be coach of the Team; or (xiv) is provided 90 days' notice of adidas' intent to terminate this Agreement.

8.2 Team shall have the right to terminate this Agreement if: (i) adidas is adjudicated as insolvent, or declares bankruptcy; or (ii) adidas fails to make payment to Team of any sums due pursuant to this Agreement within sixty (60) days following the receipt by adidas of written notice from Team that such payment is past due. Team acknowledges that adidas has sixty (60) days to pay all invoices and that Team is required to send adidas a second notice (after the sixty (60) day period) stating that such payment is past due.

8.3 In addition to any rights and remedies adidas may have under this Agreement, at law or in equity, for each single case of a material breach of this Agreement, adidas shall be entitled to reduce Team's annual Travel Allotment up to 50% of the annual Travel Allotment payable at the time of the breach. Such amount may, at adidas' sole discretion, be deducted from any future payments due to Team or Team shall pay adidas immediately upon adidas' request for such amount.

9.    **Rights Upon Termination.**    Upon termination of this Agreement for any reason, adidas shall pay Team the balance, if any, of Travel Allotment for the then current Contract Year earned as of the effective date of termination based on the following formula: The total annual Travel Allotment for the Contract Year in which termination occurs shall be divided by three hundred sixty five (365), and the quotient thereof shall be multiplied by the number of days in that Contract Year which preceded the effective date of termination. Any payment of Travel Allotment for the Contract Year during which termination occurs shall be applied against adidas' obligation to pay Team the foregoing amount.    If such calculation results in a negative number, then Team shall within fifteen (15) days following such termination remit such amounts to adidas. Notwithstanding the foregoing, if adidas suspends any payment(s) to Team pursuant to Section 7.1 and subsequently terminates this Agreement or it expires prior to adidas' payment of any suspended payments, then adidas shall pay Team as follows:  (i) with respect to any suspended payments of Travel Allotment for the Contract Year in which the suspension notice was given, adidas shall pay Team the amount that equals the annual Travel Allotment for such

10

·Contract Year divided by three hundred sixty-five (365) and then multiplying the quotient thereof by the number of days in such Contract Year that preceded the effective date of the suspension notice; (ii) with respect to any payments of Travel Allotment for the Contract Year(s) following the Contract Year in which the suspension notice was given, no amount; and (iii) provided that any payment of Travel Allotment for the Contract Year in which the suspension notice was given shall be applied against adidas' obligation to pay Team hereunder.  For example: if, under an agreement that runs annually until December 31, 2011, Team's last Travel Allotment payment was made June 30, 2010, adidas' suspension notice was effective on July 15, 2010, and adidas terminates the agreement on July 27, 2010, then Team would receive Travel Allotment due for the period of July 1, 2010 through July 14, 2010, but Team would not receive any Travel Allotment due for the period from July 15, 2010 through termination.

**10.    Rights Upon Expiration/Termination.** Upon expiration or termination of this Agreement, Team acknowledges that adidas shall: (i) in perpetuity, have the right to internal and external non-commercial use for reference, historic/informative, public display and inclusion in the adidas museum any Products, advertising or promotional materials which, include the Team Endorsement; (ii) for a period of six (6) months following the effective date of expiration or termination, have the right to continue to sell Products bearing the Team Endorsement; and (iii) for a period of sixty (60) days following the effective date of expiration or termination, have the right to use advertising and promotional materials bearing the Team Endorsement which were printed or ordered prior to the effective date of expiration or termination.

**11.    Limitation of Liability.** Team, on behalf of Team, Team's heirs, successors and assigns, hereby releases adidas and its Affiliates and their respective employees, owners, agents, officers, directors and their successors in interest from all liability for injury, death, and property loss and damage that results from Team's participation in athletics and other recreational and competitive athletic activities, which relate to the use of any adidas Products or any activities related to Team's performance under this Agreement.  ADIDAS SHALL NOT UNDER ANY CIRCUMSTANCES BE LIABLE TO TEAM, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT; NOR ANY LOSS OF BUSINESS OR LOSS OF PROFITS. Team voluntarily agrees to expressly assume all risks of injury and death that may result from participation in athletics and other recreational and competitive athletic activities, which relate in any way to the use of any adidas Product provided under this Agreement, or from any activities related in any way to performance under this Agreement

**12.    Confidentiality.**    All terms of this Agreement are confidential and neither party shall disclose any term hereof without the prior written consent of the other party, unless disclosure is required by law.  Team further agrees that Team may receive confidential information owned by, or proprietary to, adidas, including but not limited to information relating to adidas, adidas Products (including prototype products) and its marketing plans and strategies and Team shall not disclose such confidential information to any third party.  Notwithstanding the foregoing: (i) either party may disclose the terms hereof to such party's professional, financial and similar advisors provided such other persons or firms agree not to disclose such information to any third party; and (ii) adidas shall have the right to disclose the terms of this Agreement to any of its Affiliates, partners, distributors, manufacturers or licensees.

**13.    Dispute Resolution/Injunctive Relief.** Excluding equitable relief as provided below, the parties agree that any dispute arising out of or related to this Agreement shall be submitted to a mutually agreed upon mediator for non-

11

binding confidential mediation in Portland, Oregon. If the dispute cannot be resolved through mediation, it shall be submitted to final, binding and confidential arbitration before the Arbitration Service of Portland in Portland, Oregon. Team further acknowledges that the Team Endorsement and the services provided hereunder are special and unique, that the breach of this Agreement will cause irreparable harm to adidas and that adidas shall be entitled to injunctive relief to prevent Team from breaching or continuing to breach this Agreement. The parties agree that the procedures outlined in this Section are the exclusive methods of dispute resolution.

14.    **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon. The parties hereby agree and consent to the exclusive jurisdiction and venue of any state or federal court located in Multnomah County, Oregon.

15.    **Assignment/3rd Parties.** Neither party may assign this Agreement without the express written approval of the other party; provided that adidas may assign or sub-license this Agreement and its rights and obligations to Affiliates, and adidas or Affiliate partners, manufacturers, licensees and distributors, without the consent of Team. Team may not delegate the obligations of this Agreement. Except as expressly provided herein, nothing contained herein shall grant any third party, any rights or remedies under this Agreement.

16.    **Infringement.** If adidas learns of any unauthorized use of the Team Endorsement or any use of any material that is (or may) infringe the publicity rights of Team, then Team grants adidas the right to take any action adidas deems necessary (at its sole expense and by attorneys of adidas' choice), including suing for infringement and joining Team as a party. Team agrees to cooperate and assist adidas in any such action and that the monetary proceeds from any such action (including a settlement) will belong first to adidas to cover its expenses

(including attorneys' fees), with the balance (if any) split equally between adidas and Team.

17.    **Notices.** All notices or other communications provided for herein shall be given in writing by overnight delivery (e.g., Fed Ex or UPS) and shall be deemed given upon receipt, or refusal of receipt by Team. Notice shall be made to Team at the address above and to adidas at adidas America, Inc., 5055 N. Greeley Avenue, Portland, Oregon 97217, attn: General Counsel. A party may change its address by giving notice thereof to the other party.

18.    **Entire Agreement.** This Agreement constitutes the entire understanding between the parties and cannot be amended or modified except by an agreement in writing signed by adidas and Team. All previous understandings or agreements between Team and adidas relating to the subject matter hereof shall have no further force and effect.

19.    **Severability.** Every provision of this Agreement is severable. If any term hereof is held to be illegal or unenforceable for any reason, the other terms of this Agreement shall not be affected. Notwithstanding the foregoing, the parties shall negotiate (in good faith) and mutually agree upon the terms of a legal and enforceable provision to replace such term.

20.    **Relationship of the Parties.** Team's performance of services for adidas hereunder is in Team's capacity as an independent contractor and nothing contained in this Agreement shall be construed to establish an employer/employee, partnership or joint venture relationship between Team and adidas. Team shall be solely responsible for the payment of all taxes on any compensation or products received under this Agreement.

21.    **Waiver.** The failure of either party to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or otherwise limit such party's right to subsequently enforce such provision.

12

FOIA Confidential Treatment Requested

ADID000013872

22.  **Section Captions.**  Section and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent, intent or meaning of this Agreement or any provision hereof.

* * * END OF STANDARD TERMS AND CONDITIONS* * *

13

Schedule 1

1.1.   Team grants to adidas the exclusive right and license during the Contract Term to serve as the exclusive "Official Sponsor" of the Team.

1.2.   Team hereby grants to adidas the right to use the slogans "Official Sponsor," "Official Outfitter" and "Official Footwear and Apparel Supplier" of Team and/or any of the Teams and/or any similar slogans (each a "Slogan") that adidas deems appropriate for use in the development, promotion, marketing and sale advertising of adidas Products during the Term.

1.3.   adidas shall be identified as the "Official Sponsor," or "Official Outfitter" or "Official Footwear and Apparel Supplier" within the Product Category in all brochures, flyers, programs and other promotional materials of any kind or description in any way produced by or associated with Team, any Events or the Teams through the use of Slogans.

1.4.   Consultant agrees that Team will participate in adidas' camps and tournaments upon request (e.g., Team must participate in UPRISING Summer Championships, at least two Gauntlet events and adidas UPRISING Gauntlet Finale, UPRISING All- American Camp if invited ).Team is responsible for travel for all participants in non-adidas Nations events including camps and tournaments. In addition, Consultant will provide regional support for adidas events and adidas Nations (e.g., scouting).

1.5.   adidas shall have the right to place stadium-sized banners or other appropriate signage at all Events. adidas shall supply such banners or other signage and Team shall use its best efforts to place them in highly visible locations.

1.6.   At no cost to adidas, Team shall place an adidas trademark or logo (with the particular trademark or logo to be identified in each case by adidas) and/or Slogan on all printed materials used in connection with all Events and Team events, including all posters, programs, newspaper ads, direct mail flyers, and all other collateral materials that are produced by Team during the Term.  All existing stocks of all such printed materials referred to above in this same paragraph are exempt from this requirement. To the extent that Team advertises in magazines, Team shall also include an adidas trademark or logo (to be selected by adidas). The use and placement of such Slogan, trademark or logo shall be subject to adidas' prior approval, which Team shall seek from adidas before the use thereof. If adidas does not reject a proposed use within ten (10) days of being presented with such proposal, its consent to such use shall be deemed to have been given.

1.7.   During the Term, Team will use its best efforts to provide adidas with tickets to all Events or Team events at no cost. Team shall also use reasonable efforts to obtain parking passes and hospitality passes to the extent passes are necessary.

PDX 1188798v1 51391-112                          1

FOIA Confidential Treatment Requested                          ADID000013874

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

adidas                                              Team

BY:                                                 

_____                    _____
Chris McGuire                                       **Thomas Gassnola, as director of Team**
Head of Sports Marketing                            **and in his individual capacity**

                                                    Address:

BY:                                                 ████████████████████████████████

                                                    _____

_____
Paul Ehrlich
General Counsel

4

FOIA Confidential Treatment Requested                                      ADID000013875

Schedule 1

1.1.    Team grants to adidas the exclusive right and license during the Contract Term to serve as the exclusive "Official Sponsor" of the Team.

1.2.    Team hereby grants to adidas the right to use the slogans "Official Sponsor," "Official Outfitter" and "Official Footwear and Apparel Supplier" of Team and/or any of the Teams and/or any similar slogans (each a "Slogan") that adidas deems appropriate for use in the development, promotion, marketing and sale advertising of adidas Products during the Term.

1.3.    adidas shall be identified as the "Official Sponsor," or "Official Outfitter" or "Official Footwear and Apparel Supplier" within the Product Category in all brochures, flyers, programs and other promotional materials of any kind or description in any way produced by or associated with Team, any Events or the Teams through the use of Slogans.

1.4.    Consultant agrees that Team will participate in adidas' camps and tournaments upon request (e.g., Team must participate in UPRISING Summer Championships, at least two Gauntlet events and adidas UPRISING Gauntlet Finale, UPRISING All- American Camp if invited ).Team is responsible for travel for all participants in non-adidas Nations events including camps and tournaments. In addition, Consultant will provide regional support for adidas events and adidas Nations (e.g., scouting).

1.5.    adidas shall have the right to place stadium-sized banners or other appropriate signage at all Events. adidas shall supply such banners or other signage and Team shall use its best efforts to place them in highly visible locations.

1.6.    At no cost to adidas, Team shall place an adidas trademark or logo (with the particular trademark or logo to be identified in each case by adidas) and/or Slogan on all printed materials used in connection with all Events and Team events, including all posters, programs, newspaper ads, direct mail flyers, and all other collateral materials that are produced by Team during the Term.  All existing stocks of all such printed materials referred to above in this same paragraph are exempt from this requirement. To the extent that Team advertises in magazines, Team shall also include an adidas trademark or logo (to be selected by adidas). The use and placement of such Slogan, trademark or logo shall be subject to adidas' prior approval, which Team shall seek from adidas before the use thereof. If adidas does not reject a proposed use within ten (10) days of being presented with such proposal, its consent to such use shall be deemed to have been given.

1.7.    During the Term, Team will use its best efforts to provide adidas with tickets to all Events or Team events at no cost. Team shall also use reasonable efforts to obtain parking passes and hospitality passes to the extent passes are necessary.

PDX 1188798v1 51391-112                        1

FOIA Confidential Treatment Requested                        ADID000013876

**Oliveira, Diane**

| | |
|---|---|
| **From:** | Gatto, Jim |
| **Sent:** | Monday, January 09, 2017 1:26 PM |
| **To:** | Janes, Edwin |
| **Cc:** | Adams, Gerald |
| **Subject:** | Consultant invoice |
| **Attachments:** | US 12-15-16.pdf |

Edwin,

Can you please process for payment.

601000 6038 62782005

Thanks - Jim

***Jim Gatto***
***Director of Global Sports Marketing***
***adidas Basketball***
**971-234-4979**
**jim.gatto@adidas.com**

GOVERNMENT
EXHIBIT
1029
S2 17 Cr. 686 (LAK)

1

# Thomas Gassnola



New England Playaz
219 Reservoir Road
Ludlow, MA  01056

| | |
|---|---|
| **DATE:** | January 4, 2017 |
| **INVOICE #** | 3250 |
| **FOR:** | *Consultant* |

**Bill To:**
adidas
Accounts Payable
5055 N. Greeley Ave
Portland, OR 97217

03727740

| DESCRIPTION | AMOUNT |
|---|---|
| 2017 1st Quarter Consultant Fee and T & E for 1st Quarter 2017 | $90,000.00 |
| | |
| Hampden bank | |
| 19 harrison ave springfield mass 01103 | |
| | |
| Bank Phone # 413-452-5151 | |
| Routing Number: 211870977 | |
| Account Number: 9000320425 | |
| Swift code: NORHUS33 | |
| | |
| **TOTAL** | $90,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

- 255 -

ServiceNow                                                          Page 1 of 4

## Subject: the ticket has been updated or assigned to you.
## Please check your ticket.

**ASPEN** Financial Shared Service Center

### FINANCE REQUEST UPDATED

| | | |
|---|---|---|
| Dear Diane Oliveira, | Ticket #. | FR0125132 (https://adidasaspen service-now com/itserviceshop/requests_detail do? idT=sn_sm_finance_request&sysparm_view=my_finance_requests&idC=4e74b195db10b2c09c155101ce96192f) |
| | Request Date | 01/12/2017 |
| the ticket has been updated or assigned to you. Please check your ticket. | Request Time | 14:05.50 |
| | Requester. | Edwin Janes |
| | Priority: | 3 - Medium |
| | Due Date. | 01/16/2017 |
| | Due Time | 10:05.50 |
| | | check status (https://adidasaspen.service-now com/itserviceshop/requests) |

The brief description of your request is:

6038017446

Please process the attached invoice for vendor 6038038017. This vendor is in SAP but not SRM. Please also see the attached approval email from Jim Gatto.

C. Marie, LLC

Budget code is: 601000 6038 62782005

Thank you!

We are working diligently to complete your request as quickly as possible. You can view the current status of your ticket under My Requests (https //adidasaspen.service-now.com/itserviceshop/requests).

Please feel free to contact us for further questions or comments!
If you have any questions about this call – especially if you feel that it has not been fully resolved – please contact your Service Desk again.

adidas group © 2015

## Subject: the ticket has been updated or assigned to you.
## Please check your ticket.

https://adidasaspen.service-now.com/PDFGenerator.do?table=sn_sm_finance_request&id=...  1/13/2017

ServiceNow                                                Page 2 of 4

**ASPEN** Financial Shared Service Center

## FINANCE REQUEST UPDATED

| | | |
|---|---|---|
| Dear Linda Farrell, | Ticket #. | FR0125132 (https://adidasaspen.service-now com/itserviceshop/requests_detail.do?idT=sn_sm_finance_request&sysparm_view=my_finance_requests&idC=4e74b195db10b2c09c155101ce96192f) |
| | Request Date. | 01/12/2017 |
| the ticket has been | Request Time: | 14:05 50 |
| | Requester | Edwin Janes |
| | Priority: | 3 - Medium |
| updated or assigned | Due Date: | 01/16/2017 |
| | Due Time | 10 05 50 |
| to you. Please check your ticket. | | check status (https://adidasaspen.service-now com/itserviceshop/requests) |

The brief description of your request is:

Please process the attached invoice for vendor 6038038017. This vendor is in SAP but not SRM. Please also see the attached approval email from Jim Gatto.

Budget code is: 601000 6038 62782005

Thank you!

We are working diligently to complete your request as quickly as possible, You can view the current status of your ticket under My Requests (https://adidasaspen.service-now.com/itserviceshop/requests).

Please feel free to contact us for further questions or comments!
If you have any questions about this call – especially if you feel that it has not been fully resolved – please contact your Service Desk again.

adidas group © 2015

## Subject: Finance request - Ticket FR0125132 has been opened

**ASPEN** Financial Shared Service Center

## FINANCE REQUEST OPENED

| | | |
|---|---|---|
| Dear Edwin Janes, | Ticket # | FR0125132 (https //adidasaspen service-now com/itserviceshop/requests_detail do? idT=sn_sm_finance_request&sysparm_view=my_finance_requests&idC=4e74b195db10b2c09c155101ce96192f) |
| | Request Date | 01/12/2017 |
| we will assist you in your request opened by you in the Self Service Portal. | Request Time: | 14-05.50 |
| | Requester | Edwin Janes |
| | Priority: | 3 - Medium |
| | Due Date | 01/16/2017 |
| | Due Time | 10.05 50 |
| | | check status (https //adidasaspen service-now com/itserviceshop/requests) |

The brief description of your request is:

Please process the attached invoice for vendor 6038038017. This vendor is in SAP but not SRM. Please also see the attached approval email from Jim Gatto.

Budget code is: 601000 6038 62782005

Thank you!

We are working diligently to complete your request as quickly as possible. You can view the current status of your ticket under My Requests (https://adidasaspen.service-now.com/itserviceshop/requests).

Please feel free to contact us for further questions or comments!
If you have any questions about this call - especially if you feel that it has not been fully resolved – please contact your Service Desk again.

adidas group © 2015

## Subject: Ticket FR0125132 - Priority 3 - Medium for 6038 - adidas America Inc. assigned to group Retained_Ca

**ASPEN** Financial Shared Service Center

## SPECIAL TICKET NOTIFICATION

https://adidasaspen.service-now.com/PDFGenerator.do?table=sn_sm_finance_request&id=...    1/13/2017

USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 282 of 412

Dear Agent,

The request FR0125132 has been assigned to group Retained_Canton .

Requester: Edwin Janes
Country Code  6038 - adidas America Inc.
Category Level 1: Accounts Payable (AP)
Category Level 2: Invoice Processing
Category Level 3: Other Invoice Processing
Priority: 3 - Medium
Assigned to:
Description: Please process the attached invoice for vendor 6038038017. This vendor is in SAP but not SRM. Please also see the attached approval email from Jim Gatto.
Budget code is: 601000 6038 62782005 Thank you!

Please feel free to contact us for further questions or comments!

adidas group © 2015



**BERKSHIRE BANK**
America's Most Exciting Bank·
P.O. Box 1308, Pittsfield, MA 01202

**January 31, 2017**

425   Page 2 of 3
NEW ENGLAND PLAYAZ INC

| Date | Description | Additions | Subtractions | Balance |
|------|-------------|-----------|--------------|---------|
| 01-18 | #ACH Credit<br>ADIDAS AMERICA I 2700115158 170118<br>2700115158 | 90,000.00 | | 92,634.89 |
| 01-19 | #Withdrawal<br>TLR 101 BR 1327 | | -27,500.00 | 44,509.89 |



GOVERNMENT
EXHIBIT
306A-2
S2 17 Cr. 686 (LAK)

SDNY_00029395

Wire Transfer | Security Admin | Entity Profile | Help | Logoff | **WireXchange®**

Heather Arbour

11/20/17 09:39 AM

# Monson Savings
**Your Bank Forever**

where families **save**, businesses **prosper**, communities **benefit**

## Outgoing Wire Detail

### General Information

Wire Sequence Number: 8143
Type of Wire: New Wire
Create Print Receipt
Wire Status: Complete
OFAC Status: OFAC Passed

### Audit Trail Information

Entered: 02/24/17 12:06 PM by Lindsey Ferreira
MA DL S90688392 EXP 02/02/18
BASKETBALL CAMP
Verified: 02/24/17 01:10 PM by Jamie Blaxland
Posted: 02/24/17 01:11 PM by Jamie Blaxland
Verified Extracted: 02/24/17 01:11 PM by System
Verified Extracted: 02/24/17 01:11 PM by System
Forwarded to Fed: 02/24/17 01:11 PM by System
Completed: 02/24/17 01:11 PM by System

### Basic Settlement Information

Effective Date: 02/24/17
IMAD: 20170224GMQFMP01010026
OMAD: 20170224I1B7031R01555902241411FT03
Amount: $20,000.00
Wire Fee: $25.00 - Domestic Wire Fee
Fee Account: Savings 2204024651
Sending Financial Institution: 211871219 Monson Savings Bk
Receiving Financial Institution: 121000248 WELLS FARGO NA
Business Function Code: CTR-Customer Transfer
Type Code: 1000 - Basic Funds Transfer

### Originator Information

Originating FI Name:
Originator: DANIELLE LABARRE
Originator Account: D 2204024651
Originator Address: ████████████
LUDLOW MA 01056-2820
Originator Country: United States

### Beneficiary Information

Beneficiary FI Name:

GOVERNMENT EXHIBIT 305B
S2 17 Cr. 686 (LAK)

SDNY_00030406
11/20/2017

https://wirexchange.goxroads.com/wx/wire/wp_wire_detail.cfm?envir=211871219&wire...

