NOS. 21-1764, -2029

# United States Court of Appeals
*for the*
# Fourth Circuit

BRIAN BOWEN, II,

*Plaintiff-Appellant,*

– v. –

ADIDAS AMERICA INC; JAMES GATTO; CHRISTIAN DAWKINS;
MUNISH SOOD; THOMAS GASSNOLA; CHRISTOPHER RIVERS,

*Defendants-Appellees*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA AT COLUMBIA

**PETITION FOR REHEARING *EN BANC***

WILLIAM W. WILKINS, ESQ.
MAYNARD NEXSEN PC
104 South Main Street, Suite 900
Greenville, South Carolina 29601
(864) 370-2211
bwilkins@maynardnexsen.com

W. MULLINS MCLEOD, JR.
COLIN V. RAM
MCLEOD LAW GROUP LLC
Three Morris Street, Suite A
Charleston, South Carolina 29403
(843) 277-6655
mullins@mcleod-lawgroup.com
colin@mcleod-lawgroup.com

*Attorneys for Plaintiff-Appellant*

CP COUNSEL PRESS    (800) 4-APPEAL • (321000)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

GROUNDS FOR REHEARING EN BANC ........................................................ 1

BACKGROUND ................................................................................................. 5

ARGUMENT ....................................................................................................... 9

    I.    The Majority Failed to Recognize That NCAA Eligibility Is
          A Business and Property Interest .................................................. 9

        a.    The Majority's Decision Cannot Be Reconciled
            with *Alston* ........................................................................... 9

        b.    The Majority's Decision Cannot Be Reconciled with
            the Second Circuit's Affirmance of Appellees'
            Criminal Convictions ......................................................... 12

    II.    The Majority Improperly Ignored the True Nature of the
           Bargained-For Exchange Between Brian and UofL ................................ 13

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bowen v. Adidas Am. Inc.*,
 No. 21-1764, 2023 WL 6629831 (4th Cir. Oct. 12, 2023) ...................................... 3

*Eur. Cmty. v. RJR Nabisco, Inc.*,
 150 F. Supp. 2d 456 (E.D.N.Y. 2001) ...................................................................13

*In re Conco, Inc.*,
 855 F.3d 703 (6th Cir. 2017) ..................................................................................14

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. NCAA v. Alston*,
 141 S. Ct. 2141 (2021) ............................................................................................10

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
 375 F. Supp. 3d 1058 (N.D. Cal. 2019) .................................................................10

*Maze v. Bd. of Directors for Commonwealth Postsecondary Educ.
  Prepaid Tuition Tr. Fund*,
 559 S.W.3d 354 (Ky. 2018) ....................................................................................14

*Metro Louisville/Jefferson Cty. Gov't v. Abma*,
 326 S.W.3d 1 (Ky. Ct. App. 2009) .........................................................................14

*Nat'l Collegiate Athletic Ass'n v. Alston*,
 141 S. Ct. 2141 (2021) ......................................................................................*passim*

*O'Bannon v. NCAA*,
 802 F.3d 1049 (9th Cir. 2015) ................................................................................10

*Reiter v. Sonotone Corp.*,
 442 U.S. 330 (1979) ..................................................................................................9

*United States v. Gatto*,
 986 F.3d 104 (2d Cir. 2021) ............................................................................. 5, 12

**Statutes and Other Authorities:**

15 U.S.C. § 15(a) ...............................................................................................................9

18 U.S.C. § 1964 ...............................................................................................................7

18 U.S.C. § 1964(c) ..........................................................................................................9

Fed. R. App. P. 35(b)(1)(A) .............................................................................................1

Fed. R. App. P. 35(b)(1)(B) .............................................................................................1

This case presents the question whether elite college student-athletes preparing for professional athletic careers have a business or property interest in their NCAA eligibility. Although this is the first time any federal court of appeals has directly considered this question, just two years ago, the Supreme Court in *National Collegiate Athletic Association v. Alston* unanimously recognized that elite NCAA Division I student-athletes have such an interest in the education-related benefits they receive in rejecting the NCAA's artificial constraints over the valuable athletic labor these athletes provide to their schools. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021). Ultimately, this Court's answer to this question will have far-reaching implications for current and rising student-athletes deciding where to commit their athletic talents.