Beneficiary FI Account:
Beneficiary FI Address:
Beneficiary: TIMICHA KIRBY
Beneficiary Account: D 3713587800
Beneficiary Address: ████████████████████
CHARLOTTE, NC 28277
Beneficiary Country: United States
Reference For Beneficiary: BASKETBALL CAMP
Originator To Beneficiary:

**Core System Information**

Debit Account: Savings 2204024651
Debit Fee Account: Savings 2204024651
Credit Account: Federal Reserve 1001026000000
Reference Number: 13:11:41.71    59580.22      0.00    59555.22

<u>Reuse Wire</u>

<u>Create Recurring Wire Template</u>

<u>Add Memo</u>

Electronic Mail:
<u>Monson Savings Bank</u>



SDNY_00030407
11/20/2017

# Thomas Gassnola

# INVOICE

New England Playaz
184 Lockland Ave
Ludlow, MA  01056

**DATE:** May 1, 2017
**INVOICE #** 1601
**FOR:** *Consulting*

**Bill To:**

Jim Gatto
5055 North Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| Tournament Activation/Fee | $70,000.00 |
| | |
| Hampden bank | |
| 19 harrison ave springfield mass 01103 | |
| | |
| Bank Phone # 413-452-5151 | |
| Routing Number: 211870977 | |
| Account Number: 9000320425 | |
| Swift code: NORHUS33 | |
| | |
| **TOTAL** | $70,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

GOVERNMENT
EXHIBIT
1040
S2 17 Cr. 686 (LAK)

| **From:** | "Gatto, Jim" <jim.gatto@adidas.com> |
|---|---|
| **Sent:** | Tue, 23 May 2017 09:25:43 -0700 (PDT) |
| **To:** | "Guidera, Olivia [External]" <olivia.guidera@externals.adidas.com> |
| **Subject:** | TJ Invoice May 2017 v2.xls |
| **Attachments:** | TJ Invoice May 2017 v2.xls |

Olivia,

Can you please submit this invoice.  He should be in system.  Let me know if any issues.

601000 6038 62782555

Thanks - Jim



**BERKSHIRE BANK**
America's Most Exciting Bank®
P.O. Box 1508, Pittsfield, MA 01202

**May 31, 2017**
0425   Page 3 of 3
NEW ENGLAND PLAYAZ INC



| Date | Description | Additions | Subtractions | Balance |
|------|-------------|-----------|--------------|---------|
| 05-31 | #ACH Credit<br>ADIDAS AMERICA I 2700126729 170531<br>2700126729 | 70,000.00 | | 78,609.98 |
| 05-31 | Ending totals | 83,192.28 | - 27,478.90 | $76,985.03 |

**CHECKS**

| Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|
| 1077 | 05-30 | 1,000.00 | | | |

**GOVERNMENT
EXHIBIT
306A-3**
S2 17 Cr. 686 (LAK)

SDNY_00029408



**BERKSHIRE BANK**

America's Most Exciting Bank®
P.O. Box 1308, Pittsfield, MA 01202

**June 30, 2017**

█████ 425   **Page 2 of 3**
NEW ENGLAND PLAYAZ INC

| Date | Description | Additions | Subtractions | Balance |
|------|-------------|-----------|--------------|---------|
| 06-14 | #Wire Transfer-Out<br>OUTGOING WIRE BNF NICHELLE PLAYER;REF ;WIRE/OUT -<br>20171650062800 | | -15,000.00 | 26,848.20 |
| 06-14 | #Direct S/C - Fee<br>DOMESTIC WIRE OUT | | -25.00 | 26,823.20 |

SDNY_00029410

```
GFX/PAYplus Connect Message Print - Message Inquiry Display Dialog Box

User: brice      Bank: Berkshire Bank      Date: 09/11/17 14:11:01

Message Status: PNRM
Seq Num: 20171650062800     Related Seq Num: 20171650085300
Pay Method: FED Output     Message ID: FTI0811
Date Recvd: 06/14/2017 08:59:01    Value Date: 06/14/2017

Sender: 211871691,    Receiver: 026009593
Amount: $15,000.00
Debit info --
     Account: 9000320425
     Name:   NEW ENGLAND PLAYAZ INC
     Addr1:  219 RESERVOIR ROAD
     Addr2:  LUDLOW MA 01056-1694
     Addr3:
     Addr4:

Credit info --
     ABA:    026009593
     Name:   BANK OF AMERICA, N.A., NY
     Addr1:
     Addr2:
     Addr3:
     Addr4:

Advice:           Dept:   DEPT1    Trancode: DOMESTIC
Category:         Linesheet:        Create Template:

Message Text:

     Sndr Info   {1500}30        P
     Msg Type    {1510}1000
     IMAD        {1520}20170614MMQFMPB8000106
     Amount      {2000}000001500000
     Sender DI   {3100}211871691
     Sndr Ref    {3320}20171650062800*
     Rcvr DI     {3400}026009593
     Bus Func    {3600}CTR
     BNF         {4200}D488054808016*
                 NICHELLE PLAYER*
                 ███████████████
                 EULESS, TX 76039*
     ORG         {5000}D9000320425*
                 NEW ENGLAND PLAYAZ INC*
                 219 RESERVOIR ROAD*
                 LUDLOW MA 01056-1694*
```

GOVERNMENT
EXHIBIT
306E
S2 17 Cr. 686 (LAK)

SDNY_00029087

- 267 -

FOIA Confidential Treatment Requested



**UNIVERSITY OF KANSAS
ATHLETIC MULTI-YEAR
FINANCIAL AID AGREEMENT**



November 8, 2017

Silvio DeSousa

Tuition Group:  Standard – NR

Dear Silvio,

This is to certify that the University of Kansas will award you athletic financial aid in the following amount(s):

**Sport:  Men's Basketball**

| Type of Award: | Initial Tender | Total Amount of Award Spring 2018: | 100% |
|---|---|---|---|
| Residency: | Non-Resident | Total Amount of Award 2018-2019: | 100% |
| Period of Award: | January 2018 – May 2021 | Total Amount of Award 2019-2020: | 100% |
|  | *Summer Aid not included & must be awarded separately. | Total Amount of Award 2020-2021: | 100% |

The Athletic Grant-in-Aid Agreement is based on the university's official cost of attendance for each academic year. The KU Financial Aid & Scholarships office determines the cost of attendance by July 1 or each academic year. Athletic aid awards will be adjusted accordingly and dollar figures will be provided once the appropriate year's rates are finalized.

Recommended: _____    Date ___11/8/17___    BB

Sheahon Zenger, Director of Athletics

Approved: _____    Date ___11/8/17___

Angela Karlin, Director – Financial Aid & Scholarships

NCAA rules restrict the total amount of an athletic grant-in-aid to the value of tuition & fees, room, board, books, and other expenses related to attendance as determined by the institution, otherwise known as the cost of attendance. My athletic grant-in-aid award will be based on the university's official cost of attendance as of July 1 of each academic year. If I receive a cost of attendance adjustment, my athletic aid will not be altered. If I receive an institutional or outside scholarship or other financial aid during the academic year, I am required to notify the Assistant Athletics Director for Student Services and the KU Financial Aid & Scholarships office and provide the contact information of the awarding agency and the amount of the award. If necessary, those funds may replace a portion of my athletic aid to remain in compliance with NCAA, Big 12 Conference, and federal financial aid rules.

My athletic aid shall not be reduced or cancelled during the period of this award as long as I remain eligible in accordance with NCAA, Big 12 Conference, and University of Kansas rules and guidelines.
My athletic aid will not be reduced or cancelled during the period of the award on the basis of my athletic ability; performance; contribution to my team's success; due to an injury or illness that prevents me from participating in athletics; or for any other reason based upon athletics.  In the event that I incur an injury during the period of the award in the supervised conduct of my sport of such severity that the team physician deems it inadvisable for me to continue to participate, the continuation of this grant will be considered on the basis of academic and conduct standards without reference to my ability to compete in athletics.

(over)

Page 1 of 2

**GOVERNMENT
EXHIBIT
1815**
S2 17 Cr. 686 (LAK)

DOJ-KU-SD-000530

FOIA Confidential Treatment Requested

**Conditions of this Athletic Scholarship**
I understand that to qualify for this athletic aid, I must:
- Fulfill the admission requirements of the University of Kansas.
- Meet and maintain the eligibility requirements for athletic participation and financial aid established by the National Collegiate Athletic Association (NCAA), the Big 12 Conference, and/or the University of Kansas.
- Meet the athletic and academic expectations, including all ethical conduct provisions, as presented by my coach, the University of Kansas Athletic Department, and the University of Kansas.

I am aware that, in accordance with NCAA Bylaw 15.3.5.1, the amount of this athletic aid may be immediately reduced or cancelled during the period of the award if:
- I become ineligible for intercollegiate competition.
- I omit or give false information on my admission application, national letter of intent, athletics financial aid agreement, or other financial aid applications.
- I engage in serious misconduct that brings disciplinary action from the University of Kansas.
- I voluntarily withdraw from my sport for personal reasons at any time.
- I violate NCAA, Big 12 Conference, and/or departmental rules & policies.
- I violate the Student-Athlete Code of Conduct, Jayhawk Honor Code, and/or written team rules.
- I violate the University of Kansas Athletics Department's drug testing policy.
- I violate any University of Kansas academic policies.
- I fail to adhere to academic standards as outlined for me by Student-Athlete Support Services or my head coach; including, but not limited to: failure to take examinations, failure to complete an excessive number of academic assignments, and failure to attend an excessive number of classes.
- I do not successfully pass all attempted credits or maintain a minimum cumulative GPA of 2.0.
- I earn my undergraduate degree from the University of Kansas.
- I exhaust my eligibility in this sport.
- I fail to participate in required team practices, medical rehabilitation treatment, or other team activities.
- I fail to adhere and abide by non-athletic performance related rules and policies as set forth by the Athletics Department and my sport program (e.g., hosting duties).

I am also aware that my athletic aid must be reduced or cancelled if:
- I sign a professional sports contract for my sport.
- I accept money or the promise of money for the use of my athletics skill or participation in my sport.
- I agree to be represented by an agent and/or receive benefits from an agent.
- I receive other aid that causes me to exceed my individual limit or team limit.

Please indicate your acceptance of this Athletic Financial Aid Agreement by signing and dating below.
Document expires 14 days after issuance date.

Signed _Silvio Da S...2_    Date _11/13/17_
_Student-Athlete_

Signed _____    Date _11/13/17_
_Parent (if student-athlete is not 18 or older)_

**PLEASE RETURN ONE SIGNED COPY TO:**
Beth Swank, Assistant Athletics Director for Student Services
Kansas Athletics
1651 Naismith Drive
Lawrence, KS 66045
FAX: 785-864-5289
bethswank@ku.edu

v.06/17

Page 2 of 2

DOJ-KU-SD-000531

- 269 -

FOIA Confidential Treatment Requested



**2018-19**

Administered by the NCAA on behalf of the Collegiate Commissioners Association (CCA).

Do not sign prior to 7 a.m. (local time) on the following dates or after the final signing date listed for each sport.

| SPORT (Place an "X" on the proper line.) | INITIAL SIGNING DATE | FINAL SIGNING DATE |
|---|---|---|
| X  Basketball (Early Period) | November 8, 2017 | November 15, 2017 |
| ___ Basketball (Regular Period) | April 11, 2018 | May 16, 2018 *(Division I)* |
|  |  | August 1, 2018 *(Division II)* |
| ___ Football (Early Period for Division I) | December 20, 2017 | December 22, 2017 |
| ___ Football (Midyear JC Transfer) | December 20, 2017 | January 15, 2018 |
| ___ Football (Regular Period) | February 7, 2018 | April 1, 2018 |
| ___ Soccer and Men's Water Polo | February 7, 2018 | August 1, 2018 |
| ___ All Other Sports (Early Period) | November 8, 2017 | November 15, 2017 |
| ___ All Other Sports (Regular Period) | April 11, 2018 | August 1, 2018 |

## IMPORTANT - READ CAREFULLY

It is important to read this entire document before signing it. One copy is to be retained by you and the other copy is to be returned to the institution which will file a copy with the appropriate conference office. It is permissible to transmit copies electronically. The National Letter of Intent (NLI) is a voluntary program with regard to both institutions and prospective student-athletes. No prospective student-athlete or parent is required to sign the NLI for a prospective student-athlete to receive athletics aid and participate in intercollegiate athletics.

1. **Initial Enrollment in Four-Year Institution.** This NLI applies only to prospective student-athletes who will be entering four-year institutions for the first time as full-time students. It is permissible for 4-2-4 transfer student-athletes to sign the NLI provided a previous valid NLI does not apply. The terms of the previous NLI are satisfied if a student-athlete graduates from the two-year college.

2. **Financial Aid Requirement.** At the time I sign this NLI, I must receive a written offer of athletics financial aid for the entire 2018-19 academic year from the institution named in this document. The offer must list the terms, conditions and amount of the athletics aid award. (A midyear football two-year college transfer student-athlete must receive a written offer of athletics financial aid for the remainder of the 2017-18 academic year. If the institution does not renew the athletics aid for the following academic year, the student-athlete must be released of the NLI). In order for this NLI to be valid, my parent/legal guardian and I must sign the NLI and I must also sign the offer of athletics aid (see institutional policy for parent/legal guardian signature) prior to submission to the institution named in this document, and any other stated conditions must also be met. If the conditions stated on the financial aid offer are not met, this NLI shall be declared null and void.

   * **Professional Sports Contract.** If I sign a professional sports contract in the sport in which I signed the NLI, I remain bound by the NLI in all other sports, even if NCAA rules prohibit the institution named in this document from providing me with athletics financial aid for the sport in which I signed the NLI.

3. **Provisions of Letter** fulfilled.

   a. **One-Year Attendance Requirement.** The terms of this NLI shall be satisfied if I attend the institution named in this document for one academic year (two semesters or three quarters) as a full-time student.

   b. **Two-Year College Graduation.** After signing this NLI while in high school and if I later attend a two-year college, the terms of this NLI will be satisfied if I graduate from the two-year college.

4. **Basic Penalty.** I understand that if I do not attend the institution named in this document for one full academic year and I enroll in another institution participating in the NLI program, I may not compete in intercollegiate athletics until I have completed one full academic year in residence at the latter institution. Further, I understand I shall be charged with the loss of one season of intercollegiate athletics competition in all sports. This is in addition to any seasons of competition used at any institution.

5. **Early Signing Period Penalties.** Prospective student-athletes who will participate in football are prohibited from signing an NLI during the early signing period for another sport. A prospective student-athlete who signs an NLI during the early period in a sport other than football will be ineligible for practice and competition in football during the first year of enrollment at an NLI member institution and shall forfeit one season of competition in football. In circumstances where a prospective student-athlete's primary sport is not football, but anticipates participating in football, the prospective student-athlete should delay signing an NLI until either the football signing period or during the regular signing period for all other sports.

6. **Release Request and Appeal Process.** In the event I wish to be released from my NLI obligation, the NLI release request and appeal process information can be reviewed on the NLI Web site at www.national-letter.org. I understand that the NLI Policy and Review Committee has been authorized to issue interpretations, settle disputes and consider appeals for complete release from the provisions of the NLI when extenuating circumstances are determined to exist and the signing institution denies my request for release. I further understand the Committee's decision may be appealed to the NLI Appeals Committee, whose decision shall be final and binding.

2018-19 - 1

DOJ-KU-SD-000532

FOIA Confidential Treatment Requested

7. **Letter Becomes Null and Void.** This NLI shall be declared null and void if any of the following occur:

   a. **Admissions Requirement.** This NLI shall be declared null and void if the institution named in this document notifies me in writing that I have been denied admission or, by the opening day of classes in fall 2016, has failed to provide me with written notice of admission, provided I have submitted a complete admission application. It is my obligation to provide, by request, my academic records and an application for admission to the signing institution. If I fail to submit the necessary academic credentials and/or application to determine an admission decision prior to September 1, the NLI office per its review with the institution will determine the status of the NLI.

   If I am eligible for admission, but the institution named in this document defers my admission to a subsequent term, the NLI will be declared null and void; however, this NLI remains binding if I defer my admission.

   b. **Eligibility Requirements.** This NLI shall be declared null and void if, by the opening day of classes in fall 2016, I have not met NCAA initial eligibility requirements; NCAA, conference or institution's requirements for athletics financial aid; or two-year college transfer requirements, provided I have submitted all necessary documents for eligibility determination.

      (1) This NLI shall be rendered null and void if I become a nonqualifier per the NCAA Eligibility Center. This NLI remains valid if I am a partial qualifier per NCAA Division II rules unless I do not meet the institution's policies for receipt of athletics aid.

      (2) It is my obligation to register with and provide information to the NCAA Eligibility Center. If I fail to submit the necessary documentation for an initial-eligibility decision and have not attended classes at the signing institution, the NLI office per its review with the institution will determine the status of the NLI.

      (3) This NLI shall be rendered null and void if I am a midyear football two-year college transfer and I fail to graduate from two-year college at midyear, if required per NCAA, conference or institutional rules. The NLI remains binding for the following fall term if I graduated, was eligible for admission and financial aid and met the two-year college transfer requirements for competition for the winter or spring term, but chose to delay my admission.

   c. **One-Year Absence.** This NLI shall be declared null and void if I have not attended any institution (two-year or four-year) for at least one academic year, provided my request for athletics financial aid for a subsequent fall term is denied by the signing institution. *Service in active duty with the U.S. armed forces or an official church mission for at least 12 months can use the One-Year Absence to null and void the NLI.* I may still apply this provision if I initially enrolled in an NLI member institution but have been absent for at least one academic year. To apply this provision, I must file with the appropriate conference office a statement from the director of athletics that such athletics financial aid will not be available for the requested fall term.

   d. **Discontinued Sport.** This NLI shall be declared null and void if the institution named in the document discontinues my sport.

   e. **Recruiting Rules Violation.** If eligibility reinstatement by the NCAA student-athlete reinstatement staff is necessary due to NCAA and/or conference recruiting rules violations, the institution must notify me that I have an option to have the NLI declared null and void due to the rules violation. It is my decision to have the NLI remain valid or to have the NLI declared null and void, permitting me to be recruited and not be subject to NLI penalties.

8. **Recruiting Ban After Signing.** I understand all participating conferences and institutions are obligated to respect my signing and shall cease contact with me and my family members after my signing this NLI which includes me and my family members not initiating contact with athletic staffs at other institutions. Any contact in excess of an exchange of a greeting is not permitted regardless of the conversation. The conversation does not have to result in recruiting discussion for a recruiting ban violation to occur. I shall notify any coach who contacts me that I have signed an NLI. Once I enroll in the institution named in this document, the NLI Recruiting Ban is no longer in effect and I shall be governed by applicable NCAA bylaws.

9. **7-Day Signing Deadline.** If my parent/legal guardian and I do not sign this NLI and accompanying offer of athletics aid within 7 days after the date of issuance (noted on the signing page) it will be invalid. The 7-day signing deadline does not apply if the NLI is received on the last day of a signing period (e.g., August 1). In this case, the 7-day signing deadline only applies if there are 7 days remaining for the signing period. Additionally, the institution must file the NLI with its conference office within 14 days of the date of final signature; otherwise, the NLI is invalid. The 7-day signing deadline does not apply to the Division I football early signing period.

10. **Statute of Limitations.** I am subject to the NLI penalty if I do not fulfill the agreement; however, if I do not attend an NLI member institution to fulfill the agreement or penalty and four years has elapsed since my signing date, the NLI is no longer binding. Therefore, this NLI is in full force and effect for a period of four years, commencing with the date I sign this NLI, if I do not attend an NLI member institution during the period of four years.

11. **Coaching Changes.** I understand I have signed this NLI with the institution and not for a particular sport or coach. If a coach leaves the institution or the sports program (e.g., not retained, resigns), I remain bound by the provisions of this NLI. I understand it is not uncommon for a coach to leave his or her coaching position.

12. **Coaching Contact Prohibited at Time of Signing.** A coach or an institutional representative may not hand deliver this NLI off the institution's campus or be present off campus at the time I sign the NLI per NCAA rules. This NLI may be delivered by courier service, express or regular mail, email, fax, mobile app or any other electronic means. An NLI submitted to an institution electronically is permissible.