## GROUNDS FOR REHEARING EN BANC

Rehearing en banc is proper when (1) the panel opinion conflicts with a decision of the Supreme Court, or (2) the case involves a question of exceptional importance. *See* Fed.R.App.P. 35(b)(1)(A), (B). This case easily clears both hurdles.

- The opinion conflicts with *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021), an antitrust case recognizing that the athletic labor provided by NCAA Division I student-athletes is tendered at below-market rates due to the artificial restraint of "amateurism" and implicitly recognizing such labor as a business or property interest under the Sherman Act.

- Hundreds of thousands of student-athletes participate in NCAA sports every year. The opinion artificially diminishes the value of these students' athletic labor, particularly the athletic labor of elite student-athletes who are effectively required to

1

participate in NCAA Division I athletics prior to advancing to professional leagues such as the NBA and NFL.

The *Alston* Court recognized that "[t]he most talented athletes are concentrated in the markets for Division I basketball and FBS football," *id.* at 2152, and concluded that "[t]here are no 'viable substitutes'" for talented athletes preparing for their professional sports careers "as the NCAA's Division I essentially *is* the relevant market for elite college football and basketball," *id.* at 2156. Critically, the Court recognized that "student-athletes have nowhere else to sell their labor" other than to NCAA athletic programs. *Id.*.

The majority's decision, however, disregards the realities of the college sports industry described in *Alston* and, instead perpetuates the outdated myth that student-athletes have no interest in the extraordinary labor they provide to their schools—labor that generates billions of dollars in revenue for their universities and for their sponsors like Adidas, but none for the athletes due to the NCAA-imposed 'amateurism' that forces student-athletes to sell their labor at below-market rates. *Alston*, 141 S. Ct. at 2168 (Kavanaugh, J., concurring).

And, although the *Alston* Court expressly rejected "a sort of judicially ordained immunity" placed on athletic 'amateurism' simply because an athlete's labor falls "at the intersection of higher education, sports, and money," *id.* at 2159, the majority nevertheless embraces this immunity, finding that because Appellant Brian Bowen continued to receive *tuition* benefits from the University of Louisville ("UofL") after he

was declared ineligible to participate in the NCAA, "he continued to receive the maximum compensation allowed" in exchange for his labor. *Bowen v. Adidas Am. Inc.*, No. 21-1764, 2023 WL 6629831, at *6 (4th Cir. Oct. 12, 2023) (hereinafter "Op."). Yet, the record below proves that the tuition benefits given to Brian was neither the sole nor the most valuable benefit Brian bargained for in exchange for providing UofL his athletic services; rather, Brian provided his athletic labor in exchange for the professional athletic-related benefits that UofL offered him and every member of its top-tier basketball program: elite coaching, athletic training, and high-pressure competition crucial to his transition to a professional career in the NBA.

The majority did not explore the present-day realities of college athletics as the *Alston* Court did. Rather, it rested on outdated cases involving non-elite student-athletes participating in non-professional track athletic programs to hold that no student-athlete in America has a business or property interest in his or her NCAA eligibility. Remarkably, the majority simply concluded that Brian's loss of his eligibility to play NCAA basketball and concomitant loss of the valuable athletic-related benefits that are afforded to Division I athletes is not an injury to "business" or "property." Op. at *7. This, despite the *Alston* Court's recognition of the absence of any "viable substitute" for elite Division I athletes seeking the necessary training, coaching, and preparation for a professional sports career. *Alston*, 141 S.Ct. at 2152. As Judge King stated in his dissent in this case: "it is absurd to say that a person can be left without a

3

market for his labor without sustaining a business or property injury." Op. at *15. (King, Circuit Judge, dissenting) (hereinafter "King Op.").

The majority concluded that although student-athletes provide extraordinarily demanding labor to benefit their universities and their team's athletic apparel sponsors—labor upon which the entire intercollegiate athletic industry is built—the student-athletes have no legally cognizable interest in their labor. Op. at *17-18. Put plainly, the majority's holding echoes long-abandoned views of non- and under-compensated labor in this country. As the *Alston* Court explained:

> The bottom line is that the NCAA and its member colleges are suppressing the pay of student athletes who collectively generate billions of dollars in revenues for colleges every year. Those enormous sums of money flow to seemingly everyone except the student athletes. College presidents, athletic directors, coaches, conference commissioners, and NCAA executives take in six- and seven-figure salaries. Colleges build lavish new facilities. But the student athletes who generate the revenues, many of whom are African American and from lower-income backgrounds, end up with little or nothing.