It is important to read more information about the NLI at www.national-letter.org

Copyright © National Letter of Intent    Rev.10/01/2017    2016-19 - 2

- 271 -

DOJ-KU-SD-000533

FOIA Confidential Treatment Requested

**NLI**

2018-2019

Name of Prospective Student-Athlete   **DE SOUSA**             **SILVIO**
_____
                           Last                                      First                  Middle Initial

Permanent Address   **BRADENTON**       **FL**       **34210**       **US**
                           City                      State           Postal Code          Country

Prospective Student-Athlete's NCAA ID    **1708859371**       Date of Birth   ███████
(must be registered with the NCAA Eligibility Center and on the Institutional Request List)

Submission of this NLI has been authorized by:

SIGNED   _[signature]_                **11/08/2017**     _BB_
       Director of Athletics (or designee)              Date Issued to Prospective Student-Athlete

For Institutional Use Only:
Two-year college transfer ☐
Two-year college expected graduation date _____
(if required to graduate)

     **MEN'S BASKETBALL**
           Sport

This is to certify my decision to enroll at _____   **University of Kansas**
                                                  Name of Institution

I certify that I have read all terms and conditions included in this document. I have discussed them with the coach and/or other staff representatives of the institution named above, and I fully understand, accept and agree to be bound by them. I understand that signing this NLI is voluntary and I am not required to sign the NLI to receive athletics aid and participate in intercollegiate athletics. Additionally, I give my consent to the signing institution, to disclose to authorized representatives of its athletics conference, the NCAA and the NLI Office any documents or information pertaining to my NLI signing. Further, I give my consent to the NLI Office to disclose my name and personally identifiable information from my education records to a third party (including but not limited to the media) as necessary to correct any inaccuracies reported by the media or related to my NLI signing, without such disclosure constituting a violation of my rights, including my rights under the Family Educational Rights and Privacy Act.

If I falsify any part of this NLI, or if I have knowledge that my parent or legal guardian falsified any part of this NLI, I understand I shall forfeit the first year of my athletics competition at any NLI member institution.

My signature on this NLI nullifies any agreements, oral or otherwise, which would release me from the conditions stated within this NLI.

SIGNED   _Silvio DeSo [signature]_       **11/13/17**       **10:02 AM**
       Prospective Student-Athlete's Signature      Signing Date (Mth/Day/Yr)     Time (Designate - A.M./P.M.)
                                                                Do not sign prior to 7:00 a.m.
                                                                (local time) on the initial signing date.

Parent/ legal guardian signature required if prospective student-athlete
has not reached his or her 21st birthday.

SIGNED   _[signature]_              **11/13/17**       **10:30 AM**
       (Check one) ☐ Parent or ☑ Legal Guardian Signature    Signing Date (Mth/Day/Yr)    Time (Designate - A.M./P.M.)
                                                                 Do not sign prior to 7:00 a.m.
                                                                (local time) on the initial signing date.

**Fenny Falmagne**            ███████         silviodsa93@gmail.com
   Print Name of Parent/Legal Guardian        Telephone Number (including area code)      Email Address

Copyright © National Letter of Intent                                             **NLI**

                                                                               Rev. 10/01/2017

DOJ-KU-SD-000534

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK



---------------------------x
                           :
UNITED STATES OF AMERICA    :
                           :
v.                         :      S2 17 Cr. 686 (LAK)
                           :
James Gatto,               :
Merl Code, and             :
Christian Dawkins,         :
                           :
          Defendants.      :
                           :
---------------------------X
```

```
                    Recorded Conversation
                       708-314-3402



            Date: August 11, 2016
            Time: 4:50:19 PM
            Session Number: 733
            Participants: Merl Code
                          James Gatto



            (U/I) - UNINTELLIGIBLE
            (PH) - PHONETIC SPELLING
```

**GOVERNMENT EXHIBIT**

**7T**

S2 17 Cr. 686 (LAK)

```
CODE:          What's going on, brother?

GATTO:         Yeah, sorry.

CODE:          No.  So, here's the deal.  Kid -- there's a
               kid named Nassir Little who's top --

GATTO:         Right.

CODE:          -- five or six in the country who Larranaga
               and those guys really want.  The problem is,
               Arizona's offered the kid 150, and we're
               trying to keep him from going to one of their
               schools.  So, it was brought to me through
               Brad and Christian, who said, hey, do you
               think Jim would be able to keep him at Miami,
               because they really want the kid.  And I
               said, I don't know the answer to that.  I'll
               have to ask Jim if he's willing to do that.
               I don't know how, and what, and where, and,
               you know, why, and blah, blah, blah.

GATTO:         He's got --

CODE:          He's --

GATTO:         -- he's got -- he's, he's going to be a
               senior, right?

CODE:          Yes.  He's, he's a rising senior.

GATTO:         So this will be '18. When would they need the
               money?

CODE:          Uh, again, it doesn't have to be all in one
```

lump sum.  I can, I can make it work if

you're saying you'll do it.  I can tell them

that, you know, its installments, and we'll

figure out how to get it to you, when, where,

how, blah, blah, blah.  So, just, I mean, I

know you have some, some uh -- and he's not

committing tomorrow, right?  So, it's not one

of those where I need an answer today, you

know what I'm saying?  I just wanted to put

it on your plate, because, like I told you,

TJ was inserting himself into the

conversation. And that's okay.  I love TJ.

I'm just saying that they don't know him

enough to do it --

GATTO:          Right.

CODE:           -- and they weren't really comfortable with

it.  And I just said, well, I'll have a

conversation with Jim, and if he wants to do

it, then I'll deal with it; and if not, then,

you know --

GATTO:          Did they, did they bring any of that up to --

does Rivers know anything about it?

CODE:           I don't know.  I don't know.

GATTO:          All right.

CODE:           I mean, but it would help, it would help us,

it would help us dramatically if Rivs got

the, the team deal, because they weren't --

they didn't get any money this year, like

none.

GATTO:      Yeah.  Rivs told me that he was, because I

had asked him.  He said he was going to give

them 50 or something next year.

CODE:       Okay.  Well, if that's the case, then, yeah,

it helps us tremendously --

GATTO:      That's --

CODE:       -- get it done, because, I mean, I can -- if

he's getting 50, and we're going to get the

kid, you know, whatever it is he's looking

for, if we can match the Arizona deal, then

okay, great.  Then he's set.

GATTO:      Do we have to match the Arizona deal?

CODE:       I don't know if we have to match it, but I

can have that conversation.

GATTO:      All right.  All right.

CODE:       Okay?

GATTO:      Well, let me talk to Rivers on some things

and then, you know, obviously, like you said,

we don't need an answer today, but, I mean,

if I, if I have to pay it out in '18, that's

fine.  I just, you know --

CODE:        Yeah.  I mean, I can -- we can, we can push

             it into '18 if we do it.  I mean, you know,

             like what we're doing in the other situation

             where we're -- you know, if we do 25, or 30,

             or something, in, in '17, and then we push

             the rest of it into '18, I don't see that

             being an issue.  Like, it shouldn't be a

             problem.

GATTO:       Yeah.  I just don't know if I, I just don't

             know if I can do anything in '17.  That's

             what I'm saying.  The --

CODE:        Sure.

GATTO:       January of '18 is -- you know, I could do it

             all, you know, with January; and then, you

             know, June; and then --

CODE:        We --

GATTO:       -- when he gets on campus.

CODE:        That's fine.  And we can --

GATTO:       Is that --

CODE:        -- and we can, and we can protect ourselves

             by saying, look, if the kid commits in, if

             the kid commits in January, we'll start it

             then.

GATTO:       Right.

CODE:        Like, I can, I mean --

GATTO:        Right.

CODE:            -- I can finagle it.  You just talk to
                Rivers, and hit me back, and let me know kind
                of what, what you, what you, what you think
                is the best course of action. And then, I'll
                see what, what I can do with the numbers.

GATTO:  Yeah.  Just try, try to get it to – what did we do
                with Bowen?  100?

CODE:        Yep.

GATTO:       Yeah.

CODE:        I don't know if they'll take –

GATTO:       (U/I).

CODE:        I, I don't, I don't know if they'll take that
                much less, but if I can take it down at least
                25, then probably.

GATTO:  Alright.  Well, let's just see.

CODE:        Okay.  I'll --

GATTO:       So, Christian, how's Christian --

CODE:        -- I'll have that conversation.

GATTO:       So, how's Christian involved?

CODE:        So, Christian and Brad have a longstanding
                relationship.  Christian is the guy who
                introduced me to Brad when he had the kid.

GATTO:       Okay.  I got it.

CODE:        So, so, that's his dude, and that's, that's

why this whole TJ thing kind of spooked him,
because he was like, listen, I like TJ, but I
don't really want TJ handling anything I've
got my hands on.  I said, well, again, that's
a conversation I need to have with Gatto.

GATTO:        Alright.

CODE:         You know.

GATTO:        It's nothing against TJ. He's comfortable,
              you know, talking to, talking to you, so --

CODE:         Um-hum, um-hum.

GATTO:        I just gotta tell TJ that.  Which I will --

CODE:         Yeah.

GATTO:        -- once I figure everything out.

CODE:         Okay.  You -- When are you, when are you,
              when are you heading off -- you're on a
              family vacation now, so I'm going to leave
              you alone, so I'll talk to you next week.

GATTO:        No, no, I'm fine.  Yeah, I mean, I'll check
              it, yeah.  I'll, I'll figure it out by early,
              early next week.

CODE:         Okay.  All right, cool.  Well, enjoy the
              family.  Okay, man.

GATTO:        All right.  Thank you.

CODE:         All right.  Thank you.

                  [End of recording.]

- 279 -

| From: | Merl Code <merlcode@gmail.com> |
|---|---|
| Sent: | Mon, 26 Jun 2017 10:30:42 -0700 (PDT) |
| To: | Jim Gatto <jim.gatto@adidas.com> |
| Subject: | Fw: Karolina Khaos EFT & Direct Deposit Information |
| Attachments: | Scanned from a COS-EID_35572MFP (21).pdf;IMG_2314.JPG;IMG_2315.JPG;IMG_2316.JPG |

Sent from my BlackBerry 10 smartphone.
**From:** Brian Chatman <btchatman@gmail.com>
**Sent:** Thursday, May 18, 2017 1:28 PM
**To:** Chris Rivers
**Cc:** Merl Code; RICKY ROBERTSON
**Subject:** Karolina Khaos EFT & Direct Deposit Information

Afternoon Mr. Rivers,
I am resubmitting this information to you from the Karolina Khaos on behalf of our Directors Rick Robertson and Erik Glenn.

In the attachment you will find the following: Direct Deposit Form, A proof of account ownership letter, A W-9 form, and a copy of a voided check.

Thanks in advance for your help. We are definitely looking forward to representing & finishing strong for South Carolina again this year on the Adidas Uprising Gauntlet Series.

--
Brian T. Chatman
803-413-7339

**GOVERNMENT EXHIBIT 1072**
S2 17 Cr. 686 (LAK)

Christian Dawkins and Merl Code

| 253 | Inbox | From<br>+17083143402<br>Merl Code*<br><br>Direction:<br>Incoming | 5/22/2017<br>4:47:28<br>PM(UTC+0) | Read:<br>5/22/2017<br>4:47:28<br>PM(UTC+0) | Read | Don't send Bowen to Oregon!!! Call me<br>Source Extraction: File System | |

**GOVERNMENT EXHIBIT 102S-1**
S2 17 Cr. 686 (LAK)

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK



----------------------------x
                            :
UNITED STATES OF AMERICA    :
                            :
v.                          :      S2 17 Cr. 686 (LAK)
                            :
James Gatto,                :
Merl Code, and              :
Christian Dawkins,          :
                            :
          Defendants.       :
                            :
----------------------------X
```

```
                    Recorded Voicemail




              Date: May 27, 2017 Time:
              1:19 PM
              Session Number: 1825
              Participants: Rick Pitino
                            Jim Gatto



              (U/I) - UNINTELLIGIBLE
              (PH)  - PHONETIC SPELLING
```

GOVERNMENT
EXHIBIT
58T
S2 17 Cr. 686 (LAK)

MR. GATTO:        Coach, Jim Gatto with Adidas.  Hope all is
                  well.  Um, sorry to bother you over the
                  weekend, but I just got a call about a
                  player I want to discuss with you.  Um, so,
                  when you get a chance, if you can call me at
                  (503) 754-8013.  Thanks, Coach.  Bye-bye.



SUPPLEMENT NO. 3

**Unofficial Visit Record**

University of Louisville
Office of Athletic Compliance

*13.7.1 Number Permitted- A prospective student-athlete may visit a member's institution's campus at his or her own expense an unlimited number of times. A prospective student-athlete may make unofficial visits before his or her senior year in high school. Please submit this form no later than one week after the unofficial visit.*

*TO BE COMPLETED BY COACHES:*

Prospect's Full Name: **Brian Bowen**   Sport: **Basketball**

Prospect's High School: **LaLumiere**   Graduation Date: **2017**

Accompanied By: 1. **Brian Bowen Sr** Rel: 1. **Father**   4.   Rel: 4.

Accompanied By: 2. **Carrie Malecke** Rel: 2. **Mother**   5.   Rel: 5.

Accompanied By: 3. **CHRISTIAN DAWKINS** 3. **AAU COACH**   6.   Rel: 6.

Arrival Date and Time: **5/28/17  10:30pm**   Departure Date and Time: **5/30/17  1:00pm**

Transportation Method: **(Car)**   Air   Provided By and Relationship:

Lodging: **(Hotel)**   Dorm   N/A   Other: **Marriott**   Provided By and Relationship: **Dad**

*13.7.2 Entertainment/Tickets– During a unofficial visit, an institution may not pay any expenses or provide any entertainment except a maximum of three complimentary admissions (issued only through a pass list) to a home athletics event at any facility within a 30 mile radius of campus in which the institution uses for practice or competition. Additional tickets may not be reserved.*

| Event/Date: | Number of Tickets (limit 3): |
|---|---|
| Event/Date: | Number of Tickets (limit 3): |
| Event/Date: | Number of Tickets (limit 3): |

Did the prospect receive transportation to view off-campus practice/competition facilities?   Yes   **(No)**
If yes, which facilities? _____
Who Provided Transportation? _____
Mode of Transportation: _____
Did the prospect eat meals with other prospects or current student-athletes?   Yes   No
If Yes, did the prospect pay for his or her own meals?   (Attach proof of payment)   Yes   No   N/A
Where did the meal take place? _____
Did the prospect stay on-campus with a current student-athlete?   Yes   **(No)**

If yes, where: _____ with whom: _____

*The prospect met with the following individuals during the unofficial visit:*

| Individual/Title: | Purpose of Meeting: |
|---|---|
| **RECRUITING** ⟷ | **MBB STAFF** |
| Individual/Title: | Purpose of Meeting: |
| Individual/Title: | Purpose of Meeting: |

Signature of Coach: _**Michl Bowden**_ Date: **5/31/17**

Compliance Approval: _____ Date: _____

13

GOVERNMENT
EXHIBIT
**1616A**
S2 17 Cr. 686 (LAK)

# UNIVERSITY OF LOUISVILLE.



**Personal Information:**

Hometown: Saginaw, MI.

Instagram: @tugs20boy

Twitter: @20tugs

# Brian Bowen (2017) – Unofficial Visit

**Position:** 6'7" Small Forward          **High School:** La Lumiere School

**Family:** Brian will be accompanied by his mother, Carrie, father, Brian Sr., and friend, Christian Dawkins.

**Academics:** Brian is interested in studying business in college.

**High School:** Brian is a very athletic and dynamic player with the ability to score at all levels. Brian has great length and energy, which allows him to make an impact at both ends of the floor. With deep range, Brian has the ability to open up driving lanes for him and his teammates. This past season Brain helped lead La Lumiere to the Dicks National Championship and is currently ranked #13 overall by ESPN in the 2017 class.



GOVERNMENT
EXHIBIT
1619
S2 17 Cr. 686 (LAK)

CONFIDENTIAL

UOL0091598

# UNIVERSITY OF LOUISVILLE.

# Welcome
# Brian Bowen

**Monady, May 29th, 2017:**

| | |
|---|---|
| 10:00am | Meeting – Jenny Sawyer (Academics) |
| 11:00am | Tour KFC Yum! Center Arena |
| 12:00pm | Tour Thorton's Academic Center |
| 1:00pm | Meeting – Kayla Matrunick (Nutritionist) |
| 2:00pm | Lunch – Rafferty's |
| 3:00pm | Campus Tour |
| 4:00pm | Meeting – Coach G (Strength & Conditioning Coach) |
| 4:30pm | Film/Meeting – Coach Pitino |
| 7:30pm | Dinner – Griff's Restaurant |



CONFIDENTIAL

UOL0091599

## Chat with Christian & Merl

5/31/2017 5:52:37 PM - 5/31/2017 5:52:37 PM

**Export Details:**

| | |
|---|---|
| Device Name | iPhone |
| Device ID | afbe99735a4c4bc80722e62227df58c399b4b6fb |
| Backup Date | Tuesday, October 24, 2017 6:16 PM |
| Backup Directory | afbe99735a4c4bc80722e62227df58c399b4b6fb |
| iOS | 11.0.3 |
| Current Time Zone | (UTC-05:00) Eastern Time (US & Canada) |
| Created with | iExplorer v4.1.9.0 |

**Participants:**

+1 989-493-4317, Christian Vaugh

+1 708-314-3402, Merl Code

Wednesday, May 31, 2017

Me                                                5:52 PM

I need to speak with both of y asap

GOVERNMENT
EXHIBIT
107E
S2 17 Cr. 686 (LAK)

SDNY_00016520

Merl Code                                              TJ Gassnola

Wednesday, May 31, 2017

Me

By the way.  This Bowen thing looks good for us

Perception wise

I think                                                              6:20 PM

Me

Thanks bro                                                        6:20 PM

Merl Code

Thnx!!!                                                              6:21 PM

Merl Code

I think it's great for us!!! Thnx for the support!! Real Talk!!!     6:21 PM

Me

U always have mine.   I was never upset at you

I just don't like sloppy shit that makes ppl look fucking stupid     6:22 PM

Merl Code

Agreed!!!!                                                          6:22 PM

Me

Call me back                                                       6:37 PM

Merl Code

Call me when u get a minute                                        6:52 PM

**GOVERNMENT
EXHIBIT
107P-3**
S2 17 Cr. 686 (LAK)

```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
 2


 3
    ---------------------------x
 4                             :
    UNITED STATES OF AMERICA   :
 5                             :
    v.                         :     S2 17 Cr. 686 (LAK)
 6                             :
    James Gatto,               :
 7  Merl Code, and             :
    Christian Dawkins,         :
 8                             :
            Defendants.        :
 9  ---------------------------X
10

11

12

13

14
                    Recorded Voicemail
15

16

17

                    Date: June 1, 2017
18                  Time: 12:21 PM
                    Session Number: 1834
19                  Participants: Rick Pitino
                                  Jim Gatto
20

21

                    (U/I) - UNINTELLIGIBLE
22                  (PH)  - PHONETIC SPELLING
23

24

25
```

GOVERNMENT
EXHIBIT
59T
S2 17 Cr. 686 (LAK)

1

1   GATTO:      Coach, Jim Gatto.  Hope all is well.  Checking
2               in.  Heard the good news.  Um, it's going to be
3               great, and I'm excited for you guys.  And, uh,
4               just give me a call back, or I'll try you soon.
5               Thanks, Coach.  Bye-bye.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# UNIVERSITY OF LOUISVILLE
### Athletics Financial Aid Agreement for Student-Athletes
### Beginning Academic Year: 2017-2018

**I. Student-Athlete:** Brian Bowen II

**Sport:** Men's Basketball    **Student ID#:**

**Permanent Street Address:** ███████

**City, State, Zip:** ███████

**II. Type of Award:** ◉ Initial Award    ○ Renewal Award    ○ Transfer Student-Athlete

**Period of Award:** ○ One Academic Year    ◉ Multi-Year

**III. For administrative purposes the award will be distributed as follows:**

**Tuition & Fees:** ○ In-State    ◉ Out-of-State    ○ KY/IN Reciprocity
**Housing & Meals:** ◉ On-Campus    ○ Off-Campus

| Academic Yr. | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 | 2021-2022 |
|---|---|---|---|---|---|
| Tuition & Fees: | FULL | FULL | FULL | FULL | - |
| Books: | FULL | FULL | FULL | FULL | - |
| Housing: | FULL* | FULL | FULL | FULL | - |
| Meals: | FULL | FULL | FULL | FULL | - |
| Misc. Expenses (Gap): | FULL | FULL | FULL | FULL | - |
| **IV. Renewable Value:** | Percentage Equal To FULL | Percentage Equal To FULL | Percentage Equal To FULL | Percentage Equal To FULL | Percentage Equal To $0.00 |

*Total Award Amount / COA Less other non-athletics aid received if aid exceeds individual or team limit.*

*NOTE: The equivalency percentage may change if other countable aid is awarded.*

☐ In accordance with the National Letter of Intent (NLI) policy, I choose to defer my admission until the Spring semester of 2018.

**Please read carefully the terms and conditions on the back of this form, and indicate your acceptance of this athletic grant-in-aid and its terms by signing this agreement below.**

| | | Comments: (For Office Use Only) |
|---|---|---|
| *Signature of Student-Athlete* | Date 6/1/17 | Minardi Hall |
| *Signature of Parent or Guardian (if student is a minor)* | Date 6/1/17 | * Full housing scholarship awarded in 2017-18 covers the full on-campus rate. Any fees or damages are the S/A's responsibility. |
| *Signature of Head Coach* | Date 6/1/17 | |
| *Signature of Director of Financial Aid (or designee)* | Date 6/1/17 | |
| *Signature of Director of Athletics (or designee)* | Date 6/1/17 | |

GOVERNMENT
EXHIBIT
1607
S2 17 Cr. 686 (LAK)

## TERMS AND CONDITIONS OF ATHLETIC TENDER AGREEMENT

Notice: Cost of attendance is calculated annually, and the scholarship value is subject to increasing or decreasing. Full housing awards for on-campus properties cover the on-campus rate. Any fees or damages are the student-athlete's responsibility.