*Alston* at 2168 (Kavanaugh, J., concurring).

Because the majority's opinion is inconsistent with the principles set forth in *Alston* and with the modern-day realities of the collegiate sports marketplace, and because the issues in this case are of exceptional importance to the over 500,000 student-athletes presently participating in NCAA athletics nationwide and to the athletic recruiting ability of the 146 NCAA member institutions located throughout the Fourth Circuit, rehearing en banc is warranted.

## BACKGROUND

After being heavily recruited by top Division I schools, on June 1, 2017, Plaintiff-Appellant Brian Bowen II, a five-star college basketball recruit and projected first-round NBA draft pick, began his freshman year as a starting player at UofL UofL's offer to Brian provided him with the absolute best athletic benefits a future NBA player could possibly receive: elite coaching, immediate playing time, high-profile positions on the court, professional athletic training, strength and nutrition services, nationally-televised competition against other elite players and teams, and strategy sessions reading game film. J.A. 1464-70, 1702-05. In exchange, Brian agreed to provide UofL with his nationally recognized talent, skill, and labor that it needed to maintain a highly successful and profitable basketball program. *See, e.g.*, *United States v. Gatto*, 986 F.3d 104, 118 (2d Cir. 2021) ("No doubt, universities stand to profit if their men's basketball programs are successful.").

On September 23, 2017, following a federal investigation, Brian and the college sports world were blindsided by the revelation that he was a target of an illegal recruiting scheme spearheaded by Adidas and its agents. Adidas's agents, whom the dissent identified as the "Adidas Schemers," engaged in bribery, money laundering, and wire fraud targeting the country's most talented high school basketball players to secure their commitment to Adidas-sponsored universities where they would wear Adidas shoes and apparel in front of televised audiences of millions of fans. The bribery scheme "primarily targeted the parents and guardians of talented young African American

5

athletes—largely from poor backgrounds—and used an array of unlawful means to secure their attendance at Adidas-sponsored NCAA universities. With an utter lack of tact, the Schemers described their secret strategy as the 'Soul Patrol' and the 'Black Ops.'" King Op. at *9.

As Judge King noted in his dissent, Brian—who had no knowledge of the bribery scheme or of any wrongdoing in his recruitment—was immediately declared ineligible by UofL, lost his eligibility to play NCAA basketball at any member institution, and never played in a single college basketball game. King Op. at *9-10. Indeed, within 24 hours of the public unsealing of Appellees' bribery scheme, UofL's associate athletic director notified coaches that "MBB student-athlete Brian Bowen has been declared ineligible from athletics participation immediately" and that he "is both ineligible to compete and ineligible to participate in practice, conditioning, weights, sport performance, skill instruction or any other countable activity." J.A. 1330.[1]

Brian's loss of eligibility was also an immediate consequence under various NCAA bylaws designed to punish and, thus, disincentivize schools and their apparel sponsors (*i.e.*, Adidas) from engaging in such conduct. Brian's pathway to the NBA—playing one or two seasons of Division I basketball before entering the NBA draft—was blocked forever.

---

[1] The majority's statement that the University of South Carolina and not UofL declared Brian ineligible is mistaken. *See* Op. at *2. The dissent correctly describes the sequence of events. *See* King Op. at *10.

The moment UofL declared Brian ineligible to compete, he was stripped of the valuable athletic-related benefits he had received and would have continued to receive in exchange for his athletic labor. Indeed, Brian's ability to provide his athletic labor to UofL is precisely why his NCAA eligibility was a material term under his Athletic Tender Agreement with UofL—without it he was ineligible to participate on the basketball team and ineligible to receive these athletic benefits.

Brian sued Defendants-Appellees under the federal RICO Act, 18 U.S.C. § 1964, for destroying his NCAA eligibility, his Athletic Tender Agreement with UofL, and his other financial interests. Discovery revealed overwhelming evidence of the bribery scheme, wire fraud, and money laundering as well as how these predicate acts of racketeering injured his business and property interests as an athlete preparing for a career in the NBA. The district court erroneously granted summary judgment in favor of Appellees, holding that as a mere college athlete, Brian lacked standing to bring a RICO claim because he apparently had no "business" or "property" interest in his NCAA eligibility, nor any legal expectation to receive any athletic benefits under his Athletic Tender Agreement, and no property interest in the legal fees he incurred in his effort to have his eligibility reinstated.