I understand this tender may be immediately reduced or canceled at any time if I:
- Render myself ineligible for intercollegiate competition (e.g. academic redshirt)
- Fraudulently misrepresent any information on an application, letter of intent, or financial aid agreement.
- Engage in repeated or serious misconduct warranting substantial disciplinary penalty (including but not limited to team rules and/or athletic department regulations).
- Voluntarily withdrawal from a sport at any time for personal reasons
- Violate other non-athletically related conditions (e.g., full compliance with academic policies or standards, compliance with athletics department rules or policies).
- Graduate (e.g., earn first baccalaureate degree).
- Fail to graduate after the academic term immediately preceding my anticipated graduation date.
- Have a change in my student status (e.g., residency; on/off campus housing) regardless of reason (e.g., property reclassification).
- Have a change my enrollment status (e.g., dropping courses; switching from campus course to on-line course).
- Fail to meet the terms and conditions of an athletic master lease (e.g., lost key; utility overage).
- Receive an outside and/or institutional non-athletics countable aid (e.g., Trustee's Scholarship; NSP award)

I understand that this tender must be immediately reduced or canceled if I:
- Sign a professional sports contract in my respective sport
- Accept compensation for participating in an athletics contest.
- Agree orally or in writing to be represented (presently or in the future) by an agent, or accept any benefit from an agent or a representative of an agent.
- Receive an outside and/or institutional non-athletics countable aid which causes me to individually exceed NCAA financial aid limits (e.g., Trustee's Scholarship; NSP award) or U of L Stacking Limit Policy.
- Receive an outside and/or institutional non-athletics countable aid which causes my team to exceed NCAA financial aid limits (e.g., Trustee's Scholarship, NSP award).

I understand that this tender will not be reduced, canceled, or non-renewed at any time.
- On the basis of my athletics' ability, performance, condition, or contribution of the team's success.
- Or for any other athletics reason.

I understand the terms of renewals and nonrenewals are as follows:
- The renewal of institutional financial aid shall be made on or before July 1 prior to the academic year in which it is to be effective.
- Renewal award is subject to any contingency in the agreement.
- The renewal value is specified in Subsection Four of the Financial Aid Agreement. Please note the value is subject to changing year to year (e.g., tuition averages decrease).
- The institution shall promptly notify in writing each student-athlete who received an award the previous academic year and who has eligibility remaining in the sport in which the financial aid was awarded the previous academic year whether the grant has been renewed, reduced, or not renewed for the ensuing academic year.
- Notification of financial aid renewals, reductions, and nonrenewals must come from the institution's regular financial aid authority and not from the institution's athletics department
- It is permissible for an institution that has notified a student-athlete that he or she will not be provided institutional financial aid for the next academic year subsequently to award financial aid to that student-athlete.

I understand that if my athletic aid is reduced or canceled at any time:
- The institution's regular financial aid authority shall notify me in writing of the opportunity for a hearing.
- The institution shall have established reasonable procedures for promptly hearing such a request and shall not delegate the responsibility for conducting the hearing to the university's athletics department or its faculty athletics committee.

CONFIDENTIAL

UOL000897



**UNIVERSITY OF LOUISVILLE.**

Office of Athletic Compliance

June 1, 2017

Mr. Brian Bowen, II

████████████

Dear Brian,

I am pleased to inform you that the University of Louisville Athletics Department will award you an out-of-state grant-in-aid consisting of FULL (Tuition, Room, Board, Books and Miscellaneous Expenses) for the 2017-18, 2018-19, 2019-20, 2020-21 academic years and Zero for the 2021-22 academic year.

Enclosed you will find the financial aid agreement confirming your commitment to attend the University of Louisville. Your athletic award carries with it certain terms and conditions that are explained on the back of the agreement. Please make sure you read and understand these terms and conditions before signing your financial aid agreement.

1) The financial aid agreement must be signed by you and your parents or Legal Guardian if you are under the age of 21.

2) Retain one copy of the Financial Aid Agreement and, using the enclosed envelope, send two copies back as soon as possible.

Congratulations on your commitment to join the University of Louisville family. We look forward to having you join us as a student-athlete.

Best regards,

John C. Carns
Sr. Associate Athletic Director

**University of Louisville** ▪ Student Activities Center, 2nd Floor ▪ Louisville, KY 40292
P: 502.852.7728   F: 502.852.0079   W: gocards.com

CONFIDENTIAL

UOL000898

| Form 16-3a | Academic Year: 2016-17 |
|---|---|

**Student-Athlete Statement – NCAA Division I**

| | |
|---|---|
| **For:** | Student-athletes. |
| **Action:** | Sign and return to your director of athletics. |
| **Due date:** | Before your first competition each year. |
| **Required by:** | NCAA Constitution 3.2.4.6 and NCAA Bylaw 12.7.2. |
| **Purpose:** | To assist in certifying eligibility. |
| **Effective Date:** | This NCAA Division I Student-Athlete Statement shall be in effect from the date this document is signed and shall remain in effect until a subsequent Division I Student-Athlete Statement form is executed. |

Student-athlete: _Brian Bowen II_
_____ - (Please print name)

This form has six parts:

I.   A statement concerning eligibility;

II.  A Buckley Amendment consent;

III. An affirmation of status as an amateur athlete;

IV.  Results of drug tests;

V.   Previous involvement in NCAA rules violation(s); and

VI.  An affirmation of valid and accurate information provided to the NCAA Eligibility Center and admissions office, including ACT or SAT scores, high school attendance, completion of coursework and high school grades.

If you are an incoming freshman, you must complete and sign Parts I, II, III, IV and VI to participate in intercollegiate competition. If you are an incoming transfer student or a continuing student, you must complete and sign Parts I, II, III, IV and V to participate in intercollegiate competition.

Before you sign this form, you should read the Summary of NCAA Regulations, or another outline or summary of NCAA legislation, provided by your director of athletics or his or her designee or read the bylaws of the NCAA Division I Manual that deal with your eligibility. You are responsible for knowing and understanding the application of all NCAA Division I bylaws related to your eligibility. If you have any questions, you should discuss them with your director of athletics or your institution's compliance officer, or you may contact the NCAA at 317-917-6222.

National Collegiate Athletic Association
*Supporting student-athlete success on the field, in the classroom and for life*
Equal Opportunity/Affirmative Action Employer

CONFIDENTIAL

UOL000932

Student-Athlete Statement – Division I
Form 16-3a
Page No. 2

The conditions that you must meet to be eligible and the requirement that you sign this form are indicated in the following bylaws of the Division I Manual:

* NCAA Bylaws 10, 12, 13, 14, 15, 16, 18.4 and 31.2.3.

**Part I:  Statement Concerning Eligibility.**

By signing this part of the form, you affirm the following:

Your institution has provided you a copy of the Summary of NCAA Regulations, or another outline or summary of NCAA legislation, or the relevant sections of the Division I Manual and that your director of athletics (or his or her designee) gave you the opportunity to ask questions about them.

You have knowledge of and understand the application of NCAA Division I bylaws related to eligibility, recruitment, financial aid, amateur status and involvement in gambling activities.

You are aware of the NCAA drug-testing program and that you have signed or will sign the current NCAA Drug-Testing Consent Form.

All information provided to the NCAA, the NCAA Eligibility Center and the institution's admissions office is accurate and valid, including ACT or SAT scores, high school attendance, completion of coursework and high school grades, as well as your amateur status.

You have reported to the director of athletics or his or her designee of your institution any violations of NCAA regulations involving you and your institution.

You affirm that you understand that if you sign this statement falsely or erroneously, you violate NCAA legislation on ethical conduct and you will further jeopardize your eligibility.

_Brian Bowen II_
Name (please print)

_Be B~ II_
Signature of student-athlete

_6 - 9 - 17_
Date

_Basketball_
Sport(s)

_[redacted]_        _18_
Date of birth        Age

_[redacted]_
Home address (street or P.O. Box)

_[redacted]_
Home city, state, and zip code

CONFIDENTIAL                                    UOL000933

- 295 -

Student-Athlete Statement – Division I
Form 16-3a
Page No. 3

## Part II: Buckley Amendment Consent.

By signing this part of the form, you certify that you agree to disclose your education records.

You understand that this entire form and the results of any NCAA drug test you may take are part of your education records. These records are protected by the Family Educational Rights and Privacy Act of 1974 and they may not be disclosed without your consent.

You give your consent to disclose only to authorized representatives of this institution, its athletics conference (if any) and the NCAA, except as permitted in the Drug-Testing Consent form, the following documents:

1.   This form;

2.   Results of NCAA drug tests and related information and correspondence;

3.   Results of positive drug tests administered by a non-NCAA national or international sports governing body;

4.   Any transcript from your high school, this institution or any junior college or any other four-year institution you have attended;

5.   Precollege test scores, appropriately related information and correspondence (e.g., testing sites, dates and letters of test-score certification or appeal) and, where applicable, information relating to eligibility for or conduct of nonstandard testing;

6.   Graduation status;

7.   Your social security number and/or student identification number;

8.   Race and gender identification;

9.   Diagnosis of any education-impacting disabilities;

10.  Accommodations provided or approved and other information related to any education-impacting disabilities in all secondary and postsecondary schools;

11.  Records concerning your financial aid; and

12.  Any other papers or information pertaining to your NCAA eligibility.

You agree to disclose these records only to determine your eligibility for intercollegiate athletics, your eligibility for athletically related financial aid, for evaluation of school and team academic

CONFIDENTIAL

UOL000934

Student-Athlete Statement – Division I
Form 16-3a
Page No. 4

success, for awards and recognition programs highlighting student-athlete academic success (e.g., Elite 90), for purposes of inclusion in summary institutional information reported to the NCAA (and which may be publicly released by it), for NCAA longitudinal research studies and for activities related to NCAA compliance reviews and institutional performance program.  You will not be identified by name by the NCAA in any such published or distributed information.  This consent shall remain in effect as long as any issues regarding the purposes listed above exist.

You also agree that information regarding any infractions matter in which you may be involved may be published or distributed to third parties as required by NCAA policies, bylaws or procedures.

_Brian Bowen II_
Name (please print)

_B— B— II_                                        _6-9-17_
Signature of student-athlete                       Date

_____                         _6-9-17_
Signature of  parent or legal guardian (if student-athlete is a minor)      Date

**Part III:  Affirmation of Status as an Amateur Athlete.**

You affirm that you have read and understand the NCAA amateurism rules.

By signing this part of the form, you affirm that, to the best of your knowledge, you have not violated any amateurism rules since you requested a final certification from the NCAA Eligibility Center or since the last time you signed a Division I student-athlete statement, whichever occurred later.

You affirm that since requesting a final certification from the NCAA Eligibility Center, you have not provided false or misleading information concerning your amateur status to the NCAA, the NCAA Eligibility Center or the institution's athletics department, including administrative personnel and the coaching staff.

_Brian Bowen II_                                  _6-9-17_
Name (please print)                                Date

_B— B— II_
Signature of student-athlete

| | |
|---|---|
| **From:** | Merl Code <merlcode@gmail.com> |
| **Sent:** | Mon, 5 Jun 2017 14:59:56 -0700 (PDT) |
| **To:** | Jim Gatto <jim.gatto@adidas.com> |
| **Subject:** | Karolina Khaos Invoice |
| **Attachments:** | Karolina Khaos Adidas Invoice 2017.xls |

Jim,

Please see the invoice.

Let me know if the organization needs to provide any additional info.

Thanks

Sent from my BlackBerry 10 smartphone.

GOVERNMENT
EXHIBIT
1065
S2 17 Cr. 686 (LAK)

# Karolina Khaos

**INVOICE**

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605

**DATE:**          June 8, 2017
**INVOICE #**                    1
**FOR:**

**Bill To:**
Jim Gatto
Adidas Basketball
5055 North Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| Travel Team Expenses | $25,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| **TOTAL** | $25,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

- 299 -

| From: | Gatto, Jim |
|---|---|
| Sent: | Mon, 26 Jun 2017 17:05:17 -0700 (PDT) |
| To: | Ames, Trevor[trevor.ames@adidas-group.com] |
| Subject: | RE: Invoice to process |

Rick Robertson (robertson570742@bellsouth.net)

**From:** Ames, Trevor
**Sent:** Monday, June 26, 2017 4:08 PM
**To:** Gatto, Jim
**Subject:** RE: Invoice to process

Will give it a shot. Do you have an email contact?

**Trevor Ames**
**Financial Analyst – Sports Marketing**

**From:** Gatto, Jim
**Sent:** Monday, June 26, 2017 3:06 PM
**To:** Ames, Trevor
**Subject:** RE: Invoice to process

They sent these as well.  Does this work?

**From:** Ames, Trevor
**Sent:** Monday, June 26, 2017 2:56 PM
**To:** Gatto, Jim
**Subject:** RE: Invoice to process

Can be by end of week. However, I know this is a pain but the vendor team will not take that void check because it does not have the account name on there. Would they happen to have something like that?

Thanks,

trevor

**Trevor Ames**
**Financial Analyst – Sports Marketing**

**From:** Gatto, Jim
**Sent:** Monday, June 26, 2017 2:44 PM
**To:** Ames, Trevor
**Subject:** RE: Invoice to process

How long will it take to get set up and sent out?

**From:** Ames, Trevor
**Sent:** Monday, June 26, 2017 2:28 PM
**To:** Gatto, Jim
**Subject:** RE: Invoice to process

Hey Gatto,

GOVERNMENT
EXHIBIT
1093
S2 17 Cr. 686 (LAK)

Sorry still do not see anything checked the tax number too. What you sent me is good to set up just need a void check or a signed letter from the bank.

Thanks,

trevor

**Trevor Ames**
**Financial Analyst – Sports Marketing**

**From:** Gatto, Jim
**Sent:** Monday, June 26, 2017 10:48 AM
**To:** Ames, Trevor
**Subject:** RE: Invoice to process

Here you go, maybe under Robertson?

**From:** Ames, Trevor
**Sent:** Thursday, June 22, 2017 11:46 AM
**To:** Gatto, Jim
**Subject:** RE: Invoice to process

Hey Gatto,

I cannot find these guys in the System. We will need to set them up as a vendor. Do you need the forms?

Thanks,

Trevor

**Trevor Ames**
**Financial Analyst – Sports Marketing**

**From:** Gatto, Jim
**Sent:** Tuesday, June 13, 2017 11:11 AM
**To:** Ames, Trevor
**Subject:** Invoice to process

Trevor,

They should be in the system but I am paying for this on one of my codes not from his grassroots code.

601000 6038 62782555

Let me know if you have any questions

Thanks - Jim

*Jim Gatto*
*Director of Global Sports Marketing*
*adidas Basketball*
**971-234-4979**
**jim.gatto@adidas.com**



On Thursday, July 6, 2017, 6:28 PM, Merl Code <merl@3stripebasketball.com> wrote:

FYI

Sent from my BlackBerry 10 smartphone.

---

**From:** Merl Code <merl@3stripebasketball.com>
**Sent:** Thursday, July 6, 2017 6:27 PM
**To:** Guidera, Olivia [External]
**Subject:** Re:

I've added the missing information requested. Thanks for all of your help!

Sent from my BlackBerry 10 smartphone.

---

**From:** Guidera, Olivia [External]
**Sent:** Thursday, July 6, 2017 6:21 PM
**To:** Merl Code
**Cc:** Rick Robertson
**Subject:** Re:

Hey Merl,

Thank you for sending this! I will get it submitted now.

Attached is the updated invoice with a few changes I made. I changed the ' Bill To ' address, and there are some items in red that need to be added.

Once the PO number comes through lets chat again on next steps

Thank you!

**Olivia Guidera**
Grassroots Basketball
5055 N. Greeley Ave. | Portland, OR

GOVERNMENT
EXHIBIT
603
S2 17 Cr. 686 (LAK)

SDNY_00033428

1

T: 2014461132

**From:** Merl Code <merl@3stripebasketball.com>
**Date:** Thursday, July 6, 2017 at 10:38 AM
**To:** Olivia Guidera <Olivia.Guidera@externals.adidas.com>
**Cc:** Rick Robertson <robertson570742@bellsouth.net>
**Subject:** <no subject>

Olivia,

Ricky wanted me to pass along the invoice with the Vendor/Customer number included. Please let me know what other changes or additions need to be made. He's currently at work and has limited access to a computer

Sent from my BlackBerry 10 smartphone.
This e-mail or any attachments may contain confidential or privileged information. Unless you are the intended recipient, you may not disclose, copy or use any information herein. If you have received this e-mail in error, please notify the sender immediately by reply and delete the e-mail from your system.

2

SDNY_00033429

# Karolina Khaos

**INVOICE**

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605
Phone Number: (864) 363.2660
Email Address: robertson570742@bellsouth.net

| | |
|---|---|
| **DATE:** | June 18, 2017 |
| **INVOICE #** | 1 |
| **PO Number:** | |

Vendor# 6038040871

**Bill To:**
adidas America
Attn: Accounts Payable
685 Cedar Crest Road
Spartanburg, SC 29301

| DESCRIPTION | AMOUNT |
|---|---|
| July Travel Team Expenses | $30,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| **TOTAL** | $30,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

SDNY_00033430

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK



-----------------------------x
                             :
UNITED STATES OF AMERICA     :
                             :
v.                           :      S2 17 Cr. 686 (LAK)
                             :
James Gatto,                 :
Merl Code, and               :
Christian Dawkins,           :
                             :
          Defendants.        :
                             :
-----------------------------X
```

```
                       Recorded Conversation
                          989-493-4317



                    Date: July 10, 2017
                    Time: 12:43:19 PM
                    Session Number: 17
                    Participants: Munish Sood
                                  Merl Code
                                  Jeff



                    (U/I) - UNINTELLIGIBLE
                    (PH)  - PHONETIC SPELLING
```

GOVERNMENT
EXHIBIT
57T
S2 17 Cr. 686 (LAK)

**- 305 -**

SOOD:           Hey, Jeff, it's Munish.

JEFF:           Hey, Munish, what's going on?

SOOD:           Hey, I got uh Merl on the phone, okay.

CODE:           Merl.

JEFF:           Merl, right?

CODE:           No, no.  Hold on.

SOOD:           Hello. Hey guys.

CODE:           Hello.

SOOD:           Hey guys.

JEFF:           Hello.

SOOD:           Hey, Jeff.  Hey, Jeff, Merl.  You guys are
                all on.

JEFF:           Oh, good.  Nice job.  What's going on?

CODE:           Thank you.  Thank you.

SOOD:           So hey, sorry for my voice again.  And it is
                not because I was partying too much (U/I).

CODE:           I don't believe that, but okay.

JEFF:           Yeah, me neither.

SOOD:           All right, all right, whatever.  Um, this
                shouldn't take too long but, Merl, as you
                know, um, Christian is helping the Bowen
                family out.

CODE:           Yes.

SOOD:           And my --

CODE:           Well, yeah.  I'm helping the Bowen family

out, but yeah.  Go ahead.

SOOD:          Well, let me start, let me start again.  I
               hear you.  Merl is helping the Bowen family
               out.  Yeah, but I guess the father was
               expecting money today.

CODE:          So, yeah.  So let me, let me kind of give
               you guys the back story so you'll kind of
               know what's going on.  So certainly, man,
               you guys are being introduced to, you know,
               shoe wars and how stuff happens with kids
               and getting into particular schools and so
               this is kind of one of those instances where
               we needed to step up and help one of our
               flagship schools in Louisville, you know,
               secure a five-star caliber kid.  So
               obviously that helps, you know, our
               potential business in terms of, in terms of
               Adidas.

JEFF:          In terms of an Adidas school, yeah.

CODE:          Right.  And then as an Adidas school.

JEFF:          An Adidas school.

CODE:          Yes.  Jeff?

JEFF:          Go ahead, sorry, I was just tuning out for a
               second.  Sorry.

CODE:          Okay.  So, so, yeah.  So, you know, we had

to do some things to help in -- from that
vantage point.  So long story short, it's
got to go through some, some processes, um,
and steps and what have you to -- and it
takes a while.  So we're talking another two
or three weeks before it really runs through
the corporate structure and dad was – dad's
expectations were, you know, Christian was
going to be able to able him to do some
things, you know, a month ago. Um. And so
that obviously hasn't happened so Christian
called me and said, hey, I'm going to lean
on Jeff and Munish, um, to get it done.
Would you mind, you know, just making sure
that they were, um, aware of the situation
and with the understanding that, that they
would be reimbursed.  And I said "no, I have
no problem with that."  So that's kind of
what, what it is and what happened and how
it happened.  So yes, it's in process.
We've already done our part on our end.
We're waiting for um purchase orders and
numbers and that kind of stuff to come back
and go through the accounts payable system
and so it is in process.  Um, but again,

|         |                                                    |
|---------|----------------------------------------------------|
|         | will take probably another two or three            |
|         | weeks.                                             |
| JEFF:   | So, Merl, just so, just so -- because this         |
|         | is obviously all new to me and --                  |
| CODE:   | Sure.                                             |
| JEFF:   | -- the expert -- and you're the expert here.       |
|         | Um. So this is something that Adidas does          |
|         | with obviously top, top, top kids going to         |
|         | Adidas schools where they, they, they will,       |
|         | they're able to give them some type of            |
|         | compensation like people using (U/I).              |
| CODE:   | So no -- no.  I mean when I say no, again,          |
|         | it's not a situation where, you know, we           |
|         | partake in, so we're actually taking care of       |
|         | the relationship with Christian, right.  So        |
|         | that whatever, whatever he will decide to do       |
|         | or how he will decide to do it, so it's           |
|         | really him helping us, third party, but            |
|         | we're not, we're not engaging in any              |
|         | monetary relationship with uh, a, um,             |
|         | amateur athlete.  We're engaging in a             |
|         | monetary relationship with a business             |
|         | manager and whatever he decides to do with        |
|         | it, that's between him and the family.            |
| JEFF:   | Got you.                                          |

**- 309 -**

CODE:        Um. You know, so no, we don't -- we can't.
             You know what I mean, we can't --

JEFF:        Right.

CODE:        --get involved directly in those kind of
             situation scenarios but certainly when it
             helps one of our flagship schools, you know,
             we're more apt to try to help that business
             manager or that particular agent or -- you
             know, because that's, you know, helps them
             and it helps us.

JEFF:        And then --

CODE:        But we don't, you know, we don't directly do
             it.

JEFF:        Right, right.  Explain it better than I
             guess then from what Munish was telling me
             yesterday, I guess this kid or the dad was
             promised 100,000 over the year, 25,000 a
             quarter, does that sound right?

CODE:        Yes.

JEFF:        And then -- now, has he, has he received a
             payment yet or this is the first one and he
             was just expecting it sooner?

CODE:        I think, I think Christian had said, uh -- I
             think at the time Christian was there, he
             would have received his first installment

```
                       sooner.