The district court's rationale was rooted in a strained reading of inapposite case law standing for the limited but unremarkable proposition that no one has a *constitutional right* to play college sports. Therefore, the court reasoned, college athletes who commit their skill and labor to the $20 billion NCAA Division I basketball marketplace on their

7

way to the NBA have an "insufficient" interest in their NCAA eligibility. J.A. 2168-70. Yet, just weeks after the district court granted summary judgment, the *Alston* decision was issued, which affirmed that "certain restrictions on benefits that NCAA member schools can provide to student-athletes contravene the antitrust laws." King Op. at *13; *see also Alston*, 141 S. Ct. at 2152-54.

The majority affirmed the district court, however. While acknowledging that "losing his NCAA eligibility prevented [Brian] from playing college basketball, thereby improving his basketball skills, and increasing his prospects of being selected in the NBA draft," Op. at *7, the majority held that Brian's loss of these coveted athletic services, which the *Alston* Court characterized as having no "viable substitutes" outside of the NCAA, did not amount to a legally cognizable business or property interest.

Judge King dissented, finding that the *Alston* decision properly described the marketplace for elite college athletes preparing for professional athletic careers. *See* King Op. at *14 ("[S]tudent-athletes have nowhere else [other than NCAA member schools] *to sell their labor*." (quoting *Alston*)). He described the full panoply of athletic-benefits Brian received as an NCAA-eligible student-athlete as "exceedingly valuable to Brian." *Id.* at *16. Zeroing in on the majority's error, he found that it "fail[ed] to appreciate that Brian's scholarship was only part of the compensation he received from UofL in exchange for his valuable athletic labor." *Id.* Judge King concluded:

> It takes a tortured reading of the term "business or property" to maintain that the term does not include Brian's ability to participate in the sole market for his athletic labor and to obtain valuable compensation in the

8

>form of the elite coaching and playing experience offered nowhere but an
>NCAA Division I basketball program.

*Id.* at *17. It is Brian's loss of these athletic-related benefits, among other benefits, that provide him with statutory standing to bring suit.

## I. The Majority Failed to Recognize That NCAA Eligibility Is A Business and Property Interest

### a. The Majority's Decision Cannot Be Reconciled with *Alston*

RICO statutory standing requires only injury to the plaintiff's "business or property" caused by a defendant's predicate criminal acts. 18 U.S.C. § 1964(c). The Supreme Court in *Reiter v. Sonotone Corp.* stated that an expansive interpretation should be given to the term "injury to business or property" and recognized that "when a commercial enterprise suffers a loss of money it suffers an injury in both its 'business' and its 'property.'" 442 U.S. 330, 339 (1979). Brian's athletic career (i.e., exchanging his basketball labor for valuable athletic benefits) falls squarely within this definition.

*Alston* was an antitrust case filed against the NCAA and major collegiate athletic conferences by Division I basketball and football college athletes under the Sherman Act and the Clayton Act, the latter of which authorizes "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" standing to sue. *See* 15 U.S.C. § 15(a). The college athletes contended that the NCAA's restrictions barring them from receiving fair market compensation for their labor violated federal antitrust laws. The district court in *Alston* recognized the college athletes' business and property rights in their labor (i.e., their standing to sue) and

9

enjoined NCAA rules restricting education-related benefits that may be provided to those athletes. *See In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1109 (N.D. Cal. 2019).

The Ninth Circuit affirmed. *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1266 (9th Cir. 2020), *aff'd sub nom. NCAA v. Alston*, 141 S. Ct. 2141 (2021). In a concurring opinion, Judge Smith wrote that "the freedom guaranteed each and every business, no matter how small, is the freedom to compete" and that "[t]hose protections extend to sellers of goods and services—such as Student-Athletes—to the same extent they do buyers, consumers, or competitors." *Id.* at 1267 (Smith, Circuit Judge, concurring).