JEFF:                  Okay.  So he hasn't yet.  So this will be

                       his first, first payment.

CODE:                  Yes, yes.

JEFF:                  So, um, so if, if, uh I'm able to help, you

                       know, obviously Christian and you guys with

                       this payment -- how does it work going

                       forward?  Like will I have help like --

CODE:                  Well, no.  It will be a -- it should be a

                       one-time only um situation.  You shouldn't

                       be involved in this afterward, because the

                       process should have been established and

                       going forward, you shouldn't have any

                       involvement.

JEFF:                  And then --

CODE:                  So it should just be a one-time deal.

JEFF:                  One.  Okay.  And then Adidas will pick up

                       the remaining three payments once everything

                       gets sorted out, I guess.

CODE:                  We'll, we'll, we'll make sure Christian has

                       whatever he needs.

JEFF:                  Right, right, right.  Yeah, yeah, yeah.  I

                       got you.

CODE:                  Yes, yes.

JEFF:                  Okay.  All right.  That sounds good.  So
```

- 311 -

|       |                                                          |
|-------|----------------------------------------------------------|
|       | then how does the money um exchange hands?               |
|       | Like is it the cash?  Is it wire?                        |
| CODE: | From who to who?  From -- I'm not sure what               |
|       | Christian does with his relationship with                |
|       | the family.  I'm not --                                  |
| JEFF: | So I guess, so I guess if I laid it out, how              |
|       | am I going to get that?                                  |
| CODE: | I would suggest, I would suggest for, for                |
|       | cleanliness and lack of, lack of questions,              |
|       | I would always assume cash is better, right?             |
| JEFF: | Yeah, I would -- yeah.                                    |
| CODE: | For reimbursement, certainly that can happen             |
|       | a number of ways.  If you don't care, then               |
|       | certainly it could be via check.  If you do              |
|       | care, it could be by other means.                        |
| JEFF: | Okay.  Okay.                                             |
| SOOD: | Merl, so, um Merl, when you help Christian               |
|       | or anyone like him, is it typically a check              |
|       | or a wire you would send to these guys and               |
|       | then that's their problem?                               |
| CODE: | Well, yeah.  Typically it will be a --                   |
|       | because I need to be able to use it --                   |
| SOOD: | Right.                                                   |
| CODE: | -- because he's basically getting paid as a              |
|       | consulting fee so he can incur whatever                  |

| | |
|---|---|
| | taxes or whatever, you know, because I don't want to, I don't want to get into that fight. |
| SOODE: | Yeah, right. |
| CODE: | So, so for us, he'll be -- cut a check that will, that will say consulting fees, and that will be done and then -- however he decides to disseminate those funds afterwards is on him. |
| SOOD: | Right, but could you pay the management company because as you know, we have this company called Loyd Management. |
| CODE: | Yeah, I mean, we can, we can cut the check to whoever needs the check to be cut to. |
| JEFF: | Okay. Perfect. So then can -- |
| CODE: | But it won't be -- so it won't come directly from, um, because we can't have a, again, a direct relationship with a management company. |
| SOOD: | All right. |
| CODE: | So, so what will happen was it'll go to a -- it's in process to go to a 501(c)(3). |
| JEFF: | Okay. |
| CODE: | Right. And then that 501(c)(3) will then cut the check wherever you guys need it to |

|          |                                                      |
|----------|------------------------------------------------------|
|          | be cut.                                              |
| SOOD:    | Okay, got it.                                        |
| JEFF:    | Okay.  All right.  And then, and then, um -- and I'm assuming the fact that Christian's involved, I guess so this this money, whatever Christian is doing with the family, um, how you guys are helping him, uh, I guess the the kid's father, he's already been -- like he's already on the same page that like - |
| CODE:    | Yes.                                                 |
| JEFF:    | -- ultimately like we think this kid is coming to Christian and coming to you guys. |
| CODE:    | Yes, there you go.                                   |
| JEFF:    | Okay.                                                |
| CODE:    | There you go, yes.                                   |
| JEFF:    | All right.                                           |
| CODE:    | That is, that is the rationale behind any of this taking place, so, yes. |
| JEFF:    | Fantastic.  So how do I --                           |
| CODE:    | These are the kinds of situations that we, you know, we have our hands on. |
| JEFF:    | And we, we talked about it when we met in New York, yeah. |
| CODE:    | Right.                                               |

JEFF:            This is like exactly what we were talking
                 about about getting in at the, at the right
                 time with all of --

CODE:            Sure.

JEFF:            -- you know, with your wealth of connections
                 and knowledge.  So how, how would we, how
                 would -- so if I have to lay it out, it's
                 got to go to -- it has to go to you first or
                 it just needs to go to Christian?

CODE:            No, it goes to Christian.  I don't need to
                 touch it.

JEFF:            You don't need to touch it.

CODE:            No.

JEFF:            It just goes to Christian.

CODE:            Yeah, it goes to him --

SOOD:            Yeah.

CODE:            -- because he's going, he's going to be the
                 one dealing with dad and family, not me.

JEFF:            Okay.

CODE:            So I won't deal with dad and family until I,
                 you know, see them during the season and
                 that kind of deal.  So I'm -- I need --
                 there needs to be some separation, um, from
                 me and that, and then Christian's already
                 got an established relationship with, you

|           | know, with the kid and his dad.                              |
|-----------|--------------------------------------------------------------|
| JEFF:     | Okay.  All right.  So we'll we'll try to -                   |
| CODE:     | Okay.                                                        |
| JEFF:     | Yeah, so let me um -- cause obviously we want to try to get an answer today.  I just need like a couple hours, maybe I'll try to have an answer to you like before you get on the plane, and then, uh we'll just figure out the logistics of the money. |
| SOOD:     | All right. That's perfect.                                   |
| CODE:     | So give me -- today is the 10th.  So, um by my guestimation, by the 25th, this should be done.  It should be finished around then. |
| JEFF:     | The twenty - you (U/I) you just said.  My phone lost connection. |
| CODE:     | I said by the -- yeah, by the 25th of this month, you know.  |
| JEFF:     | This month.                                                  |
| CODE:     | I said probably within a couple weeks before, before this whole thing in process is taking, taking, uh taking shape.  So I'm saying it should take shape in the next two weeks, so by the 25th of this month, it should have been – |
| JEFF:  Returned in full. |

```
CODE:         -- in hand, absolutely.

JEFF:         Okay.  And then obviously, if it's -- you'll

              just keep us posted.

CODE:         I'll keep you posted of something if there's

              any delays or hiccups or what have you.

JEFF:         Delay.

CODE:         But there shouldn't be.  I mean I'm

              expecting a purchase order sometime between

              today and Wednesday.

JEFF:         Okay.
```

14



(End of recording)

**7/8/2017 1:38:42 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Can we get bowen taken care of Monday & we get it back n two weeks? Book isnt until 21.

Status: Sent
Delivered: 7/8/2017 1:38:43 AM(UTC+0)

**7/8/2017 1:38:47 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
21st"

Status: Sent
Delivered: 7/8/2017 1:38:47 AM(UTC+0)

**7/8/2017 1:39:18 AM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
I told Jeff we call him tomorrow together

Status: Read
Read: 7/8/2017 1:39:19 AM(UTC+0)

**7/8/2017 1:39:23 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
With FVV bring contracts & I'll handle geting him signed. He won't sign on the spot but I'll get it done .  Bring Alicia as well.

Status: Sent
Delivered: 7/8/2017 1:39:23 AM(UTC+0)

**7/8/2017 1:39:47 AM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Yes - done

Status: Read
Read: 7/8/2017 1:39:55 AM(UTC+0)

**7/8/2017 1:40:07 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
8p reservation at mastros tomo

Status: Sent
Delivered: 7/8/2017 1:40:07 AM(UTC+0)

**7/8/2017 1:40:20 AM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Let's meet earlier so we can call Jeff

Status: Read
Read: 7/8/2017 1:40:20 AM(UTC+0)

**7/8/2017 1:40:37 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
He may bring brother & girlfriend.

Status: Sent
Delivered: 7/8/2017 1:40:37 AM(UTC+0)

**7/8/2017 1:40:45 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Where r u staying? When do u get n?

Status: Sent
Delivered: 7/8/2017 1:40:46 AM(UTC+0)

- 321 -

**GOVERNMENT**
**EXHIBIT**
**102N-3**
S2 17 Cr. 686 (LAK)

**7/8/2017 1:40:58 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Hard rock at 1

Status: Read
Read: 7/8/2017 1:45:42 AM(UTC+0)

**7/8/2017 1:41:16 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
We probably won't eat since we having dinner at 10

Status: Read
Read: 7/8/2017 1:45:42 AM(UTC+0)

**7/8/2017 1:45:48 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Lol. Fred will eat!

Status: Sent
Delivered: 7/8/2017 1:45:48 AM(UTC+0)

**7/8/2017 1:45:52 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
I'm eating!

Status: Sent
Delivered: 7/8/2017 1:45:52 AM(UTC+0)

**7/8/2017 1:46:02 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Jeff is pay

Status: Read
Read: 7/8/2017 1:46:08 AM(UTC+0)

**7/8/2017 1:46:06 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Paying

Status: Read
Read: 7/8/2017 1:46:08 AM(UTC+0)

**7/8/2017 1:46:10 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Lol!!

Status: Sent
Delivered: 7/8/2017 1:46:10 AM(UTC+0)

**7/8/2017 1:46:16 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Have him prepay

Status: Sent
Delivered: 7/8/2017 1:46:16 AM(UTC+0)

**7/8/2017 2:35:07 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Bryce Johnson having a great GT

Status: Read
Read: 7/8/2017 2:35:14 AM(UTC+0)

**7/8/2017 2:35:12 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Game

Status: Read
Read: 7/8/2017 2:35:14 AM(UTC+0)

**7/8/2017 2:35:15 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Yes

Status: Sent
Delivered: 7/8/2017 2:35:16 AM(UTC+0)

**7/8/2017 7:39:10 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
In Vegas

Status: Read
Read: 7/8/2017 11:18:13 PM(UTC+0)

**7/8/2017 11:19:06 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Let's do a call with Jeff if need be before dinner. I got situations secured. I need Bowen's dad good until adidas money comes in next week.

Status: Sent
Delivered: 7/8/2017 11:19:07 PM(UTC+0)

**7/8/2017 11:25:48 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Ok

Status: Read
Read: 7/9/2017 12:57:27 AM(UTC+0)

**7/9/2017 2:43:03 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Bring paperwork?

Status: Read
Read: 7/9/2017 3:00:44 AM(UTC+0)

**7/9/2017 2:43:33 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
On call. I'll b there at 8:15. Yes tell him u want him to look over

Status: Sent
Delivered: 7/9/2017 2:43:33 AM(UTC+0)

**7/9/2017 2:56:12 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
We are 10 mins behind

Status: Read
Read: 7/9/2017 3:00:44 AM(UTC+0)

**7/9/2017 3:00:47 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Me too

Status: Sent
Delivered: 7/9/2017 3:00:47 AM(UTC+0)

| | |
|---|---|
| **7/9/2017 1:49:19 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| What's your plan for today? | |
| Status: Read | |
| Read: 7/9/2017 4:13:29 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 3:50:35 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Connect me with Fred pls via text | |
| Status: Read | |
| Read: 7/9/2017 4:13:29 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:13:40 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| I have like 6 meetings. U? | |
| Status: Sent | |
| Delivered: 7/9/2017 4:17:10 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:17:23 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| I have pool party | |
| Status: Read | |
| Read: 7/9/2017 4:18:52 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:18:39 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Dinner with Malik - you coming? | |
| Status: Read | |
| Read: 7/9/2017 4:18:52 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:18:57 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| Yes. Wat time | |
| Status: Sent | |
| Delivered: 7/9/2017 4:18:57 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:19:12 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Should we try and coordinate with Raymond ? Think it's worth meeting together | |
| Status: Read | |
| Read: 7/9/2017 4:21:52 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:19:17 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| 8 | |
| Status: Read | |
| Read: 7/9/2017 4:21:52 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:20:17 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Do we need to call Jeff- 3 way conf | |
| Status: Read | |
| Read: 7/9/2017 4:21:52 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:22:06 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| Yes. I need money out tomo. I'll get him back. | |
| Status: Sent | |
| Delivered: 7/9/2017 4:22:07 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:22:35 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Call me in 15 | |
| Status: Read | |
| Read: 7/9/2017 4:22:41 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:22:46 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| And I'll call him | |
| Status: Read | |
| Read: 7/9/2017 4:22:48 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:22:50 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| Will hit u after mtg | |
| Status: Sent | |
| Delivered: 7/9/2017 4:22:51 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 4:23:26 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Ok | |
| Status: Read | |
| Read: 7/9/2017 8:48:12 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 8:48:16 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| Anything? | |
| Status: Sent | |
| Delivered: 7/9/2017 8:48:16 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 8:57:08 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| For? | |
| Status: Read | |
| Read: 7/9/2017 9:04:34 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 9:04:38 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| Tomo? | |
| Status: Sent | |
| Delivered: 7/9/2017 9:04:39 PM(UTC+0) | |

| | |
|---|---|
| **7/9/2017 9:09:35 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| I'll call Jeff | |
| Status: Read | |
| Read: 7/9/2017 9:11:31 PM(UTC+0) | |

**7/9/2017 10:56:31 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
I need that tomo! Need 30 or he can send directly to their acct. I have to get this done. U can confirm with merl too that adidas is sending 25.

Status: Sent
Delivered: 7/9/2017 10:56:40 PM(UTC+0)

**7/9/2017 10:57:11 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Working on it

Status: Read
Read: 7/10/2017 12:59:49 AM(UTC+0)

**7/10/2017 12:40:45 AM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Call me

Status: Read
Read: 7/10/2017 12:59:49 AM(UTC+0)

**7/10/2017 1:00:07 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Time n place for malik tomo

Status: Sent
Delivered: 7/10/2017 1:00:07 AM(UTC+0)

**7/10/2017 1:00:10 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Tonight

Status: Sent
Delivered: 7/10/2017 1:00:10 AM(UTC+0)

**7/10/2017 1:00:45 AM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
7;30 at Zuma in Cosmopolitan

Status: Read
Read: 7/10/2017 1:01:39 AM(UTC+0)

**7/10/2017 1:01:45 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Ok.

Status: Sent
Delivered: 7/10/2017 1:01:45 AM(UTC+0)

**7/10/2017 4:32:17 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Update? Phones r ringing

Status: Sent
Delivered: 7/10/2017 4:32:18 PM(UTC+0)

**7/10/2017 4:33:16 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Waiting

Status: Read
Read: 7/10/2017 5:58:13 PM(UTC+0)

**7/10/2017 4:55:36 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Good call merl and Jeff

Status: Read
Read: 7/10/2017 5:58:13 PM(UTC+0)

**7/10/2017 4:55:39 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Stay tuned

Status: Read
Read: 7/10/2017 5:58:13 PM(UTC+0)

**7/10/2017 7:14:09 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Taking off in15 mins,Jeff trying to arrange 25k

Status: Read
Read: 7/10/2017 9:38:04 PM(UTC+0)

**7/10/2017 7:14:28 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Txt him directly

Status: Read
Read: 7/10/2017 9:38:04 PM(UTC+0)

**7/10/2017 7:47:11 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
In mtg.

Status: Sent
Delivered: 7/10/2017 7:47:18 PM(UTC+0)

**7/10/2017 7:47:21 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Urgent call me

Status: Read
Read: 7/10/2017 9:38:04 PM(UTC+0)

**7/10/2017 7:50:08 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)**
Taking off in 15

Status: Read
Read: 7/10/2017 9:38:04 PM(UTC+0)

**7/10/2017 9:38:14 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
My bad. Was trying to close troy brown.

Status: Sent
Delivered: 7/10/2017 10:22:01 PM(UTC+0)

**7/10/2017 9:38:20 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
U obviously in air.

Status: Sent
Delivered: 7/10/2017 10:22:01 PM(UTC+0)

45

**7/10/2017 10:23:17 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Jeff bringing 25k tomorrow to deposit

Status: Read
Read: 7/11/2017 2:28:47 AM(UTC+0)

**7/10/2017 10:23:26 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
I finally got wifi

Status: Read
Read: 7/11/2017 2:28:47 AM(UTC+0)

**7/11/2017 2:58:45 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Call me

Status: Read
Read: 7/11/2017 3:12:11 PM(UTC+0)

**7/11/2017 5:10:09 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
Ready

Status: Read
Read: 7/11/2017 5:12:33 PM(UTC+0)

**7/11/2017 5:10:12 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
??

Status: Read
Read: 7/11/2017 5:12:33 PM(UTC+0)

**7/11/2017 5:12:40 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Give me ten mins

Status: Sent
Delivered: 7/11/2017 5:12:44 PM(UTC+0)

**7/12/2017 3:31:40 AM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
We confirmed for 5 at the Grand Hyatt tomorrow

109 East 42nd Street, Park Avenue at Grand Central Terminal, Midtown East, New York City, NY

Status: Read
Read: 7/12/2017 3:32:35 AM(UTC+0)

**7/12/2017 3:32:48 AM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Ok cool. Give him 19400. Put the rest n my acct.

Status: Sent
Delivered: 7/12/2017 3:32:49 AM(UTC+0)

**7/12/2017 3:20:50 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
We confirmed

Status: Read
Read: 7/12/2017 3:54:25 PM(UTC+0)

**7/12/2017 3:20:53 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
For 5

Status: Read
Read: 7/12/2017 3:54:25 PM(UTC+0)

**7/12/2017 3:54:13 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
We will deposit 3k

Status: Read
Read: 7/12/2017 3:54:25 PM(UTC+0)

**7/12/2017 3:54:53 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Ok. Yes confirmed.

Status: Sent
Delivered: 7/12/2017 3:54:54 PM(UTC+0)

**7/12/2017 3:55:38 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
19400 to dad, 2600 to cover flights and 3k into acct

Status: Read
Read: 7/12/2017 3:56:38 PM(UTC+0)

**7/12/2017 3:55:48 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
What's his dad look like

Status: Read
Read: 7/12/2017 3:56:38 PM(UTC+0)

**7/12/2017 3:56:53 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
Big black dude. Lol. He will find u. I told him ur the Indian guy.

Status: Sent
Delivered: 7/12/2017 3:56:55 PM(UTC+0)

**7/12/2017 3:57:00 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)**
I'm going to give u each other's number

Status: Sent
Delivered: 7/12/2017 3:57:00 PM(UTC+0)

**7/12/2017 3:57:12 PM(UTC+0)Direction:Incoming, +16099337246 (Munish  Sood)**
That helps

Status: Read
Read: 7/12/2017 5:27:04 PM(UTC+0)

46

| | |
|---|---|
| **7/12/2017 4:28:44 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| You have any Tennis contacts? | |
| Status: Read | |
| Read: 7/12/2017 5:27:04 PM(UTC+0) | |
| **7/12/2017 4:28:52 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Need tickets for client | |
| Status: Read | |
| Read: 7/12/2017 5:27:04 PM(UTC+0) | |
| **7/12/2017 5:27:07 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| Lol no | |
| Status: Sent | |
| Delivered: 7/12/2017 5:27:08 PM(UTC+0) | |
| **7/12/2017 5:27:11 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| I'm black | |
| Status: Sent | |
| Delivered: 7/12/2017 5:27:11 PM(UTC+0) | |
| **7/12/2017 5:29:26 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| True | |
| Status: Read | |
| Read: 7/12/2017 6:30:22 PM(UTC+0) | |
| **7/12/2017 6:35:35 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| He's delayed. In chicago | |
| Status: Sent | |
| Delivered: 7/12/2017 6:35:36 PM(UTC+0) | |
| **7/12/2017 6:41:46 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| Wtf | |
| Status: Read | |
| Read: 7/12/2017 6:47:21 PM(UTC+0) | |
| **7/12/2017 6:41:54 PM(UTC+0)Direction:Incoming, +16099337246 (Munish Sood)** | |
| How much? | |
| Status: Read | |
| Read: 7/12/2017 6:47:21 PM(UTC+0) | |
| **7/12/2017 6:47:26 PM(UTC+0)Direction:Outgoing, +19894934317 (CV)** | |
| Finding out. Now | |
| Status: Sent | |
| Delivered: 7/12/2017 6:47:26 PM(UTC+0) | |

47

**- 326 -**

**Messages with Chris, Munish (+16099337246, +19894934317)**



**C** Received from **Chris** on Jul 12, 2017 3:12:24 PM
Brian I included Munish on this txt. Munish I included Brian. U two connect directly - tomo is all set

Sent on Jul 12, 2017 3:13:08 PM
Ok got it **D**

**M** Received from **Munish** on Jul 12, 2017 3:45:37 PM
See you tomorrow Brian at 11:15- terminal C

**M** Received from **Munish** on Jul 12, 2017 3:45:50 PM
We can touch base on am

Sent on Jul 12, 2017 11:42:02 PM
Finally made it in see you in the am **D**

**M** Received from **Munish** on Jul 13, 2017 7:05:03 AM
Wow - long day
Let's plan on meeting 11:15-11:30- can we please meet at Terminal C arrivals outside I will double park. We can meet
outside the door closest to Starbucks

Sent on Jul 13, 2017 7:55:45 AM
Yes it was but yes see you at terminal c **D**

Sent on Jul 13, 2017 11:15:32 AM
Grabbing my rental and heading over they're slow **D**

**M** Received from **Munish** on Jul 13, 2017 11:30:24 AM
200 Park Ave, Florham Park NJ

Sent on Jul 13, 2017 11:33:07 AM
Ok got it leaving in 5 minutes **D**

**M** Received from **Munish** on Jul 13, 2017 12:41:06 PM
How are you looking?

**M** Received from **Munish** on Jul 13, 2017 1:21:57 PM
Just waiting for sandwich and be there in 5

Failed to send on Jul 13, 2017 1:24:44 PM
Ok sounds good ⊗ **D**

**M** Received from **Munish** on Jul 13, 2017 7:57:42 PM
Nice to meet you, hope you are on your way home

**M** Received from **Munish** on Jul 13, 2017 7:57:53 PM
Look forward to working together

Sent on Jul 15, 2017 1:29:14 PM
It was great meeting you also. Believe it or not I just landed back home at 1:30 this morning. Had delays and
cancellations again. I'm so glad to be back home but ttys. Look forward to future endeavors. **D**

**M** Received from **Munish** on Jul 15, 2017 2:01:04 PM
Wow - speak soon

**GOVERNMENT
EXHIBIT
106F
S2 17 Cr. 686 (LAK)**

B                                          - 1 -                           Nov 30, 2017, 10:00:37 AM

SDNY_00027845

- 327 -

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK




---------------------------x
                           :
UNITED STATES OF AMERICA   :
                           :
v.                         :      S2 17 Cr. 686 (LAK)
                           :
James Gatto,               :
Merl Code, and             :
Christian Dawkins,         :
                           :
          Defendants.      :
                           :
---------------------------X
```

```
                    Recorded Conversation
                       989-493-4317



                    Date: July 13, 2017
                    Time: 11:14:57 A.M.
                    Session Number: 4914
                    Participants: Christian Dawkins
                                  Munish Sood



                    (U/I) - UNINTELLIGIBLE
                    (PH)  - PHONETIC SPELLING
```