The Supreme Court's unanimous affirmance in *Alston* demonstrates the majority's error in holding that Brian's NCAA eligibility is not a cognizable business or property interest. The *Alston* college athletes plainly suffered injury to their "business or property" arising from NCAA rules that limited the compensation they could receive in exchange for their athletic labor. *See Grant-in-Aid Cap Antitrust Litig.,* 375 F. Supp. 3d at 1062.[2]

---

[2] The Division I basketball and football plaintiffs in *Alston* were *required* under antitrust law to have suffered an injury to their business or property interests; had they not, they would have lacked standing to sue. *See also O'Bannon v. NCAA*, 802 F.3d 1049, 1066 (9th Cir. 2015) ("[T]he labor of student-athletes is an integral and essential component of the NCAA's product.").

10

In justifying its holding, the majority deemed *Alston* inapplicable because the Supreme Court focused on one subset of restraints—education-related benefits—and not restraints on athletic-related benefits. Op. at *7. But for purposes of determining whether student-athletes have a business or property interest in their athletic labor, this is a distinction without a difference.

The *Alston* Court, including Justice Kavanaugh's concurrence, made clear the horizontal restraints imposed on student-athletes affect *all* interests. And should the Court review a later challenge to restraints on college players' athletic-related benefits, it too would be subject to a rule of reason analysis under antitrust law *as the restraints imposed on education-related benefits and athletic-related benefits are equally subject to antitrust scrutiny*. *Alston*, 141 S. Ct. at 2167. In other words, the majority cannot escape the reality that participation in college athletics is a business and property interest to the young athletes who devote their labor to it by arguing that *Alston* addressed only a subset of the restraints imposed upon them. Indeed, because there are no "viable substitutes" to Division I basketball for athletes pursuing professional careers in the NBA, Brian's NCAA eligibility was necessary to his pursuit of a professional athletic career.[3]

---

[3] The NBA's collective bargaining agreement requires players to sit out one year after high school before entering the NBA draft, and no player may contract with an NBA team unless they first participate in the NBA draft. J.A. 1690-91. This is why participation in NCAA Division I college basketball is critical for elite athletes like Brian on their way to professional careers—players coming out of high school cannot simply take a year off from serious competition before entering the NBA draft without significantly diminishing their skills while their college-bound peers hone their skills as players on top Division I teams.

11

### b. The Majority's Decision Cannot Be Reconciled with the Second Circuit's Affirmance of Appellees' Criminal Convictions

Adidas's destruction of Brian's NCAA eligibility served as the lynchpin of the criminal convictions of its agents for the predicate acts of wire fraud in the parallel criminal case. *See Gatto*, 986 F.3d at 109-110. Their convictions and guilty pleas were premised on their causing UofL (and other schools) to award scarce scholarships to recruits like Brian who were subsequently rendered ineligible due to the bribery scheme. Brian's basketball labor had immense value to UofL such that the loss of his NCAA eligibility resulted in five criminal convictions with three defendants serving time in prison.

Indeed, UofL was awarded criminal restitution for having allocated one of its scholarships to Brian precisely because the bribery scheme robbed him of his NCAA eligibility and denied UofL the benefit of his athletic skills and labor. *Id.* at 112-13, 126 ("The Universities would not have awarded the Recruits this aid had they known the Recruits were ineligible to compete."); *see also id.* at 116-17 ("[I]f the Recruits' ineligibility had been discovered by the schools, . . . the Recruits would have never been permitted to play in the NCAA for Adidas-sponsored schools, defeating the purpose of the payments and potentially derailing the Recruits' professional careers."). In other words, had Adidas's scheme not destroyed Brian's NCAA eligibility, UofL would not have been victimized and no one would have been convicted of criminal misconduct.

Yet, under the majority's rationale, UofL received everything to which it was entitled under its Athletic Tender Agreement with Brian: he attended classes and participated on the team. That he was rendered ineligible, according to the majority's reasoning, was an unfortunate side effect of the bribery scheme that lacked any business value. Thus, to reconcile Adidas's agents' criminal convictions with the majority's decision that NCAA eligibility is of no value to a student-athlete requires this court to find that a servant providing labor suffers no cognizable business or property loss when he is injured, but the master receiving the servant's labor does.[4]

## II. The Majority Improperly Ignored the True Nature of the Bargained-For Exchange Between Brian and UofL

Rehearing en banc is also warranted because this appeal involves a question of exceptional importance to the thousands of student-athletes who, like Brian, exchange their athletic labor for the benefits of elite-level coaching and training. Regardless of his academic goals, Brian would not have entered into the Athletic Tender Agreement if UofL had not also promised (an understanding that UofL does not deny) that as a member of the basketball team he *would* receive the coaching, training, strategy sessions, playing time, etc. necessary to launch his NBA career.