**GOVERNMENT
EXHIBIT
63T**
S2 17 Cr. 686 (LAK)

SOOD:          Hey D.

DAWKINS:       What up brother.

SOOD:          Can you talk, or are you in the middle of
               something, are you traveling?

DAWKINS:       I'm on the plane right now, (U/I) take off.

SOOD:          Alright call me when you get somewhere, I
               just need 45 seconds of your time.

DAWKINS:       I'm good now, I'm (U/I) what's going on?

SOOD:          Alright so listen ya know this shit makes me
               very nervous when I got to go run around
               drop cash off to people I don't know. I know
               you know him, (U/I) especially a lot of
               money, so we can't do this shit again my
               man.

DAWKINS:       Yeah nah I think that umm, I think that, I
               think that everybody's being a little more
               nervous they need to be, I mean listen-

SOOD:          Ok.

DAWKINS:       I think that, I know that (U/I) ya know
               y'all haven't really done this before, but
               this is, this is not a big deal, like this
               guy is as trustworthy as a parent that we've
               ever (U/I)

SOOD:          Yeah he's your family.

DAWKINS:       Yeah.

**- 329 -**

SOOD:          No I get it, I just don't want this to be a
               habit, and ya know this last minute shit is
               scary.

DAWKINS:       (U/I) I understand.

SOOD:          If we're going to make 5 million dollars
               three years from now we gotta be ya know we
               gotta be we gotta be as kosher as possible.

DAWKINS:       Yeah I understand.

SOOD:          As my Jewish, my Jewish friends, my diamonds
               friends tell me.

DAWKINS:       I understand

SOOD:          So I'll, other than that just keep that in
               mind. I mean, I know you know this, let's
               try to avoid this shit in the future.

DAWKINS:       For sure I mean obviously I don't want to do
               this kind of shit, but it was more of a time
               sensitive situation.

               SOOD: Last minute.  Yeah yeah one time I get
               it, I mean otherwise Alicia won't fucking,
               otherwise Alicia fucking go to Steve Pina
               and I won't, she won't come visit me in
               jail.

DAWKINS:       [Laughter], Pina said that Pina said that
               she likes him so (U/I)

5

**From:**       Gatto, Jim
**Sent:**       Tue, 25 Jul 2017 12:14:46 -0700 (PDT)
**To:**         Ames, Trevor[trevor.ames@adidas-group.com]
**Cc:**         Guidera, Olivia [External][Olivia.Guidera@externals.adidas.com]
**Subject:**    Copy of Kharolina Khoas July Travel Expenses Invoice .xls
**Attachments:** Copy of Kharolina Khoas July Travel Expenses Invoice .xls

Trevor,

Olivia and I have been having issues getting this paid, it has been over a month and Olivia has not received any responses per her inquiries.  She can update you with any questions you might have.

Budget code to be used is 622500 6038 62782005

Thanks - Jim



GOVERNMENT
EXHIBIT
1077
S2 17 Cr. 686 (LAK)

- 333 -

ADID000001055

# Karolina Khaos

**INVOICE**

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605
Phone Number: 864-363-2660
Email Address: robertson570742@bellsouth.net

| | |
|---|---|
| **DATE:** | June 18, 2017 |
| **INVOICE #** | 1 |
| **PO Number:** | |

Vendor# 6038040871

**Bill To:**
adidas America
Attn: Accounts Payable
685 Cedar Crest Road
Spartanburg, SC 29301

| DESCRIPTION | AMOUNT |
|---|---:|
| July Travel Team Expenses | $30,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| **TOTAL** | $30,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

| From: | "Guidera, Olivia [External]" <Olivia.Guidera@externals.adidas.com> |
|---|---|
| Sent: | Tue, 25 Jul 2017 11:18:38 -0700 (PDT) |
| To: | "Gatto, Jim" <Jim.Gatto@adidas.com> |
| Subject: | Re: Karolina Khaos invoice |
| Attachments: | Kharolina Khoas July Travel Expenses Invoice .xls |

Sounds good, here you go -

**Olivia Guidera**
Grassroots Basketball
5055 N. Greeley Ave. | Portland, OR
T: 2014461132

**From:** "Gatto, Jim" <Jim.Gatto@adidas.com>
**Date:** Tuesday, July 25, 2017 at 11:11 AM
**To:** Olivia Guidera <Olivia.Guidera@externals.adidas.com>
**Subject:** Re: Karolina Khaos invoice

Can you send me invoice again. Let me try thru Trevor.

Sent from my iPhone

On Jul 25, 2017, at 11:04 AM, Guidera, Olivia [External] <Olivia.Guidera@externals.adidas.com> wrote:

> None… I've followed up twice on the opened ticket.

Who set them up? I really don't know what to do about this one… Is there someone else that would know about this better? Or is there a different way we can pay them?

**Olivia Guidera**
Grassroots Basketball
5055 N. Greeley Ave. | Portland, OR
T: 2014461132

**From:** "Gatto, Jim" <Jim.Gatto@adidas.com>
**Date:** Tuesday, July 25, 2017 at 9:40 AM
**To:** Olivia Guidera <Olivia.Guidera@externals.adidas.com>
**Subject:** Karolina Khaos invoice

> Any update??
>
> *Jim Gatto*
> *Director of Global Sports Marketing*
> *adidas Basketball*
> **971-234-4979**
> **jim.gatto@adidas.com**

GOVERNMENT
EXHIBIT
1078
S2 17 Cr. 686 (LAK)

# Karolina Khaos

**INVOICE**

***C/O Ricky Robertson***
104 Chesterfield Rd
Greenville, SC 29605
Phone Number: XXX
Email Address: XXX

| | |
|---|---|
| **DATE:** | June 18, 2017 |
| **INVOICE #** | 1 |
| **PO Number:** | |

Vendor# 6038040871

**Bill To:**
adidas America
Attn: Accounts Payable
685 Cedar Crest Road
Spartanburg, SC 29301

| DESCRIPTION | AMOUNT |
|---|---|
| July Travel Team Expenses | $30,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| **TOTAL** | $30,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

| From: | "Ames, Trevor" <trevor.ames@adidas-group.com> |
|---|---|
| Sent: | Wed, 26 Jul 2017 15:39:10 -0700 (PDT) |
| To: | "Gatto, Jim" <Jim.Gatto@adidas.com>; "Guidera, Olivia [External]"<Olivia.Guidera@externals.adidas.com> |
| Subject: | FW: Invoice Ready for Immediate Pay |
| Attachments: | 20170726144346294.pdf |

Sent it in today. They should be seeing payment soon.

**Trevor Ames**
**Financial Analyst – Sports Marketing**

**From:** Ames, Trevor
**Sent:** Wednesday, July 26, 2017 2:37 PM
**To:** svc_FSS_AP_6038_US
**Subject:** Invoice Ready for Immediate Pay

Hello,

The attached invoice is ready for immediate pay. Please let me know if you have any questions.

Thank you,

Trevor

**Trevor Ames**
**Financial Analyst – Sports Marketing**
adidas North America
5055 North Greeley Avenue
Portland, OR 97217

T:(971)234-4356
E:Trevor.Ames@adidas-group.com

GOVERNMENT
EXHIBIT
1079
S2 17 Cr. 686 (LAK)

ADID000001059

# Karolina Khaos

INVOICE

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605
Phone Number: 864-363-2660
Email Address: robertson570742@bellsouth.net

**DATE:** June 18, 2017
**INVOICE #** 1
**PO Number:**

Vendor# 6038040871

**Bill To:**
adidas America
Attn: Accounts Payable
685 Cedar Crest Road
Spartanburg, SC 29301

| DESCRIPTION | AMOUNT |
|---|---|
| July Travel Team Expenses | $30,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| **TOTAL** | $30,000.00 |

Lindsay Harksen
*Finance Manager*

622500 6038 62782005

Jim Gatto

**THANK YOU FOR YOUR BUSINESS!**

# Wells Fargo Simple Business Checking

Account number: **9828396896**   ■ May 18, 2017 - May 31, 2017   ■ Page 1 of 4



## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS**  (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:*  Wells Fargo Bank, N.A. (367)
P.O. Box 6995
Portland, OR  97228-6995

RICKY L ROBERTSON
DBA RICKY ROBERTSON KAROLINA KHAOS
104 CHESTERFIELD RD
GREENVILLE SC 29605-3402

## Your Business and Wells Fargo

Cash flow is a key indicator of the financial health of your business. Find tips and strategies for effective cash flow management at wellsfargoworks.com.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s).  Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| Business Online Banking | ☐ |
| Online Statements | ☐ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☐ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---:|
| Beginning balance on 5/18 | $0.00 |
| Deposits/Credits | 25,250.00 |
| Withdrawals/Debits | - 0.00 |
| **Ending balance on 5/31** | **$25,250.00** |
| Average ledger balance this period | $2,035.71 |

Account number:  **9828396896**

**RICKY L ROBERTSON**
**DBA RICKY ROBERTSON KAROLINA KHAOS**

*South Carolina account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):  053207766

For Wire Transfers use
Routing Number (RTN):  121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

GOVERNMENT
EXHIBIT
308E

S2 17 Cr. 686 (LAK)

Sheet Seq = 0056734
Sheet 00001 of 00002

SDNY_00010581

Account number: **9828396896** ∎ May 18, 2017 - May 31, 2017 ∎ Page 2 of 4



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|--------------|-------------|-------------------|---------------------|---------------------|
| 5/18 | | ATM Cash Deposit on 05/18 1714 Augusta Street Greenville SC 0002628 ATM ID 6913F Card 4228 | 50.00 | | |
| 5/18 | | ATM Cash Deposit on 05/18 1714 Augusta Street Greenville SC 0000788 ATM ID 6917G Card 4228 | 200.00 | | 250.00 |
| 5/31 | | eDeposit IN Branch/Store 05/31/17 09:13:18 Am 461 The Parkway Greer SC 6896 | 25,000.00 | | 25,250.00 |
| **Ending balance on 5/31** | | | | | 25,250.00 |
| **Totals** | | | **$25,250.00** | **$0.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

## Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 05/18/2017 - 05/31/2017 | Standard monthly service fee $10.00 | You paid $0.00 |
|------|------|------|

We waived the fee this fee period to allow you to meet the requirements to avoid the monthly service fee. Your fee waiver is about to expire. You will need to meet the requirement(s) to avoid the monthly service fee.

| How to avoid the monthly service fee | Minimum required | This fee period |
|------|------|------|
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $2,036.00 ☑ |

C1/C1

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|------|------|------|------|------|------|
| Cash Deposited ($) | 200 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 2 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

 # IMPORTANT ACCOUNT INFORMATION

**Please note the following in connection with your Wells Fargo Debit or ATM Card:**
At certain ATMs inside Wells Fargo branches, during branch hours, your daily ATM withdrawal limit may not apply, and you may be able to access and perform transactions on accounts that are not linked to your card. At most ATMs, however, your daily ATM withdrawal limit will apply, and you will only have access to accounts linked to your card.

The Consumer Account Agreement, Business Account Agreement, and Selected Terms and Conditions for Wells Fargo Consumer Debit and ATM Cards; Business Debit, ATM and Deposit Cards; Campus Debit Card and Campus ATM Card; Wells Fargo Advisors Accounts; and Private Bank Debit Cards are revised as follows:

SDNY_00010582

Account number: **9828396896** ▪ May 18, 2017 - May 31, 2017 ▪ Page 3 of 4



In the sections entitled, "Electronic fund transfer services", "Issuance of a card and Personal Identification Number (PIN)", "What you can do at Wells Fargo ATMs", "Daily limits and funds available for use with cards" and "Linking accounts for card access and designating primary account", references to "linked account(s)" and "accounts linked to your card" have been changed to "account(s)".

In the section entitled, "Daily limits and funds available for use with cards", modifications have been made to reflect that at certain ATMs inside Wells Fargo branches, during branch hours, your daily ATM withdrawal limit may not apply, and you may be able to access and perform transactions on accounts that are not linked to your card. At most ATMs, however, your daily ATM withdrawal limit will apply, and you will only have access to accounts linked to your card.

Account number: **9828396896** ■ May 18, 2017 - May 31, 2017 ■ Page 4 of 4



**WELLS FARGO**

---

### General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

---

### Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your          $ _____
register or transfers into          $ _____
your account which are not          $ _____
shown on your statement.          + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . $ _____

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total amount** | $ |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

SDNY_00010584

# Wells Fargo Simple Business Checking

Account number:  **9828396896**  ■  June 1, 2017 - June 30, 2017  ■  Page 1 of 4



RICKY L ROBERTSON
DBA RICKY ROBERTSON KAROLINA KHAOS
104 CHESTERFIELD RD
GREENVILLE SC 29605-3402

**Questions?**

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS**  (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (367)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Cash flow is a key indicator of the financial health of your business. Find tips and strategies for effective cash flow management at wellsfargoworks.com.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s).  Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☐ |
| Online Statements | ☐ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☐ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 6/1 | $25,250.00 |
| Deposits/Credits | 3,200.00 |
| Withdrawals/Debits | - 28,442.06 |
| **Ending balance on 6/30** | **$7.94** |
| Average ledger balance this period | $3,817.68 |

Account number:  **9828396896**

**RICKY L ROBERTSON**
**DBA RICKY ROBERTSON KAROLINA KHAOS**

*South Carolina account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):  053207766

For Wire Transfers use
Routing Number (RTN):  121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

Sheet Seq = 0081744
Sheet 00001 of  00002

SDNY_00010585

Account number:   **9828396896**   ■ June 1, 2017 - June 30, 2017   ■ Page 2 of 4



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 6/1 | | ATM Withdrawal authorized on 06/01 1714 Augusta Street Greenville SC 0002774 ATM ID 6913F Card 4228 | | 4,000.00 | |
| 6/1 | | Withdrawal Made In A Branch/Store | | 16,000.00 | 5,250.00 |
| 6/2 | | ATM Withdrawal authorized on 06/02 1714 Augusta Street Greenville SC 0002271 ATM ID 6917G Card 4228 | | 300.00 | 4,950.00 |
| 6/5 | | ATM Withdrawal authorized on 06/03 500 N Main St Mauldin SC 0006269 ATM ID 0380Q Card 4228 | | 140.00 | 4,810.00 |
| 6/15 | | Purchase authorized on 06/13 Basketball Promoti 7023357883 NV S587164858299952 Card 4228 | | 300.00 | |
| 6/15 | | Purchase authorized on 06/13 Phenom Hoop Report 7049024975 NC S467165011908533 Card 4228 | | 1,050.00 | 3,460.00 |
| 6/27 | | Deposit Made In A Branch/Store | 3,200.00 | | |
| 6/27 | | Purchase authorized on 06/27 Aau Basketball 407-934-7200 FL S387177703647703 Card 4228 | | 1,875.00 | 4,785.00 |
| 6/28 | | Purchase authorized on 06/27 Tripadvisor Flipke 855-898-2877 MA S387178830135006 Card 4228 | | 2,343.03 | |
| 6/28 | | Purchase authorized on 06/27 Tripadvisor Flipke 855-898-2877 MA S387178832084759 Card 4228 | | 2,433.43 | 8.54 |
| 6/30 | | Cash Deposited Fee | | 0.60 | 7.94 |
| **Ending balance on 6/30** | | | | | **7.94** |
| **Totals** | | | **$3,200.00** | **$28,442.06** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 06/01/2017 - 06/30/2017 | Standard monthly service fee $10.00 | You paid $0.00 |
|------|------|------|

We waived the fee this fee period to allow you to meet the requirements to avoid the monthly service fee. This is the final period with the fee waived.
For the next fee period, you need to meet the requirement(s) to avoid the monthly service fee.

| How to avoid the monthly service fee | Minimum required | This fee period |
|------|------|------|
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $3,818.00 ☑ |

C1/C1

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|------|------|------|------|------|------|
| Cash Deposited ($) | 3,200 | 3,000 | 200 | 0.0030 | 0.60 |
| Transactions | 1 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.60** |



# IMPORTANT ACCOUNT INFORMATION

SDNY_00010586

Account number:  **9828396896**  ▪ June 1, 2017 - June 30, 2017  ▪ Page 3 of 4



**Revised Agreement for Online Access**
We're updating our Online Access Agreement effective September 15, 2017.
To see what is changing, please visit wellsfargo.com/onlineupdates.

Periodically, it is necessary to update selected sections of the disclosures you received when you opened your account. These updates provide you with the most up to date account information and are very important; so please review this information carefully and feel free to contact us with any questions or concerns.

We are updating the Account Agreement ("Agreement") dated April 24, 2017. Effective August 15, 2017, in the section titled "Rights and Responsibilities", the subsections "When can you close your account?" and "If you request to close your account, we may allow you to keep funds in your account to cover outstanding items to be paid" are deleted and replaced with the following:

**When can you close your account?**

You can request to close your account at any time if the account is in good standing (e.g., does not have a negative balance or restrictions such as legal order holds or court blocks on the account). At the time of your request, we will assist you in withdrawing or transferring any remaining funds, bringing your account balance to zero.
- All outstanding items need to be processed and posted to your account before your request to close. Once the account is closed items will be returned unpaid.
- Any recurring payments or withdrawals from your account need to be cancelled before your request to close (examples include bill payments, debit card payments, and direct deposits) otherwise, they may be returned unpaid.

We will not be liable for any loss or damage that may result from not honoring items or recurring payments or withdrawals that are presented or received after your account is closed.

At the time of your request to close:
- For interest-earning accounts, it stops earning interest from the date you request to close your account.
- Overdraft Protection and/or Debit Card Overdraft Service will be removed on the date you request to close your account.
- The Agreement continues to apply.
- If you have requested to close your account and a positive balance remains, we may send you a check for the remaining balance. Even after your account is closed, you will remain responsible for any negative balance.

In California branches you can request to close your account at any time if the account does not have any restrictions such as legal order holds or court blocks. Even after your account is closed, you will remain responsible for any negative balance.

All other aspects of the Agreement remain the same. If there is a conflict between the updated language above and the Agreement, the updated language will control.

Thank you for being a Wells Fargo customer. As a valued Wells Fargo customer, we hope you find this information helpful. Again, if you have questions or concerns about these changes, please contact your local banker or call the number listed on your statement.