---

[4] The majority also erred in refusing to recognize Brian's property interest in the attorneys' fees he incurred in his unsuccessful effort to restore his eligibility, which provides an independent basis for standing. *See, e.g., Eur. Cmty. v. RJR Nabisco, Inc.*, 150 F. Supp. 2d 456, 493 (E.D.N.Y. 2001).

13

The majority acknowledges that when Brian and other student-athletes enter into athletic tender agreements, they are exchanging their athletic labor for coaching, training, and playing time, not for tuition, room, and board. *See* Op. at *5. Nevertheless, the majority concludes that Brian has no business or property interest in his Athletic Tender Agreement because the benefits due to him as a member of UofL's basketball team are not explicitly delineated in the Agreement, which it deems "unambiguous." Op. at *5. But Kentucky law does not require this outcome. Rather, Kentucky law "will imply an obligation to carry out the purpose for which the contract was made." *In re Conco, Inc.*, 855 F.3d 703, 712 (6th Cir. 2017); *see Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 9 (Ky. Ct. App. 2009). Here, the plain and obvious purpose of the Agreement was to secure Brian's labor in exchange for providing him with elite coaching, training, playing time, and other athletic benefits. J.A. 1461-73, 1477-79, 1484-91, 1702-05, 1708-1711. No one denies that these benefits would have been provided to Brian—it was in UofL's best interest to provide everything it could to support Brian's peak performance on the basketball court. Any interpretation of the Athletic Tender Agreement that disregards the basketball labor required of Brian and the reciprocal athletic benefits he was to receive contravenes Kentucky law to assign preference to the "'interpretation which gives a reasonable, lawful, and effective meaning to all the terms' over a reading 'which leaves a part unreasonable, unlawful, or of no effect.'" *Maze v. Bd. of Directors for Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 363 (Ky. 2018) (citation omitted). In other words, the

14

majority's interpretation of the Agreement is wholly unreasonable in light of its obvious purpose and because it is oblivious to the realities of the relationship between elite college athletes and their teams.

Another core flaw in the majority's reasoning is that it results in a contract that can only be breached by Brian, and can only be enforced by UofL. On the one hand, if Brian were to decide he no longer wanted to play basketball, UofL could enforce its contractual rights by depriving him of his tuition. On the other hand, if UofL were to keep Brian on the team but arbitrarily deny him the training and coaching it promised when recruiting him, the majority's reasoning would leave Brian with no recourse. Moreover, this lopsided outcome exists because NCAA eligibility rules preclude Brian and UofL from entering into an agreement that accurately reflects the true nature of their transaction, *i.e.*, that Brian is selling his athletic labor in exchange for the valuable training and coaching essential for a successful NBA career. But the NCAA's rules cannot diminish the value of this transaction between Brian and UofL just as they were found not to diminish the value of the labor of the student-athletes in *Alston*.

## CONCLUSION

The Court should grant rehearing en banc in this case.

Respectfully submitted this 26th day of October, 2023.

>  /s/ William W. Wilkins
> William W. Wilkins
> MAYNARD NEXSEN
> 104 South Main Street, Suite 900
> Greenville, South Carolina 29601

Phone: (864) 370-2211
Fax: (864) 477-2699
bwilkins@maynardnexsen.com

Colin V. Ram
W. Mullins McLeod, Jr.
McLEOD LAW GROUP, LLC
P.O. Box 21624
Charleston, South Carolina 29413
Phone: (843) 277-6655
Fax: (843) 277-6660
colin@mcleod-lawgroup.com
mullins@mcleod-lawgroup.com

*Attorneys for Appellant Brian Bowen II*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
Effective 12/01/2016

No. 21-1764    Caption: Brian Bowen, II v. Adidas America Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains __3,833__ [*state number of*] words

[ ] this brief uses monospaced type and contains ____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
MS Word ____ [*identify word processing program*] in
Garamond, 14 pt. ____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
____ [*identify word processing program*] in
____ [*identify font size and type style*].

(s) William W. Wilkins

Party Name Appellant Brian Bowen, II

Dated: 10/26/2023