Sheet Seq = 0081745
Sheet 00002 of  00002

SDNY_00010587

Account number:  **9828396896**  ■  June 1, 2017 - June 30, 2017  ■  Page 4 of 4



───────────────────────────────────────────────

**General statement policies for Wells Fargo Bank**

■ **Notice:**  Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies.  If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at:  Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation.  In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

───────────────────────────────────────────────

**Account Balance Calculation Worksheet**

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your        $ _____
register or transfers into           $ _____
your account which are not            $ _____
shown on your statement.           + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . $ _____

| Number | Items Outstanding | Amount |
|--------|-------------------|--------|
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        | **Total amount  $** |        |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

SDNY_00010588

# Wells Fargo Simple Business Checking

Account number: **9828396896** ■ July 1, 2017 - July 31, 2017 ■ Page 1 of 4



RICKY L ROBERTSON
DBA RICKY ROBERTSON KAROLINA KHAOS
104 CHESTERFIELD RD
GREENVILLE SC 29605-3402

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted
**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (367)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Cash flow is a key indicator of the financial health of your business. Find tips and strategies for effective cash flow management at wellsfargoworks.com.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☐ |
| Online Statements | ☐ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☐ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 7/1 | $7.94 |
| Deposits/Credits | 1,000.00 |
| Withdrawals/Debits | - 961.50 |
| **Ending balance on 7/31** | **$46.44** |
| Average ledger balance this period | $257.21 |

Account number: **9828396896**

**RICKY L ROBERTSON**
**DBA RICKY ROBERTSON KAROLINA KHAOS**

*South Carolina account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):  053207766

For Wire Transfers use
Routing Number (RTN):  121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

Sheet Seq = 0056637
Sheet 00001 of  00002

SDNY_00010589



Account number:  **9828396896**  ■  July 1, 2017 - July 31, 2017  ■  Page 2 of 4

WELLS FARGO

---

### Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------|-------------|---------|-----------|---------|
| 7/10 | | Deposit Made In A Branch/Store | 1,000.00 | | 1,007.94 |
| 7/17 | | Purchase authorized on 07/13 Comfort Inn 864-2830370 SC S38719469713750 Card 4228 | | 190.30 | |
| 7/17 | | Purchase authorized on 07/13 Comfort Inn 864-2830370 SC S58719471008909 Card 4228 | | 190.30 | |
| 7/17 | | Purchase authorized on 07/13 Comfort Inn 864-2830370 SC S58719471295202 Card 4228 | | 190.30 | |
| 7/17 | | Purchase authorized on 07/13 Comfort Inn 864-2830370 SC S38719471314466 Card 4228 | | 190.30 | |
| 7/17 | | Purchase authorized on 07/13 Comfort Inn 864-2830370 SC S58719471337744 Card 4228 | | 190.30 | 56.44 |
| 7/31 | | Monthly Service Fee | | 10.00 | 46.44 |
| **Ending balance on 7/31** | | | | | **46.44** |
| **Totals** | | | **$1,000.00** | **$961.50** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 07/01/2017 - 07/31/2017 | | Standard monthly service fee $10.00 | You paid $10.00 |
|---|---|---|---|
| **How to avoid the monthly service fee** | | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | | |
| · Average ledger balance | | $500.00 | $257.00 ☐ |
| C1/C1 | | | |

### Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Cash Deposited ($) | 1,000 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 1 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |



# IMPORTANT ACCOUNT INFORMATION

---

Periodically, it is necessary to update selected sections of the disclosures you received when you opened your account. These updates provide you with the most up to date account information and are very important; so please review this information carefully and feel free to contact us with any questions or concerns.

SDNY_00010590

WELLS FARGO

---

We updated the Business Account Agreement ("Agreement"). In the section titled "Available balance, posting order, and overdrafts," the following question about our standard overdraft coverage was added:

**What is Wells Fargo's standard overdraft coverage?**
Our standard overdraft coverage is when, at our discretion, we pay checks or automatic payments (such as ACH payments) into overdraft rather than returning them unpaid. You can request to remove our standard overdraft coverage from your account by speaking to a banker.

Important: If you remove our standard overdraft coverage from your account, the following will apply if you do not have enough money in your account or accounts linked for Overdraft Protection to cover a transaction:
- We will return your checks and automatic payments (such as ACH payments) and assess a non-sufficient funds/NSF returned item fee and you could be assessed additional fees by merchants.
- We will not authorize transactions such as ATM withdrawals or everyday debit card purchases into overdraft.
- We will not authorize certain transactions (such as cashed checks, recurring debit card transactions, or Bill Pay transactions) into overdraft. However, if these transactions are authorized when your account has enough money but are later presented for payment when your account does not have enough money, we will pay the transaction into overdraft and charge an overdraft fee.

All other aspects of the Agreement remain the same. If there is a conflict between the language above and the Agreement, this language will control.

If you remove our standard overdraft coverage and your account is enrolled in Debit Card Overdraft Service, Debit Card Overdraft Service will be removed and we will not authorize transactions such as ATM withdrawals or everyday debit card purchases into overdraft.

To learn more about tools that Wells Fargo offers to help you avoid overdraft and/or returned item fees, visit wellsfargo.com/biz/checking/quickstart/overdraft-protection, speak with a local banker or call the phone number on the top of your statement. Thank you for being a Wells Fargo customer. As a valued Wells Fargo customer we hope you find this information helpful.

Account number:  **9828396896**  ■  July 1, 2017 - July 31, 2017  ■  Page 4 of 4



---

### General statement policies for Wells Fargo Bank

■ **Notice:**  Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies.  If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at:  Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation.  In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

---

### Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your                          $ _____
register or transfers into                              $ _____
your account which are not                          $ _____
shown on your statement.                          + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . $ _____

| Number | Items Outstanding | Amount |
|--------|-------------------|--------|
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        | **Total amount  $** |        |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

SDNY_00010592

# Wells Fargo Simple Business Checking

Account number:  **9828396896**  ■  August 1, 2017 - August 31, 2017  ■  Page 1 of 4



RICKY L ROBERTSON
DBA RICKY ROBERTSON KAROLINA KHAOS
104 CHESTERFIELD RD
GREENVILLE SC 29605-3402

### Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted
**1-800-CALL-WELLS**  (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:*  Wells Fargo Bank, N.A. (367)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Cash flow is a key indicator of the financial health of your business. Find tips and
strategies for effective cash flow management at wellsfargoworks.com.

### Account options

*A check mark in the box indicates you have these convenient
services with your account(s).  Go to wellsfargo.com/biz or
call the number above if you have questions or if you would
like to add new services.*

Business Online Banking  ☐
Online Statements  ☐
Business Bill Pay  ☐
Business Spending Report  ☐
Overdraft Protection  ☐

## Activity summary

| | |
|---|---|
| Beginning balance on 8/1 | $46.44 |
| Deposits/Credits | 31,300.00 |
| Withdrawals/Debits | - 30,200.00 |
| **Ending balance on 8/31** | **$1,146.44** |
| Average ledger balance this period | $1,043.21 |

Account number:  **9828396896**

**RICKY L ROBERTSON**
**DBA RICKY ROBERTSON KAROLINA KHAOS**

*South Carolina account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):  053207766

For Wire Transfers use
Routing Number (RTN):  121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements
please call the number listed on your statement or visit your Wells Fargo store.

Sheet Seq = 0052806
Sheet 00001 of  00002

SDNY_00010593

Account number:  **9828396896**  ■  August 1, 2017 - August 31, 2017  ■  Page 2 of 4



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|--------------|-------------|-------------------|--------------------|--------------------|
| 8/1 | | Adidas America I 2700132201 2700132201 \lea*1*029774737\ | 30,000.00 | | |
| 8/1 | | ATM Check Deposit on 08/01 1714 Augusta Street Greenville SC 0008372 ATM ID 6917G Card 3073 | 500.00 | | |
| 8/1 | | Withdrawal Made In A Branch/Store | | 5,000.00 | |
| 8/1 | 99 | Check | | 25,000.00 | 546.44 |
| 8/10 | | Purchase Return authorized on 08/08 Tripadvisor Flipke 4029357733 MA S627222548551042 Card 4228 | 300.00 | | |
| 8/10 | | Purchase Return authorized on 08/08 Tripadvisor Flipke 4029357733 MA S627222548551041 Card 4228 | 500.00 | | 1,346.44 |
| 8/21 | | ATM Withdrawal authorized on 08/21 137 S Pleasantburg Dr Greenville SC 0003007 ATM ID 0203F Card 4228 | | 200.00 | 1,146.44 |
| **Ending balance on 8/31** | | | | | **1,146.44** |
| **Totals** | | | **$31,300.00** | **$30,200.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Summary of checks written   *(checks listed are also displayed in the preceding Transaction history)*

| Number | Date | Amount |
|--------|------|--------|
| 99 | 8/1 | 25,000.00 |

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 08/01/2017 - 08/31/2017 | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $1,043.00 ☑ |
| C1/C1 | | |

### Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 3 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |



# IMPORTANT ACCOUNT INFORMATION

Account number: **9828396896**  ■  August 1, 2017 - August 31, 2017  ■  Page 3 of 4



Beginning in August 2017, we are enhancing the description of certain non-consumer ACH debit entries to include "Business to Business ACH". This entry description may appear on your statements and online banking transaction histories. The terms governing these entries remain the same and are found in the Business Account Agreement section titled "Funds transfer service" under the subsection "ACH transactions". Under ACH rules, a Business to Business ACH debit entry has a return time frame of one business day from the date the entry posted to your account. In order for the Bank to meet this deadline, you are required to notify us to return any Business to Business ACH debit entry as unauthorized by the cutoff time which is currently 3:00 PM Central Time. If you do not notify us within one business day from the date the unauthorized entry is posted to your account, we will not be able to return it without the cooperation and agreement of the originating bank and the originator of the debit entry. Any other effort to recover the funds must occur solely between you and the originator of the entry.

Account number: **9828396896** ■ August 1, 2017 - August 31, 2017 ■ Page 4 of 4



## General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your        $ _____
register or transfers into             $ _____
your account which are not             $ _____
shown on your statement.             + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . $ _____

| Number | Items Outstanding | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  | **Total amount** $ |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# Wells Fargo Simple Business Checking

Account number: **9828396896** ■ September 1, 2017 - September 30, 2017 ■ Page 1 of 4



RICKY L ROBERTSON
DBA RICKY ROBERTSON KAROLINA KHAOS
104 CHESTERFIELD RD
GREENVILLE SC 29605-3402

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (367)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Cash flow is a key indicator of the financial health of your business. Find tips and strategies for effective cash flow management at wellsfargoworks.com.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☐ |
| Online Statements | ☐ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☐ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 9/1 | $1,146.44 |
| Deposits/Credits | 25,000.00 |
| Withdrawals/Debits | - 25,080.00 |
| **Ending balance on 9/30** | **$1,066.44** |
| Average ledger balance this period | $1,915.77 |

Account number:  **9828396896**

**RICKY L ROBERTSON**
**DBA RICKY ROBERTSON KAROLINA KHAOS**

*South Carolina account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):  053207766

For Wire Transfers use
Routing Number (RTN):  121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

Sheet Seq = 0053374
Sheet 00001 of  00002

Account number:  **9828396896**  ■  September 1, 2017 - September 30, 2017  ■  Page 2 of 4



---

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 9/7 | | ATM Withdrawal authorized on 09/07 901 Grove Rd Greenville SC 0001333 ATM ID 6020S Card 4228 | | 80.00 | 1,066.44 |
| 9/20 | | Adidas America I 2700136077 2700136077 \lea*1*030446828\ | 25,000.00 | | 26,066.44 |
| 9/21 | 100 | Check | | 25,000.00 | 1,066.44 |
| Ending balance on 9/30 | | | | | 1,066.44 |
| **Totals** | | | **$25,000.00** | **$25,080.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Summary of checks written  *(checks listed are also displayed in the preceding Transaction history)*

| Number | Date | Amount |
|---|---|---|
| 100 | 9/21 | 25,000.00 |

### Monthly service fee summary

For a complete list of fees and detailed account information, see the Wells  Fargo Account Fee and Information Schedule and Account Agreement applicable to your account (EasyPay Card Terms and Conditions for prepaid cards) or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 09/01/2017 - 09/30/2017 | | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|---|
| **How to avoid the monthly service fee** | | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | | |
| · Average ledger balance | | $500.00 | $1,916.00 ☑ |

The Monthly service fee summary fee period ending date shown above includes a Saturday, Sunday, or holiday which are non-business days.
Transactions occurring after the last business day of the month will be included in your next fee period.
C1/C1

---

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 2 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

---



# IMPORTANT ACCOUNT INFORMATION

---

As part of our commitment to make things right, we have entered into a $142 million class action settlement related to the opening of unauthorized accounts.

SDNY_00010598

Account number: **9828396896** ■ September 1, 2017 - September 30, 2017 ■ Page 3 of 4



If you believe Wells Fargo opened a checking, savings, credit card or line of credit account for you without your permission, or if you purchased identity theft protection from us, you may be entitled to compensation from this fund.

To find out more, go to www.WFSettlement.com or call 1-866-431-8549. You may be eligible for reimbursement of fees, compensation for potential impact on your credit, and an additional cash payment based on any money remaining in the fund after benefits and costs are paid out.

If you have specific questions about any of your accounts or services, please visit your Wells Fargo branch or call the toll-free number that appears on this statement. We realize you have a choice when it comes to banking. It is our privilege to be able to serve you.

---

Effective November 15, 2017, you can make debit, ATM or prepaid card purchase transactions up to the maximum daily dollar purchase limit established for your card, subject to your available balance. However, we will no longer authorize purchases or payments in certain circumstances that exceed your daily purchase limit. To view your daily card limits, login to online banking from your computer, then select Accounts and Settings from the More menu, then Profile and Settings, and then View Account Profile in the Manage Account Settings section. If you have questions, please call the number on your statement.

---

Beginning in August 2017, we are enhancing the description of certain non-consumer ACH debit entries to include "Business to Business ACH". This entry description may appear on your statements and online banking transaction histories. The terms governing these entries remain the same and are found in the Business Account Agreement section titled "Funds transfer service" under the subsection "ACH transactions". Under ACH rules, a Business to Business ACH debit entry has a return time frame of one business day from the date the entry posted to your account. In order for the Bank to meet this deadline, you are required to notify us to return any Business to Business ACH debit entry as unauthorized by the cutoff time which is currently 3:00 PM Central Time. If you do not notify us within one business day from the date the unauthorized entry is posted to your account, we will not be able to return it without the cooperation and agreement of the originating bank and the originator of the debit entry. Any other effort to recover the funds must occur solely between you and the originator of the entry.

Sheet Seq = 0053375
Sheet 00002 of 00002

SDNY_00010599

Account number:  **9828396896**  ■  September 1, 2017 - September 30, 2017  ■  Page 4 of 4



---

**General statement policies for Wells Fargo Bank**

■ **Notice:**  Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies.  If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at:  Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation.  In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

---

**Account Balance Calculation Worksheet**

1.  Use the following worksheet to calculate your overall account balance.

2.  Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3.  Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.**  The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.**  Any deposits listed in your                    $ _____
register or transfers into                               $ _____
your account which are not                          $ _____
shown on your statement.                          + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.**  The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . .   $ _____

| Number | Items Outstanding | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **Total amount** $ |  |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC.  NMLSR ID 399801

SDNY_00010600

*dis*

8-1-17

099
67-776/532 9444

Date

Pay to the
Order of _Loyd Pric_____ $ 25,000

_twenty five thousand dollars 2_____ Dollars

Wells Fargo Bank, N.A.
South Carolina
wellsfargo.com

For _Consulting Fees_                    _[signature]_

⑆053207766⑆ 9828396896⑈ 00099

Seq: 14
Batch: 524203
Date: 08/01/17

Seq:00014 08/01/17
BAT:524203 CC:0057330603
WT:01 LTPS:Atlanta ET
BC:Pleasantburg BC SC2 547

Credited To The Account Of
The Within Named Payee
Endorsement Guaranteed
Bank of America, N.A.

REQUEST 00007008962000000 25000.00
ROLL ECIA  20170801  000008720326728
JOB ECIA  E  ACCT 3670009828396896
REQUESTOR U553696
18867864 10/24/2017 Research 18867954

Summons and Subpoenas Department
D1111-016
Charlotte  NC  28201

GOVERNMENT
EXHIBIT
308A
S2 17 Cr. 686 (LAK)

SDNY_00010571

**100**
67-778/532 9444

9-21-17 Date

Pay to the
Order of    *Loyd Inc*    | $25,000

*twenty five thousand and 00/100*    Dollars

Wells Fargo Bank, N.A.
South Carolina
wellsfargo.com

For _____    *Bey Rohrs*

⑈053207766⑈ 9828396896⑈ 00100

Seq: 59
Batch: 306741
Date: 09/21/17

Seq:00059 09/21/17
BAT:306741 CC:0057330600
WI:01 LIPS:Atlanta ET
BC:Pleasantburg BC SC2-547

*deposit only*

REQUEST 00007008962000000 25000.00
ROLL ECIA  20170921  000008323198677
JOB ECIA  E  ACCT 3670009828396896
REQUESTOR U553696
18867864  10/24/2017 Research 18867954

Summons and Subpoenas Department
D1111-016
Charlotte  NC  28201

SDNY_00010572

| Amount: | $8,000.00 | Sequence Number: | 3052712711 |
| Account: | 857097068 | Capture Date: | 08/03/2017 |
| Bank Number: | 21187169 | Check Number: | 102318 |



Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|-----------|-----|-----|-----------|
| 08/03/2017 | 3052712711 | 11000138 | Rtn Loc/BOFD | Y | | BANK OF AMERICA, NA |

SDNY_00022681

Men's Basketball
2017-2018
Certification of Eligibility

| Name | ID | Certification Date | Comments |
|------|-----|------|------|
| Adel, Deng | 5050137 | August 25, 2017 | |
| Bowen, Brian | 5265761 | August 25, 2017 | |
| Enoch, Steven | 5262409 | PRACTICE ONLY | YIR FA17/SP18 |
| Griffin, Jo | 5161216 | August 25, 2017 | |
| King, VJ | 5125304 | August 25, 2017 | |
| Mahmoud, Anas | 5007624 | August 25, 2017 | |
| McMahon, Ryan | 5058374 | August 25, 2017 | |
| Nwora, Jordan | 5236227 | August 25, 2017 | |
| Perry, Darius | 5246341 | August 25, 2017 | |
| Redding, Jacob | 5261543 | August 25, 2017 | |
| Snider, Quentin | 1899756 | August 25, 2017 | |
| Spalding, Raymond | 1829537 | August 25, 2017 | |
| Sutton, Dwayne | 5020315 | August 25, 2017 | |
| Thomas, Lance | 5236292 | August 25, 2017 | |
| Williams, Malik | 5231331 | August 25, 2017 | |

Signed: _____    Date: 8/31/2017

Head Coach and Compliance Officer

| | |
|---|---|
| **Head Coach** | Rick Pitino |
| **Director of Operations** | Michael Bowden |
| **Academic Counselor** | Kamari Wooten |
| **Equipment Manager** | Vinny Tatum |
| **Sports Performance** | Ray Ganong |
| **Sports Medicine** | Fred Hina |
| **Sports Information Director** | Kenny Klein |

GOVERNMENT
EXHIBIT
1603
S2 17 Cr. 686 (LAK)

CONFIDENTIAL

UOL000776

- 362 -

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK




---------------------------x
                           :
UNITED STATES OF AMERICA   :
                           :
v.                         :     S2 17 Cr. 686 (LAK)
                           :
James Gatto,               :
Merl Code, and             :
Christian Dawkins,         :
                           :
          Defendants.      :
                           :
---------------------------X






                    Recorded Conversation
                       708-314-3402




              Date: September 13, 2017
              Time: 8:10:40 PM
              Session Number: 6503
              Participants: Merl Code
                            James Gatto




              (U/I) - UNINTELLIGIBLE
              (PH)  - PHONETIC SPELLING
```

GOVERNMENT
EXHIBIT
12T
S2 17 Cr. 686 (LAK)

**- 363 -**

```
CODE:        Anything you need from me?

GATTO:       No, just when's the, when's the next, ah,

             payment we've got to make for --

CODE:        Make for Bowen?

GATTO:       -- Bowen?

CODE:        I will tell you -- because we said four, we

             did 25, so I will tell you probably November.

GATTO:       All right.  Well, let's, let's get, let's get

             the invoice in now, however --

CODE:        Okay.
```

**- 364 -**

```
GATTO:          -- they do it, and that's --

CODE:           Okay.

GATTO:          -- that's probably going to take a

                month --

CODE:           Okay.

GATTO:          -- knowing our system.  Let's just get, let's

                get that out of the way --

CODE:           Okay.

GATTO:          -- now; and then, we'll figure out the other

                50 in, in '18.

CODE:           Okay, okay.  Sounds good.

GATTO:          All right?
```

| | |
|---|---|
| **From:** | Merl Code <merl@3stripebasketball.com> |
| **Sent:** | Thu, 14 Sep 2017 14:22:21 -0700 (PDT) |
| **To:** | Jim Gatto <jim.gatto@adidas.com> |
| **Subject:** | Travel Team Expenses |
| **Attachments:** | Karolina Khaos(November Travel Expenses)Adidas Invoice 2017.xls |

Jim,

Per our discussion I'm sending over the invoice requested for submission and processing.

Thanks

Sent from my BlackBerry 10 smartphone.

GOVERNMENT
EXHIBIT
1088
S2 17 Cr. 686 (LAK)

# Karolina Khaos

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605

# INVOICE

**DATE:** September 18, 2017
**INVOICE #** 2
**FOR:**

**Bill To:**
Jim Gatto
Adidas Basketball
5055 North Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| Novmeber Travel Team Expenses | $25,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| | |
| Adidas Customer/ Vendor# 6038040871 | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL** | $25,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

| | |
|---|---|
| **From:** | Gatto, Jim |
| **Sent:** | Thu, 14 Sep 2017 14:34:09 -0700 (PDT) |
| **To:** | Guidera, Olivia [External][Olivia.Guidera@externals.adidas.com] |
| **Subject:** | Invoice to process |
| **Attachments:** | Karolina Khaos(November Travel Expenses)Adidas Invoice 2017.xls |

601000 6038 62782005

We have paid them before, took a little time but was finally paid if you remember.  Let me know if you need anything else.

Thanks - Jim

**Jim Gatto**
**Director of Global Sports Marketing**
**adidas Basketball**
**971-234-4979**
**jim.gatto@adidas.com**

GOVERNMENT
EXHIBIT
1090
S2 17 Cr. 686 (LAK)

# Karolina Khaos

**INVOICE**

***C/O Ricky Robertson***
104 Chesterfield Rd
Greenville, SC 29605

| | |
|---|---|
| **DATE:** | September 18, 2017 |
| **INVOICE #** | 2 |
| **FOR:** | |

**Bill To:**
Jim Gatto
Adidas Basketball
5055 North Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| Novmeber Travel Team Expenses | $25,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| | |
| Adidas Customer/ Vendor# 6038040871 | |
| | |
| | |
| | |
| **TOTAL** | $25,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

# Karolina Khaos

INVOICE

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605

| | |
|---|---|
| **DATE:** | September 18, 2017 |
| **INVOICE #** | 2 |
| **FOR:** | |

**Bill To:**
Jim Gatto
Adidas Basketball
5055 North Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| Novmeber Travel Team Expenses | $25,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| Adidas Customer/ Vendor# 6038040871 | |
| **TOTAL** | $25,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

GOVERNMENT
EXHIBIT
1004
S2 17 Cr. 686 (LAK)

FOIA Confidential Treatment Requested

- 370 -

ADID000000508

FOIA Confidential Treatment Requested                                                ADID000000509

ADID000000510

Accounting document history
6038-0035170400-2017

| Created on | Created by | IC document | SAP Document | Company Code | Invoice date | Total amount | Currency | History Created |
|---|---|---|---|---|---|---|---|---|
| 15.09.2017 | OSORIESB | | 35170400 | 6038 | 18.09.2017 | 25.000,00 | USD | 19.09.2017 14:13:07 |
| Vendor | Vendor No | | Reference | | | | | |
| RICKY L ROBERTSON | 6038040871 | | 2 | | | | | |

| Scheme | Line item | Description | Cost Object | Amount | Currency | Status |
|---|---|---|---|---|---|---|
| | 001 | 6038040871 | | 25.000,00 | USD | |
| AA | 002 | 601000 | | 25.000,00 | USD | ⊘ released |

## Release status:

| Step | Scheme | Approval Status | Deadline | Recipient | Status | Substitute of | Started by | Processed on | Processed at | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | AA | △ started | 25.09.2017 | GATTOJIM | Sent | | OSORIESB | 15.09.2017 | 10:51:02 | |
| 2 | AA | △ started | 25.09.2017 | GATTOJIM | Sent | | OSORIESB | 15.09.2017 | 10:51:02 | |
| 3 | AA | ⊘ released | 25.09.2017 | GATTOJIM | Approved | | OSORIESB | 18.09.2017 | 15:48:36 | |
| 4 | AA | ⊘ released | | | Scheme approved | | OSORIESB | 18.09.2017 | 15:48:36 | |

FOIA Confidential Treatment Requested

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK



---------------------------x
                           :
UNITED STATES OF AMERICA   :
                           :
v.                         :      S2 17 Cr. 686 (LAK)
                           :
James Gatto,               :
Merl Code, and             :
Christian Dawkins,         :
                           :
          Defendants.      :
                           :
---------------------------X
```

```
                    Recorded Conversation
                       708-314-3402




            Date: September 20, 2017
            Time: 2:16:48 PM
            Session Number: 8068
            Participants: Merl Code
                          Ricky Robertson



            (U/I) - UNINTELLIGIBLE
            (PH)  - PHONETIC SPELLING
```

**GOVERNMENT EXHIBIT 18T**
S2 17 Cr. 686 (LAK)

ROBERTSON:    I can't be there man.  Yo, what's up boy.

CODE:         Yo, what up man.  Yo, uh, I got your email,
              so --

ROBERTSON:    Hold on, hold on, hold on, hold on.  You
              know, it's loud in here.  Hold on.  All
              right.  Say what, now?

CODE:         I said I got the, uh, the email you
              forwarded me.

ROBERTSON:    Okay, okay, okay, okay.

CODE:         Uh, you got the information on what you did
              with it last time?

ROBERTSON:    I should have the receipt in the folder I
              keep all the stuff in.

CODE:         Hold on.

ROBERTSON:    Got to go home and look.  I had --

CODE:         I think I've still got it in my texts, but -
              -

ROBERTSON:    But if not, if not, I can get it.  I can get
              it when I get home this evening.  Do you
              need me to do the same thing tomorrow, write
              another check?

CODE:         Yep.

ROBERTSON:    Okay.  All right.  And how much am I
              supposed to write a check for again?

CODE:         25.

ROBERTSON:     For 25?

CODE:          Um-hum.

ROBERTSON:     Okay.  Okay.  I'll go deposit it in Bank of
               America tomorrow, then, in the morning.
               They need it today, or --

CODE:          No, no, no, no, no, no.  I ain't in no rush.
               I, uh, I just want to go ahead and knock it
               out so, you know, I don't have to keep
               dealing with it.

ROBERTSON:     Okay, okay.

CODE:          And this'll probably be the last one, um,
               for, for a while, so --

ROBERTSON:     That's cool, that's cool.  Then, I'll knock
               that out in the morning before I come to
               work, right?  Because they don't need it
               tonight, right?  Yeah, I'll go do that in
               the morning, then.  Yeah, because I just
               seen they got the email yesterday.  I didn't
               know what the hell was going on, so I just
               forwarded it to you.  I didn't know what the
               hell was going on with it.  I know you told
               me it might come more than once, but you
               didn't know exactly --

CODE:          Yeah.

ROBERTSON:     -- how much it was going to come.

CODE:           Yeah.  Twice.  I think it's, it's -- that
                was the second one, so --

ROBERTSON:      Right, right, right.  It was the second one,
                right.  All right.  Well, I'll put it in in
                the morning, man.  If I can't get the
                information tonight, I'll call you.  Because
                I think I've got it -- I know I've got it at
                home, the receipt, from when I wrote it.  I
                can --

CODE:           I've got --

ROBERTSON:      -- give it to you.

CODE:           I've got, I've got the, I've got the, the
                picture of the receipt you sent me, but, you
                know, they don't put the account number on
                there, so I don't if --

ROBERTSON:      Oh, yeah.  I think -- you sent me the
                account number, didn't you?

CODE:           I thought --

ROBERTSON:      Yeah.

CODE:           -- I did, but I don't know --

ROBERTSON:      (U/I) go back, let me go back and --

CODE:           I don't know if --

ROBERTSON:      -- double check.

CODE:           -- if I kept it, because I --

ROBERTSON:      I can -- I kept it, I don't erase none of

```
                          your text, so I, I --

CODE:               Yeah, I think I --

ROBERTSON:          -- (U/I).

CODE:               -- yeah, I think I deleted it, because I

                    didn't want that shit in my phone just in

                    case, you know --

ROBERTSON:          Yeah.  You can't do that.  Right.

CODE:               Okay, well check.  If you don't have it,

                    just let me know, and I'll ask him for it,

                    too, so --

ROBERTSON:          Okay.

CODE:               I'll, I'll be with him tonight, so.

ROBERTSON:          Sounds good.

CODE:               All right.
```

Merl Code

Ricky Robertson



Rick Robertson (Mobile)

1:40 PM

He came back I put it in
Sep 16, 2017

Cool! Thnx
Sep 16, 2017

81F224C0-1.jpg

Sep 21, 2017

http://bleacherreport.com/articles/2734433-
shawn-eichorst-fired-as-nebraska-athletic-
director?tsm=1 via http://ble.ac/teamstream

Sep 22, 2017

Enter a message

SDNY_00022819

**GOVERNMENT
EXHIBIT
103D-4**
S2 17 Cr. 686 (LAK)

SDNY_00022820



USCA4 Appeal: 21-2029    Doc: 11    Filed: 12/15/2021    Pg: 402 of 412

| From: | Gatto, Jim |
| Sent: | Mon, 19 Jun 2017 16:19:09 -0700 (PDT) |
| To: | Guidera, Olivia [External][Olivia.Guidera@externals.adidas.com] |
| Subject: | Invoice to process |
| Attachments: | Karolina Khaos(July Travel Expenses)Adidas Invoice 2017.xls |

Olivia,

I sent you invoice last week for them, was for something else.  This is for some travel, can you please process this one as well.

622500 6038 62782005

Thanks - Jim

**Jim Gatto**
**Director of Global Sports Marketing**
**adidas Basketball**
**971-234-4979**
**jim.gatto@adidas.com**

GOVERNMENT
EXHIBIT
1069
S2 17 Cr. 686 (LAK)

# Karolina Khaos

**INVOICE**

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605

**DATE:**      June 18, 2017
**INVOICE #**      1
**FOR:**

**Bill To:**
Jim Gatto
Adidas Basketball
5055 North Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| July Travel Team Expenses | $5,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| **TOTAL** | $5,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

| | |
|---|---|
| **From:** | Merl Code <merl@3stripebasketball.com> |
| **Sent:** | Thu, 6 Jul 2017 10:38:38 -0700 (PDT) |
| **To:** | Olivia Guidera <Olivia.Guidera@externals.adidas.com> |
| **Cc:** | Rick Robertson <robertson570742@bellsouth.net> |
| **Attachments:** | Karolina Khaos(July Travel Expenses)Adidas Invoice 2017.xls |

Olivia,

Ricky wanted me to pass along the invoice with the Vendor/Customer number included. Please let me know what other changes or additions need to be made. He's currently at work and has limited access to a computer

Sent from my BlackBerry 10 smartphone.

GOVERNMENT
EXHIBIT
1099
S2 17 Cr. 686 (LAK)

# Karolina Khaos

**INVOICE**

*C/O Ricky Robertson*
104 Chesterfield Rd
Greenville, SC 29605

| | |
|---|---|
| **DATE:** | June 18, 2017 |
| **INVOICE #** | 1 |
| **FOR:** | |

**Bill To:**
Jim Gatto
Adidas Basketball
5055 North Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| July Travel Team Expenses | $30,000.00 |
| | |
| Wells Fargo Bank | |
| Greenville Lewis Plaza | |
| 1714 Augusta St | |
| Greenvilles, SC 29605 | |
| Routing Number:  053207766 | |
| Account Number: 9828396896 | |
| | |
| | |
| Adidas Customer/ Vendor# 6038040871 | |
| | |
| | |
| | |
| | |
| **TOTAL** | $30,000.00 |

**THANK YOU FOR YOUR BUSINESS!**

- 383 -

| | |
|---|---|
| **From:** | Gatto, Jim |
| **Sent:** | Thu, 6 Jul 2017 15:32:27 -0700 (PDT) |
| **To:** | Guidera, Olivia [External][Olivia.Guidera@externals.adidas.com] |
| **Subject:** | Re: Kharolnia Khaos July Expenses Invoice |

No. One invoice is fine. Just wanted to make sure I was tracking my invoices. All good. Thanks

Sent from my iPhone

On Jul 6, 2017, at 3:30 PM, Guidera, Olivia [External] <Olivia.Guidera@externals.adidas.com> wrote:

> Haha I know same .. It's hard to keep this organized

Merl combined the two into once invoice, would you prefer he separates them out?

Thank you!

**Olivia Guidera**
Grassroots Basketball
5055 N. Greeley Ave. | Portland, OR
T: 2014461132

**From:** "Gatto, Jim" <Jim.Gatto@adidas.com>
**Date:** Thursday, July 6, 2017 at 3:28 PM
**To:** Olivia Guidera <Olivia.Guidera@externals.adidas.com>
**Subject:** Re: Kharolnia Khaos July Expenses Invoice

Code is correct. Did we combine two invoices for them? Didn't we have for $25k and another for $5k?

So many invoices, I am losing my mind. Lol

Sent from my iPhone

On Jul 6, 2017, at 3:21 PM, Guidera, Olivia [External] <Olivia.Guidera@externals.adidas.com> wrote:

> Hey Gatto,

Before I submit this invoice for Karolina Khaos (July Travel Expenses for 30k), I want to confirm that the below budget code is correct -

622500 6038 62782005

Thank you!

**Olivia Guidera**
Grassroots Basketball
5055 N. Greeley Ave. | Portland, OR
T: 2014461132

**GOVERNMENT EXHIBIT 1075**
S2 17 Cr. 686 (LAK)

FOIA Confidential Treatment Requested

ADID000001051

3:18-cv-03118-JFA    Date Filed 08/23/19    Entry Number 86-27    Page 1 of 1

**United States v. Gatto, et al, S2 17 Cr. 686 (LAK)**
**New England Playaz Payment Summary Chart**

| GX | Payee | Invoice Date | Amount | Description | Approver / Budget Manager |
|---|---|---|---|---|---|
| 1130 | New England Playaz | 1/13/2016 | $ 75,000.00 | Grassroots Activation | Jim Gatto; Chris McGuire |
| 1132 | New England Playaz | 2/3/2016 | $ 75,000.00 | Grassroots Activation & Travel Expenses | Jim Gatto; Chris McGuire |
| 1134 | New England Playaz | 2/4/2016 | $ 32,500.00 | No invoice provided. Contractual Travel Allotment February 2016 | Jim Gatto; Chris McGuire |
| 1014 | New England Playaz | 6/9/2016 | $ 32,500.00 | No invoice provided. Contractual Travel Allotment May 2016 | Jim Gatto; Chris McGuire; Chris Rivers |
| 1016 | New England Playaz | 6/24/2016 | $ 15,000.00 | June/July Expenses | Jim Gatto; Chris McGuire |
| 1018 | New England Playaz | 8/2/2016 | $ 15,000.00 | Consultant Fee, T&E expenses for August 2016 | Jim Gatto |
| 1019 | New England Playaz | 8/2/2016 | $ 20,000.00 | Consultant Fee, T&E expenses for July 2016 | Jim Gatto |
| 1021 | New England Playaz | 9/15/2016 | $ 90,000.00 | Consultant Fee and T&E for remainder of 2016 | Jim Gatto |
| 1023 | New England Playaz | 10/15/2016 | $ 50,000.00 | Basketball Team Tournaments Fee | Jim Gatto |
| 1025 | New England Playaz | 11/15/2016 | $ 17,810.00 | T&E Expenses October and November | Jim Gatto |
| 1027 | New England Playaz | 12/9/2016 | $ 25,000.00 | 2016 Remainder consultant fee | Jim Gatto |
| 1029 | New England Playaz | 1/4/2017 | $ 90,000.00 | 2017 1st Quarter Consultant Fee and T&E for 1st Quarter 2017 | Jim Gatto |
| 1032 | New England Playaz | 2/20/2017 | $ 42,500.00 | 2017 College Travel and Base Comp | Jim Gatto; Chris McGuire; Zion Armstrong |
| 1038 | New England Playaz | 4/12/2017 | $ 31,500.00 | Consultant Fee & T&E Expenses | Jim Gatto |
| 1040 | New England Playaz | 5/1/2017 | $ 70,000.00 | Tournament Activation Fee | Jim Gatto |
| 1043 | New England Playaz | 5/15/2017 | $ 30,000.00 | Consultant Fee & T&E Expenses | Jim Gatto; Chris McGuire |
| 1046 | New England Playaz | 8/1/2017 | $ 50,000.00 | Consultant Fee | Jim Gatto |
| | | Total: | $ 761,810.00 | | |

GOVERNMENT
EXHIBIT
**3002**
S2 17 Cr. 686 (LAK)

3:18-cv-03118-JFA    Date Filed 08/23/19    Entry Number 86-28    Page 1 of 1

**United States v. Gatto, et al., S2 17 Cr. 686 (LAK)**
**Thomas Gassnola Payment Summary Chart**

| GX | Payee | Invoice Date | Amount | Description | Approver / Budget Manager |
|---|---|---|---|---|---|
| 1110 | Thomas Gassnola | 8/17/2015 | $9,650.00 | Consultant - July Travel Expenses | Jim Gatto |
| 1112 | Thomas Gassnola | 9/13/2015 | $18,500.00 | Consultant Fee and Travel expenses for August/September | Jim Gatto |
| 1114 | Thomas Gassnola | 10/1/2015 | $16,700.00 | Monthly Consulting Fee, additional travel expenses for September | Jim Gatto |
| 1116 | Thomas Gassnola | 11/1/2015 | $30,000.00 | Monthly Consulting Fee, travel expenses for October and November | Jim Gatto |
| 1118 | Thomas Gassnola | 11/17/2015 | $10,221.67 | Consultant Fee/Travel expenses | Jim Gatto |
| 1120 | Thomas Gassnola | 12/15/2015 | $19,450.00 | Consultant Fee/T&E Expenses/Maui College Invitational | Jim Gatto |
| 1124 | Thomas Gassnola | 1/13/2016 | $35,000.00 | Consultant T&E payment for 2016 | Jim Gatto |
| 1126 | Thomas Gassnola | 4/16/2016 | $50,000.00 | Consultant Fee | Jim Gatto |
| 1128 | Thomas Gassnola | 5/20/2016 | $50,000.00 | Consultant Fee ($25,000), Team Travel ($25,000) | Jim Gatto |

Total:        $ 239,521.67

GOVERNMENT
EXHIBIT
3003
S2 17 Cr. 686 (LAK)

# NAME

# INVOICE

MERL CODE
202 ROCKBROOK CT
GREER, SC 29650

**DATE:** June 17, 2017
**INVOICE #** 11
**FOR:** *Consulting/Travel Expenses*

**Bill To:**
Jim Gatto
Adidas Basketball
5055 N. Greeley Ave
Portland, OR 97217

| DESCRIPTION | AMOUNT |
|---|---|
| Consulting Fee | 50,000.00 |
| Travel Expenses | 25,000.00 |
| **TOTAL** | $75,000.00 |

GREENVILLE FIRST
100 VERDAE BLVD, Suite#100
GREENVILLE, SC 29607
(864) 679.9000
Routing Number 053208011
Account Number 0040907
Swift code:

GOVERNMENT
EXHIBIT
1010
S2 17 Cr. 686 (LAK)

| | |
|---|---|
| **From:** | Gatto, Jim |
| **Sent:** | Mon, 19 Jun 2017 12:59:19 -0700 (PDT) |
| **To:** | Guidera, Olivia [External][Olivia.Guidera@externals.adidas.com] |
| **Cc:** | Adams, Gerald[gerald.adams@adidas.com] |
| **Subject:** | 2017 Adidas ConsultingTravel Expenses.xls |
| **Attachments:** | 2017 Adidas ConsultingTravel Expenses.xls |

Olivia,

Can you please process this one for Merl.  Should be in system.

@Gerald, consultant line item

Thanks – Jim

601000 6038 62782005

ADID000001010

Accounting document history
6038-0035163179-2017

| Created on | Created by | SAP Document | IC document | Company Code | Invoice date | Total amount | Currency | History Created |
|---|---|---|---|---|---|---|---|---|
| 03.07.2017 | NOBREPAU | 35163179 | | 6038 | 17.06.2017 | 75.000,00 | USD | 14.07.2017 20:10:06 |
| Vendor | Vendor No | Reference | | | | | | |
| MERL CODE | 6038039230 | 11 | | | | | | |

| Scheme | Line item | GL account | Description | Cost Object | Approval type | Amount | Currency | Status |
|---|---|---|---|---|---|---|---|---|
| | 001 | 6038039230 | | | | 75000,00 | USD | |
| CO | 002 | 601000 | Symbols cash fixed | 62782005 | Internal Order | 75000,00 | USD | ◇ released |

**Release status:**

| Step | Scheme | Approval Status | Deadline | Recipient | Status | Substitute of | Started by | Processed on | Processed at | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CO | △ started | 15.08.2017 | GATTOJIM | Sent | | NOBREPAU | 03.07.2017 | 10:01:34 | |
| 2 IO | CO | △ started | 18.07.2017 | GATTOJIM | Sent | | NOBREPAU | 03.07.2017 | 10:01:40 | |
| 3 IO | CO | ◇ released | 18.07.2017 | GATTOJIM | Approved | | GATTOJIM | 05.07.2017 | 15:34:42 | |
| 4 CC | CO | △ started | 13.07.2017 | MCGUICHR | Sent | | GATTOJIM | 05.07.2017 | 15:34:51 | Attachments: all on behalf of (GATTOJIM) |
| 5 CC | CO | ◇ released | 13.07.2017 | MCGUICHR | Approved | | GATTOJIM | 07.07.2017 | 02:43:32 | |
| 6 L1 | CO | △ started | 17.07.2017 | ARMSTZIO | Sent | | MCGUICHR | 07.07.2017 | 02:43:40 | Attachments: all |
| 7 L1 | CO | ◇ released | 17.07.2017 | ARMSTZIO | Approved | | MCGUICHR | 14.07.2017 | 20:09:58 | |
| 8 | CO | ◇ released | | | Scheme approved | | NOBREPAU | 14.07.2017 | 20:10:01 | |

FOIA Confidential Treatment Requested

ADID000376564